# In The Matter Of:

*Keith Sylvester vs.*
*James Barnett, et al.*

---

*Detective James Barnett*
*April 9, 2021*

---

*LYON REPORTING, INC.*
*Certified Court Reporters*
*P.O. Box 81124*
*Atlanta, Georgia 30366*
*770/458-5500   800/767-2030*

Original File James Barnett - 4-9-21.txt
**Min-U-Script® with Word Index**

Keith Sylvester vs.
James Barnett, et al.

Detective James Barnett
April 9, 2021

---

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF GEORGIA
                     ATLANTA DIVISION
 3   KEITH SYLVESTER,            )
 4             Plaintiff,        )
 5        vs.                    ) CIVIL ACTION FILE
 6   JAMES BARNETT, and DARREN   ) No. 1:19-cv-4300-LMM
     SMITH, in their individual  )
 7   capacities,                 )
 8             Defendants.       )
 9   - - - - - - - - - - - - - - -)
10
11           DETECTIVE JAMES BARNETT
12
13   VIDEOTAPED AND STENOGRAPHICALLY RECORDED
                    ZOOM DEPOSITION
14
15           Friday, April 9, 2021
                  10:00 a.m.
16
17
18
19        Allison H. Bradford, CCR B-929
20
21
22
23              LYON REPORTING, INC.
                Certified Court Reporters
24   P. O. Box 81124, Atlanta, Georgia  30366
           770-458-5500    800-767-2030
25              www.lyonreporting.com
```

---

**Page 3**

```
 1              INDEX TO EXAMINATION
 2                                      Page No.
 3   Examination by Mr. Greenamyre        5, 204
 4   Examination by Ms. Lewis               192
 5
 6              INDEX TO EXHIBITS
 7
 8   Plaintiff's                          Initial
     Exhibit          Description        Reference
 9
10   Number 1    Arrest warrant             27
11   Number 2    NIJ article                73
12   Number 3    Investigative report       73
13   Number 4    USAA sketch of home        87
14   Number 5    Report from Mike Sprinkel  97
15   Number 6    Booking report for Cornelius  132
16                Muckle
17   Number 7    Crime scene video         151
18   Number 8    Scene audio recording     160
19
20
21
22
23
24
25
```

---

**Page 2**

```
 1            A P P E A R A N C E S
 2
 3   On behalf of the Plaintiff:
 4
 5            ZACK GREENAMYRE, Esq.
              SAMANTHA FUNT, Esq.
 6            Mitchell & Shapiro
              SUITE 650
 7            3490 Piedmont Road
              Atlanta, Georgia  30303
 8            (404)812-4747
              zack@mitchellshapiro.com
 9
10   On behalf of the Defendants:
11
12            KAREEMAH L. LEWIS, Esq.
              STACI MILLER, Esq.
13            City of Atlanta Department of Law
              55 Trinity Avenue, SW
14            Atlanta, GA 30303
              (404)546-6318
15            karlewis@atlantaga.gov
              sjmiller@atlantaga.gov
16
17
18   Also present:  Frank Lemmon, videographer
                    Mitchell & Shapiro
19
20                  * * * * *
21
22
23
24
25
```

---

**Page 4**

1  (Pursuant to O.C.G.A. Section 15-14-37, the
2  court reporter's disclosure was provided to all
3  counsel present at this time.)

4  **THE VIDEOGRAPHER:** On the video record
5  at 10:03.

6  **MR. GREENAMYRE:** This will be the
7  deposition of Detective James Barnett in the
8  matter of Sylvester versus Barnett, et al., Case
9  Number 1:19-cv-4300 pending in the Northern
10 District of Georgia, taken pursuant to notice
11 and agreement of counsel for all purposes
12 permissible under the Federal Rules.

13 Good morning, Detective Barnett.  My name
14 is Zack Greenamyre, and I represent Keith
15 Sylvester in this case.

16 **THE WITNESS:** Good morning.

17 **MR. GREENAMYRE:** And I thank you for
18 being with us today.  I know that there are a
19 million things that you would rather being doing
20 than this, but we appreciate it.  I can tell you
21 I've been deposed before, and it's not the best.
22 Kareemah, can we agree that all objections
23 except to privilege and form are preserved and
24 reserved?

25 **MS. LEWIS:** Agreed.

Page 5

1    **MR. GREENAMYRE:** And that just
2  objection to form is sufficient for any form
3  objection?
4    **MS. LEWIS:** Agreed.
5    **MR. GREENAMYRE:** Can we swear the
6  witness.
7    DETECTIVE JAMES BARNETT,
8  being first duly sworn, was examined and testified as
9  follows:
10    **EXAMINATION**
11  **BY MR. GREENAMYRE:**
12   Q   Detective, have you ever given a deposition
13  before?
14   **A   I have.**
15   Q   How many depositions have you given before?
16   **A   Two, two others.**
17   Q   And what was the context of those prior
18  depositions?
19   **A   My first deposition was -- I believe I was**
20  **a witness. It was a case that I was involved in as a**
21  **detective when I was in the zone, Zone 5. I can't**
22  **remember what the case was about but -- and the**
23  **second one was another homicide-related deposition**
24  **where I had to also witness -- the victim's family**
25  **was suing the apartment complex where he was killed.**

Page 6

1  **And that was late last year.**
2   Q   Do you know what county that was in?
3   **A   Fulton. Both of them were Fulton.**
4   Q   Was the first one, was that a suit against
5  law enforcement or was that just a civilian versus
6  civilian?
7   **A   I believe it was a civilian -- I know it**
8  **wasn't versus law enforcement. I believe it was**
9  **civilian versus civilian, but I really don't remember**
10  **much about it. It was probably seven or eight**
11  **probably years ago.**
12   Q   You know the basic deal with depositions.
13  A couple of extra things to emphasize for today. At
14  any time you want to go back to an earlier question
15  or you remember something that you would like to add or
16  modify a previous answer, don't hesitate, right?
17  Just interrupt me and say can we go back.
18   **A   Okay.**
19   Q   And of course we prefer that you do in the
20  space of today as we all have it on the record
21  clearly, we'll try and talk one at a time just for
22  the court reporter's sake. Sometimes I'm not great
23  at that, so just we'll try and do our best. Let me
24  know if you need a break at any time. Just answer
25  the question that's been asked, and then we can take

Page 7

1  a break.
2   **A   Okay.**
3   Q   I'm going to endeavor to ask questions as
4  clearly as possible, but there will be times where
5  I'll ask questions that are less than perfectly
6  clear. If I ask you a confusing question will you
7  let me know?
8   **A   Sure.**
9   Q   Or ask me for clarification.
10   **A   Okay.**
11   Q   Would you agree that it would be fair to
12  assume that if you answer a question, I can assume
13  that you understood it?
14   **A   Yes.**
15   Q   From time to time Kareemah may object.
16  That's fine. Unless she tells you not to answer, you
17  can go ahead and answer. She's just preserving it
18  for the record.
19   **A   Understood.**
20   Q   If you need to refer to documents or want
21  me to pull up a document -- this is sort of a
22  document or evidence intensive case -- just let me
23  know. Do you have any documents in front of you?
24   **A   I have my narrative, 22-page narrative, and**
25   **I've got the Defendant's objections and responses to**

Page 8

1  **Plaintiff's first questions that Ms. Lewis sent me**
2  **the other day. Those are the only two documents that**
3  **I have on hand.**
4   Q   Okay. And in front of you, is the device
5  that's with the camera on you, is that a laptop, a
6  tablet?
7   **A   It's a city -- it's my city cell phone.**
8  **But I have the capability to charge it if I need to.**
9   Q   Okay.
10   **A   And I'm having a little sun issue right**
11  **here in front of me I wasn't anticipating.**
12   Q   I can see you clearly enough. If it's a
13  problem, just let us know and we can re-orient. And
14  looks like you're at home, and no one else is in the
15  room with you; is that correct?
16   **A   Correct.**
17   Q   Would you agree that there are no
18  communications of any kind other than on the record
19  through Zoom with your attorney during this time?
20   **A   That's correct. I've got another cell**
21  **phone here with me, personal cell phone; but that's**
22  **the only communication device in here. And I would**
23  **tell you that I am on call for homicide number one**
24  **right now in the rotation, though I don't -- I don't**
25  **know when the next homicide is going to be, but that**

Page 9

1  may be an issue.
2    Q   Stuff happens.  We'll try and get through
3  it.  But things happen, and we'll work around it.
4  And I will try and -- generally I take depositions
5  that tend to be on the shorter end of things, but
6  there's a lot to go through here.  I don't think this
7  will be especially short, but I'll try to get it
8  through it as expeditiously as I can.
9        First I'm going to ask you sort of some
10  background general principle type questions not
11  directly represented to the facts or circumstances of
12  this case.
13    A   Okay.
14    Q   Do you agree that in drafts and filing
15  incident reports and investigation reports it's
16  important for law enforcement officers to be accurate
17  complete and honest?
18    A   Absolutely, yes.
19    Q   Accurate meaning describe events correctly?
20    A   I do.
21    Q   Complete meaning not leave out any
22  important details, right?
23    A   Correct.
24    Q   And honest meaning not lying, right?
25    A   Absolutely.

Page 10

1    Q   And in APD, actually if you look to your
2  22-page report it says at the bottom of every page
3  that your statements there are made under oath,
4  right?
5    A   Yes, it does say that.
6    Q   I haven't seen that in a lot of
7  departments, so I thought that was interesting.  Same
8  thing with warrant affidavits.  You would agree that
9  warrant affidavits must be accurate, complete and
10  honest?
11    A   Absolutely.
12    Q   And you agree that the Fourth Amendment
13  protects citizens from prosecutions without probable
14  cause, right?
15        MS. LEWIS:  Object as to form.  You
16    may answer.
17    A   I do, yes.
18    Q   (By Mr. Greenamyre)  You agree that in
19  drafting a warrant affidavit a law enforcement
20  officer must include all facts that are material to a
21  probable cause finding?
22    A   I do, yes.
23    Q   Do you agree that an officer cannot
24  knowingly or recklessly include incorrect inculpatory
25  facts in an warrant affidavit?

Page 11

1        MS. LEWIS:  Objection as to form.  You
2    may answer.
3    A   I do agree with that.
4    Q   (By Mr. Greenamyre)  Agree that an officer
5  cannot knowingly or recklessly omit exculpatory
6  facts?
7    A   I agree with that, yes.
8    Q   Do you agree that an officer who should
9  have known that their warrant application failed to
10  establish probable cause violates the Fourth
11  Amendment?
12    A   Well, I would say that I would put up the
13  facts that I believe establish probable cause, but it
14  would be up to the judge whether I've established
15  probable cause.  Of course, anytime I write a warrant
16  I think there's going to be probable cause or I
17  wouldn't waste my time doing it.
18    Q   I guess maybe the key language in that
19  statement was an officer should have known that their
20  warrant application failed to establish probable
21  cause violates the Fourth Amendment.  Do you agree or
22  disagree with that statement?
23        MS. LEWIS:  Object as to form, but you
24    may answer.
25    A   I don't understand what should have.  I

Page 12

1  mean, how do you establish should have?  I always put
2  forward arguments that I believe -- that I believe
3  create the probable cause necessary for an arrest
4  warrant or a search warrant or anything like that.
5        I should have?  That's kind of -- I don't
6  know what that means, should have.  Do you mean like
7  based on my training I should have known this or
8  should have known that?  I mean, I put forth all my
9  arguments that I know that are relevant in a search
10  warrant and arrest warrant.
11    Q   (By Mr. Greenamyre)  Should have with
12  respect to a reasonably competent law enforcement
13  officer, not perfection but a reasonable officer?
14    A   Right.  Nothing is perfection, but I strive
15  for that.  Yeah, I believe I'm a competent
16  investigator, yes.
17    Q   I'm not speaking to you generally.  As a
18  general principle do you agree that an officer who
19  should have known that their warrant application
20  failed to establish probable cause, if they were
21  acting as a reasonable officer, that they violated
22  the Fourth Amendment in taking out a warrant?
23        MS. LEWIS:  Objection as to form.  You
24    may answer.
25    A   Yeah.  I mean, I'm not -- when I go to work

Page 13

1 in the afternoon I don't try to violates anyone's
2 constitutional rights, and I just provide arguments
3 that I think establish evidence in the case. So yes.
4    Q    (By Mr. Greenamyre)  And sorry.  Just a few
5 kind of like basic questions like this, and we'll get
6 into more, you know, concrete questions.
7    A    Okay.
8    Q    Do you agree that an officer cannot
9 unreasonably disregard certain pieces of evidence by
10 choosing to ignore information that has been offered
11 to him or her?
12    A    Correct.  Yes, I agree with that.
13    Q    Agree that an officer cannot elect not to
14 obtain easily discoverable facts that might tend to
15 exculpate a suspect?
16    A    Yes, I believe that is correct.
17    Q    Do you agree that an officer must
18 articulate the basis for their belief that the
19 subject committed the alleged crime and that that
20 articulated basis must be accurate and honest?
21    A    Yes.
22    Q    Agree that probable cause depends on the
23 totality of the circumstances known or readily
24 available to the officer?
25    A    Absolutely I agree with that, yes.

Page 14

1    Q    And agree that there can be cases from time
2 to time where there is significant or even
3 overwhelming evidence of guilt, but then a single
4 conclusive fact like, for example, and alibi can
5 negate probable cause?
6         MS. LEWIS:  Objection as to form.  You
7    may answer.
8    A    Yes.
9    Q    (By Mr. Greenamyre)  I believe there was a
10 story someone was telling at the scene of this fire
11 about -- I forgot which officer's war story it was,
12 but about a couple that, you know, had split up or
13 were on the outs, and their house was set on fire
14 with gasoline, and they found the husband burned up
15 and deceased and inside the pool in the backyard.  Do
16 you remember that story?
17    A    Yes.  Defective Demeester I believe had
18 that case.  Yeah, I remember that.
19    Q    And it looked like really clear that the
20 wife did it, and so they found the wife was in Sandy
21 Springs or wherever.
22    A    Right.
23    Q    A couple more background type questions.
24 Can you confirm that no discipline or adverse action,
25 anything like that has been taken against you for the

Page 15

1 facts and circumstances of this case?
2    A    That is true.  I've received no discipline.
3    Q    And you'll agree that you were -- for the
4 totality of the relevant time you were acting within
5 the scope of your employment as an Atlanta Police
6 Department law enforcement officer?
7    A    I was.
8    Q    If there is a settlement or a verdict in
9 this case, is it your understanding that any
10 settlement or verdict will be paid by the city or
11 paid by you personally?
12    A    I haven't really discussed those facts.  I
13 haven't discussed that.  But actually that's the
14 first I have heard of any kind of payment.
15    Q    To be clear, there hasn't been a payment,
16 but obviously with this lawsuit it's a possibility.
17 Was this your first lead homicide case?
18    A    It was the first case I was the lead hom
19 at, that's true.
20    Q    It is a doozy of a first case.
21    A    It is a doozy.
22    Q    How were you assigned this?  Was this some
23 kind of hazing process?
24    A    No.  It seems like it though.  Like I said
25 before, there's a rotation.  Like I say, there's 15

Page 16

1 homicide detectives, and your name is just on a board
2 in an order that's kind of established over time.
3 And you're number one, so the next homicide that
4 comes up is yours unless you're on vacation or what.
5 And then after -- then you go to the bottom of the
6 list, and then number two is number one.  So the next
7 homicide or death investigation or whatever that
8 comes up, then that person is number one lead.  So
9 it's totally random.
10    Q    And when did you start up with homicide?
11    A    April 2018.
12    Q    And when did you start -- did you
13 immediately go to 15 on the board or was there a
14 period where you were being secondary?
15    A    There was a period where I wasn't on the
16 board.  Typically when a detective first gets to the
17 unit they're not on the board in the rotation at all.
18 And you just -- you go to the scenes basically, and
19 you help out.  Basically you sit secondary.  I guess
20 that's what it is.
21         But really there's a primary, and there's
22 not really a secondary.  Like maybe you're partner or
23 whatever.  It's the whole unit.  It's a team effort.
24 So you have the lead detective who kind of signs
25 everything, warrants and directs the overall

Page 17

1  investigation.  But you can go to anybody in the unit
2  and they're willing to help you with whatever your
3  problem is or your goal is.  Because everybody has
4  their, you know, niches, different types of expertise
5  you may have.  You'll say, well, I've got a cell
6  phone issue, so I'll go to this detective, or I've
7  got a -- you know, an interview, so I'd like to
8  consult this.  So it's really a team effort.  It's
9  the whole unit.
10  Q    And we'll get into some details about that
11  with the facts of this case as we go.  But there were
12  a number of officers or detectives that responded to
13  the scene of the fire, correct?
14  A    Yes.
15  Q    Who all was at the scene?  You said
16  Demeester?
17  A    Zimbrick, Leonpacher, Summer Benton.  I
18  believe that's her name.  There was another detective
19  that was not there, but she was pulling video from
20  another location, I think, or looking for possible
21  video in the area.  So, you know, it was -- like I
22  said, it was a team effort.  I think any detective on
23  day watch at that time was probably, you know,
24  tremendously or indirectly involved in it somehow.
25  Q    And when did you join APD?

Page 18

1  A    I was hired in 2005, end of 2005.
2  Q    And did you have any law enforcement
3  employment prior to that?
4  A    No.
5  Q    So although this was your first lead
6  homicide case, you had done probably, you know,
7  hundreds of warrants prior to this, right?
8  A    Correct.
9  Q    Same probable cause standard, you know,
10  whether it's your first warrant or your thousandth
11  warrant, right?
12  A    Yes.
13  Q    So we mentioned this is sort of a doozy of
14  a case.  I'm trying to understand how you think about
15  it looking back at it now obviously with the benefit
16  of hindsight and new evidence and in the form a
17  geofence warrant, and I think there's a prosecution
18  of a guy named Muckle, M-U-C-K-L-E.  As you sit here
19  now today do you still think that there is probable
20  cause today, not back in 2018, but do you think
21  that's probable cause today to believe that Keith
22  Sylvester killed his mother and stepfather and set
23  their house on fire?
24  MS. LEWIS: Zack, I'm going to object
25  at this juncture and instruct my client not to

Page 19

1  answer.  There is still an ongoing investigation
2  which is still pending.  We would threaten the
3  integrity of that investigation putting those
4  details and facts on this record that can
5  potentially be accessible to the public.
6  We are objecting.  I'm actually instructing
7  my client not to answer at this juncture, and
8  you and I can talk more or maybe even approach
9  the Court if we need to.  But at this juncture
10  due to it not being relevant and there being an
11  ongoing pending criminal investigation at this
12  moment, I would instruct my client not to answer
13  that line of questioning.
14  MR. GREENAMYRE: Tell me, Kareemah,
15  what is the scope of the investigative privilege
16  that you're claiming?
17  MS. LEWIS: Well, it's a relevancy
18  objection because this claim is not based on any
19  new outcome or investigative activities.  So to
20  the extent that your complaint doesn't encompass
21  any allegations with regards to Detective
22  Barnett's present involvement with this case,
23  that information is not relevant.  But also the
24  investigation is still ongoing, and I don't want
25  to threaten its -- the credibility of that

Page 20

1  investigation or its integrity.  And again, it's
2  an issue that we may not agree on, and I'm not
3  opposed to contacting chambers to get more
4  direction on it.
5  MR. GREENAMYRE: Yeah, we may need to
6  because there's been no motion for protective
7  order, there's been no motion to stay
8  proceedings.  This is the first I've heard of
9  it.  And I think the questions that I'm going to
10  ask throughout the entirety of this are geared
11  towards what information was known at the time
12  and also what information was knowable at the
13  time.
14  And that's going to get into information
15  that, you know, you may say is privileged in
16  some way.  And, you know, from an investigative
17  standpoint to the extent that applies at all,
18  especially in the absence of a protective
19  order --
20  MS. LEWIS: I'm sorry.  I didn't mean
21  to interrupt.
22  MR. GREENAMYRE: No, no.  Go ahead.
23  MS. LEWIS: I think on that end I
24  wouldn't think a protective order would be
25  necessary because the information is just not

Page 21

1 relevant and thus is not within the scope of
2 discoverable relevant information.
3 To the extent that your client's claims are
4 based on the Investigator Barnett's
5 investigative activities that stemmed from the
6 warrant, all of that information and all of the
7 activities are prior to any subsequent arrests
8 in this case and any subsequent investigation.
9 So I think it's safe to say that you can
10 ask what information he knew at the time because
11 that's directly relevant to the complaint. But
12 anything that happened after that is going to be
13 privileged and irrelevant. And that's the
14 stance on -- that we need a protective order.
15 **MR. GREENAMYRE:** You would agree with
16 me that information that could have been
17 obtained at the time the warrant was taken is
18 certainly relevant to ask the witness about in
19 the context of this deposition?
20 **MS. LEWIS:** Yes, if it's -- as long as
21 we're not going into information that has been
22 subsequently developed. If you're not asking
23 about the specifics of that I think it's fair to
24 say could you have obtained this information.
25 Yes, not restricting that. But if we're going

Page 22

1 into the specifics of how the subsequent
2 geofence warrant was obtained and Mr. Muckle --
3 any items or topics with regards to the
4 subsequent developments post the issuance of
5 these warrants, I think that's where we're going
6 to have the some gray area issues.
7 **MR. GREENAMYRE:** So, I mean, I
8 think -- I mean, are you saying that there's
9 still a pending investigation as to Keith
10 Sylvester?
11 **MS. LEWIS:** I am not excluding that.
12 I don't want to threaten the integrity of the
13 investigation by listing all the suspects in
14 this case. I'm not excluding that.
15 **MR. GREENAMYRE:** So, I mean, I think
16 I'm clearly entitled to ask any questions about
17 any evidence having to do with my client, and I
18 think any kind of relevancy objection is not
19 well taken, especially if it's a relevancy
20 objection not to answer is not well taken in the
21 context of a discovery deposition.
22 **MS. LEWIS:** That's my instruction.
23 Would you like to contact the Court, take a
24 moment or pause to get on the phone or have to
25 get some more guidance on this issue? Or you

Page 23

1 can proceed with your questions and I will just
2 object as necessary. I'm not sure if we'll have
3 the same issue with all of your questions.
4 **MR. GREENAMYRE:** Yeah. I'm trying
5 think of if there's a way we can work around it.
6 I tend to think not. But give me a second, let
7 me look through this. Can we go off the record
8 for like five minutes?
9 **MS. LEWIS:** Sure.
10 **THE VIDEOGRAPHER:** Going off the video
11 record at 10:30.
12 (Off-the-record discussion.)
13 **THE VIDEOGRAPHER:** We are back on the
14 video record at 10:36.
15 **MR. GREENAMYRE:** Okay. So I think the
16 most likely result here is that we're going to
17 have to come back and do this deposition again
18 down the road. But I want to go ahead with --
19 and to be clear, I don't think any of these
20 objections are appropriate. I mean, you can
21 object for the record, but I don't think it's
22 appropriate to instruct the witness not to
23 answer.
24 We would anticipate having -- teeing up
25 Judge May's Rule 37 process and going that way.

Page 24

1 I do want to try and get through today as much
2 as we can, So I will try and do that.
3 Q (By Mr. Greenamyre) So Detective Barnett,
4 let me ask you just a cleaner question for the record
5 because I think I had a lot of preamble to the last
6 one. As you sit here today do you think that there
7 is probable cause to believe that Keith Sylvester
8 committed the crimes he was originally charged with
9 in your warrant affidavit from December 2018?
10 **A I do.**
11 Q What was that?
12 **A I do, yes.**
13 Q And in addition to the facts outlined in
14 the warrant that we will look at, what, if any, new
15 facts or facts that weren't included in the warrant
16 inform that determination?
17 **MS. LEWIS:** I'm going to object to the
18 extent it asks for new facts. Can you clarify
19 that?
20 Q (By Mr. Greenamyre) What, if any, facts
21 not allowed in the original warrant inform your
22 conclusion that you just stated that there's probable
23 cause today to prosecute Keith for the crimes?
24 **A I stand by the original facts. I don't**
25 **have any new facts.**

Page 25

1    Q    All right.  And that's helpful, and that
2  may help Kareemah and I get over some of our
3  disputes.  I take it that you disagree with the DA's
4  determination that the case should not be presented
5  to a grand jury?
6    A    I do disagree with that, although I can
7  understand Paul Howard came to that determination
8  because, in my opinion, it's, you know -- some
9  others, that he didn't want to prosecute a case, a
10 case that he -- that was -- what's the word.  I
11 disagree with his stance on it, but I can understand
12 why he made that decision.
13   Q    And so a slightly different question than,
14 you know, whether you still think there's probable
15 cause to prosecute Keith Sylvester for the original
16 crimes.  Do you today subjectively, you personally,
17 believe that Keith committed the crimes you
18 originally charged him with in your affidavit?
19   A    Yes.
20   Q    And without going beyond the facts of --
21 that are contained in the publicly available warrant
22 for the arrest and prosecution of Cornelius Muckle,
23 you will agree that Mr. Muckle is currently charged
24 with these sames murders, right?
25   A    Yes.

Page 26

1    Q    And he's currently detained at Rice Street,
2  correct, to the best of your knowledge?
3    A    Yes.
4    Q    And you would agree that for Mr.
5  Sylvester's prosecution, the death penalty was on the
6  table and was something that the prosecution stated
7  may be used to punish Mr. Sylvester for those crimes
8  if he was found guilty?
9    A    I have never heard the death penalty ever
10 being used in Fulton County.  I mean, that is
11 something that -- I never even -- no, I've never
12 heard death penalty at all.
13   Q    But you would agree that if the facts
14 showed that Keith strangled and murdered his mother
15 and stepfather and then set the house on fire, that
16 would be an especially heinous crime?
17   A    Yes.
18   Q    And do you recall whether the prosecutor
19 ever mentioned the death penalty on the record in any
20 court proceeding while you were present?
21   A    I've never heard any -- no, never.
22   Q    I want to share my screen.  Let me know if
23 you see this document.
24   A    Yes, I see it.
25   Q    It's a two-page document dated December

Page 27

1  28th, 2018.  Do you recognize this to be your warrant
2  affidavit for the arrest of Keith Sylvester?
3    A    Yes.
4    Q    And can we mark this as Plaintiff's 1.
5        (Plaintiff's Exhibit Number 1 was
6        marked.)
7    Q    So I want to go through this in a little
8  bit of detail and try and, you know, pull out the
9  inculpatory facts.  Let me know if I need to zoom or
10 scroll or anything.  If you want to take a second to
11 read through the entirety of it that's fine, but I'll
12 to kind of go through it line by line in some parts.
13 Are you going to do that or do you want to read
14 through it one time first?
15   A    No.  Go ahead.
16   Q    All right.  So looking into the second
17 paragraph of the probable cause narrative, starting
18 here it originally says there's a fire, and I want to
19 try and pull out the inculpatory facts.  I'll try and
20 identify them.  If you know any others that are
21 inculpatory that I'm not talking about, please let me
22 know, okay?
23   A    Okay.
24   Q    So one would be the back burglary bar door
25 was found open with the deadbolt engaged as if it had

Page 28

1  been locked.  Would you agree that's an inculpatory
2  fact as to Keith?
3    A    Yes.
4    Q    And just briefly, what is the theory on
5  which that tends to show that he committed these
6  murders?
7    A    The key was used to lock the bolt after the
8  person left.
9    Q    And then a second inculpatory -- possibly
10 inculpatory fact, the female victim had what at first
11 appeared to be wires from a cable junction box around
12 her neck.  Would you agree that's an inculpatory
13 fact?
14   A    Can you explain what you mean exactly how
15 that is inculpatory?
16   Q    I guess we understand each other when we
17 say inculpatory or exculpatory, right?
18   A    Inculpatory means that it provides evidence
19 toward guilt.
20   Q    Right.  So is this inculpatory or is it not
21 inculpatory?
22   A    Well, it's -- I don't see it as either.
23 It's a junction box laying across her neck.  It's
24 just a fact.
25   Q    And I guess it's not clearly inculpatory

Page 29

1 because the wires from the cable junction box were
2 not actually around her neck, you know, as in that
3 they were not actually used to -- as a ligature,
4 correct?
5          MS. LEWIS: Objection as to form.  You
6 may answer.
7      A   No, that's incorrect.  The wires were
8 around her neck strangling her.  I was at the autopsy
9 when the wires were unwound around her neck.
10     Q   (By Mr. Greenamyre)  And I'm trying to --
11 since there's a lot of forensic evidence I just want
12 to understand sort of your interpretation of this
13 data.  It's your understanding that the wires from
14 the cable junction box around her neck were used as a
15 ligature?
16     A   Yes.
17     Q   Any other inculpatory facts in this second
18 paragraph before we move on to the third paragraph?
19     A   No, I don't see any.
20     Q   Moving on to the third paragraph I want to
21 try and pull out the inculpatory statements here.  I
22 want to start with, Sylvester stated he took Harry
23 Hubbard to the Walmart at Cascade to buy
24 citronella candles to burn inside the house because
25 of a bug problem.  I assume this is a fact you

Page 30

1 consider inculpatory?
2      A   Yes.
3      Q   Just tell me briefly why.
4      A   Well, the central air unit at the Hubbards'
5 house was not working, so they had all their windows
6 open.  And because of that in the summer, the heat, I
7 guess they had a mosquito and bug problem.  So they
8 bought the citronella candles to burn inside, which
9 is a toxic candle meant to be burned outside.
10          And that got my attention.  That was kind
11 of strange.  And then on top of this the other items
12 that were bought, mothballs and alcohol, it was just
13 something that if you Google on -- you know, if you
14 Google those items, then the first thing you pull up
15 is someone starting a fire using these kind of items.
16 And I thought that was noteworthy.
17     Q   Understood.  When you say these items, when
18 you Google these items the first thing that comes up
19 is fire, a little bit of ambiguity in your answer.
20 Are you referring to specifically the mothballs and
21 the rubbing alcohol?
22     A   Yes.
23     Q   And not specifically the citronella candle?
24     A   No, the citronella has got my attention
25 because who burns citronella candles inside?  It's a

Page 31

1 toxic -- it's a toxic pesticide.
2      Q   Certainly I have terrible mosquitoes in my
3 backyard, and it's a balance between getting too
4 close to the citronella and getting chewed up, right?
5      A   Right.  But outside, not inside.
6      Q   Correct.  Let me ask a better question.
7 Was there any evidence from the medical examiner or
8 otherwise that either Deborah or Harry Hubbard had
9 been poisoned from the citronella candle?
10     A   No.
11     Q   But it got your attention because it's
12 toxic and seems like an error of judgment to burn
13 that indoors, right?
14     A   Correct.
15     Q   Another fact, Sylvester stated in an
16 interview that he had never driven around all night
17 for nothing before this incident.  I assume that's an
18 inculpatory fact?
19     A   Yeah.  To me it was strange that he drove
20 around all night playing video poker on this
21 particular night.  When I asked him, do you have a
22 gambling problem or do you do this on a regular
23 basis, and he said no.
24     Q   This statement in the interview, that was
25 one that was recorded, correct?

Page 32

1      A   Yes.
2      Q   Do you remember what Mr. Sylvester's
3 explanation was for why he was, you know, maybe
4 driving around all night?
5      A   When I had -- when -- as far as the
6 multiple interviews that I had with Sylvester, he
7 talked a lot.  When you tried to ask him a question
8 that I was interested in, he would be vague or
9 talk -- want to talk about something else.  He had
10 what he wanted to talk about, but when I made a
11 question he was either indirect or vague or just
12 didn't want to or couldn't -- just couldn't answer
13 the question.
14          So he would not give long-winded
15 explanations if I had -- so if I made a point, he
16 would say -- he would skirt around the issue or avoid
17 it altogether and just not answer and talk about
18 something else like have you checked my parents'
19 mailbox for letters for Harry Hubbard, stuff that I
20 just didn't think at the time were relevant to the
21 investigation.
22     Q   And a couple of points in follow-up to
23 that, but first not to accuse you of doing the same
24 thing that you're saying Keith did, and I know from
25 talking to Keith, and you're not wrong, but, you

Keith Sylvester vs.
James Barnett, et al.

Detective James Barnett
April 9, 2021

Page 33

1  know, specifically did he ever provide anymore
2  detailed explanation about why that night he might
3  have been driving around playing video poker if he
4  hadn't done it other times?
5      A   I don't recall a good excuse.  I just
6  recall not getting an explanation of why he was
7  driving around all night recording his movements.
8      Q   And, you know, another point there about
9  Mr. Sylvester sometimes getting hung up on things
10 that are not relevant, you know, just to be clear, I
11 know that he filed a pro se lawsuit before we worked
12 together.  And I just want to make sure that you
13 understand that the amended complaint that we filed
14 that I drafted is now the operative complaint and
15 not, you know, anything that he filed prior to that.
16 Is that your understanding?
17     A   If you say so.  You know, I don't know the
18 legal status of any other lawsuits.
19     Q   So we're going to talk about the SD card
20 especially in paragraph 4.  But with the exception of
21 the two facts we highlighted in paragraph 3 and the
22 SD cards that we'll talk about in a second, any other
23 inculpatory facts in this paragraph?
24     A   No.
25     Q   So going on to paragraph 4, I'll highlight

Page 34

1  these two sentences.  Deborah Hubbard's son Keith
2  Sylvester enthusiastically handed over SD cards that
3  Sylvester had installed in his vehicle to Atlanta
4  Fire Captain Bonner.  Sylvester volunteered the SD
5  before arrest investigators realized Sylvester had
6  video and before anyone at the scene knew a murder
7  had been committed.
8      Taking those facts as sort of one, I assume
9  that you understood those to be inculpatory.  Is that
10 fair?
11     A   Yes.
12     Q   And tell me a little bit about why.
13     A   In an investigation I try to put myself --
14 although it's hard to do -- in the place of the
15 victim's family.  And in this case I couldn't help
16 but do it.  First of all, I don't know why he would
17 be giving video -- if you had just found out that
18 your parents had been murdered and burned up in a
19 house, why you would be trying to give -- why would
20 you think of video in your car trying to explain
21 where you were and that you didn't have anything to
22 do with this.  Why that would be the first thing in
23 your mind at the scene.
24     I mean, it just kind of astounded me.  And
25 I mean, like I said, when the arson investigators got

Page 35

1  there -- homicide didn't come out until several hours
2  later.  Like I said, I was at home when I got the
3  call.  But the day watch people that were there
4  weren't called till later because -- and this was the
5  thing that was concerning to all of us -- was when
6  the bodies were initially discovered and the arson
7  investigators came, before we had gotten there and
8  before the ME or anybody had gotten there Harry
9  Hubbard's body had already been removed from the
10 house because at that time he didn't think anything
11 was suspicious about it.
12     And then when the arson investigators got
13 to -- like I said, I don't know exactly how this
14 happened because I wasn't there, but it's my
15 understanding when the arson investigators got to
16 Deborah Hubbard's body and saw all these cables
17 wrapped around her neck, then they say, hey, this
18 kind of looks suspicious, we probably should call
19 homicide.
20     And so when I got there Harry Hubbard's
21 body was already en route or had arrived at the ME's
22 office.  And when they discovered the wires around
23 Deborah's neck is when everything was put on hold and
24 everything was closed down and crime scene tape went
25 up, and homicide was notified.

Page 36

1      So in all this when Keith is trying to say,
2  hey, I couldn't have possibly had anything to do with
3  this situation because here, here's all my -- here's
4  all my activities last night video recorded.  And I
5  just thought that was strange because he's given over
6  all this exculpatory evidence before a crime was
7  discovered.
8      And I thought that was -- I thought that
9  was strange.  And everybody thought that was strange.
10 The fire -- the arson investigators called my
11 attention, hey, this guy is giving us evidence that
12 he wasn't involved in this before this was a crime,
13 before we realized this was a crime.
14     And that got my attention, and that's why I
15 put it in the -- and I asked Keith, you know, why are
16 you driving around recording your activities, you
17 know.  It was a rear-view mirror with a camera in it.
18 I didn't know anything like that existed really.  I
19 know people had, you know, cameras in a car; but I
20 hadn't really seen a setup like this before.  And
21 when I asked him that question I said, why do you
22 tape yourself or -- what I expected him to say was,
23 well, in case I have an accident, you know, it would
24 be for insurance or if, you know, I get pulled over
25 by the police there's some kind of, you know,

Page 37

1  complaint or something.
2       And actually I don't see how that would
3  help because if the camera looked forward, it didn't
4  look that way.  But I expected him to have some kind
5  of answer like that.  But he told me, oh, it's in
6  case I have some kind of artistic -- artistic -- what
7  did he say.  Some kind of, you know, an idea about a
8  song or something that he could sing it or whatever,
9  and it would be recorded.
10      I just thought it was strange that on the
11 night he's riding around and his parents are burning
12 up in a house, and he's recording all his activities.
13 That's why I put that in.
14  Q   Got it.  Give me just one second.  I'm
15 making some notes.  So it sounds like within that
16 answer, you know, there may be at least three reasons
17 that this sentence that's highlighted or two
18 sentences that were highlighted were inculpatory to
19 your mind.  One, that he volunteered the information
20 in this first place to exculpate himself before
21 anybody thought there was anything -- a murder going
22 on, right?
23  A   Right.
24  Q   And two, that he had a dash cam in the
25 first place?

Page 38

1  A   Well, the reason for it -- I mean --
2  Q   Maybe two and three are related.  Three was
3  going to be that, you know, he told you that the
4  reason for him having the dash cam was to record his
5  artistic musing or ideas rather than for accidents or
6  crazy drivers or recording police encounters, right?
7  A   Yes.
8  Q   Next highlighted sentence, in parentheses,
9  Sylvester showed deception on the CVSA test.  I
10 assume that that was inculpatory to your mind?
11  A   Yes.
12  Q   CVSA, computer voice stress analysis,
13 right?
14  A   Yes.  And I've got that parentheses
15 because, you know, I realize that kind of thing
16 doesn't stand up in court, but I thought it was an
17 important element toward probable cause.
18  Q   I mean, what's your understanding of the
19 efficacy or success rate of CVSA on detecting lies?
20  A   Well, I mean, they use it for a reason.  I
21 mean, I've never been -- you know, we're always told
22 there's no such thing as a lie detector test.  And I
23 believe that.  I believe that machines can be --
24 they're not foolproof.
25      But they can be used as a tool to help not

Page 39

1  incriminate somebody but guide the investigation to
2  where you think -- to guide an investigation in the
3  direction that probably it should be going.  It's a
4  tool, not necessarily everything you put your money
5  in, all your money in that basket or all your eggs in
6  that basket, but it's a tool that can help direct --
7  help direct an investigation.
8       I wouldn't -- like I said, I'm not
9  qualified to use the machine.  You know, I've heard
10 people do say good things about it.  People swear up
11 and down on it, and I've heard people say, you know,
12 this isn't worth anything.  So I'm kind of middle of
13 the road.  Yeah, they're not infallible, but I
14 believe that they can be used as a tool to direct an
15 investigation.
16  Q   Fair enough.  And one way it could be used
17 is you tell the suspect, you know, this is a truth
18 machine; it's going to get it right.  And then, you
19 know, they do however they do on the test, and you
20 say, look, there's some inconsistencies here.  And
21 then sometimes the suspect may say, well, okay, let
22 me tell you the truth, the real truth now, right?
23  A   Right.
24      MS. LEWIS: Object to the form.  You
25   may answer.

Page 40

1  A   (Continuing)  I mean, as far as techniques
2  for interviews and interrogation, yeah, you could
3  tell that to a suspect or, you know, a defendant and
4  hopefully -- I mean, you don't have to be a pretty
5  gullible suspect.  But in this instance, you know,
6  another detective gave -- I'm not certified to give
7  the test.  Another detective gave the test, and I
8  remember reviewing the video interview of that test.
9  And the detective and Sylvester became very
10 argumentative.
11      I don't think that was, you know -- after
12 Sylvester was told the results of the test, I don't
13 believe the detective had the opportunity to do those
14 kind of techniques because Sylvester became very
15 agitated, stood up and basically walked out.  So
16 there was no follow-up on that test.  The test was
17 given, and he didn't like it, and he left.
18  Q   And maybe if you recall, you followed up
19 with him a little bit after that by phone, right?
20  A   I'm sure I did, yeah.
21  Q   And do you recall that the Detective Darren
22 Smith, he was the one who administered the CVSA,
23 right?
24  A   Correct.
25  Q   And you recall that he told Mr. Sylvester

Page 41

1 that it was maybe between 99 and a hundred percent
2 accurate?
3    **A   I don't recall.  I don't recall that.**
4    Q   Okay.  I was going to do this later, but I
5 think it will maybe speed things up a little bit if I
6 show you this now.  Can you see this, at least the
7 start of this article, the title and the author of it
8 or, you know, the NIJ?
9    **A   I do.  I see it.**
10   Q   And are you familiar with the NIJ
11 generally?
12   **A   I've heard of it, I think.  I'm not really
13 familiar with it.**
14   Q   Are you aware that it's a branch of the
15 Department of Justice?
16   **A   Yes.**
17   Q   And I just want to highlight this portion
18 which reads, does VSA actually work.  According to a
19 recent study funded by the National Institute of
20 Justice, two of the most popular VSA programs in use
21 by police departments across the country are no
22 better than flipping a coin when it comes to
23 detecting deception regarding recent drug use.  Would
24 that surprise you?
25      **MS. LEWIS:** Objection as to form.  You

Page 42

1    may answer.
2    **A   I took a course one time in statistics, and
3 I learned that you can find an argument on either
4 side.  I'm sure you could probably pull up an article
5 saying these are the best things since sliced bread.
6 But yeah, I can see that they don't like it at all.
7 But then like I said before, some people swear by it.
8 And I'm not in either camp.**
9    Q   (By Mr. Greenamyre)  Understood.  And just
10 to be clear, you wouldn't expect the National
11 Institute of Justice as the sub-unit of Department of
12 Justice to be in the business of intentionally
13 misrepresenting statistics, would you?
14      **MS. LEWIS:** Objection as to form.  You
15      may answer.
16   **A   There's a lot of federal departments, and
17 I'm sure there's a lot of opinions in the federal
18 government.**
19   Q   (By Mr. Greenamyre)  Is that a yes or a no
20 or you just can't answer?
21      **MS. LEWIS:** Objection.  Sorry.  Mr.
22      Barnett, renewing my objection.  You may answer.
23   **A   It doesn't surprise me that some
24 organizations don't count on -- don't really rely or
25 believe that CVSA should be counted on in drug cases.**

Page 43

1    **Q   (By Mr. Greenamyre)  Another sentence here
2 in paragraph 4, Investigator Hogan stated he believed
3 Melissa Sylvester had been coached in what to say
4 prior to his interview with Melissa.  Is that an
5 inculpatory fact?**
6    **A   Yes.**
7    Q   Was the interview with Melissa recorded in
8 any way?
9    **A   She was in an interview room, and I
10 believe -- if it wasn't video interviewed, I
11 believe -- I don't know.  I don't know the answer to
12 that.  It may have been audio recorded.  It may have
13 been video recorded, but I'm not sure.  Since she
14 wasn't there as you know, a witness to be
15 interviewed, it's a possibility that she did not --
16 that was not recorded.  But I don't remember.  But I
17 know Investigator Hogan, and he usually records
18 interviews.  So I'm thinking that I could probably
19 find that interview at least audio recorded.**
20   Q   Okay.  I'll represent to you that I haven't
21 seen it; but, you know, maybe we can put our heads
22 together between you and Kareemah and the open
23 records people and get that.  Who was present for the
24 interview besides Investigator Hogan and Melissa
25 Sylvester?

Page 44

1    **A   I recall that they were the only two in the
2 interview.  I might have come in briefly because I
3 was -- this is three years ago, but I think I was in
4 and out.  He was kind of, you know, just kind of
5 care-taking her, babysitting her while I was
6 interviewing Keith, from what I recall.  But I'm not
7 sure.  I may have talked to -- I may have -- I'm
8 pretty sure I did talk to Melissa, thinking about it
9 now.  But it was Hogan that spent most of the time
10 with her, I believe.**
11   Q   So Hogan, Melissa and probably you for
12 portions; is that fair?
13   **A   Yeah, that's fair.**
14   Q   And to the extent it refreshes your memory,
15 did you listen or watch Hogan's interview with
16 Melissa after the fact or did you just go off of what
17 Investigator Hogan said or reported to you about it?
18   **A   I probably went with what Investigator
19 Hogan said.**
20   Q   Is Investigator Hogan also one of the
21 homicide detectives?
22   **A   Yes.**
23   Q   And obviously you were aware that Melissa
24 Sylvester was intellectually disabled, right?
25   **A   Correct.**

Page 45

1   Q  Do you know the nature of her intellectual
2 disability?
3   A  I do not.
4   Q  I mean, do you have a sense from
5 interacting with her whether she suffered from, you
6 know, mental retardation or something like autism or
7 some combination?
8   A  You know, I'm not qualified to say that,
9 but I would say mental -- you mental retardation. I
10 would say that.
11   Q  I'm not asking you for any kind of clinical
12 diagnosis, but just what was your impression?
13   A  She wasn't very smart.
14   Q  And did you, in the portion of whatever
15 conversation you had with -- or you were present for
16 with Melissa, did you personally observe what you
17 thought were indications of her being coached?
18   A  Well, that's kind of hard. I would say I
19 remember her being absolutely convinced that Keith
20 had nothing to do with this incident, this crime.
21 She probably told me that 100 times. And, you
22 know -- but I could see where Hogan was coming from.
23 She would mention certain things over and over about
24 why she thought this. It was like somebody had said
25 that I didn't have anything to do with it and here's

Page 46

1 why.
2      She would -- almost like she would parrot
3 something that somebody else had said. And I had a
4 lot of sympathy for Melissa. She was in a terrible
5 situation. And I could go on about her in my fear
6 for her in all this. Her family had contacted me. I
7 think they were in Virginia.
8   Q  Yeah. We'll -- and go ahead. Sorry.
9   A  Her sisters were concerned because they
10 felt that Keith had always -- well, they felt like he
11 married her within, you know, months of meeting her
12 at Walmart, that he married her because -- Sylvester,
13 he's a very clever person. I will say that about
14 him. And they believe that his relationship with her
15 was based on him taking advantage of her financially.
16      Because, you know, Keith had a history of
17 fraud, and he had several apartments and a house that
18 his mom lived in that he kind of, you know, used her
19 to get her benefits. And that was the family's
20 feeling.
21      And when all of this happened they were
22 concerned and called me about -- you know, they
23 wanted to know if an arrest was ever made on Keith,
24 they wanted to bring her back to -- I believe it was
25 Virginia -- their house so they could look after her.

Page 47

1      And, you know, when the arrest was made I
2 called Melissa's family and said, yeah, the arrest
3 was made. But when I was listening to jail calls,
4 you know, I found out that Melissa had stayed
5 within -- in the area with a caretaker of some sort
6 and hadn't gone back to her family. Which it was
7 concerning to me because, you know, she was --
8 without somebody looking after her she wouldn't do
9 very well.
10   Q  Go ahead.
11   A  I told them -- yeah, I told the family -- I
12 assumed that they were going to send somebody to pick
13 her up, but I don't know if that ever happened or it
14 didn't work out or she didn't want to. But, you
15 know, when the arrest was made I drove -- I drove
16 Melissa back to her apartment and, you know, made
17 sure she got home all right.
18      There was just a lot I couldn't do for her;
19 but, you know, I was very sympathetic to her
20 situation. And I felt like that Keith was taking
21 advantage of her because of her, you know, learning
22 disability or whatever you want to call it, and I
23 just -- I felt very sorry for her.
24   Q  A couple of follow-up questions. You said
25 she was staying with a caretaker. Do you know who

Page 48

1 that was?
2   A  It was a female, but I don't recall who it
3 was. I don't think it was a relative. It might have
4 been a friend of Sylvester or somebody that knew him.
5 But I don't know who -- I might have known the name
6 at a period of time, but I don't know who it is now
7 or was.
8   Q  Was it your sense that it was someone who
9 was paid for these services, professional or a family
10 member of friend?
11   A  I believe it was a family member or friend
12 of Keith, but I'm not saying that they weren't paid.
13 They may have been paid. Because I know she would, I
14 know, run errands, take Melissa to the grocery store,
15 this sort of thing. I couldn't really -- this is
16 from, you know, the jail call, so I couldn't really
17 determine a lot about it. But I know she had
18 somebody looking after her. That's one thing that
19 made me feel a little better about the whole
20 situation.
21   Q  You referenced calls with Melissa's sisters
22 and parents. Would all of the calls at least prior
23 to the warrant with the sisters and parents be
24 recorded?
25   A  Now, I would say yes, but one thing that

Keith Sylvester vs.
James Barnett, et al.

Detective James Barnett
April 9, 2021

Page 49

1  I've realized being a homicide investigator is this
2  being my first case, you learn things in this case --
3  especially this kind of case, you learn things that
4  you take to your next case:  Well, I could do better
5  here.
6       So if you'd ask me about a case right now,
7  definitely those conversations would be recorded
8  because I use my city phone to do it.  And I put
9  those in a file in the One Drive.  But, you know,
10 there's a possibility I didn't record those, but I
11 believe I did.
12      And I specifically -- what I do remember
13 about the conversations with Melissa's parents were
14 the fact that they had told me that -- I don't think
15 it was her parents.  I might have talked to her mom,
16 but mostly it was one of her sisters.  They said that
17 Keith was kind of a controlling jealous type spouse.
18 And I'd heard that from other family members too,
19 that he wouldn't let Melissa out of his sight.  He
20 got angry when she talked to other people if he
21 wasn't there and so forth.  Very controlling,
22 especially with Melissa.
23      And I think it kind of -- this is my
24 opinion.  I think it kind of went over to his mom
25 too.  He was kind of running the show.  He was living

Page 50

1  in her house, she was buying him cars and things like
2  that.  But as far as Melissa, he never -- according
3  to the family he never would let her go anywhere
4  where he wasn't present or there.
5       And out of the blue on July 3rd or a few
6  days before he buys a ticket for Melissa to fly back
7  home for a few days when all this occurred.  And it
8  was not a planned vacation or trip or anything like
9  that.  It was a surprise to her family when they
10 realized that she was going to be coming back to
11 Virginia and especially without Sylvester.
12      So I thought that was also noteworthy in
13 all this information that this guy that never lets
14 his wife out of his sight suddenly sends her on a
15 trip during this incident, during this time frame.  I
16 thought that was important.
17    Q    All right.  All that's helpful.  I'm going
18 to follow up.  We'll go to some of those points
19 later.  I want to first follow up, go back to the
20 question about coaching.  One follow-up before that.
21 You said that, you know, there was a concern that
22 Keith was taking advantage of Melissa's benefits.
23 You know, she had what, I guess disability check and
24 a Section 8 voucher?
25    A    I don't know about the disability, but I'm

Page 51

1  not surprised.  I definitely knew about the Section 8
2  department because like I said before, when Keith was
3  explaining all this to me in the interview he says,
4  now, I know this is going to sound like fraud or
5  illegal or something to that extent.  And then he
6  proceeded to tell me that he had a Section 8
7  apartment in Decatur, Scottsdale, something like
8  that, and then he had Melissa's C 8 apartment on
9  Skipper.  And then him and Melissa were living on
10 Harvel Drive with his mom.
11    Q    So beyond the benefits of the disability
12 check and a Section 8 voucher, you weren't aware of
13 Melissa being an especially wealthy person, were you?
14    A    No.  She was not wealthy.
15    Q    Going back to the last question, it was
16 about coaching.  And I asked you what evidence of
17 coaching you personally saw.  And you said maybe
18 repetition, that she would repeat a fact again and
19 again.  Anything else beside repetition that you
20 personally saw?
21    A    Not that I can recall.
22    Q    What specifically did Hogan say about why
23 he thought she was being coached in the interview?
24    A    I don't think he elaborated on it.  He just
25 said that he felt like -- I mean, Hogan is a guy

Page 52

1  who's been through hundreds of investigations and --
2  not investigations but hundreds of interviews, and
3  when he says somebody -- when he says he feels like
4  somebody's been coached, I took note of it.  But he
5  didn't give any details about why he thought that.
6    Q    Understood.  Obviously you knew from repeat
7  interactions with Melissa as well as conversations
8  with family that Melissa was intellectually disabled.
9  What if anything did Hogan know about her
10 intellectual disability?
11    A    I don't know if he had any kind of
12 knowledge.  I mean, when you meet her you know
13 something's up.  But I mean, like I said, it was a
14 first -- I believe it was the first time he'd met
15 her.  So maybe I told him that she was, you know,
16 mentally handicapped, is probably the way I put it.
17 But I don't think he has any foreknowledge of her
18 situation.
19    Q    And you're not a hundred percent one way or
20 another whether you told him that prior to the
21 interview or not?
22    A    No, I don't know.  I don't know that.
23    Q    And did you have any particular basis with
24 which to try and distinguish her repeating herself
25 as, you know, potentially a symptom of her

Page 53

1  intellectual disability versus, you know, potentially
2  her being coached by her husband?
3      A   No.  I mean, I have no expertise in that
4  field.  It's just when -- you know, when you talk to
5  somebody like -- my job basically is to talk to
6  people about everything.  And when you interact with
7  people as a job, you just sort of kind of -- I would
8  say gut feeling about, hey, this person, you know,
9  thinks this or this person is this kind of person or
10  whatever.
11      And I just got the gut feeling that, you
12  know, she had been prepped.  Do I have any expertise
13  or certifications in knowing that?  No, I don't.  But
14  it's a part of my job to be a listener.  And, you
15  know, and Hogan too.  So, you know, no, I don't --
16  could it have been a symptom of her intellectual
17  disability?  Yeah, maybe.
18      She does repeat herself quite a bit.  But
19  you get a sense when you're talking to somebody the
20  words that she would use maybe are not the words that
21  she would come up with; that maybe somebody else told
22  her that word or, you know, little things like that
23  that you pick up on that's kind of odd.
24      Q   I imagine you talk to all kinds of people
25  from all walks of life in the course of your work,

Page 54

1  Detective?
2      A   That's correct.
3      Q   And you certainly had a fair share of a
4  cast of characters in this instance?
5      A   Yeah.  And I would add that most people
6  that I talk to -- and I say this all the time -- most
7  of the people that I talk to lie.  And it's just
8  figuring out what is the lie and what isn't.  Even
9  people that don't need to lie.  I don't know.  People
10  get flustered when they talk to the police.  I ask
11  them what's their favorite color, there's a
12  possibility they might tell me the wrong color.  I
13  just take note of that and I always remember that.
14  It's just for useful knowledge.
15      Q   Understood.  So we looked at paragraph 5
16  and pulled out I think three specific facts or sets
17  of facts that you identified as inculpatory.  Looking
18  at this again are there any other inculpatory facts
19  in this paragraph 5 of the warrant affidavit?
20      A   Well, the part where I put the victim --
21  where Harry and Deborah were traveling back to
22  Buffalo on August 1st after a reconciliation, so the
23  way I understood the whole thing was Harry had --
24  Harry Hubbard had cheated on Deborah or had done
25  something to make her not want to be around him.  I'm

Page 55

1  not sure how long they'd been married.  I know
2  they're both outstanding people, veterans and so
3  forth, but there had been some kind of problem in the
4  marriage.
5      And she moved down to Atlanta to get away
6  from Harry at the suggestion and encouragement of
7  Keith, according to family.  And so it was my
8  understanding that, you know, Keith has got his --
9  he's living in his mom's house, his mom has bought
10  him a car.  You know, he uses her electricity to keep
11  his ice cream truck cold by running an extension cord
12  through the window and all this weird stuff.  And
13  then he's got two other apartments.
14      So the way I saw it was that the
15  possibility of a reconciliation between Harry and
16  Deborah and her traveling back to Buffalo and
17  possibly say, well, okay, I made up with Harry and,
18  you know, we're getting back together, we're going to
19  sell the house in Atlanta -- from what I understand
20  is Harry and Keith did not get along.  There was some
21  tension in the relationship.  And to me, having
22  Deborah move back to Buffalo, New York would be bad
23  for -- would be bad for Keith losing an income stream
24  like that.  That's kind of the reason I put that in
25  there.

Page 56

1      Q   Got it.  That makes sense.  And I'll have a
2  few follow-ups on that.  Anything else in this
3  paragraph inculpatory that we haven't already talked
4  about?
5      A   No.  That's the one that struck out at me.
6      Q   As far as time goes, you know, we've got
7  more than halfway through this, and maybe we can take
8  a quick break.  Is that okay?
9      A   Sure, yeah.
10      Q   So moving onto the sixth, the next
11  paragraph on -- fifth paragraph here, the highlighted
12  sentence, the possibility of this crime being a
13  random home invasion or burglary is remote due to the
14  lack of similar crimes in the area and the personal
15  nature of this case.
16      I assume that's inculpatory towards Keith
17  because it excludes strangers, right?
18      A   Correct.
19      Q   For the lack of similar crimes in the area
20  aspect of this fact, is that from your general
21  knowledge and appearance as a detective in the
22  Atlanta Police Department or is there any kind of
23  statistical, you know, analysis that you made prior
24  to taking out this warrant to inform that statement?
25      A   No.  I had our crime -- I forgot what they

Page 57

1   call it -- the crime analysts, there's an office that
2   they do the stats. And I had requested them to do a
3   crime analysis report for me about that area. And,
4   you know, as far as people going into houses,
5   burglaries, I believe there's one burglary in the
6   area. But as far as people going in, killing two
7   elderly people and burning their house up, like you
8   said yourself, it was humdinger of a first case. And
9   no, nothing like that has occurred in the area.
10      It just did not appear to me something that
11  would just happen out of the blue. And, you know,
12  the crime analysis team gave me a little -- I don't
13  know if it's an Excel chart or whatever about the
14  crime statistics in the area. And the only thing
15  that I can remember and the only thing the neighbors
16  in the area would talk about would be maybe one
17  burglary within the year.
18      But it was just not -- it was a nice
19  neighborhood. It was not a crime-ridden
20  neighborhood. It was mostly elderly folks that had
21  been there for a long time, and everybody was shocked
22  by the crime. And it was just an outlier. I think
23  if you looked at the entire city of Atlanta, this
24  doesn't happen often. I haven't heard of it before.
25  So, you know, it was unusual.

Page 58

1   Q   Right. So, I mean, the fact of a double
2   strangulation plus arson that's going to be one of
3   the more, you know, whatever word you want to use,
4   gruesome murders that happen in the city of Atlanta,
5   not just in a given year but over a period of time,
6   right?
7   A   Correct.
8   Q   And I guess that goes to my next question
9   too in the sentence, the personal nature of the case,
10  I assume that means especially the strangulation
11  aspect of it?
12  A   Yes, yes. Very personal. Kind of like --
13  I mean, we go to a lot of shootings; and, you know,
14  anybody can shoot anybody, but the strangulation and
15  when somebody is beat to death, those are very
16  personal.
17  Q   I guess we already talked about the Buffalo
18  fact, but another fact in here, importantly several
19  family members raised concerns with -- that Keith
20  Sylvester may have been involved in the murder of his
21  mother and stepfather. I assume that's inculpatory.
22  Correct?
23  A   Yeah, that's correct. I don't think --
24  honestly, I don't think I talked to anyone that
25  didn't think Sylvester was involved in the crime in

Page 59

1   some fashion. I think maybe Althea, his sister, was
2   kind of on the fence there for a while. But I think
3   she finally -- she finally decided he might be
4   involved in it too. I can't speak for her, but
5   that's just kind of the impression I got.
6   Q   And certainly those comments from family
7   members, you know, whether they were inculpatory or
8   exculpatory towards Mr. Sylvester would generally
9   have been recorded on your phone, right?
10  A   Yes.
11  Q   Any other inculpatory facts in this
12  paragraph 5 spanning the first and second page?
13  A   Well, the Ron Martin thing, Sylvester
14  pointed his finger at Mr. Martin early in the --
15  maybe on the first day of the investigation. So
16  myself and another detective, we did the general
17  canvas of the area and talked to -- knocked on doors
18  and talked to neighbors and things like that. And
19  Mr. Martin was one of the people we talked to.
20      So Keith had accused his neighbor of being
21  involved, possibly being involved in the murder and
22  arson because Ron had -- there was an abandoned house
23  across the street and next -- it was -- Ron lived
24  across the street from the crime scene, and there was
25  a house next to the Hubbards' house that was

Page 60

1   abandoned or being worked on. I can't remember.
2       But Ron would go over there to charge his
3   cell phones and things, walk into the yard. And I
4   think that Keith had a run-in with Ron walking
5   through his yard. And so because Ron had walked
6   through the yard and Keith might have even called the
7   police on him -- I can't remember -- but he believed
8   that Ron might have something to do with it.
9       And I interviewed Ron with another
10  detective, and it just didn't seem like he would have
11  any kind of reason to harm his neighbors, especially
12  burning down their house, you know. I guess -- it
13  just didn't make any sense to me. And Ron actually
14  cried. When I told you I talk to people as part of
15  my job, Ron even broke down and cried for the
16  death -- because of the death of the elderly couple
17  next door. He seemed legitimately upset about it.
18      I just didn't feel like Ron had the motive
19  or didn't seem suspicious at all to me. That was
20  just one of the cases that Keith would send me on
21  these chores to do, and then I would do my best to
22  knock down that -- you know, to see if, yeah, maybe
23  Ron did have something to do with it.
24      Now, I mentioned the letters that Keith
25  said that because Harry was receiving letters by the

---

Page 61

1 mailboxes at 2495 Harvel, maybe he was involved in
2 the crime. And I just didn't understand that. And
3 one of the -- he just had these weird motives that he
4 thought -- you know, that he'd dream up that maybe
5 this person was involved or maybe that person.
6      And finally I created a list at one of the
7 interviews, and I think there was five points that
8 Sylvester had made. I said, Keith, okay, so why
9 would Ron kill your parents, or Ron, if Harry was
10 involved -- why would Harry be involved in his own
11 murder. And when you asked these pointed questions
12 to Keith, he would like -- well, you know -- he
13 couldn't -- he wouldn't expand on it, and he would
14 misdirect and redirect and start talking about some
15 other crazy notion.
16      And I remember asking him, hey, why would
17 your stepdad be involved in his own murder. That
18 doesn't make any sense to me. So I went through this
19 list of things that Keith thought that somebody or
20 this person might have been involved or that person
21 might have been involved. And I was just -- I was
22 asking Keith, why this. And then I would explain to
23 him why that didn't make any sense, and he didn't
24 really have an answer for it. So that's my answer.
25    Q    And I guess to be clear, Ron was -- was he

---

Page 62

1 squatting in the house that he lived or did he have a
2 lease; do you know?
3    A    I don't remember. I know they -- I know
4 the house was not in good shape. It didn't have air.
5 When he came out to talk to us he was sweating to
6 death. This was in July. And his wife lived with
7 him there, and his boss would drive into the driveway
8 and sleep in his car overnight with the air
9 conditioner on. I don't remember. It might have
10 been his house at one time and then it wasn't anymore
11 or he still leased. I don't know his legal thing
12 there. I really wasn't that interested in why he was
13 there. But it wasn't a good situation.
14    Q    Sure. And clear that he didn't have
15 electricity or running water?
16    A    He didn't have anything. I don't know even
17 know if they had water.
18    Q    Almost there. Moving onto the sixth
19 paragraph, inculpatory fact, I assume the discrepancy
20 in time between whether he left the mother's house
21 between 5:00 and 7:00 p.m. or whether he left between
22 8:00 and 9:00 p.m., was that inculpatory to you?
23    A    It was a small detail that I was concerned
24 about, yeah. I thought so.
25    Q    Looking back on it now with the benefit of

---

Page 63

1 all the evidence that you have, cell phone records,
2 video, et cetera, what's your best guess as to when
3 he left the mother's house?
4    A    I would say when he said, 8:00 or 9:00. I
5 don't know. Sometime in the early evening of the
6 2nd, 2018.
7    Q    So that's not a big fact but just a little
8 detail, right?
9    A    Correct.
10    Q    Next sentence, so that's taking Harry
11 Hubbard to the Walmart at 1105 Research Center and
12 bought citronella candles, mothballs, rubbing alcohol
13 and Fabuloso cleaner on the evening of 7-2 hours
14 before the fire. I assume that's inculpatory, right?
15    A    Yes.
16    Q    And the inculpatory aspects of that are the
17 toxicity of the citronella candles and the fact that
18 mothballs and rubbing alcohol when used in
19 conjunction can start a fire, right?
20    A    Right. And it would explain the absence of
21 an accelerant.
22    Q    The Fabuloso cleaner not inculpatory?
23    A    No -- no. I just include everything or I
24 think I included everything that was bought.
25    Q    And I'm just trying to totally understand

---

Page 64

1 what your thinking is, so I'll ask some dumb
2 questions. We talked about the citronella, we just
3 talked about the mothballs and the alcohol leaving no
4 trace. Next sentence, arson investigators also
5 learned that the beneficiary of the house insurance
6 policy was Keith Sylvester. An inculpatory fact,
7 right?
8    A    Yes. I believe I learned that from
9 Lieutenant Dorgan.
10    Q    And what's your understanding of the
11 truthfulness of that fact as you sit here today?
12    A    I don't have a problem with that fact. I
13 mean, when the USAA insurance policy news came out I
14 believe at the preliminary hearing, Keith acted like,
15 what, my mom had insurance on the house, how unusual.
16 He was like, I didn't know about that; I couldn't be
17 a beneficiary.
18      I said, well, you know, you're a biological
19 son of the policyholder; why wouldn't you be a
20 beneficiary. It was just like the whole family, even
21 the people up in Buffalo, New York were -- like they
22 never heard of house insurance before. And I talked
23 to the guy at USAA, the investigator, several of them
24 I think over the years, and they said the payout of
25 the policy was $180,000. So I stand by that.

---

Page 65

1    Q    And your understanding was that Keith
2  Sylvester was the only beneficiary of the homeowners
3  insurance policy?
4    A    No.  I think that -- you know, I don't know
5  how insurance companies work, but there are several
6  children.  Like the family -- it's a huge family on
7  both Harry's side and Deborah's side, coverage, and
8  I'm sure it would be spread out.
9         Now, I don't know.  I mean, that's just --
10 you know, the insurance payout, of course, has been
11 put on hold because of this investigation, and it's
12 still on hold.  They'll contact me every once in a
13 while saying, any updates.  And I'll say, well, no, I
14 don't have updates; it's still under investigation.
15        So I'm sure that -- the strange thing was
16 when I said, yeah, there's an insurance policy on
17 this house, and everybody was like, what.  You know,
18 it was like disbelief.  Not only Keith but the family
19 up in Buffalo.
20        So I don't know if Deborah had taken out an
21 insurance policy in secret.  They weren't aware that
22 you have to have an insurance policy on a house that
23 you own.  I don't know what the situation was.  But
24 as far as how they paid out, I don't know.  But I
25 know it was a large payout that was possible with

Page 66

1  that house being burned up.
2    Q    So just to be clear, where it says arson
3  investigator also learned that the beneficiary of the
4  house insurance policy was Keith Sylvester, that that
5  should maybe say he was a beneficiary of that house
6  insurance policy, to be more accurate?
7    A    Well, the way they told me at the time was
8  he was, so that's what I went with.
9    Q    I guess that's my -- sorry.  I didn't mean
10 to talk over you.
11        MS. LEWIS:  If the witness can be
12    allowed to finish answering the question.
13    Q.  (By Mr. Greenamyre) Yeah, please.  Or I can
14 try and ask a clearer question.
15    A    With the knowledge that I had at the time
16 when I was writing that affidavit that is what I
17 knew.
18    Q    Okay.  And to be clear, when you say that
19 is what I knew, you believed that Keith was the only
20 beneficiary of the homeowner insurance policy, right?
21    A    That was my impression.
22    Q    Got it.
23    A    In law enforcement we have this thing
24 where -- I don't even know the legal term of it, but
25 an officer can rely on the statements of another

Page 67

1  officer as the truth.  And that's kind of -- that's
2  where I'm going.  The investigators, the arson
3  investigators that were involved in this
4  investigation, all my friends and, you know, fellow
5  detectives in the homicide unit, the officers on the
6  scene, they all collect evidence; and when you get to
7  a homicide scene you've got all this information
8  coming at you from all directions.  And you take what
9  they say as the truth as you know it at that time.
10 So yeah, that was my understanding.
11    Q    Sure.
12    A    I trust my people that I work with.
13 They've got no reason to lie.  It's like I don't know
14 Keith.  I didn't know Keith on July 3rd.  I just met
15 the man.  So I just took the investigation, you know,
16 where the evidence took it.
17    Q    And it sounds like any time you're doing an
18 investigation it's going to be to a certain extent
19 collaborative, but it sounds like in this instance
20 and maybe within the culture of APD homicide
21 especially collaborative, so I understand what you're
22 saying.
23    A    It's not just a culture either.  I mean,
24 there's a legal term for it, but you take the word of
25 another officer.  You can take the statement of

Page 68

1  another officer as the truth.
2    Q    It probably has a couple of words.  Maybe
3  joint knowledge doctrine, collective knowledge
4  doctrine, something like that.  I know where you're
5  going.  And as of December 28th, 2018 USAA had also
6  provided you with their file of the case including
7  the policy itself, right?
8    A    Yeah.  It takes up a whole volume of --
9  it's a large policy.
10    Q    Below this we have the fact about the
11 deadbolt and the door being locked.  I believe we've
12 already talked about that, right?
13    A    Yes.
14    Q    And next inculpatory fact, new inculpatory
15 fact, Sylvester was the only person with a spare key
16 to the house which he admits in the interview.
17 Inculpatory?
18    A    Yes.
19    Q    And according to Willie Jenkins, Jr.
20 Sylvester refused to return the key and said that
21 Sylvester had attempted to put his mother into a
22 hospital or a home, right?
23    A    I'd forgotten that, but I recall that now.
24    Q    Willie's statements you considered
25 inculpatory, correct?

Keith Sylvester vs.
James Barnett, et al.

Detective James Barnett
April 9, 2021

Page 69

1    A   Yes.

2    Q   I think we've talked about every single
3  sentence in this paragraph 6, but anything we missed
4  that we didn't talk about as far as inculpatory facts
5  in that paragraph?

6    A   No.

7    Q   Almost there.  The next paragraph is
8  essentially one fact that Keith, when he heard about
9  the fire, didn't call his mother and drove relatively
10  normally to the scene as depicted in his dash cam,
11  right?

12    A   Yeah.  And I told you before that I try to
13  put my place in the person's -- in a person's mind
14  what they're going through if I can.  And I don't
15  know if it's possible in this case, but I tried to
16  kind of imagine what I would do or -- if somebody had
17  called me and told me that my mom's house was on
18  fire, the first thing I would do is pick up the phone
19  and try to call my mom while I am on the way to the
20  car.  And I would miss every stop light and run every
21  stop sign speeding there.

22         And it struck me that that wasn't Keith's
23  reaction.  And it also struck another detective that
24  was in the interview with -- he was like, why didn't
25  you call your mom.  And I asked Keith that, and he

Page 70

1  said, I don't know.  He didn't have an answer.  I
2  would have.  If it was me, if my mom's house was on
3  fire, like, hey, Mom, are you okay.  So I thought
4  that was important to put in the affidavit.

5    Q   And maybe not the most important fact but a
6  fact that caught your attention and you thought was
7  material to the probable cause analysis; is that
8  fair?

9    A   Yes.

10    Q   So moving onto the ninth paragraph about
11  family members, I believe we've talked about if not
12  each of these particular people in their statements
13  but generally that each of these people said
14  something about Keith that caught your attention,
15  correct?

16    A   Yes.

17    Q   And you considered that inculpatory?

18    A   Yes.

19    Q   And correct me if I'm wrong, but from my
20  review of the recordings of this, I believe that all
21  of the statements that each of these folks gave that
22  cast aspersions on Keith had to do with his general
23  character or things that had happened in the past or
24  things that had happened afterwards, but that none of
25  it -- nobody provided, you know, new or unknown facts

Page 71

1  about the night of July 2nd and July 3rd that weren't
2  already known to law enforcement; is that fair?

3    A   Yes.

4    Q   And the final sentence and paragraph is
5  basically sort of a summation and process of
6  elimination; Keith Sylvester is the only person with
7  motive, opportunity and ability to have committed
8  this crime?

9    A   Yes.

10    Q   And any other facts, inculpatory facts that
11  you were aware of at the time going back to December
12  28th, 2018 not included in this warrant affidavit?

13    A   I don't think so.

14         MR. GREENAMYRE: Let's take a break.
15  Do you want to take a quick five- or ten-minute
16  break or do you want to -- tell me what you want
17  to do.

18         THE WITNESS: Whatever.

19         MR. GREENAMYRE: Ten minutes sounds
20  good if that's good with you and Kareemah.

21         MS. LEWIS: That's good.  Do you know
22  about how much longer you're anticipating?

23         MR. GREENAMYRE: It's going to be a
24  while longer.  I would say I'm not halfway but
25  not far from it.  It's little bit hard to say

Page 72

1  because I've jumped around.  And we've knocked
2  down a bunch of stuff, so it should good quicker
3  from here.

4         MS. LEWIS: Okay.  Is five minutes
5  okay, Detective Barnett?

6         THE WITNESS: Yes, ma'am.

7         MS. LEWIS: I have some matters after
8  this that I don't want this to run into, if
9  that's okay.

10         THE WITNESS: Okay.

11         MR. GREENAMYRE: A minute before
12  12:05.

13         MS. LEWIS: Okay.

14         THE VIDEOGRAPHER: Going off the
15  record at 11:58.

16         (A brief recess was taken.)

17         THE VIDEOGRAPHER: We are back on the
18  video record at 12:05.

19    Q   (By Mr. Greenamyre) All right.  So we've
20  been talking for a while about Plaintiff's 1 which is
21  the warrant affidavit.  Anything else material about
22  the warrant application that we haven't talked about
23  already?

24    A   I don't believe so.

25    Q   I want to show you a document.  I'll

Case 1:19-cv-04300-LMM   Document 108   Filed 12/10/21   Page 20 of 79
Keith Sylvester vs.
James Barnett, et al.
Detective James Barnett
April 9, 2021

Page 73

1 represent to you that it's 22 pages. Does that
2 appear to be your investigative report that you
3 referenced earlier?
4 **A** Yes.
5 **MR. GREENAMYRE:** And can we mark this
6 as Exhibit 3.
7 (Plaintiff's Exhibit Number 3 was
8 marked.)
9 **MR. GREENAMYRE:** And did we mark the
10 exhibit, the NIJ article as Exhibit 2?
11 **MS. LEWIS:** I don't have it, Zack.
12 **MR. GREENAMYRE:** If we didn't, can we
13 mark that as 2 now.
14 (Plaintiff's Exhibit Number 2 was
15 marked.)
16 **Q** (By Mr. Greenamyre) So it says here at the
17 top date of report August 29th, 2018. I assume some
18 of this was written before that, correct?
19 **A** Yes. That is probably -- yeah. It's an
20 ongoing process. That date is not necessarily the
21 day it was written.
22 **Q** What's your understanding of what that date
23 means? Is that that date it was last changed or the
24 date the whole report was finished?
25 **A** It was probably a change, an update.

Page 74

1 **Q** Well, help me figure it out. And I don't
2 fault you for not knowing the answer to this, but it
3 looks like at the end we have September 3rd, 2020
4 which is going to postdate the date of the report on
5 August 29th.
6 **A** So around the time that he was arrested I
7 of course updated it and probably changed the date on
8 this narrative, which you have to do by clicking up
9 on it. It's a whole process. But all this other
10 stuff for whatever reason I just added without
11 updating that date. There's no rhyme or reason to
12 it.
13 **Q** When you create a report are you writing
14 like into a proprietary software or what are you
15 writing into when you write a narrative like this?
16 **A** It's just a Word document on the desktop.
17 I'm not sure of the technical word for it.
18 **Q** So it's a Word document, and the APD form
19 just has these boxes at the top and bottom, right?
20 **A** Yeah. I'm not even sure that this form was
21 designed for this kind of thing. It's just what APD
22 uses. And they've gone through -- the date on this
23 form as last revised has 2001 at the bottom there.
24 It say APD 002N.
25 So the last time they looked at this form

Page 75

1 was 2001. You know, they go through different kinds
2 of forms, and every investigator kind of does their
3 updates or their narrative on however they feel --
4 there's no written rule about how to write a
5 narrative.
6 **Q** Understood. As a matter of your personal
7 practice, what do you do to write a report or, you
8 know, how do you take notes? Walk me through your
9 process, you know, because you're -- especially in
10 this case you get calls from people every day and run
11 around town talking to detectives. How do you keep
12 track of all that?
13 **A** I take notes and make recordings, and I try
14 to -- unless something comes up, I try to update my
15 notes daily. That would be the ideal thing. But
16 it's not always possible because of, you know, I get
17 called out to homicides or different investigations.
18 So the day never goes like you think it's going to
19 go. So ideally I'll try to update my notes daily,
20 but sometimes I can get behind a little bit and have
21 to catch up.
22 **Q** Understood. When you say take notes,
23 physically do you have like a spiral-bound notebook
24 or a legal pad or is this something you're typing
25 into a notes app on your phone? What's your process?

Page 76

1 **A** All of the above.
2 **Q** And do you as a matter of course save your
3 notes in whatever form they're taken?
4 **A** Usually, yes.
5 **Q** Did you save your notes or have you saved
6 your notes for your investigation in this case, to
7 the best of your knowledge?
8 **A** To the best of my knowledge, yes.
9 **Q** So you would have I guess paper notes plus
10 electronic notes in a notes app related to this
11 investigation?
12 **A** Correct.
13 **Q** Is your APD-issued phone -- I guess I don't
14 care what it is now but what it was from July 1st to
15 December 31st of 2018. Was that an iPhone?
16 **A** No.
17 **Q** What kind of phone was it?
18 **A** It was an Android Galaxy phone. I'm not
19 sure which model. It was not this phone. It was a
20 previous model. It was like a 6 or a 7 maybe. I
21 don't know.
22 **Q** Issued by APD?
23 **A** Yes.
24 **Q** And I think you mentioned this earlier.
25 You said something about a One Drive. Is that a

Page 77

1  Microsoft storage, you know, cloud storage system?
2  **A   Yeah.  That's the memory that the City**
3  **provides for us to save our files.**
4  Q   And you as a matter of course update or,
5  you know, would upload anything relevant to the
6  investigation to that One Drive and store it there?
7  **A   Yes.**
8  Q   And then how do you share materials?  Like
9  I guess you share them in different ways or you can
10  share parts of a file.  In this case when you're --
11  you know, after you do the warrant what's your
12  contact with the DA's office?
13  **A   There's two ways.  Sometimes they'll come**
14  **with a hard of their own, plug it into my computer**
15  **and I'll share the file or I can provide a link.**
16  **Lately I've been providing a link to my One Drive**
17  **file so they can pull it up on their computer.**
18  Q   And that would just be the entirety of the
19  information that has been uploaded to the One Drive
20  for a given case?
21  **A   Correct.**
22  Q   So in this case what was your file or your
23  folder name?  Was it Hubbard or Sylvester or --
24  **A   It's Hubbard and Hubbard with a case**
25  **number, something like that.**

Page 78

1  Q   Got it.  And you would have shared the
2  entirety of that file.  Do you remember whether you
3  shared the entirety of that file as a link or whether
4  they came by with a hard drive?
5  **A   I believe in those days three years ago**
6  **they were coming by with their own hard drive.  But**
7  **lately, like I said, I've been sharing the link.**
8  Q   A ton of video in this case, lot of
9  gigabytes?
10  **A   Too much video really.  Yeah, it's almost**
11  **going to fill up my One Drive.  I don't know what**
12  **I'll do after that.**
13  Q   I have similar problems with my computer.
14  Remind me, when was the City of Atlanta data breach?
15  **A   That was right before this before I came to**
16  **homicide.  It was in, I believe it was March of April**
17  **like 2018, maybe February or March of 2018.  And then**
18  **when I got to homicide we were still suffering from**
19  **ramifications of that breach.**
20  **The -- a lot of information had been lost**
21  **from what I understand, and One Drive was kind of**
22  **a -- something they developed after the breach to be**
23  **able to save all of our case notes and, you know,**
24  **information, video and stuff like that.  I believe**
25  **the One Drive was adopted after the case -- after the**

Page 79

1  breach.
2  Q   And I guess to make sure I understand, you
3  know, in July you may have been dealing with the
4  ramifications of the breach going on old cases, but
5  it didn't affect, you know, the Hubbard Sylvester
6  case?
7  **A   No, it shouldn't have.**
8  Q   You're not aware of any files being
9  affected by the data breach in this particular case?
10  **A   No.**
11  Q   And if I'm taking a break to write some
12  stuff down, usually that's cutting a bunch of stuff
13  out.  So even though it's taking me a second that's
14  usually good.  Was Keith arrested on December 28th or
15  December 29th?
16  **A   What's the date of the arrest warrant that**
17  **we were looking at?**
18  Q   Yeah.  It was the 28th.
19  **A   Okay.  So I think he was arrested on the**
20  **29th, the next day.**
21  Q   And he came to -- you met up to do an
22  interview or something like that, and then you told
23  him that he was under arrest?
24  **A   That's right.**
25  Q   And more or less without incident?

Page 80

1  **A   Yes.**
2  Q   What happened with his -- I know you said
3  that his -- you drove his wife back to her house
4  afterwards.  What happened with Keith's car?
5  **A   I impounded it for safekeeping.**
6  Q   And just to be clear, there wasn't like a
7  warrant for the car or anything like that?
8  **A   No.**
9  Q   Do you know whether Melissa had a driver's
10  license?
11  **A   No.  The reason -- I don't know if she did.**
12  **There was no way -- my recollection is she did not**
13  **have a driver's license.  That's why I took it over.**
14  Q   You said -- you started to say the
15  reason --
16  **A   From what I can remember she did not have a**
17  **driver's license.  So at that time my concern was --**
18  **and to be totally honest, where he parked was an open**
19  **parking lot across the street from the headquarters**
20  **where there is a homeless encampment currently, tents**
21  **and things like that.  And unfortunately in Atlanta**
22  **we have a problem with people breaking in and**
23  **stealing cars.  It's an epidemic really.**
24  Q   I understand.
25  **A   So I was kind of in a -- so the options**

Page 81

1 were either put it in a safe place for Keith or it
2 was going to get stolen. I had no doubt. And I just
3 didn't have any good options, so I tried to
4 accommodate him with that. But I just didn't see a
5 good answer for that.
6    Q   Understood. Was there any significance to
7 the date of arrest?
8    A   No. And I know what you're referring to,
9 that Keith suggested that I arrested him on his
10 mother's birthday. And I never thought I had to say
11 this, but I have never written arrest warrants based
12 on some kind of astronomical -- you know, kind of
13 birthday.
14       And to be honest, today is my birthday,
15 April 9th. And I thought, wow, are they doing this
16 because it's my birthday. And so I can understand
17 why he would think that, but it is not true.
18       As a matter of fact, I did not realize it
19 was Deborah's birthday until -- it was later. I was
20 like, wow, maybe I should hold off a day and write
21 this warrant, but I felt like it was the time to do
22 it. It had no -- her birthday or Harry's birthday
23 had no bearing on the speed of this investigation. I
24 just -- I have to say it because it was brought up.
25    Q   I understand. I was hoping that your

Page 82

1 answer was just no and we can move on, but I will
2 tell you that that was a question that Keith asked me
3 to ask. So I understand. To your mind what was the
4 earliest time that Keith was considered as a possible
5 suspect?
6    A   When I arrived at the scene and was getting
7 out of my car, a detective came up to me and said,
8 you ought to hear this guy's story; it doesn't sound
9 right. I was literally getting out of my car when it
10 was brought to my attention that Keith may be a
11 suspect.
12    Q   So right from the start?
13    A   Yes. And later when I went back and looked
14 at the body camera footage from the officers at the
15 scene, and Keith was going on -- he was watching the
16 house burn and the fire department put it out. And
17 he's telling the officers on the scene all this about
18 this can't be happening, you know, blah, blah, blah.
19       And the officers were whispering, and I
20 believe it's on video. It's like, this guy -- this
21 isn't making any sense. So it was just -- the
22 arriving officers had questions about Keith's
23 sincerity while the house was still on fire.
24    Q   And I guess that would be some combination
25 of, you know, the fact that he'd been there a couple

Page 83

1 of hours before without like a clear reason why and
2 that he volunteered, you know, the camera right off
3 the bat, right?
4    A   Yeah. There may have been a couple of
5 other weird things. I can't recall them right now.
6 But maybe if I reviewed the body camera footage
7 something would come out, but I don't remember.
8 Those are the two main things.
9    Q   Yeah. And if as we go on today you come up
10 with anything else that, you know, you remember, oh,
11 this is why we thought it was Keith right at the
12 beginning, just let me know.
13       So we talked about collective knowledge
14 doctrine earlier, you know, relying on other
15 officers. A couple of questions tangentially related
16 to that. Who made the decision to take out the
17 warrant for Keith Sylvester on December 28th?
18 Obviously you. Anybody else make that decision with
19 you?
20    A   Well, it was -- I wouldn't say -- it's me
21 primarily. It was just the investigation was at a
22 point where at that time I didn't see -- besides
23 getting certain warrants for the tower docs, cell
24 towers in the area in time memorialize the phone
25 numbers that were being used in the area at that

Page 84

1 time, I didn't see anything else that would develop.
2 It was kind of at a stopping point. I didn't see
3 how -- at that time I didn't see how anything else
4 could come up.
5    Q   When you were taking out a warrant, do you
6 need to get approval from anyone in any way or is it
7 your -- if it's your decision, is it a final
8 decision?
9    A   Yes, it's pretty much -- it's my decision.
10    Q   What, if any, considerations did you have
11 immediately prior to taking out the warrant with
12 anybody about whether there was enough probable cause
13 to proceed, or did you not have any of those
14 conversations at all?
15    A   I definitely had conversations.
16    Q   So go ahead.
17    A   Yeah. With fire I had a call with
18 Lieutenant Dorgan, and I gave him -- I don't know if
19 I asked his opinion, but I told him that there would
20 be -- that I would be writing a warrant. And his
21 question was, I remember Lieutenant Dorgan saying do
22 we have enough. And at that point I explained to him
23 what I had and why I thought that I should go
24 forward. And I also had conversations with other
25 detectives, other veteran detectives in my office,

Page 85

1 and there was no one with the opinion that there
2 wasn't enough probable cause to proceed.
3    Q    Anybody besides Lieutenant Dorgan from the
4 fire and rescue department and other detectives
5 within the homicide unit?
6    A    I talked to -- we had a meeting I guess
7 months before that with Captain -- I forgot his
8 name -- and Lieutenant Dorgan, and they came over to
9 the homicide office and we discussed the case.
10       But unfortunately, you know -- I also told
11 Ms. Lewis about this -- that I don't have any
12 expertise in arson, and arson investigators just
13 couldn't give me a lot of information besides the
14 fact that the fire was started without the use of
15 accelerants and this fire was started in two places
16 in the house.
17       So I couldn't get any kind of time frame on
18 the fire, whether it was a slow-burning fire or
19 whether it was, you know, an immediate fire that
20 would have been noticeable to neighbors and called
21 911 right away.  We just didn't know how long this
22 fire had been burning, how long the Hubbards had been
23 dead.
24       So like I said, they couldn't offer me a
25 lot.  And I appreciate everything that they did for

Page 86

1 me.  I sent some stiff -- I believe they forwarded
2 some of the evidence to the GBI who also confirmed,
3 you know, they couldn't find any accelerants and this
4 and that.
5       But I was pretty secure that I had solved
6 the accelerant problem because of the mothballs and
7 the alcohol.  I was convinced that that's how the
8 fire was started, and that would explain there were
9 no accelerants.
10      But, you know, I had lengthy discussions
11 with other detectives in my office who all agreed
12 that Sylvester was the guy.  I don't think I've ever
13 talked -- except for you, I don't think I've ever
14 talked to anyone that didn't think that Keith had
15 something to do with this incident, honestly.  Even
16 his family and friends.
17    Q    And I guess Lieutenant Dorgan at least had
18 a question at one point, you know, do we have enough.
19    A    So he didn't say -- he didn't say to delay
20 it or stop it or anything like that.  He said, do we
21 have enough.  And at that time I wrote the warrant.
22 You know, if he'd have said, hey, let's have a
23 meeting, let's talk about this, slow down, I would
24 have done it.  I mean, there was no rush, there was
25 no deadline, there was no anything.  Like, I was

Page 87

1 getting no pressure.  I just feel like the
2 investigation was at a spot where, you know, I wasn't
3 going to get anything else.  That's how I felt at the
4 time.
5    Q    All right.  So the last question was any
6 conversations about probable cause, you know, right
7 before it happened.  You know, we talked about the
8 one with Lieutenant Dorgan, we talked about a series
9 of conversations I understand with other detectives.
10 You mentioned one with Dorgan and Captain -- was this
11 Captain Bonner of the fire and rescue department?
12    A    Yes.
13    Q    And that was back in July; is that correct?
14    A    It might have been.  It was early in the
15 investigation.  I'm not sure which month.
16    Q    Understood.
17       MR. GREENAMYRE:  This is -- can we
18 mark this as Exhibit 4.
19       (Plaintiff's Exhibit Number 4 was
20 marked.)
21    Q    And this is a sketch from USAA of the home.
22 Obviously it's not perfect, a computerized sketch.
23 Help me understand this:  Is bedroom 2 the office
24 where Deborah was found?
25    A    Where is 2?

Page 88

1    Q    Two is up here in the upper right as you're
2 looking at the --
3    A    No, no, no, no.  That's the front of the
4 house?
5    Q    So I think this is the front right here,
6 right?  Down at the bottom in the center, foyer
7 entry, and then we have the carport off to the left.
8    A    Yeah, okay.  So this house is kind of
9 designed backwards, if I remember.  She was found in
10 the back bedroom.  Well, it was more -- there was an
11 office.  It was used as an office.  Yeah, I think
12 bedroom -- no, no, no.  Bedroom 3 I believe is where
13 she was found.
14    Q    Okay.
15    A    And Harry Hubbard was found in the hallway
16 right in front.
17    Q    Right.  So bedroom 3, that also has the
18 sort of metal door, and then it had the glass sliding
19 door?
20    A    Yes.
21    Q    And when you said that arson told you that
22 there were -- I think you said two points of origin,
23 right?
24    A    Yeah.  I believe the point of origin was
25 bedroom 2 and bedroom 3.

Page 89

1  Q   So the back right part of the house?
2  A   Yes.
3  Q   All right.
4  A   You said that when I remembered something I
5  was going to say to interrupt you.
6  Q   Yeah, please.
7  A   I wanted to add that the arson
8  investigators after I took out the warrant on
9  Sylvester, they added arson warrants to them also.
10  And I didn't request that.  They did that, you know,
11  as backup and support for the murder warrants.  But I
12  never requested nor -- they told me that they were
13  going to do it, and I appreciated it.
14  Q   And that was -- did they write out like the
15  warrant affidavit?
16  A   I don't know how they do it.  I don't know.
17  Q   Would the lead on that have been Dorgan?
18  A   Probably.
19  Q   All right.  I just want to confirm what
20  information you had or I guess had available to you
21  as of December 28th, 2018 when you took out the
22  warrant.  You had scene photos and videos from a
23  bunch of different entities, right?
24  A   Correct.
25  Q   Atlanta Fire, Atlanta Police Department,

Page 90

1  body cameras, right?
2  A   Yes.
3  Q   You had the USAA materials including, you
4  know, scene photos?
5  A   You know, you mentioned that before.  I'm
6  not sure when I got that USAA stuff, but possibly.
7  Q   So you certainly -- if you didn't have the
8  USAA stuff, you could have gotten the USAA stuff from
9  them prior to the warrant, right?
10  A   Yes.
11  Q   You had the medical examiner's photos from
12  the scene and the autopsy?
13  A   Yes.
14  Q   You had I guess video and receipts from
15  Walmart?
16  A   Correct.
17  Q   AT&T phone records from Harry, Deborah and
18  Keith?
19  A   Yes.  I had -- I took out several search
20  warrants for phone records.
21  Q   Any other search records for phone records
22  prior to taking out the warrant for Keith?
23  A   Well, I don't recall.  There was also video
24  from the convenience stores where Keith frequented
25  that night.

Page 91

1  Q   And the video from his dash camera itself,
2  right?
3  A   Yes.
4  Q   And Keith's cell phone records from AT&T
5  included GPS locations, correct?
6  A   Yes.  I assume so.  I don't recall
7  directly; but yeah, probably.
8  Q   I guess did you or any detective that you
9  were working with, to your knowledge, input
10  information from Keith's AT&T records to determine
11  his location at any given time?
12  A   Well, that was -- that probably was done as
13  routine.  We have a cell phone guy in our unit who's
14  very good at that.  But his location never really
15  concerned me.  I knew where he was.  He had video
16  evidence of where he was, when he was.  Yeah.  But
17  I'm sure he was exactly where he said he was when he
18  said he was.  I've got no doubt about that.
19  Q   Did you also pull LPR information from the
20  area?
21  A   Yes.  And I can't remember if there was a
22  LPR at the -- where that road -- where Harvel
23  connects into wherever road that is.  But I seem to
24  recall the LPR information, yes.
25  Q   It was somewhere on maybe the main road

Page 92

1  close to Harvel?
2  A   Yes.
3  Q   And I assume you would have pulled the
4  records from that night?
5  A   Yes.
6  Q   And nothing you found there discredited
7  anything that Keith said about his location?
8  A   No.
9  Q   Just one second.  I won't spend a lot of
10  time on this, but do you recognize this email from
11  detective -- how do you pronounce the last name?
12  A   Leonpacher.
13  Q   Do you remember this email that he sent you
14  on July 9th?
15  A   I do.
16  Q   And in this you were able to also
17  corroborate what Keith said about where he was at,
18  right?
19  A   Yes.
20  Q   Even though there was some discrepancies in
21  the time stamps on his dash cam that said it was like
22  some date in June and there's some weird time stamps
23  for, you know, the convenience stores, were y'all
24  were able to piece all that together, right?
25  A   With the times that he showed up at the

Page 93

1  convenience stores we were able to establish a
2  correct timeline.  The clock on that recorder on his
3  camera had never been set, I guess.  And there's a
4  couple -- actually I was going through this with
5  Leonpacher.  There is a couple of misprints there on
6  times that were mistakes, but he clarified that.  So
7  that is -- there's one or two discrepancies on that
8  email, but we have discussed it, myself and the
9  Detective Leonpacher.
10     Q    And no need to go into great detail about
11  the discrepancies there just because, like you said,
12  you had no reason to doubt Keith's location was where
13  he said he was?
14     A    No.  I believe he was where he said he was,
15  yes.
16     Q    And Keith told you he was -- you know, he
17  pulled into the driveway just for a second somewhere
18  around 3:00 a.m., right?
19     A    Yes.
20     Q    And he didn't even get out of the car, did
21  he?
22     A    No.
23     Q    He says he saw Brandon or BJ Graham.  Do
24  you remember that?
25     A    Who?  No, I don't.  Say that again.

Page 94

1     Q    I think BJ Graham is someone who lives on
2  that street, and if I remember correctly, Keith said
3  that he remembered seeing BJ Graham when he pulled
4  in, seeing his car or something like that.
5     A    Now that you mention that, I believe that
6  that was the guy that lived at the corner.  And he
7  did mention that, and I took it to mean, well, here's
8  proof that, you know, you can talk to him and he saw
9  me.  And I did go talk to BJ.  That was one of the
10  recorded interviews.  And BJ doesn't remember seeing
11  Keith, I don't believe.
12     Q    But BJ did say that he was driving -- he
13  left around 3:00 a.m. to go get money from the ATM,
14  right?
15     A    Yes.
16     Q    Right.  I don't know whether you have more
17  than one theory or multiple theories -- or I'm sorry.
18  That doesn't make sense.  I don't know whether you
19  have multiple theories or just one theory, you know;
20  but when you presented the warrant as of December
21  28th, what was your thought about when Keith would
22  have done the strangulation and set the house on
23  fire?
24     A    Earlier in the evening of the 2nd.  My
25  theory was that he strangled his parents and -- mom

Page 95

1  and stepdad, set the fire and then left driving
2  around the city waiting for that 911 call.  And then
3  finally around 3:00 a.m. he returns to the house to
4  check on the progress of the fire because he can't
5  understand why the house isn't burning down.  That
6  was my theory.
7     Q    Okay.  So the --
8     A    And that was one of the problems that I
9  really wanted a time frame of the fire from the arson
10  guys, they just couldn't provide it.
11     Q    So this would have been shortly before he
12  left his parents' house, whether it was between 5:00
13  and 7:00 or 8:00 and 9:00, right?
14     A    Correct.
15     Q    In the evening of July 2nd, right?
16     A    Yeah.
17     Q    And so Keith would have created some kind
18  of slow burn or slow fuse for the fire, and he sort
19  of got impatient at 3:00 a.m. thinking, why hasn't
20  this lit on fire; is that sort of the thinking?
21     A    Yes.
22     Q    When the DA dismissed the charges against
23  Keith in -- about a year ago, they said that the DA's
24  Office reviewed APD's case file and evidence
25  obtained during the course of the investigation, the

Page 96

1  DA's Office also connected an independent
2  investigation and found that the defendant was likely
3  not present at the scene of the crime during the
4  commission of the crime.  Do you remember that?
5     A    I didn't hear all that, but I remember
6  when -- I don't know if they dismissed or what.  I
7  guess dismissed, yeah.
8     Q    They have -- you know, I know that later
9  they got the geofence information that led to Muckle,
10  but at that time where they made that decision not to
11  present it to a grand jury, did they have any new
12  information that you did not have at the time that
13  you took out the warrant?
14         MS. LEWIS:  I'm going to object at
15  this juncture and instruct the witness not to
16  answer.  The same objection as before, Zack.
17  That investigation is ongoing.  I think
18  testimony would threaten the credibility and
19  integrity of the investigation, and I ask the
20  witness not to answer.
21     Q    (By Mr. Greenamyre) And just to be clear,
22  the question is at time this was dismissed the
23  question is did the DA's Office have any information
24  that you did not have.
25     A    I don't know.  I don't know -- the thing is

Keith Sylvester vs.
James Barnett, et al.

Detective James Barnett
April 9, 2021

Page 97

1  she doesn't want to answer.  I don't know the time
2  frame for that.  I don't know.
3      Q   This is a ten-page document from the Fulton
4  DA's Office, I'll represent to you, authored by ADA
5  Mike Sprinkel.  Do you recognize this document?
6          MS. LEWIS: I don't see a document.
7          MR. GREENAMYRE: I apologize.  I need
8      to re-share my screen.
9      Q   (By Mr. Greenamyre)  Now do you see this
10  document?
11     A   Yeah, I recognize that.
12          MR. GREENAMYRE: And can we mark this
13      as Plaintiff's 5, Sprinkel's supplemental
14      report.
15          (Plaintiff's Exhibit Number 5 was
16      marked.)
17     Q   So it looks like on -- the geofence warrant
18  came to Mr. Sprinkel's attention in June of 2019.
19  Does that refresh your recollection as to timing?
20     A   Yeah, it does.
21          MS. LEWIS: And same objection.  This
22      information occurred post the warrant.  It has
23      to do with a pending investigation.  I'm going
24      to instruct the witness not to answer.
25     Q.  (By Mr. Greenamyre)  Earlier, you know, on

Page 98

1  the bottom of the first page and top of the second
2  page there's a brief narrative about Antonio Penn.
3  Did you ever interact with him in the course of your
4  investigation into Mr. Sylvester?
5      A   I don't recall.
6      Q   And let me ask a better question.  Prior to
7  the warrant.
8      A   I don't recall, no.  I don't think so.
9      Q   And Mr. Penn was -- do you understand him
10  to be an air conditioning repair guy?
11     A   I remember that now, yes.
12     Q   And he was someone that Keith had called in
13  the, you know, hours or day before the fire, right?
14     A   Correct.
15     Q   And Mr. Penn reported that I guess his wife
16  was sitting in the truck, reported that there was
17  some man on a ladder tampering with some wires
18  running into a house on July 2nd, 2018.  Do you
19  remember that?
20     A   Yes.
21     Q   But to be clear, this was information that
22  you did not -- you weren't aware of until after
23  December 28th, 2018, right?
24     A   Correct.
25     Q   You were aware that a K-9 had sniffed Mr.

Page 99

1  Sylvester on the morning of July 3rd?
2      A   By Dekalb County, correct.
3      Q   Was it I guess Dekalb arson or Dekalb PD or
4  unclear?
5      A   I think it was arson.
6      Q   And also the K-9 went through Mr.
7  Sylvester's ice cream truck, correct?
8      A   Yes.
9      Q   Did it also sniff his Chrysler?
10     A   I don't recall.  I'm sure he did, but I
11  don't recall.
12     Q   And sniffed the interior of the house as
13  well, right?
14     A   Yes.
15     Q   And all of those sniffs were negative,
16  correct?
17     A   Correct.
18     Q   What time did you -- one more question
19  about sniffs.  Was it your understanding that Keith
20  was wearing the same clothing as he was throughout
21  the course of the night of the July 2nd, July 3rd
22  when he was sniffed by the K-9 with the exception of
23  having changed his T-shirt?
24     A   What I recall, he changed everything.  I
25  thought he said he changed his shorts.  When he went

Page 100

1  back to the apartment at Skipper he had changed
2  clothes.
3      Q   Whether he had changed his shorts or not
4  would have been something that could have been
5  verified from the surveillance video, comparing the
6  surveillance at the gas stations and his dash cam
7  with the APD body cameras on the scene?
8      A   Yes.
9      Q   What time did you get to the scene, best
10  recollection and ball park?
11     A   I want to say around 8:00 a.m.
12     Q   And I imagine you were there for a while.
13  How long would you say?
14     A   Maybe a couple of hours.
15     Q   You were able to examine Deborah's location
16  pretty close to, you know, her final resting place?
17     A   Yes.
18     Q   She'd been maybe rotated a little bit, and
19  they said, well, stop and put her back, right?
20     A   Right.
21     Q   And you were able to walk through the --
22  all the rooms of the house to your satisfaction?
23     A   Yes.
24     Q   How many boxes of mothballs did Keith and
25  Harry Hubbard buy at Walmart?

Page 101

1    A    I don't recall.
2    Q    But that would be in the Walmart receipt
3  that you obtained?
4    A    Yes.
5    Q    Do you recognize this to be the scene at --
6  in Deborah Hubbard's kitchen after the fire?
7    A    It looks like it.
8    Q    And you see those two boxes of the
9  mothballs on the kitchen counter?
10   A    Yes.
11   Q    Did you notice those at the time?
12   A    No.
13   Q    And do those appear at least based on this
14 photo to be unopened?
15   A    I don't know.  I can't really tell.
16   Q    No indication that they are open from this
17 picture?
18          MS. LEWIS: Objection.  Asked and
19    answered.
20   Q    (By Mr. Greenamyre)  You can answer.
21          MS. LEWIS: You may answer.  My
22    apologies.
23   A    I can't tell.
24   Q    (By Mr. Greenamyre)  At some point you
25 asked the Atlanta Fire and Rescue folks, Dorgan

Page 102

1  and/or Bonner whether they had any evidence or any
2  theory about a potential slow burn?  Do you remember
3  asking them that?
4    A    I'm sure I did.
5    Q    And they said essentially, you know, we
6  don't have any information about that or to support
7  that?
8    A    Yeah.  They couldn't tell me when the fire
9  was started.
10   Q    You would agree that regardless of whether
11 they could tell you when the fire started or didn't
12 start, they didn't have any specific evidence to
13 support a slow-burn fire theory?
14   A    I'm not the arson expert, but all I could
15 tell you is they didn't provide a timeline for the
16 time of the fire.  They couldn't say when it was lit.
17   Q    I guess my --
18   A    It could have been lit the night prior or
19 it could have been lit five minutes.  I don't know.
20   Q    And I'm not asking you specifically whether
21 they could rule anything out.  I'm asking you
22 specifically whether they provided you with any
23 specific evidence tending to show that it was a
24 slow-burn fire.
25   A    No.

Page 103

1    Q    Do you recall the position of the office
2  chair in the office where Deborah was found?
3    A    No.
4    Q    And it might take me a second, but I can
5  pull up pictures if it would be helpful, or try to at
6  least.  But do you remember on the scene on July 3rd
7  detectives talking about the possibility that she had
8  fallen out of the chair based on her location and
9  based on the location and position of the office
10 chair?
11   A    I think that was an assumption that the
12 fire guys had made when they first entered the house
13 and then saw her and found her husband in the hallway
14 and started to remove him.  And then when they found
15 the wires were around her neck, I guess that
16 assumption was kind of -- said, well, maybe not.
17   Q    So there was a series of wires, you know,
18 around or on top of her neck, around her generally.
19 Is it your understanding that those wires were used
20 as a ligature?
21   A    Originally we believed the ligatures were
22 caused by a shoe lace because at the autopsy -- I got
23 pictures of it -- there was -- the nylon part of it
24 was still around her neck.  It looked like shoe
25 laces.  Dr. Heninger thought it was a shoe lace, but

Page 104

1  later we discovered that it was probably insulation
2  from the wires from the cables that were around her
3  neck and not shoe laces.
4    Q    And I think maybe it was in ADA Sprinkel's
5  reports that he mentioned that he thought maybe
6  the -- one of the cables was a nylon-coated lamp
7  cord.  Does that sound right?
8    A    Yeah, yeah.  I don't remember whether it
9  was a lamp cord.  I was thinking it was one of the
10 coaxial cables, but a lamp cord is a possibility too.
11   Q    Would you agree that it's also likely that
12 additional cables or some cables fell from the
13 ceiling and went on top of her or around her at her
14 final resting place?
15   A    It appeared that there was -- yeah, there
16 was melting.  I don't know if they came from the
17 ceiling.  I never really thought about that.  I
18 thought it was a computer junction area around where
19 she was in the office area.
20          MS. LEWIS: And my objection is as to
21    speculation, but you can continue, Detective
22    Barnett.
23   A    (Continuing)  Yeah.  The problem with the
24 fire -- and I haven't been to many, but the evidence
25 is burned up unfortunately which makes the

Page 105

1  investigation that much more difficult.  And so
2  you've got to kind of weed your way through what's
3  left, and you've got to do the best you can.
4      Q    (By Mr. Greenamyre)  Would you agree with
5  me that with -- whether it was cables that fell from
6  the ceiling or cables that were just associated with
7  that computer desk setup that was right there, there
8  were a whole bunch of cables all around her when she
9  was deceased?
10     A    Yes.
11     Q    To what extent -- how did you rule out the
12 possibility, if you did, that Deborah fell out of the
13 chair and got tangled in the wires, maybe the chair;
14 you know, in her falling out of it, it rolls over to
15 knock down one of the citronella candles in the
16 window?
17     A    Because of the fact that Harry Hubbard had
18 the same kind of ligature marks around his neck, and
19 he wasn't in that room with all those wires.
20     Q    So that -- correct me if I'm wrong, but you
21 want don't want to try and sum up your thinking,
22 right?  So that theory might have made sense except
23 for the existence of Harry suffering, you know, a
24 murder by ligature right next door, right?
25     A    Well, that and the fact that -- I mean, the

Page 106

1  ligature marks were all around her neck.  No,
2  incorrect.  The wires and what was the insulation
3  from the wires was all the way wrapped around her
4  neck.  If the wires had fallen from the ceiling like
5  you said, it would drop off a desk or had melted, you
6  would think that the wires would melt, you know,
7  maybe over three parts of her neck, not the back and
8  sides, but they wouldn't melt coming around the front
9  if they had dropped down and melted over somebody.
10 You couldn't have these marks in the front of her
11 neck or all the way around her neck.  And then add
12 that to the fact that Harry had the same condition,
13 and he wasn't in that room with all those wires.
14     Q    I know that arson is not your area of
15 specialty and, you know, you rely necessarily on the
16 arson folks.  Do you know or did you talk to them
17 about the possibility of this being an electrical
18 fire and what kind of evidence besides the bodies
19 themselves showed that it either was or wasn't an
20 electrical fire?
21     A    That meeting that we had with them.
22         MS. LEWIS:  Detective Barnett, I just
23 want to put one objection on the record, and you
24 may continue to answer.  Objection, compound
25 question.  But you may continue to answer.

Page 107

1      A    (Continuing)  We talked about a lot of
2  different things, the arson investigators, when we
3  met.  I don't recall specifically them mentioning an
4  electrical fire, but I'm sure it was mentioned.  I'm
5  trying to find all different kind of ways to how this
6  can happen, how a fire could start in two different
7  places in the same house at the same time, at
8  relatively the same time and how two people could be
9  dead in there with -- with legislature marks around
10 the necks.
11         It just didn't look like an electrical fire
12 or an accident, you know.  It's two fires in two
13 separate rooms.  It was a homicide.
14     Q    Got it.  And I assume same basic answer for
15 a fire from, you know, cigarettes?  You know, these
16 people were both smokers.  You knew that both these
17 people were smokers?
18     A    No.  I knew they were both in poor health.
19 I never really knew about the smoking.
20     Q    Did any of the family members tell you that
21 they were, you know, nighttime smokers?
22     A    Now that you say that, yeah, I do recall
23 something like that.
24     Q    And so maybe a fire from falling asleep
25 with a lit cigarette would have made sense if not for

Page 108

1  the strangulation evidence; is that fair?
2      A    Well, yeah; but you still have the problem
3  of two fires started in two locations.  So were they
4  both smoking and they both were smoking in bed and
5  both started a fire?  Unlikely.
6      Q    What is your understanding of how long
7  someone needs to asphyxiate someone by ligature
8  strangulation before they are likely to become
9  deceased?
10     A    It's a long time.  Matter of fact, I've
11 looked into it.  It's very hard to strangle somebody
12 to death.  You've got to apply pressure after they
13 lose consciousness to make sure that they just
14 haven't passed out.
15         And in this case Dr. Heninger and I talked
16 about it at length, that whoever strangled them
17 strangled them to unconsciousness but not to death.
18 And they died in combination of thermal injuries and
19 the strangulation, because like you said or I said,
20 they were both elderly, and especially Harry Hubbard
21 who was confined -- not confined but in a wheelchair
22 a lot of times.
23         They were both elderly and not in the best
24 of health, and it wouldn't have taken much to
25 strangle them to unconsciousness but not to kill them

Page 109

1  if you didn't keep the pressure on them.  It's not
2  like on TV where you can go out and strangle somebody
3  and they pass out and they're dead.  It doesn't work
4  like that.  You've got to keep blood from the brain
5  stopped for a time before they'll actually become
6  deceased.  So unfortunately in this case they were
7  not dead after they were strangled, and they died in
8  the fire.
9      Q   Understood.  And thank you for anticipating
10 some of my questions including my next question which
11 would be the TV question, right?  So understood.  So
12 just to be clear to narrow things down a little bit
13 more, to strangle someone to death you're going to
14 need to apply pressure for a couple of minutes; is
15 that fair?
16     A   That's fair.
17     Q   What is your understanding of how long you
18 strangle someone before they lose consciousness?
19     A   I'm not sure.  I'm sure everybody is
20 different.  Now, you've got people in good shape.
21 Like I said, these are elderly folks.  It probably
22 wouldn't have been very long.  I can't give a time
23 frame because I just don't -- but they were both in
24 poor shape.
25     Q   When you said you looked into this a little

Page 110

1  bit in I think one of your last answers about how
2  long it takes to strangle someone, was that something
3  that you did in connection with this case?
4      A   Yes.  And what I mean by that is I didn't
5  take a class on it or anything.  I just discussed it
6  with other knowledgeable detectives and, you know,
7  people who have seen this kind of thing before.  And
8  it's just not easy to strangle somebody to death.
9      Q   Understood.  What's your understanding
10 about how long it takes for someone to regain
11 consciousness after they've been strangled to the
12 point that they lose consciousness but not to the
13 point where they die?  Do you know whether that
14 happens in -- what's your understanding?
15     A   I don't know; but again, they were in poor
16 health.  I doubt -- I don't know.  I don't know.
17 They were in poor health, and I could see them not
18 ever regaining consciousness, although -- because
19 when Dr. Heninger did the autopsy, he cut the --
20 Harry Hubbard's I remember specifically.  He cut the
21 esophagus open and showed me.  He said, look,
22 there's, you know, ash and soot in his trachea which
23 means he was breathing during the fire.
24         So whether he was conscious, I don't know.
25 He may have been unconscious but alive.  So I don't

Page 111

1  know if they ever regained consciousness or not.
2  Hopefully not.
3      Q   I guess to be clear, you've already said
4  this, but just to be clear, both these people were
5  alive until they were consumed by the fire, right?
6      A   As far as I know, yes.  That's the way I
7  understood it.  And when he put the cause of death, I
8  believe it was strangulation, slash, thermal
9  injuries, I believe is what he -- I don't know if you
10 could actually determine it because, you know, in a
11 fire things are destroyed, and you just can't -- you
12 don't know.
13     Q   I guess your working theory was that the
14 strangulation facilitated their death by fire?
15     A   Yes.
16     Q   If they hadn't been strangled, they would
17 have likely been able to get out of the house?
18     A   Maybe, maybe not.  Like I said, he was in a
19 wheelchair.  Maybe they were in such bad health that
20 the strangulation would have eventually killed them.
21 Maybe.  I don't know.  Maybe it was just a process,
22 they were going through the death process.  I just
23 don't -- I don't know.  It's a horrible way to go.
24     Q   No doubt about it.  These pictures are
25 tough to look at.  I know that this autopsy -- that

Page 112

1  was your first autopsy, right?
2      A   My first autopsy, yeah.
3      Q   What's your understanding of where and what
4  a hyoid bone is?
5      A   I believe that is in bone in your neck.
6      Q   And what is your understanding of its
7  significance for investigations into strangulation?
8      A   Now, I'm not a doctor, but I believe that's
9  the bone that breaks sometimes when somebody is
10 strangled.  That's my understanding.
11     Q   Any idea what even -- rough sort of
12 proportions of how often the hyoid bone is going to
13 be fractured when someone has been strangled?
14     A   I don't know.  I leave that kind of thing
15 up to the doctor.  I don't know.
16     Q   And this may be another thing where you are
17 not a doctor, but would you expect it to be more
18 likely or less likely for a hyoid bone fracture to
19 exist where one has been strangled where that person
20 is relatively old as opposed to somebody who's
21 relatively young?
22     A   My answer to that question would be I would
23 expect that it would probably be more likely for the
24 bone to break in a younger person because you have to
25 put more force on the neck to make them go

Case 1:19-cv-04300-LMM   Document 108   Filed 12/10/21   Page 30 of 79
Keith Sylvester vs.                                                    Detective James Barnett
James Barnett, et al.                                                            April 9, 2021

Page 113

1 unconscious. An elderly person, I could see you not
2 putting as much as --
3        (Interruption in Zoom feed.)
4        A   (Continuing)  Sorry about that. An elderly
5 person you don't have to put as much pressure on the
6 neck, I would assume, to make them go unconscious and
7 possibly not breaking a bone. I don't remember
8 discussing that with Dr. Heninger, but a younger
9 heathier person you would not -- to me, I think you
10 would have to put more strength -- you would have to
11 strangle them harder to get them to go unconscious
12 than a couple of elderly folks that were not in good
13 health. I think it would be easier to strangle to
14 them to unconsciousness and them appear dead and not
15 have broken the bone. But again, I'm not a doctor.
16        Q   That makes sense to me. Would you be
17 surprised if it was relatively more likely for there
18 to be fractures in the hyoid bone if you have an
19 elderly or relatively elderly strangulation victim
20 just based on bone deterioration and weaker bones as
21 you get older?
22        A   I could see that. But I haven't looked at
23 that, but I could see that. I believe that.
24        Q   Is it fair to say that wasn't a
25 conversation that you and Dr. Heninger had?

Page 114

1        A   Don't recall that one. We talked a lot
2 about a lot of stuff. We talked about amount of -- I
3 think he did a test where you could check the soot
4 levels or monoxide levels in the lungs. He did those
5 kind of tests, but I don't recall anything about
6 that.
7        Q   And you were aware that neither of the
8 Hubbards' hyoid bones were fractured?
9        A   I don't recall that. I don't.
10        Q   Similar questions for large laryngeal
11 cartilages. What's your understanding of the
12 significance of a laryngeal cartilage in a
13 strangulation investigation?
14        A   I don't know what that is.
15        Q   I'll represent to you that there are
16 cartilages in your larynx or, you know, neck, throat
17 area. So fair to say that the presence or absence of
18 fractures in the laryngeal cartilages did not have an
19 effect on your probable cause determination?
20        A   It did not.
21        Q   Were you aware of whether there was
22 internal hemorrhaging of the neck in either Deborah
23 or Harry Hubbard?
24        A   These medical terms and assessments I'm not
25 just not aware. When I get the autopsy report

Page 115

1 honestly, I looked at cause of death and manner of
2 death. And it said homicide, and then it said
3 strangulation and thermal injuries.
4        So I don't know all the intricacies of
5 these -- the medical -- you know, medical terms.
6 Apart from everybody's common's knowledge. I've
7 heard about the bone that you mentioned. But all I
8 know is you have two dead people with strangulation
9 marks around their neck, and the doctor says, hey,
10 they were strangled and they suffered thermal
11 injuries too, because unfortunately they weren't
12 deceased when they were consumed by the fire.
13        Q   Is it fair to say the presence or absence
14 of internal or transverse hemorrhaging in the neck
15 didn't make an impact on your probable cause
16 determination?
17        A   No.
18        Q   Let's talk about Harry for a second. I
19 take it the evidence that you're aware of Harry dying
20 by strangulation is the band of uncharred skin around
21 his neck?
22        A   It might be wrong, but I thought the band
23 of -- correct, correct. I'm sorry. You said --
24 there was no ligature material around Harry's neck.
25 It was just the marks.

Page 116

1        Q   Did you see any -- there wasn't even like a
2 fragment of a ligature around Harry, right?
3        A   I don't think so. It was just the marks,
4 circular.
5        Q   And those marks, you know, it was a
6 circular band of skin that was lighter than
7 everything else. Did you notice any imprint, like
8 the fabric weave from the shoe lace or the lamp cord?
9        A   I didn't look that close, to be honest. I
10 was given kind of -- it was like he was doing -- Dr.
11 Heninger was doing the bodies together, and he was
12 showing me the process of how they go through the
13 basics of an autopsy and little facts about this and
14 that.
15        But I didn't get -- he didn't get that
16 detailed in the autopsy. I was observing because I
17 happened to be there, and I wanted to check -- my
18 supervisor at the time wanted to know, hey, are we
19 investigating a homicide or are we not investigating
20 a homicide.
21        And my basic reason for being there was not
22 to view the autopsy, which I ended up doing, but my
23 reason for being there was to confirm whether we had
24 a homicide or not and whether this investigation
25 would continue. And that's the reason I was there.

Case 1:19-cv-04300-LMM   Document 108   Filed 12/10/21   Page 31 of 79

Keith Sylvester vs.                                                    Detective James Barnett
James Barnett, et al.                                                        April 9, 2021

Page 117

1  I wasn't looking, you know, at samples and looking at
2  his neck. I just wasn't there for that. I was doing
3  just a general observation.
4      Q   You alluded to this earlier, but just a
5  couple or questions. Harry Hubbard was not a healthy
6  guy, correct?
7      A   Correct.
8      Q   He had had a couple of heart surgeries, had
9  stents, right?
10     A   I don't know. I knew that he had spent
11  most of his time in a wheelchair and that he was
12  elderly, but that was -- they might have told me he
13  was a smoker, maybe had high blood pressure, diabetes
14  and so forth, but I didn't know all the details.
15     Q   I believe there was a conversation between
16  you and Dr. Heninger where he said, you know, his
17  carboxyhemoglobin or like his -- the smoke in his
18  blood levels wasn't that high but it wouldn't have
19  taken much to kill someone in his condition, right?
20     A   I don't remember that. That's that test I
21  was alluding to earlier, a test on the spot.
22     Q   And you were also aware that his family
23  members had reported -- his Buffalo family members
24  had reported that Harry had been a crack cocaine
25  user?

Page 118

1      A   I believe, yeah, I do recall that.
2      Q   Including in the recent past prior to
3  coming to Atlanta?
4      A   Now that you say that, that is familiar to
5  me, yes.
6          THE WITNESS: Do you mind if we take a
7  break?
8          MR. GREENAMYRE: Oh, yeah. Sorry. I
9  appreciate you asking for that. We've been
10  going for a while. Do you want to take a short
11  lunch break, do you want to take a long lunch
12  break, do you want to just take ten minutes and
13  get back?
14         THE WITNESS: I don't need a lunch
15  break. Ms. Lewis?
16         MS. LEWIS: I think five minutes is
17  fine for me if that's okay with you Detective
18  Barnett and everybody else.
19         THE WITNESS: That will work.
20         MR. GREENAMYRE: That's fine.
21         THE VIDEOGRAPHER: Going off the video
22  record at 1:21.
23         (A brief recess was taken.)
24         THE VIDEOGRAPHER: We are back to be
25  video record at 1:26.

Page 119

1      Q   (By Mr. Greenamyre) Okay. A couple more
2  medical type questions, and we'll move on. You were
3  aware that Deborah Hubbard had had throat surgery and
4  scarring in the year or so prior to her death?
5      A   That seems familiar. The family might have
6  mentioned that. But this was three years ago. I'm
7  not sure.
8      Q   Did that factor into your probable cause
9  determination?
10     A   No.
11     Q   Let me know if you want to see some
12  documents to put the timeline together, but would you
13  agree that you obtained the warrant prior to the
14  medical examiner's report being finalized?
15     A   I would agree that I had a recorded meeting
16  with Dr. Heninger about what the outcome with the --
17  what the basic outcome would be of a report. And I
18  wanted to make sure we were on an understanding that
19  he was going to rule it a homicide from strangulation
20  and thermal injury before I wrote the warrant.
21     Q   But to be clear, you hadn't read the final
22  report at the time you took out the warrant because
23  the final report hadn't been authored yet, right?
24     A   I don't remember the time the final report
25  was authored, but that's possible.

Page 120

1      Q   Do you remember reading the report prior to
2  taking out the warrant or were you just relying on
3  your repeated conversations with Dr. Heninger?
4      A   I was relying on what Dr. Heninger told me,
5  that it was a homicide due to strangulation and
6  thermal injuries. And that's what the final report
7  concluded.
8      Q   Would you agree that Dorgan and the initial
9  investigators on the scene did not notice ligature on
10  either Harry or Deborah until they turned Deborah
11  over after removing some debris from her?
12     A   Yes.
13     Q   We talked about this a little bit, but you
14  were aware generally of marital strife between Harry
15  and Deborah, right?
16     A   Yes.
17     Q   You knew that Keith had bought Harry a dash
18  camera as a gift for Harry's car, right?
19     A   I don't remember that.
20     Q   Do you remember that there was -- the
21  trouble started, according to some people at least,
22  how the trouble started with Deborah and Harry was
23  that there was a recording of Harry and another woman
24  having sexually explicit conversations in Harry's
25  car?

Page 121

1   A   Now that you mention that, I do remember
2   that.
3   Q   And so you remember that.  Did you know
4   that Keith had bought that camera for Harry as a
5   gift?
6   A   No, I did not.
7   Q   When was -- when did Mary buy the plane
8   ticket down to Atlanta from Buffalo?
9   A   I don't recall the date.
10   Q   Yeah.  I don't know that I do either.
11   Relative to the date of the flight do you know when
12   the ticket was purchased?
13   A   I do remember the conversation about him
14   not bringing any clothes with him, and it possibly
15   was kind of a -- not a planned -- I don't know if it
16   was planned or not, but it might have been a few days
17   before he came down.  I'm not sure.  I don't
18   remember.
19   Q   Were you aware that the plane ticket was
20   either bought on the day of the flight or the day
21   before the flight at the earliest?
22   A   That might have been something I've known
23   and forgotten, but that sounds right.
24   Q   Harry came down in a hurry and didn't bring
25   any bags with him.  What do you make of that?

Page 122

1   A   Travels light.  You know, I don't know.
2   Maybe he was worried about -- I thought that maybe he
3   was worried about, you know, his relationship with
4   his wife and wanted to talk to her.  I didn't
5   really -- because Keith was trying to put it in the
6   light that Harry had something to do with this.  And
7   I just couldn't get past the fact that, how could
8   Harry have engineered his own death.  I mean, what is
9   the purpose of that.  I just didn't get it.  I didn't
10   get that whole thing that Harry, you know, came down
11   with no clothes.  Harry had mail in the mailbox at
12   Harvel.  You know, they were married.  He wanted to
13   see his wife.  I didn't think it was a big deal.
14   Q   We talked earlier about the fact that there
15   was a return ticket for August 1st or -- I believe
16   the warrant said both Harry and Deborah.  Is that
17   right?
18   A   I can't -- I know Harry had a ticket soon.
19   I would take your word for that that she might have
20   been going back.  Because that was, I thought, one of
21   Keith's greatest fears, like I said before, that they
22   would reconcile and she'd move back to Buffalo.
23   Q   And just so you don't have to take my word
24   for it I'll pull up the warrant in case it refreshes
25   your recollection, if I can.  Where is it.

Page 123

1   Apologize.  You think you're organized.  All right.
2   Showing the warrant narrative which I believe is
3   Exhibit 1 again, and states that Harry and Deborah
4   were traveling back to Buffalo on August 1st, 2018.
5   Does that refresh your memory?
6   A   It does.
7   Q   Do you know who purchased those plane
8   tickets?
9   A   No.  I thought it was Harry, but I don't
10   recall.
11   Q   Do you know whether those, either or both
12   of those plane tickets had been canceled prior to
13   July 3rd?
14   A   I don't recall.  I remember some
15   conversations about the ticket, but I don't recall
16   the specifics.
17   Q   Do you know -- do you remember Gwen Hawkins
18   who was Deborah's best friend or at a least she
19   represented herself as Deborah's best friend?
20   A   Yes.
21   Q   Do you remember what she had to say about
22   Harry and the prospects of any reconciliation?
23   A   I don't recall what she said.
24   Q   Did what she say back -- or let me ask a
25   more fair question, right?  So I'll represent to

Page 124

1   you -- if you'd like, we can listen to the
2   conversation, but I'll represent to you that she said
3   that she didn't think Deborah would ever get back
4   with Harry and that she was unlikely to go back to
5   Buffalo.  Do you recall her saying that?
6   A   No, I don't; but I'm sure she said it.  I
7   don't have any doubt that I probably recorded
8   something like that.
9   Q   And I take it that didn't influence your
10   probable cause determination?
11   A   No.  Understand, when I'm talking to folks
12   over the phone I don't know who they are or what kind
13   of motive they have or why they're talking to me or
14   if what they say is true.  I record everything of
15   course, and I take off -- you know, I assume that
16   they're telling me the truth, but I don't know.
17      And like you just said, she was
18   representing herself as Gwen, but do I know that it
19   was Gwen?  No.  Do I know that Gwen was really on
20   Deborah's side about all this?  I don't know.
21      But like I said, I talk to a lot of people,
22   and I take at face value what they're telling me is
23   true unless I can prove that it's not.  And I talk to
24   a lot of family and friends.  It was a whole family
25   tree of people that were interested in the case and

Page 125

1  still are.

2   Q   How many days was Harry in town prior to

3  his death?  Was it like two days, three days,

4  something like that?

5   A   Yeah.  It was short term.

6   Q   And when did Melissa go to Virginia to stay

7  with her parents?  Was it like the day before or, you

8  know, the day before that, the day before the fire or

9  close to that?

10   A   It was close.  Kind of like the same time

11  frame that Harry came into town that I think she was

12  leaving.  It was short term.

13   Q   Do you remember talking to Gloria Jones,

14  Melissa's mother?

15   A   Yes, I recall that.

16   Q   Do you recall Gloria Jones telling you that

17  she knew that Melissa was coming to visit a week

18  prior to her arrival?

19   A   I do not recall exactly the time frame, no.

20  But I don't doubt that.

21   Q   What did you say?

22   A   I don't doubt that.  She could have, yes.

23   Q   And if Gloria Jones was accurate in saying

24  that she knew Melissa was going to come a week prior

25  to her visit, that would have put her visit being

Page 126

1  planned prior to the purchase of Harry Hubbard's

2  ticket from Buffalo down to Atlanta, correct?

3   A   Not according to the daughters.  That's not

4  the way they interpreted it.  And I don't know --

5  when you say planned, I mean, first time ever

6  planned, because Keith never allowed her to go

7  anywhere without him.  It was unusual, and that fact

8  was brought to me by -- that fact was brought to my

9  attention by that family, those people you're telling

10  me about.

11        The sisters were concerned about Melissa,

12  her mother was concerned about Melissa.  Nobody

13  trusted Keith.  And it was unusual for her to make a

14  trip like that.  Yeah, it -- a week out, yeah.  I

15  mean, when I plan a trip, you know, it's months out.

16  If I'm going to leave the state for no reason, a week

17  out is short terms, you know, short-term notice, to

18  me.

19   Q   So your answer was with respect to what the

20  sisters said.  My question was with respect to what

21  Gloria Jones, her mother said.  And if Gloria was

22  correct that Melissa had planned this trip a week

23  before her arrival, you would agree with me that that

24  would have put it in -- prior to Harry purchasing the

25  plain ticket from Buffalo to Atlanta, correct?

Page 127

1       MS. LEWIS:  Objection.  Asked and

2  answered.  You may answer.

3   A   So from your question what I gather is

4  Keith was sending Melissa to Virginia before he knew

5  that Harry was coming down, and that would give him

6  an opportunity to kill both his stepdad and his mom.

7  I mean, I don't know what was going through his mind,

8  if he planned to kill both of them or just his mother

9  because of the house.  And he knew that he was

10  planning -- that she was planning a reconciliation

11  with Hubbard, with Harry.  You know, I don't know.  I

12  just don't know.  I can't answer that.

13   Q   (By Mr. Greenamyre)  We talked a little bit

14  about the insurance policy and the collective

15  knowledge doctrine.  Is it your understanding today

16  that Keith is not the sole beneficiary of the

17  homeowners insurance policy?

18   A   I don't know that one way or the other.  I

19  don't.  I know how the family is going to divide it

20  up.  And I'm sure the investigation is going to

21  greatly affect how it's divided up if it's divided

22  up.  I mean, that's the insurance's business.  Their

23  investigators determine that.

24   Q   Do you know whether either Deborah or Harry

25  had a will?

Page 128

1   A   I knew at the time.  I don't recall what it

2  was.  I do remember talking about a will, but I don't

3  recall the details of it.

4   Q   Are you aware that -- I'll represent to you

5  it's my understanding that neither of them had a last

6  will and testament.  Would that surprise you?

7   A   No, it doesn't surprise me.

8   Q   And I know you're not an attorney or a

9  probate attorney.  I'm not either.  But it would be

10  your understanding that any proceeds going to the

11  estate would be divided amongst Ms. Hubbard and

12  Mr. Hubbard's children?

13   A   Yeah.  I guess the probate could decide it

14  however they want.  But, I mean, if -- you can

15  designate beneficiaries or you don't have to

16  designate beneficiaries, and then it goes to Probate

17  Court.  There's a lot of things that will screw up

18  the distribution of those funds.

19   Q   Are you aware today that Keith Sylvester's

20  name is nowhere on Deborah Hubbard's USAA homeowners

21  insurance policy?

22   A   That would not surprise me.  It doesn't

23  seem to me that they were financial planners.  I

24  mean, they didn't have a will.  I guess they didn't

25  have a beneficiary.  No, that doesn't surprise me.

Page 129

1    Q   And probably -- would you agree that
2  Deborah Hubbard, probably the most financially
3  responsible for the whole extended family, at least
4  the people that you talked to?
5    **A   Definitely, yes.  She was probably the**
6  **matriarch or the anchor of that whole family.**
7    Q   I saw a note in your narrative report that
8  Harry Hubbard had an extensive criminal history, I
9  think like 46 cycles out of state.  Does that sound
10  right?
11    **A   Yes.**
12    Q   I haven't seen a copy of his criminal
13  history or whatever, whatever it looks like coming
14  out of New York.  I assume there are some drug
15  charges.  Can you just tell me a little bit about
16  what that criminal history looked like as far as
17  nature of prior offenses?
18    **A   From what I recall, I don't remember what**
19  **all the charges were; but you're on the right track**
20  **as far as drug, petty crime, things like that.  I**
21  **don't recall anything serious that really stuck out,**
22  **but I'd have to review it.**
23    Q   If there had been crimes of violence, you
24  know, ag assaults, things like that, could that have
25  affected your probable cause analysis?

Page 130

1    **A   No.  And I've mentioned before, Harry --**
2  **the master crime, Harry is not going to murder**
3  **himself.  This is one thing I just don't get, that**
4  **Harry is responsible for this.**
5    Q   Did you and Heninger ever discuss the
6  possibility that the band of uncharred skin around
7  his neck might have come from a fold of the skin or
8  kind of a fat roll in his neck?
9    **A   No.**
10    Q   But you did discuss that he was unhealthy
11  and it wouldn't have taken much to kill him?
12    **A   That's correct.**
13    Q   I guess some of this -- you didn't consider
14  it likely that Harry Hubbard died either by his own
15  hand or by accident?
16    **A   I'm trying to run it through.  Harry**
17  **strangles Deborah, Harry's lights two fires in two**
18  **different rooms and then strangles himself.  It just**
19  **don't make any sense to me.  And he's in a**
20  **wheelchair.  I think Deborah probably could have**
21  **whipped his ass.  I just don't see him as the**
22  **aggressor.  It doesn't make any sense to me.**
23    Q   We'll talk a little bit about some of the
24  family members, especially from Buffalo that you
25  talked to.  But would you agree as a general matter

Page 131

1  that family members' opinions about a person can
2  change based on whether or not that person's under
3  investigation for a heinous murder?
4    **A   Oh, yeah; that can influence your opinion.**
5    Q   Do you remember a few people in the
6  neighborhood talking about a skinny black male, a
7  mentally unstable person walking around in the
8  neighborhood?
9    **A   Skinny black male, mentally -- maybe.**
10  **Maybe.  I don't remember the details about it.  I**
11  **don't know who said it.**
12    Q   Let me blow it up because I probably have
13  another question about it as well.  Give me one
14  second.  This is your investigation report, page 9 of
15  22.  Reads, on July 11th, 2018 I conducted a phone
16  interview with Alex Ventura.  Mr. Ventura talked
17  about a skinny, B, slash, M 24 in the neighborhood.
18  Sylvester and others have mentioned before.
19         Does that refresh your recollection?  I'm
20  sorry.  I can make this bigger.
21    **A   I mean, I don't remember who Alex Ventura**
22  **is though.**
23    Q   I believe Alex Ventura is a neighborhood
24  handyman or someone who had been doing work on one of
25  the houses.

Page 132

1    **A   Okay.**
2    Q   Where it says 24, is that a police code?
3  Does that have significance or is that a typo?
4    **A   Yeah.  I shouldn't have put it there.  I**
5  **should have said demented.  That's a mentally**
6  **handicapped person, I guess.  Crazy.  Crazy.**
7    Q   Right.  I guess the police code itself is
8  that 24 is a demented person?
9    **A   Correct.**
10    Q   And there's probably a more up to date way
11  of saying that, but that's not on you.  Would you
12  agree with me that Cornelius Muckle is pretty skinny?
13         **MS. LEWIS:** I object and ask you not
14    to answer, Detective Barnett.  I guess this will
15    be a standing objection to this line of
16    questioning based on lack of relevancy as well
17    as there being an open investigation with
18    regards to that matter.
19         **MR. GREENAMYRE:** I'd like to mark as
20    the next one which I will say is 6.  Hopefully
21    that will be right.
22         (Plaintiff's Exhibit Number 6 was
23    marked.)
24    Q   Do you recognize this to be the Fulton jail
25  booking report for Cornelius Muckle for his 2020

Keith Sylvester vs.
James Barnett, et al.

Detective James Barnett
April 9, 2021

Page 133

1 arrest for the murder of Deborah and Harry Hubbard?
2     MS. LEWIS: I'm going to object and
3 renew my standing objection and ask you not to
4 answer, Detective Barnett.
5   Q   (By Mr. Greenamyre) Would you agree that
6 someone who is six-foot-five and 155 pounds is
7 skinny?
8     MS. LEWIS: Objection. Calls for the
9 witness to speculate. You may answer.
10   A   Yeah, you could say that. Well, I would
11 say that sometimes those figures aren't correct. My
12 wife is guilty of not putting her true weight on her
13 driver's license, you know. I have met the man, and
14 I wouldn't describe him as skinny.
15   Q   (By Mr. Greenamyre) Yeah. I would say my
16 weight on my driver's license might be a little out
17 of date.
18   A   I don't think he's that tall either. Of
19 course, he wasn't sitting down when I talked to him.
20   Q   And you did talk to him. Did he strike you
21 as a someone who could be described as a code 24?
22     MS. LEWIS: I'm going to object and
23 renew the standing objection and instruct you
24 not to answer, Detective Barnett.
25   Q   (By Mr. Greenamyre) So earlier we -- I

Page 134

1 asked you questions, and you testified about the
2 warrant for Keith Sylvester in the matter, and we
3 went through the inculpatory facts. And you said
4 that nothing else significant was contained within
5 your warrant application, correct?
6   A   Correct.
7   Q   Are you aware that mothballs are made of
8 naphthalene, N-A-P-H-T-H-A-L-E-N-E?
9     MS. LEWIS: Objection. Calls for
10 speculation. You may answer, Detective Barnett.
11   A   No. I wasn't -- I'm not familiar with
12 their chemical make-up.
13   Q   (By Mr. Greenamyre) Are you aware of that
14 generally naphthalene will leave evidence behind if
15 it's burned?
16     MS. LEWIS: Objection. Calls for
17 speculation. Detective Barnett, you may answer.
18   A   No. I did not know that.
19   Q   (By Mr. Greenamyre) What was your
20 understanding about whether K-9 Ace, the Dekalb Fire
21 dog -- what was your understanding about whether he
22 would have been able to detect or not detect
23 isopropyl alcohol if it was on Keith's person?
24   A   I don't know about the chemicals that he
25 can detect or not detect. All I understood from what

Page 135

1 fire told me was if there was an accelerant used, he
2 would be able to sniff it out. I mean, I relied on
3 fire for that expertise just like -- I'm not sure if
4 fire knew about the moth ball residue that you
5 mentioned either. That's news to me. Might be news
6 to them.
7   Q   You would agree with me that the family
8 told you about Deborah's missing jewelry early on in
9 the investigation, correct?
10   A   Correct.
11   Q   She wore a lot of jewelry, necklaces,
12 bracelets, rings, right?
13   A   Correct.
14   Q   Generally gold or at least appearing gold?
15   A   Correct.
16   Q   And no missing jewelry was located at the
17 scene, correct?
18   A   Correct.
19   Q   And if it was a metal jewelry or gold
20 jewelry, you wouldn't expect that to burn up into
21 nothing; you would expect to be able to find it after
22 the fact, right?
23   A   I don't know. I know pliable soft metal
24 like gold does melt, and I guess it could drop, it
25 could melt and drip somewhere. I don't know. I

Page 136

1 don't know how gold reacts to a fire.
2   Q   Fair. We can agree at least that if gold
3 was heated to the point it would melt, it would melt
4 and then resolidify, right?
5   A   Yes.
6   Q   It's not like wood that would combust and,
7 you know, leave only ashes, right?
8   A   Yes, that's right.
9   Q   Would you agree that there was no evidence
10 at the time you applied for the warrant that
11 Sylvester had pawned any of the jewelry?
12   A   There was no -- correct.
13   Q   I don't even know. Did you ask Keith about
14 the jewelry?
15   A   I don't recall. I remember taking note of
16 the fact that the jewelry was missing. I don't
17 remember if I mentioned it to him or if he mentioned
18 it to me.
19   Q   You'd agree that at the time you took out
20 the warrant you didn't have any evidence that Keith
21 either had or had and then sold the jewelry, right?
22   A   Correct, I did not.
23   Q   And you did -- I can show you your incident
24 report if it helps refresh your recollection, but you
25 did look into whether Keith had pawned anything,

---

Page 137

1 right?

2 **A   I think so.**

3 Q   And found that he had sold three items in

4 the last year, a couple of years to EcoATM.  Does

5 that refresh your recollection?

6 **A   I do remember EcoATM.  I do.**

7 Q   It's your understanding that EcoATM is sort

8 of a vending machine that will give you a little bit

9 of money for phones and tablets?

10 **A   Correct.**

11 Q   But isn't going to be pawning jewelry or

12 anything like that?

13 **A   Correct.**

14 Q   Do you recall that Ms. Muhammad from the

15 Victims Advocacy Office called concerned about Althea

16 Jenkins' attitude during their conversation, that it

17 aroused her suspicion?

18 **A   Possibly, yeah.  That makes sense.  Althea**

19 **wasn't the easier person to get along with, I**

20 **remember.**

21 Q   Seems to be the case for a lot of the

22 Sylvester Hubbard children.  Is that fair?

23 **A   Yeah, that's fair.**

24 Q   And looks like it's on page 11 of your

25 report to the extent that refreshes your

---

Page 138

1 recollection.  Do you recall I guess especially the

2 Buffalo Hubbards had concerns about both Keith and

3 Althea?

4 **A   I do remember that speculation when it came**

5 **down, yes.**

6 Q   Do you agree that in the hours before the

7 house burned down Keith made efforts to repair the

8 home's air conditioning including by hiring Antonio

9 Penn to come out to the house?

10 **A   Yes, I remember him saying that.**

11 Q   And would you agree that generally Keith

12 expending money to repair an AC unit is not

13 consistent with an intent to burn down the home in

14 the hours immediately thereafter?

15 **A   Keith didn't spend his own money.  He spent**

16 **his mother's.  I doubt that he could afford AC**

17 **repair.  I'm sure he used his mom's credit card just**

18 **like she bought him the car.  So no, I don't think he**

19 **would spend a dime on fixing that house.  I guarantee**

20 **you that it was a request from his mom to get that PC**

21 **repaired [sic].  Of course, I'll never know.**

22 Q   What was your understanding of Keith's

23 sources of income?

24 **A   I understood that he had several apartment**

25 **Section 8 -- he had drove an ice cream truck and**

---

Page 139

1 possibly maybe a pizza delivery guy.  That might have

2 been later though.

3 Q   Do you know whether she was receiving any

4 kind of disability?

5 **A   That wouldn't surprise me.  I assume that**

6 **was true.**

7 Q   Would you agree -- sorry.  I'm highlighting

8 some text on page 18 of your report.  Would you agree

9 that Deborah Hubbard's life insurance policy did not

10 favor Keith with respect to the other children?

11 **A   I wouldn't agree to that.  Like I said, I**

12 **don't know how the life -- being the closest**

13 **biological son of hers he could probably expect to**

14 **get a payout from the house.  I mean, he's the one,**

15 **seems to me, that's closest to her.**

16 **And her not having a will, you know, the**

17 **probate -- I guess it's got to take that into**

18 **consideration.  Like I said, I don't know about what**

19 **the insurance company is going to do.  But, I mean,**

20 **he's the son that's taking care of Deborah.  He's**

21 **living in the same house, so I would think that he**

22 **would get a -- that he would get a large chunk of the**

23 **money if there was insurance on the house.**

24 Q   Sorry.  Can I draw your attention to page

25 18 of your report which is I think on the screen.  I

---

Page 140

1 got a highlighted portion.  It's at the very top on

2 May 9th.  And the question is about life insurance,

3 not homeowners insurance.

4 **A   Okay.**

5 Q   And the question is, would you agree that

6 at least the life insurance doesn't treat Keith

7 different than the other kids, Deborah's other kids?

8 **A   Yeah, that's correct.  They're all listed,**

9 **as far as I know.  There might be one missing.  I**

10 **don't know.**

11 Q   Were you aware that there was a break-in at

12 Harry's Buffalo home two days after his death?

13 **A   I remember somebody saying something about**

14 **that, yeah.**

15 Q   And you didn't have any reason to

16 disbelieve that, did you?

17 **A   No.**

18 Q   Were you aware that there was -- I believe

19 Willie Jenkins had -- was suspected of burglarizing

20 Harry's home prior to Harry coming down here?

21 **A   I have heard that speculation, yes.**

22 Q   Do you have any reason to disbelieve that?

23 **A   No.**

24 Q   I think pretty much everybody said at least

25 if they were asked about it or just volunteered it

---

Page 141

1  that Willie Jenkins, Jr. was using crack cocaine at
2  this time?
3     A   Yes.  The family dynamics were incredible.
4  Yeah, I heard that.
5     Q   Speaking of the family dynamics, generally
6  would you agree that they sort of -- there were
7  step-kids and the Hubbards kind of took to -- took
8  one side, and then Deborah's kids kind of took
9  another side generally?
10    A   Yes, I agree with that.  But I had to take
11 that with a grain of salt because unfortunately both
12 their relatives were killed in the fire, and I
13 considered them both equal victims.
14    Q   Understood.  Do you remember talking to
15 Ronnette Penny?
16    A   Yes, I remember Ronnette.
17    Q   Do you remember Ronnette Penny telling you
18 her belief that someone had taken all of Deborah's
19 teeth out of her mouth?
20    A   And to go into that a little bit
21 more, I don't know if she -- I don't know exactly
22 where she came up with that.  Part of the problem was
23 when they were trying to verify the ID of the bodies,
24 they were so badly burned that it burned up their
25 fingers, you know, their fingerprints, and their

Page 142

1     teeth were -- I don't know if teeth -- I guess teeth
2  don't melt, but they were damaged.
3        And they could not for whatever reason --
4  they tried to get a dentist to identify -- I don't
5  know.  I don't know what happened, but they tried to
6  get a dentist to identify her through her teeth, and
7  that was unsuccessful, and they ended up having to do
8  a DNA test.  And I don't know if she got that from
9  all her teeth were knocked out because the dentist
10 couldn't identify her through -- I don't know where
11 she got that.  I don't know.
12    Q   It sounds -- I mean, there are at least a
13 couple of possibilities.  One is that she's sort of
14 crazy and, you know, thinks that people are stealing
15 rings and teeth out here.  Another possibility is
16 that she's slightly less crazy and, you know, just
17 got the message twisted from Atlanta to Buffalo
18 through a game of telephone, right?
19    A   Yes.  I believe it had something to do with
20 the forensic detective being unable to identify
21 Deborah through her dental records.  I mean, and you,
22 know, I listen to this stuff every day about their
23 theories and what they -- you've just got to listen
24 to it and verify what you can and move on.
25        And in a homicide it's the family that can

Page 143

1     really make or break an investigation, cooperative
2  families.  And I wouldn't say they were
3  uncooperative.  They were very cooperative overall in
4  this investigation.  Everybody was sad that those --
5  you know, that Deborah and Harry were killed, and
6  everybody wanted justice for them.  And that was my
7  job, you know, to provide that.
8     Q   Would you agree that even Keith was
9  cooperative to the extent he was telling the truth,
10 he was always volunteering information and happy to
11 talk to you at any time and let you search
12 everything, whatever?
13    A   He was very cooperative, yes.
14    Q   Did you see this video?
15    A   Yes.
16    Q   So this is the back door to the room where
17 Deborah was found, right?
18    A   Yes.
19    Q   And this was the place where the bolt was
20 engaged, right?  It was out, and that you referenced
21 in the warrant affidavit, right?
22    A   Correct.
23    Q   Did you ever talk to Keith about this back
24 door in particular?
25    A   I'm sure I mentioned it.

Page 144

1     Q   Do you remember him or anyone else telling
2  you that no one had a key to that door, that
3  particular lock?
4     A   I don't recall.
5     Q   And let me fast forward just so you're not
6  trusting me.  That's the outside, and then inside
7  it's got a little twist knob, right?
8     A   Yes.
9     Q   So you could open and you could lock and
10 unlock that from the inside but not from the outside
11 if you didn't have a key, right?
12    A   Correct.
13    Q   Did you ever recover keys from the house?
14    A   No.
15    Q   Do you know whether there were keys or not?
16 I guess the keys could have been lost in the fire or
17 the keys could have been taken.  What's your sense as
18 to that?
19    A   Either one is possible.  I mean, as far as
20 the locks, the fact that the lock there is in the
21 engaged position, we were trying to figure out, you
22 know, well, whoever lit the fire didn't come in the
23 back door and leave that way because you'd have to --
24 you can't -- you need a key to turn it or they had a
25 key.  And the same for the front door, because fire

Page 145

1 had to make a forced entry.
2    Q   I'll represent to you that at least Keith
3 told you that when they bought the house they weren't
4 provided keys to this door and that they followed up
5 repeatedly with the people who sold them the house
6 who maybe kind of pushed them off.  Does that ring a
7 bell?
8    A   No.
9    Q   I take it that that is not something that
10 you followed up with?
11   A   I don't recall that.
12   Q   Would you agree that if neither Deborah nor
13 Keith ever had a key to this door, it would make the
14 fact that this deadbolt being engaged less
15 suspicious?
16   A   Can you say that one more time?
17   Q   Yes.  Would you agree that if neither
18 Keith -- let's assume you had conclusive proof that
19 neither Keith nor Deborah ever had a copy of this key
20 to this door.  With that assumption in mind would you
21 agree that that would make the facts about this lock
22 and this door contained in your warrant affidavit
23 less inculpatory?
24        MS. LEWIS: Objection.  Calls for the
25   witness to speculate.  Detective Barnett, you

Page 146

1 may answer.
2    A   If Keith nor Deborah had a key for that
3 lock, would that lock normally be in the locked
4 position?  Yeah, I guess that's true.
5    Q   (By Mr. Greenamyre)  For the front door,
6 that was engaged -- that was locked when fire or law
7 enforcement first arrived, correct?
8    A   Yes.
9    Q   And they had to take that door through
10 force?
11   A   Yes.
12   Q   Do you know whether that door was locked,
13 you know, it had one of the locks that you can kind
14 of twist on the outside and at least locked the
15 handle on your way out or whether it was deadbolt
16 only?
17   A   I would think it had a twist lock and a
18 deadbolt, but I can't recall.
19   Q   So it's at least possible based on your
20 recollection today that someone could have twisted
21 the handle to lock the door and walked out and
22 wouldn't necessarily have needed to put a key into
23 the lock to lock the door behind them?
24        MS. LEWIS: Objection.  Calls for the
25   witness to speculate.  Detective, you may

Page 147

1    answer.
2    A   Yes.
3    Q   (By Mr. Greenamyre)  And did you look for
4 the -- I guess to what extent did you or any other
5 detective look for Deborah's keys?
6    A   There was a search made of, you know, the
7 remains -- going through a fire is -- a fire-damaged
8 house is kind of difficult.  I walked through the
9 house, film was made of the house; and, you know,
10 search was done, but nothing was found.
11   Q   Do you know where Deborah habitually kept
12 her purse when she was in the house?
13   A   No.
14   Q   You do not know?
15   A   I do not know.
16   Q   And I assume you don't know whether she
17 kept her keys in her purse or not, right?
18   A   No.
19   Q   And no purse was recovered, correct?
20   A   Correct.
21   Q   And you would expect that keys would be
22 more like gold jewelry than wood, that they
23 wouldn't -- even if they melted, there would be, you
24 know, some relic or evidence of them, right?
25   A   Right.

Page 148

1    Q   Did you ever ask Keith to show you his
2 keys, whether he had a key to this back lock.
3    A   He told me -- I recall that he only had --
4 he only had a spare key, and that's the only
5 conversation I recall.
6    Q   I guess you don't know whether the spare
7 key opened the front and the back door or not?
8    A   I don't.
9    Q   I'm trying to find a view of the chair, if
10 you'd give me a moment.  Would you agree -- so
11 looking at the 145 mark do you see this burned-out
12 office chair?
13   A   Yes.
14   Q   And do you see that has or appears to have
15 wheels?
16   A   Yes.
17   Q   Is this right here one of the -- or appear
18 to possibly be one of the citronella candles?
19   A   Yes.
20   Q   We can see here around the two-minute
21 mark -- and I'm playing it back slowly -- but there's
22 just a whole lot of wires everywhere here, right?
23   A   Yes.
24   Q   And we can see at about the 2:45 mark, it
25 looks like she's physically connected with the wire

Page 149

1  to the wall outlet, right?
2    A   Yes.
3    Q   And she's right below what appears to be a
4  fuse box, electrical box?
5    A   Yes.
6    Q   And there are electrical wires right above
7  her, correct?
8    A   Yes.
9    Q   And if you look around the four-minute
10 mark -- and I'm playing it forward -- does this sort
11 of red in color object, is it your understanding this
12 could have been a lamp, a lamp shade?
13   A   Maybe. I can't really tell.
14   Q   Does this video, at least what we've seen
15 so far, fairly and accurately depict the scene when
16 you arrived and walked through?
17   A   Yes, it does.
18   Q   And we can see that some areas of the house
19 are less burned than others. For example, the living
20 room or the den and the kitchen are -- have heavy
21 smoke damage but not nearly as much burn damage.
22   A   Yes. The brunt of the fire damaged the
23 back of the house.
24   Q   And I don't know, you know, how -- it's not
25 super bright, but would you agree right at the 7:43

Page 150

1  mark you see one of the citronella candles on the
2  stove top?
3    A   Yes. It was a citronella candle. It was
4  burning inside.
5    Q   And then at the 7:50 mark would you agree
6  that we see these two boxes in the same location as
7  the mothball boxes photo that we looked at earlier?
8    A   Yes.
9    Q   And I don't know if seeing the video is
10 going to help you at all, but do you see any evidence
11 that these boxes have ever been opened?
12   A   Nope.
13   Q   I'll just play a little bit of this. Can
14 you hear that audio?
15   A   Some of it.
16   Q   Nothing important right now.
17       (A video clip was played.)
18   Q   Did you hear that sentence, the big thing
19 is going to be does she have soot in her lungs?
20   A   Yeah, I guess.
21   Q   I can play it again if you'd like.
22   A   No, it's fine. Yeah.
23   Q   And so who are these two gentlemen we see
24 in 9:21?
25   A   That's me on the right, and that's -- I

Page 151

1  believe that's Demeester in the blue shirt.
2    Q   Do you know, do you recognize which one of
3  you was saying the big thing is going to be does she
4  have soot in her lungs?
5    A   I don't know. I don't know who said it.
6    Q   Let me play it again just to see if it
7  helps or not.
8       (A video clip was played.)
9    A   It sounds like Demeester.
10   Q   And did you understand the import of that
11 statement to be if she has soot in her lungs, that
12 means she was still breathing while the fire was
13 going on, right?
14   A   That's right. Because at that time we were
15 trying to determine whether it was a homicide or not.
16   Q   Right. And that was, you know -- I mean,
17 according to Demeester at least that was the big
18 thing, whether she had soot in her lungs in
19 determining whether or not it was a homicide?
20   A   Correct.
21       MR. GREENAMYRE: And can we mark that
22 video which is called crime scene video shot by
23 Leonpacher as 7, as Exhibit 7.
24       (Plaintiff's Exhibit Number 7 was
25   marked.)

Page 152

1    Q   Can you hear that?
2    A   Yes.
3    Q   So this is a document that was produced to
4  us. It's called initial scene recording. It's an
5  hour and 23 minutes long. It's -- I don't have any
6  video. I just have audio. And I'll play it further
7  to the extent we need, but is this a recording you
8  made or someone else made?
9    A   Yes. I don't know if I made it or somebody
10 else. Sounded like Demeester, but I don't know.
11   Q   There's going to be a bunch of people
12 talking. I'm going to ask you at a couple of points
13 --
14   A   The initial recording, it's probably a
15 recording I made as I was walking around.
16   Q   Got it. Do you remember making a recording
17 on the scene of the scene, right?
18   A   Yes.
19   Q   And was this a recording that was audio
20 only?
21   A   Yes.
22   Q   Give me just a quick second. I don't want
23 to spend any longer than we have to on this, but I
24 have a couple of questions about a couple of points.
25       THE WITNESS: Can we take a

Case 1:19-cv-04300-LMM    Document 108    Filed 12/10/21    Page 40 of 79

Keith Sylvester vs.                                                    Detective James Barnett
James Barnett, et al.                                                              April 9, 2021

Page 153

1  five-minute break?
2       MR. GREENAMYRE: Yeah. That would be
3  good. Thank you. Five minutes good for
4  everybody? I take that as a yes.
5       THE VIDEOGRAPHER: Going off the
6  record at 2:32.
7       (A brief recess was taken.)
8       THE VIDEOGRAPHER: We're back on video
9  record at 2:37.
10      MS. LEWIS: And Zack, I just have to
11 let you guys know, we're in the midst of moving,
12 so we're going to have the movers starting at
13 3:00 o'clock. I can't ensure my internet will
14 stay connected through then, but we will
15 continue until I have to join on my phone or
16 something like that.
17      MR. GREENAMYRE: Happy to take a break
18 or work around. I acknowledge that this is a
19 long deposition, so I appreciate y'all for
20 bearing with.
21      MS. LEWIS: No problem. I have that
22 we're going until 5:00 o'clock though. That
23 will be the seventh hour, so at that time I will
24 have to jump off.
25      MR. GREENAMYRE: I hope to be done

Page 154

1  well in advance of that, but I hear what you're
2  saying.
3   Q   (By Mr. Greenamyre) Do you recognize who's
4  voice that is from 18:30 to 18:42?
5   A   No, I don't.
6   Q   I'll play a little bit more, and let me
7  know.
8       (An audio clip was played.)
9   Q   Is that you asking Lieutenant Dorgan what
10 his name was?
11  A   Yes.
12  Q   And was that Lieutenant Dorgan who was
13 speaking immediately before that?
14  A   Possibly. I don't know.
15  Q   When you get -- when you have these
16 audio-only recordings, you know, either of the scene
17 visit or the witness interviews, do you get these
18 transcribed?
19  A   No.
20  Q   So if you want to go back and listen to it
21 you've just got to go all the way through?
22  A   Yes. I haven't had that circumstance yet
23 where I needed to do that.
24  Q   It would make me go crazy. I want to pick
25 it up at the 35-minute mark.

Page 155

1       (An audio clip was played.)
2   Q   Is that second voice you?
3   A   I think so.
4   Q   Who's that first voice?
5   A   Not sure. It might have been Dorgan.
6   Q   We'll play and little bit more and see if
7  it helps.
8       (An audio clip was played.)
9   Q   I believe earlier you said that was -- was
10 Demeester's anecdote?
11  A   Yes.
12  Q   Does that sound like Demeester?
13  A   Yes, it does.
14  Q   And so earlier in that recording that we
15 played, you know, you can hear Demeester -- he had
16 talked with Keith early on, right?
17  A   Correct.
18  Q   And he was trying to piece it together
19 whether it was, you know, a smoking fall-asleep or
20 something else at that point in time, right?
21  A   Yes.
22  Q   And when it says that she was medicated, do
23 you know what medications Ms. Hubbard was taking?
24  A   No, I don't. I don't recall.
25  Q   Do you know whether she was taking any kind

Page 156

1  of medications that might be scheduled substances if
2  she didn't have a prescription for them?
3   A   No.
4   Q   If she had been prescribed, you know,
5  either narcotics or benzodiazepines would that have
6  impacted your analysis at all?
7   A   I don't think so, because either she was
8  strangled or she wasn't strangled.
9   Q   Same question about Harry. Do you know
10 what medications he was taking?
11  A   I don't know. I some me had numerous ones.
12  Q   Do you know whether -- have any reason to
13 believe any of those would fall into either narcotic
14 or benzodiazepine kind of category?
15  A   I don't know.
16  Q   And again, that wouldn't have impacted your
17 probable cause determination one way or the other,
18 right?
19  A   No.
20  Q   I want to pick it up at about the 1:02
21 mark.
22      (An audio clip was played.)
23  Q   All right. One of those speakers is you,
24 right?
25  A   Yes.

Case 1:19-cv-04300-LMM   Document 108   Filed 12/10/21   Page 41 of 79

Keith Sylvester vs.                                                    Detective James Barnett
James Barnett, et al.                                                  April 9, 2021

Page 157

1    Q    And is the other speaker Dorgan or is it --
2  what was the other -- the captain's name?
3    A    Bonner.  I think it's Bonner.
4    Q    Yeah, it sounds like Bonner from what I've
5  heard from Dorgan.  And you can hear him say, you
6  know, I don't know what the fuck is going on
7  basically?
8    A    Yeah.
9    Q    And at that point in time early in the
10 investigation he seems to think that there was one
11 point of origin, correct?
12   A    Yeah, I guess.  I don't recall.  I just
13 remember that they concluded there was two points.  I
14 don't remember what the initial was.
15   Q    Well, you just heard him speculate that at
16 that point he believed that it was one point of
17 origin and that it could have spread to the other
18 room based on air flow, right?
19   A    I didn't really get what he said; but yes,
20 I will agree with that at that point.
21   Q    And that the room where at least at that
22 point he believed that it had started was the office
23 where Deborah was located, correct?
24   A    Correct.
25   Q    I'll play a little bit starting at 1:05.

Page 158

1         (An audio clip was played.)
2    Q    Again, you heard yourself say, if she's got
3  that, it's accidental, right?
4    A    Yeah.
5    Q    And who's the other speaker, the male
6  speaker?
7    A    That was Demeester.
8    Q    You would agree that there's no -- with the
9  exception of the evidence that we've talked about as
10 far as ligature, there was no evidence of, you know,
11 trauma or sexual violence or anything like that,
12 correct?
13   A    Correct.
14   Q    And of course to be fair, much of that
15 would have been burned up in the fire, right?
16   A    Could have, right.
17   Q    I want to start at about 1:07 and play a
18 little bit longer.
19        (An audio clip was played.)
20   Q    Was that Demeester again?
21   A    Yes.
22   Q    And he was saying that, you know, Harry at
23 least on the scene didn't have any signs of trauma
24 that caught anybody's attention?
25   A    That's what -- that's correct.

Page 159

1         (An audio clip was played.)
2    Q    And then we heard you say something about
3  citronella, and Demeester said something about
4  smoking, trying to put the pieces together, right?
5    A    Yes, sir.
6    Q    I don't know whether Keith said this to you
7  or Keith said this to somebody else, but I believe
8  one of Keith's errands, as you called them earlier,
9  was to look at the internet data from that night from
10 the computer where -- approximate to where Deborah
11 was found.  Do you remember him asking about that?
12   A    No, I don't.
13   Q    And, you know, his theory was something
14 along the lines of, you know, if it shows internet
15 traffic at certain times, that might show whether she
16 was awake or not.  Did you or anyone else ever send a
17 subpoena or anything like that for ISP information?
18   A    It's possible.  I can't recall.  I sent out
19 a lot of search warrants.  I can't remember if that
20 was one of them or not.
21   Q    If that was one of them, would that have
22 been reflected in your incident report, your
23 narrative?
24   A    It probably would have been, yes.  It would
25 have been definitely, yes.

Page 160

1        MR. GREENAMYRE: Can we mark this
2  initial scene recording as Exhibit 8.
3        (Plaintiff's Exhibit Number 8 was
4  marked.)
5    Q    Give me just one second.  All right.  Going
6  back to the USAA rough sketch of the home's floor
7  plan, do you know whether you or -- were you ever
8  made aware of the location of each of the citronella
9  candles in the home?
10   A    There was the one in the kitchen, and there
11 was one on the stove.
12   Q    On the stove, right?
13   A    Yes, on the stove.  And the other one was
14 in the back bedroom number 3.
15   Q    Right to the left of the door if you're
16 facing the door from behind the house, right?
17   A    Right.
18   Q    Do you know where the others were?
19   A    No, I don't.
20   Q    Do you remember whether -- I don't know if
21 the documents are clear, but this was a multi-pack of
22 citronella candles, right?
23   A    Yes.
24   Q    Do you know whether there were eight or six
25 or four?

Page 161

1   A   I don't know.
2   Q   Do you know whether or not another
3   citronella candle was found in bedroom 2 on this
4   chart, the other possible point of origin?
5   A   I don't recall one being found in there.
6   Q   There was some indication at some point in
7   the investigation that there may have been deletions
8   from Keith's dash cam.  Do you remember that?
9   A   Yes.
10   Q   And that you asked someone from the Secret
11   Service to help you with that analysis?
12   A   Correct.
13   Q   And that person took their time in getting
14   back to you and getting a report out, right?
15   A   Yes, they did.
16   Q   And that person's report, did it say
17   anything one way or another whether there had been
18   intentional deletions?
19   A   Well, yeah, there were intentional
20   deletions, but the problem was they couldn't
21   determine -- they couldn't determine as far as where
22   the deletions had been made in the recording.  The
23   way he explained it to me was once you make the
24   deletions they go into this little folder, and you
25   can't really tell where they came from.  So he wasn't

Page 162

1   able to provide much help other than that there were
2   deletions.  So we don't know where the order of
3   things they came from.
4   Q   But you would agree that basically every
5   minute of Keith's travels from the time he left his
6   mother's house around -- whether it was between 5:00
7   or 7:00 or 8:00 and 9:00, and when he came back to
8   witness the flames engulfing the home, every moment
9   of his travels is accounted for through either his
10   cell phone GPS or the surveillance videos?
11   A   Yes.
12   Q   I'm going to ask you a couple of questions
13   about phone calls you had with various members of the
14   cast of characters.  I recognize that it's years
15   after the fact, and I'm going to ask you to remember
16   things.  If you want to hear a recording, just let me
17   know and I'm happy that play it, right?  So with that
18   preface, do you remember that Angela Lawson or Angel
19   Lawson, was that one of Harry's daughters?
20   A   Yes.
21   Q   And she lived in Buffalo?
22   A   I think so.
23   Q   And do you remember her theorizing that it
24   was Keith plus Willie Jenkins, Jr. plus Althea who
25   conspired to kill Deborah and Harry?

Page 163

1   A   That sounds right.
2   Q   Ms. Lawson, Angel Lawson in a conversation
3   between you and her over the phone on August 15th,
4   2018, there is an exchange where you say that Keith
5   presented as a grieving son being fully cooperative.
6   Do you remember saying that or is that something --
7   A   I might have said that, yeah.
8   Q   And my question is, as of August 15th, 2018
9   is that a true statement that you believed or is that
10   something you're telling this woman to kind of get
11   her off your case or not share too much about the
12   investigation?
13   A   Okay.  What are you saying I said?  What
14   did you say I said?  That Keith was presenting as
15   what?
16   Q   A grieving son being fully cooperative.
17   A   I don't know the context of what I said
18   when I said that.  I mean, on the surface, yeah, he
19   was a grieving son and being cooperative.  He was.
20   So yeah.  I don't know if I -- what context I was
21   using that in, was I trying to say that that's what I
22   really believed or was that -- I don't recall.
23   Q   That's fair enough.  Especially without
24   listening to the recording.  A July 8th, 2018
25   recording Althea Jenkins, Keith's sister, do you

Page 164

1   remember her telling you that in her heart she knew
2   Keith couldn't have committed this crime despite the
3   rumors?
4   A   I don't remember her saying that, but she
5   probably said that.
6   Q   Do you remember her saying that some
7   detective was feeding bad information about Keith to
8   others?
9   A   I don't remember her saying that.
10   Q   Who is Andre Jones?  Was he one of Harry's
11   children?
12   A   I don't recall that name.  Sorry.
13   Q   That's fair.  Let me see if I can pull it
14   up and refresh both of our recollections.  Here we
15   go.  Andre Jones, son of Harry, right?
16   A   Yep.
17   Q   Andre -- would it sound right to you that
18   Andre was one of the people that reported that Willie
19   Jenkins, Jr. broke into Harry's home to steal items
20   to feed his crack habit?
21   A   Yes.  Yes.
22   Q   The phone call I'm referring to is a
23   September 18th phone call.  Do you remember that
24   Mr. Jones reported that he was talking to Harry on
25   the night of the fire on the phone?

Page 165

1    A   I don't remember that part.
2    Q   Do you remember that Andre Jones told you
3  that he hung up on Harry the night of the fire
4  because Harry was criticizing him and talking crazy?
5    A   I don't recall that, but I've just
6  forgotten.  It could have happened, yes.
7    Q   Do you remember that Andre Jones also
8  reported that he believed his sister, one of Harry's
9  kids, was also in on the murder of Deborah and Harry?
10   A   It wouldn't doubt it.
11   Q   Would you agree that you told Kimberly
12 Woodson, sister to Melissa, that the Hubbards had
13 been murdered and that Keith was a fraudster?
14   A   I could have said that.
15   Q   Tanika Hubbard is one of Harry's daughters,
16 right?
17   A   Tanika Hubbard is -- yes.
18   Q   Do you remember Tanika Hubbard speculating
19 that Deborah had killed all three of her previous
20 husbands?
21   A   I do remember that.
22   Q   She called her a black widow?
23   A   Yes.
24   Q   And cast doubt on whether her husband
25 Willie Jenkins had actually died of cancer?

Page 166

1    A   Yes.
2    Q   Prior to taking out the warrant for Keith's
3  arrest, did you look at what numbers Harry had called
4  in the days and hours prior to his death?
5    A   Don't recall.
6    Q   Do you recall trying to figure out one way
7  or another whether there were any numbers that
8  couldn't be accounted for that weren't, you know,
9  friends or family or businesses that he would have
10 been in contact with?
11   A   The only part of communication as far as
12 Harry Hubbard was concerned is one of his daughters,
13 I believe -- and I'm not sure who -- had sent me
14 pictures that Harry had sent her on July 2nd, I
15 believe.  I remember getting text pictures forwarded
16 for me that supposedly Harry had sent her around that
17 time.  But that's only thing I can remember about
18 that.
19   Q   And that was his granddaughter Nyaira?
20   A   Yeah, yeah; I think so.
21   Q   And I guess with all the phone records from
22 both -- from Deborah, Harry and Keith, did you look
23 at their calls over the prior day or two in trying to
24 figure out whether they called anybody that could
25 have been in on this or related to it or anything?

Page 167

1    A   I don't remember that being a big priority
2  in the investigation as far as who else was involved
3  in it.
4    Q   Would you agree possibly depending on what
5  is in those phone records, there could be significant
6  investigative leads, correct?
7    A   Phone records are always good tools.
8    Q   For example, if Harry Hubbard is making
9  phone calls after Keith Sylvester has left the home,
10 that would tell us -- that Harry Hubbard
11 was still alive and wasn't passed out from
12 strangulation, right?
13   A   Possibly, yes.
14   Q   And at least as you sit here today you
15 don't remember, you know, those phone records or any
16 phone activity for the day or so prior to their
17 deaths factoring into your probable cause analysis?
18   A   I had a different investigator looking at
19 phone records, but I don't recall.  I don't recall
20 that, no.
21   Q   So agree that it didn't -- for whatever
22 reason it didn't factor into your probable cause
23 determination, right?
24   A   Right.
25   Q   Do you know which detective was looking

Page 168

1  into the phone records for you?
2    A   No, I don't.
3    Q   Would there be records of notes of that in
4  either your -- I guess -- would it be in your
5  narrative report?
6    A   It would.
7    Q   And otherwise it would be memorialized in
8  emails or text messages, something like that for the
9  time period?
10   A   Correct.
11   Q   Do you remember Keith telling you that the
12 bottle of rubbing alcohol that he purchased at
13 Walmart the day before his parents or his mother and
14 stepfather died, that that bottle was still at his
15 house, or I guess not at his house, at Melissa's
16 apartment?
17   A   I remember him talking about it.  I
18 remember he said he used it for -- to clean up acne
19 or something, to clean up his face.  I don't remember
20 where he said it was.
21   Q   Did you ever ask to see whether there was a
22 bottle of rubbing alcohol purchased from Walmart at
23 Melissa's apartment?
24   A   No.
25   Q   Did anyone tell you about bouts of

---

Page 169

1 screaming or shouting or threats by Harry towards
2 Deborah?
3    A   No.
4    Q   Did anyone ever tell you that from time to
5 time Deborah would be found passed out on the floor
6 without explanation?
7    A   I don't recall that.
8    Q   And that would have been -- I guess both of
9 those last two facts would have been significant for
10 your probable cause analysis, for example, if Harry,
11 you know, had a history of domestic violence, that
12 may influence your probable cause determination?
13   A   I don't think so.  I mean, under the
14 circumstances they're both strangled.  There are two
15 separate fires that are started.  All and all there's
16 a lot of marriages that have difficulties.  And I
17 don't think he was -- I don't think he was in shape
18 to abuse Deborah in the first place.  He was elderly
19 and in a wheelchair.  I don't think that would have
20 factored in.
21      MR. GREENAMYRE: Can we take another
22 five-minute break?  And the purpose of this one
23 is to try and wrap up.
24      MS. LEWIS: Okay.
25      THE VIDEOGRAPHER: Going off the video

---

Page 170

1 record at 3:11.
2      (A brief recess was taken.)
3      THE VIDEOGRAPHER: Back on the video
4 record at 3:16.
5    Q   (By Mr. Greenamyre) Cornelius Muckle, the
6 phone that pinged back to him or located back to him,
7 was that a phone that had a telephone number
8 associated with it, like an active line, or was he
9 just using it as like a device, a Wi-Fi enabled
10 device without a phone connection?
11      MS. LEWIS: I'm going to renew my
12 standing objection at this time and instruct
13 Detective Barnett not to answer.
14   Q   (By Mr. Greenamyre) Do you know what
15 Cornelius Muckle's phone number was at the time as of
16 July 2018?
17      MS. LEWIS: Again, I'm going to
18 instruct Detective Barnett not to answer to the
19 extent that you did not rely on it to issue the
20 warrant in this matter against Defendant Keith
21 Sylvester.
22   Q   (By Mr. Greenamyre) Give me one second.  I
23 want to show you what we've previously marked as an
24 exhibit of some number which is the Sprinkel
25 supplementary report.  It says, in June of 2019 Mr.

---

Page 171

1 Sprinkel learned of a geofence warrant.  Do you know
2 whether as of June 2019 you were aware of a geofence
3 warrant?
4      MS. LEWIS: I'm going to object, my
5 standing objection to the extent you did not use
6 this information to issue the -- apply for the
7 warrant against Defendant Keith Sylvester.  I
8 instruct you not to answer.
9      MR. GREENAMYRE: And I guess,
10 Kareemah, I would hope that this question at
11 least could be answered because I'm only asking
12 about his knowledge of that as a technique or
13 not.  I'm not asking about the results.  I'm
14 just asking as of this date did you know that
15 this thing existed or not.
16      MS. LEWIS: Okay.  Agreed.
17   Q   (By Mr. Greenamyre) As of June 2019 did
18 you know whether a -- had you ever heard of or know
19 what a geofence search warrant was?
20   A   I did not.
21   Q   And now I take it you are aware of geofence
22 search warrants?
23   A   Yes.
24   Q   And they sort of work in phases where
25 you'll reach out to a phone company, you'll ask for

---

Page 172

1 certain people that may be in a certain area, and
2 then depending on the hits that you get from that,
3 then you can unmask the subscriber information; is
4 that accurate?
5      MS. LEWIS: Objection as to relevancy.
6 But you may answer, Detective Barnett.
7    A   That's the way I understand it, yes.
8    Q   (By Mr. Greenamyre) You would agree with
9 me that geofence warrants existed and were used at
10 least by some law enforcement departments back in
11 2016, 2017, 2018 and maybe before that?
12      MS. LEWIS: Objection.  Calls for
13 speculation, it's irrelevant.  Detective
14 Barnett, you may answer.
15   A   I had no knowledge of geofence warrant nor
16 did anyone in homicide at that time nor did
17 investigators, district attorneys at -- assistant
18 district attorneys at Fulton County had no knowledge
19 of that.
20   Q   (By Mr. Greenamyre) Is there any specific
21 means that you use to try and keep up with
22 developments in law enforcement technology?
23   A   Yes.  There are classes that are offered to
24 homicide units, police agencies in general.  We
25 usually get email alerts about classes that are

---

Page 173

1 available and the different kind of electronics. But
2 electronics is changing almost on a daily basis as
3 far as advancements and things like that. It's hard
4 to keep up with the latest and greatest, and it's
5 only -- yeah. Before 2019 I and nobody I knew of had
6 ever known of existence of a geofence warrant. It
7 was really a game changer.
8    Q   And it's a novel area of the law too. I
9 know there are some recent -- are you aware there are
10 recent Federal Court opinions saying the geofence
11 warrants are unconstitutional?
12       MS. LEWIS: Objection. Relevancy.
13    But you can answer, Detective Barnett.
14    A   I wasn't aware of that, but it doesn't
15 surprise me.
16    Q   (By Mr. Greenamyre) I'll represent to you
17 that is the case, although, you know, still an
18 unsettled area of the law, at least to my knowledge.
19 This is sort of a hard question to answer, but if you
20 imagine a, you know, spectrum of police officers or
21 detectives in APD, you know, some are going to be
22 more tech savvy than others. Where do you think you
23 fit on that spectrum?
24    A   Probably in the medium area. We've got
25 some old school guys that don't know how to email,

Page 174

1 and then we've got guys that can take apart a cell
2 phone and put it back together.
3    Q   Got it. You're not one of the people who's
4 trying to print out an email and then scan it and
5 then drag it and drop it to put it in the file
6 folder, are you?
7    A   No.
8    Q   That's what I figured. I just want to make
9 sure. That's my boss, for example. How many cases,
10 how many open cases do you have at any given time on
11 average?
12    A   Probably around three.
13    Q   And are these open until they're closed by
14 arrest? Is that how they're considered?
15    A   As far as -- well, I'd like to explain that
16 a little bit. When we close a case by arrest, that's
17 more of an administrative thing for -- you know, for
18 police statistics and things like that that I don't
19 have anything to do with it.
20       But investigations, especially homicide
21 investigations will continue, as you well know, after
22 the arrest. Continued by me or if I've got other
23 people that I think I need to identify or I'm still
24 waiting on some evidence to come back from the GBI or
25 the Secret Service or whatnot, they'll take their

Page 175

1 time, and also the ADA has their own investigators
2 and start preparing cases for trial, and things come
3 up and they've got to be looked at again, stuff like
4 that. So they're never really, I would say, ever
5 closed technically. Well, technically they're
6 closed, but they can always be looked at.
7    Q   Right, right. Understood. Do you remember
8 the date of Mr. Sylvester's CVSA?
9    A   No, I don't.
10    Q   Let's see if we can help each other. Looks
11 like July 8th. Does that sound right? Or no. No,
12 if you look to page 10 of your report, on July 12th,
13 looks like.
14    A   Yes, July 12th, 2018.
15    Q   And do you remember after Keith had
16 supposedly failed this CVSA, in a conversation, just
17 you and Mr. Smith, do you remember him asking you
18 what can we prove now, and you offering the response,
19 nothing, circumstances?
20    A   Yes. It's a total circumstantial case.
21 Like I said before, the CVSA just kind of guided the
22 investigation and doesn't prove anything. Not guided
23 but direct.
24    Q   Understood. What did you learn for the
25 first time, if anything, after July 12th, 2018 that

Page 176

1 inculpated Mr. Sylvester?
2       MS. LEWIS: I'm going to object to the
3    extent it may implicate the current
4    investigation. Detective Barnett, you may
5    answer to the extent it does not involve
6    testifying with regards to the pending
7    investigation.
8    A   Can you repeat the question? I'm sorry.
9    Q   (By Mr. Greenamyre) What did you learn for
10 the first time that was inculpatory as to Sylvester
11 post July 12th, 2018?
12    A   That's pretty -- that's a long time frame.
13    Q   I'm just trying to think. It seems like
14 the inculpatory facts that we went over earlier, it
15 seems like all of those were apparent the first few
16 days or at least within the first week of the
17 investigation, and I'm trying to see to what extent
18 you agree with that.
19    A   Yeah. I never even really thought about
20 that. The main thing that I was waiting on at that
21 time after that was some kind of decision from Dr.
22 Heninger and Secret Service.
23    Q   And what you learned from Dr. Heninger
24 ultimately about his conclusion was what you had
25 suspected from the day of the autopsy, right?

Case 1:19-cv-04300-LMM   Document 108   Filed 12/10/21   Page 46 of 79
Keith Sylvester vs.
James Barnett, et al.

Detective James Barnett
April 9, 2021

Page 177

1    A   Yes.
2    Q   And what you learned from the U.S. Secret
3 Service report basically didn't tell you anything
4 that you didn't already know about Sylvester's dash
5 cam; is that right?
6        MS. LEWIS: Objection to the extent
7     you are misstating his previous testimony. You
8     may answer, Detective Barnett.
9    A   I thought that the -- I thought the case
10 was stagnant. I'd been working on it for six months,
11 and I didn't see a development that would improve my
12 case that I already had after that point at that time
13 that I took the warrant.
14   Q   (By Mr. Greenamyre) Understood, but just
15 going back a second to the previous question, when
16 you finally got the final Secret Service report about
17 Mr. Sylvester's dash camera, that didn't tell you
18 anything definitive that you didn't already know; is
19 that fair?
20   A   The only thing that the Secret Service guy
21 told me that was -- I thought was interesting was the
22 fact that you couldn't really determine where those
23 deletions came from. Like, if you're running the
24 recording and you could delete something from this
25 time frame, but you don't know what deleted or what

Page 178

1 the time frame was. So yeah, that's the only thing I
2 learned from that.
3    Q   And going back to the question from a
4 minute ago, you know, can you think of anything new
5 that you learned after July 12th of 2018 that was
6 inculpatory as to Sylvester that you didn't already
7 know or suspect as of July 12th?
8    A   I probably had further conversations with
9 the family. I probably -- and I'm not sure where I
10 found out about the trips Melissa had taken to
11 Virginia. I'm not sure if that was before or after.
12 That might have been something that I learned after.
13   Q   So maybe Melissa -- you know, the
14 information about Melissa being controlled or sent
15 away, you could have learned that afterwards, and you
16 would have heard more of the same from especially the
17 Buffalo Hubbards about Keith's general character,
18 right?
19   A   Correct.
20   Q   Anything else you can think of as you're
21 sitting here today?
22   A   Not right now, no.
23   Q   When we're talking about did you learn
24 anything new after July 12th, 2018, in response to
25 some but not all of those questions your attorney

Page 179

1 interposed an objection and told you not to answer.
2 My question is, did you -- from the answers that you
3 just gave when you did answer the question, did you
4 hold any information back or is there anything -- did
5 you hold any information back or are there things
6 that you have learned that you haven't told us about?
7    A   As far as in the warrant, no.
8    Q   And even after the warrant, inculpatory
9 facts as to Mr. Sylvester. You know, I'm not asking
10 you -- I am asking you, but I understand you're not
11 going to tell me what specifically those facts are.
12 If there are new facts after the warrant that have
13 developed, I'm asking you to tell me one way or
14 another whether there are inculpatory facts after
15 July 12th, 2018 that you have not told us about by
16 following your attorney's instructions.
17       MS. LEWIS: To the extent that it's
18     not relied upon in your application for warrant
19     or arrest against Mr. Sylvester, I'll instruct
20     you not to answer that question.
21       MR. GREENAMYRE: Kareemah, we're
22     likely going to have to come back and do this
23     again to answer all of these questions.
24   Q.  (By Mr. Greenamyre) Really quick I just
25 want to confirm that certain pieces of evidence

Page 180

1 exist. I haven't seen them, but I've seen them
2 referred to, and I want to make sure we're on the
3 same page. You said that the photos that Harry sent
4 to his granddaughter on July 2nd, his granddaughter
5 Nyaira Walton, she texted those to you?
6    A   Yes.
7    Q   And those would have been put in the case
8 file?
9    A   Yes.
10   Q   Harry Hubbard's criminal history would be
11 in the case file?
12   A   Yes.
13   Q   What about texts between Angel Lawson and
14 Keith Sylvester?
15   A   Not sure about that one. Possibly.
16   Q   Yeah. I know she was talking about them.
17 I don't know that it was definitive one way or the
18 other.
19   A   I don't recall those either.
20   Q   Did Keith have two dash cams or was it one
21 dash cam that had a forward-facing camera and a
22 backward-facing camera?
23   A   It was one dash cam with both cameras.
24   Q   Were you able to obtain the rear-facing
25 video?

Page 181

1    A   No.
2    Q   So all the video you had was forward
3  facing?
4    A   Yes.
5    Q   Do you know whether with that particular
6  dash camera that was an option you could select to
7  only record forward facing versus to also record rear
8  facing?
9    A   I don't know.
10   Q   Have you ever been issued an Axon or taser
11  framed body camera by APD?
12   A   I have been, yes.
13   Q   Do you have one as a detective?
14   A   I don't use it. It's on the dock all the
15  time. Homicide is one of the units that we don't
16  usually -- well, it's not that we don't use it. We
17  don't carry them because we found that people tend to
18  talk to us less about cases when we're -- we have a
19  body camera on. So we're always plain clothed. We
20  don't use them. Sometimes we might use them to -- if
21  we don't have any other recording device to -- like
22  if the system in the office fails, the cameras, we
23  can use it to interview witnesses. But I never have
24  used it.
25   Q   I guess you would have been issued this

Page 182

1  back when you were working Zone 5 prior to coming
2  over to be a detective, you would have had the Axon
3  brand?
4    A   Yeah. We've been through two cameras. I
5  don't remember when I was issued the first one, but I
6  remember when I was on patrol we didn't have them.
7  And then when I was a detective at Zone 5 I guess we
8  had them, but we didn't have to wear them. And now
9  the same is true in homicide on that.
10   Q   Would you agree with me that with the Axon
11  at least when you activate the body camera, like, you
12  know, touch it to turn it on --
13   A   What now? I'm sorry.
14   Q   Poor question. I apologize. To turn on
15  the body camera you touch the camera located on your
16  chest, right?
17   A   Yeah. It's always running, but it's in a
18  buffering mode. And then when you touch it, it goes
19  back two minutes and records, you know, what was
20  previously on there and then goes forwards and
21  records video and sound after that, after you touch
22  it.
23   Q   Thank you for anticipating my next
24  question. Generally what happens is when you have a
25  body camera -- I'll just play, for example, a video

Page 183

1  that was produced us. 33D-2. When you hit play
2  you're going to have nothing as far as audio goes for
3  two minutes, right?
4    A   Correct.
5    Q   And then you'll hear in this one the audio
6  turns on, right?
7    A   Right.
8    Q   So you can make sure that nothing you're
9  saying -- you know what audio is going to be recorded
10  on the body camera, right?
11   A   Right.
12   Q   I want to show you 33D.
13       (A video clip was played.)
14   Q   So this is a video that was produced to us.
15  Would you agree that the audio turned on at the
16  five-second mark approximately in this video?
17   A   The five-second mark? What do you mean by
18  five second mark?
19   Q   Can you see the run time on the video right
20  here?
21   A   Yes.
22   Q   I'll play it.
23       (A video clip was played.)
24   Q   Maybe five or six seconds, right?
25       MS. LEWIS: I object as to relevancy,

Page 184

1    and that's as to speculation.
2    Q.  (By Mr. Greenamyre) You can certainly
3  testify whether you can hear a noise or not. Okay.
4  Do you have any reason -- I mean, we can see right at
5  the 01 second mark three officers are standing next
6  to each other, right?
7        MS. LEWIS: Same objection. You may
8    answer, Detective Barnett.
9    A   Correct.
10   Q   (By Mr. Greenamyre) And do you have any
11  idea why the audio doesn't start after two minutes,
12  and it starts at six seconds?
13   A   I don't.
14       MS. LEWIS: Same objection.
15   Objections.
16   Q.  (By Mr. Greenamyre) And I want to show you
17  33D-6. I'll play it from the start.
18       (A video clip was played.)
19   Q   I just played the first ten seconds of
20  33D-6. That's Keith on the night of the fire, right?
21   A   Yes.
22   Q   Do you know which officer he's talking to?
23   A   I don't.
24   Q   Do you know why that video's audio starts
25  after about zero or one or two seconds instead of

Page 185

1 after two minutes?

2 **A   I don't.  I'm not -- I mean, like I said,**
3 **I've never personally used the body cam, so I'm not**
4 **familiar with their intricacies.  I know that when I**
5 **watch video, usually the sound starts when they push**
6 **the button.**
7 **But there's other things that could -- just**
8 **off the cuff, there's other things that could start a**
9 **video, like a -- and if somebody -- for example, if**
10 **you pull your weapon out of your holster or you use**
11 **your taser, that turns on the video.  And when you**
12 **turn your siren and lights on in the car, that will**
13 **turn on the camera too.  So there could have been**
14 **things going on around them that activated his**
15 **camera.  So I don't know.  That's one explanation.**
16 Q   Sure.  Do you remember -- I think there's
17 some recording of you in the initial scene recording
18 audio that we listened to earlier talking about how
19 you were going to take a 360-degree video of the
20 suspected ligature around Deborah Hubbard's neck?
21 **A   I don't remember that.  I tried to mentally**
22 **block out most of that autopsy.  It's pretty awful.**
23 **I don't remember that.**
24 Q   Do you know whether --
25 **A   I didn't have a camera.  Are you talking**

Page 186

1 **about at the scene or at the autopsy?**
2 Q   Talking about at the scene.  At the scene.
3 **A   No, I didn't have a camera.  Now,**
4 **Leonpacher was the one who did that initial film at**
5 **the scene, that I might have been referring to his**
6 **camera.  But I didn't have a camera.  The only thing**
7 **I had was my audio recorder in my pocket.**
8 Q   And maybe it wasn't you.  Let me try and
9 play it, and we can figure it out, who said what.  So
10 I'm going to play the previously marked audio only
11 file, initial scene reporting starting at about the
12 26:30 mark.
13 (An audio clip was played.)
14 Q   So I mistakenly said or intimated that was
15 you.  That was somebody else.  Who was that?
16 **A   That's Detective Leonpacher.**
17 Q   Okay.  And we see that film.  Have you seen
18 any specific video where he shows like a 360-degree
19 view or tries to approximate that with regard to
20 Deborah at the scene around her neck?
21 **A   I don't recall that.  I didn't -- until you**
22 **played that I didn't ever remember that was said.**
23 **And when I said earlier I didn't have a camera on me,**
24 **of course I had my cell phone on me.  I did have a**
25 **camera on me, but I didn't utilize a camera.**

Page 187

1 Q   A couple of quick questions to close.  You
2 know, at the beginning of the day which seems so long
3 ago and was so long ago, you know, I asked you if you
4 as you sit here today still believe that's probable
5 cause and, in fact, that Keith Sylvester did commit
6 these murders.  At the end of the day today are both
7 those things true?
8 **MS. LEWIS:** I'm going to object to the
9 extent that we're seeking information or
10 investigative activities that go outside of the
11 warrant.  I think the question is directed to
12 whether or not Detective Barnett believes the
13 investigative activities in his application for
14 warrant for the defendant Keith Sylvester are
15 still truthful and accurate.  That's a fair
16 question, Zack.  But to the extent that it may
17 implicate whether or not there's still probable
18 cause to believe Mr. Sylvester is a suspect in
19 the investigation, I'm going to instruct Mr.
20 Barnett not to answer.
21 **MR. GREENAMYRE:** Kareemah, he answered
22 this question earlier in the deposition.  And my
23 purpose in asking it again is to see if anything
24 that we've talked about today has changed that.
25 So with that can you allow him to answer the

Page 188

1 question?
2 **MS. LEWIS:** Sure, to the extent that
3 it does not involve any new investigative
4 activities.  If you're relying on the
5 application for warrants, that's fine.  So I
6 have no objection to him answering to that
7 extent.
8 **MR. GREENAMYRE:** Okay.
9 Q   (By Mr. Greenamyre)  So looking at --
10 earlier in the deposition you said that you believed
11 as you sit here today there's probable cause to
12 arrest Mr. Sylvester.  After having talked about this
13 case for several hours and maybe remembering or
14 considering things that haven't been considered in
15 the past that we've talked about, do you still
16 believe there's probable cause to believe that Mr.
17 Sylvester killed Deborah and Harry Hubbard by
18 strangulation and arson?
19 **A   And how I would answer that was -- is I**
20 **stand by what I put in the affidavit as true and**
21 **correct to the best of my knowledge at the time.  And**
22 **at this point in the investigation I believe that**
23 **Keith Sylvester was involved in the murder of his**
24 **mother and stepfather.**
25 Q   Okay.  I'm trying to parse or understand

Page 189

1 your answer a little bit better.  Do I take it to
2 believe that he may -- your understanding today is
3 that he may not have done the strangling and the
4 arson, but he may have solicited somebody to do it?
5         MS. LEWIS: Objection.  And I'm going
6     to just renew my standing objection.  To the
7     extent you are relying on any new investigative
8     activities and/or evidence, I instruct him not
9     to answer.  However, if you are relying on the
10    previous warrant applications, please feel free
11    to answer that question to that extent.
12    A   Yeah, I don't believe that the
13 investigation was ever really very far off track, and
14 I acted -- I believe I did what I needed to do, I had
15 to do at that moment in time, and I stand behind it.
16    Q   (By Mr. Greenamyre)  And to be clear,
17 nothing about what we've talked about today has any
18 impact on your conclusion about Keith's culpability
19 today, right?
20    A   I would approach the investigation in a
21 different way.  But as I said before, I believe he's
22 culpable in this crime.
23    Q   You anticipated my next question as you've
24 done many times.  Would you change anything about how
25 your investigation went; and if so, what?

Page 190

1    A   Well, I mean, in hindsight I worked with
2 the tools that I had.
3         MS. LEWIS: Object.  I'm going to just
4     put an objection on the record as to
5     speculation, but you may answer.
6    A   (Continuing)  Thank you.  I worked with the
7 tools that I had.  And, you know, no investigation is
8 perfect.  But in good faith I worked hard on the
9 case, and I made the decisions that I thought were
10 right at the time.  And I still think the decisions I
11 made were good.  I stand behind my work.
12    Q   (By Mr. Greenamyre)  Anything specific you
13 can point to that you would have done differently in
14 the investigation if presented with the same facts
15 and circumstances today?
16         MS. LEWIS: Objection.  Calls for the
17     witness to speculate, but you may answer.
18    A   No, I can't point to one thing.  It's just
19 at the -- at that time we had limited -- more limited
20 tools than we do now.
21    Q   (By Mr. Greenamyre)  And when you say more
22 limited tools, is that a reference to the geofence
23 aspect?
24         MS. LEWIS: Objection to the extent
25     that you are implicating any evidence that may

Page 191

1 be tied to the new investigation.  But to the
2     extent it is not, you may answer.
3    A   I'm referring to that and just in things
4 that you learn, you know, in hindsight generally
5 about people and events when you look at them again.
6    Q   (By Mr. Greenamyre)  Similar question to
7 what I asked earlier.  Looking back in hindsight,
8 what you just said, you said kind of general
9 hindsight you would maybe do something differently
10 and where you have new tools, geofence warrant.  Are
11 you holding anything back from your answer to satisfy
12 your attorney's objection about the investigation or
13 did you -- would your answer be the same?
14         MS. LEWIS: Objection as to relevancy,
15     and I also renew my standing objection,
16     Detective Barnett, you may answer.
17    A   I'm not holding anything back.
18         MR. GREENAMYRE: Just trying to parse
19     this as best as possible given the parameters
20     that we've got.  I have no further questions for
21     you.
22         MS. LEWIS: I have a few brief
23     follow-up questions.  And I apologize.  We have
24     movers, children, family, pretty much everyone
25     running around in the background.

Page 192

1              EXAMINATION
2 BY MS. LEWIS:
3    Q   So Detective Barnett, I believe you
4 mentioned prior that you joined APD in 2005.  Is that
5 correct?
6    A   I was hired, yes.
7    Q   Prior to 2005.  Thank you.  And when did
8 you begin your role as detective?
9    A   April 2010.
10    Q   And when did you go to homicide?
11    A   April 2018.  I was sworn -- everything
12 seems to happen in April.
13    Q   Yeah, I just saw that.  When you began this
14 investigation into the untimely deaths of Deborah and
15 Harry Hubbard, how long had you been in homicide?
16    A   Three months.
17    Q   And what trainings had you had with regards
18 to homicide?
19    A   They offer a basic homicide investigation
20 course and a child death course, I think.  This is --
21 you know, I mentioned those emails that come out.
22 You sign up for the classes and you take them.  But a
23 big part of homicide is just going out to scenes and
24 being mentored by more senior investigators.  And as
25 I told you earlier, I've been a detective since 2010;

Page 193

1  so I have, you know, investigated dozens and dozens,
2  maybe hundreds of cases. And they're all similar to
3  homicide investigations, especially when your
4  investigation -- you're investigating aggravated
5  assaults. The only difference is in a homicide you
6  just don't have the victim as a witness. But
7  basically you handle all the investigations the same.
8  So --
9     Q   Have you handled aggravated assault
10 investigations?
11    A   Oh, yeah. Plenty of those when I was in
12 the zone, yes.
13    Q   If you had to estimate approximately how
14 many investigations you had completed prior to April
15 2018 when you came to homicide, how many
16 approximately would you say you've done prior to
17 April 2018?
18    A   Oh. How many investigations? Probably
19 hundreds. Hundreds.
20    Q   And I realize you stated this was your
21 first homicide as lead. What other roles have you
22 played with regards to homicide investigations that's
23 not lead?
24    A   When a detective -- like I said before,
25 it's kind of a team effort. And whenever the lead is

Page 194

1  assigned a case, then it's up to everybody else to
2  pitch in and help out as far as if he needs
3  assistance with canvassing, collection of evidence,
4  Processing the scene, processing the vehicle, a
5  search warrant for a premises that needs to be
6  investigated maybe having something to do with the
7  investigation. You know, cell phone -- whatever
8  needs to be done for the prime areas is assigned to
9  everyone else in the unit if he needs help.
10    Q   How many prior homicide investigations have
11 you helped on?
12    A   I would probably say -- I don't know
13 exactly, but from April until July at least one a
14 week. I guess we'd get one case a week that we go
15 out on average. So maybe six, half a dozen, a dozen
16 maybe.
17    Q   Now I'm going to jump to this investigation
18 that we're here for today involving Mr. Sylvester.
19 When you arrived on scene, I believe you mentioned
20 speaking to an arson investigator who implicated Mr.
21 Sylvester as a suspect. Had you made the
22 determination to arrest Mr. Sylvester at that time?
23    A   No, absolutely not.
24    Q   Okay. And I believe there was some video
25 Mr. Sylvester turned over to the arson investigator.

Page 195

1  At that time was this matter -- had it been deemed a
2  homicide?
3     A   Well, it was looking that way. By the time
4  I got to the scene, you know, there was a suspicion
5  that it was a homicide, but it wasn't conclusive.
6     Q   Had that been communicated to Mr.
7  Sylvester?
8     A   I don't know. I'm not sure. I don't think
9  so. I don't think so.
10    Q   I'm sorry. Let me ask this question: Did
11 you communicate that to Mr. Sylvester?
12    A   No. He didn't know who I was. I mean,
13 there was a lot of investigators there, a lot of
14 police, a lot of officers, a lot of fire. I doubt he
15 even knew homicide was on the scene.
16    Q   We talked around the medical examiner's
17 report a lot. What specifically was the opinion of
18 the medical examiner as to the cause of death?
19    A   That he -- he said that there were two
20 causes of death: strangulation and thermal injuries,
21 I believe was the term.
22    Q   Is that as to both victims?
23    A   Yes.
24    Q   And at the time that you swore applications
25 for these warrants were you aware of that opinion?

Page 196

1     A   Yes.
2     Q   I'm sorry. Were you aware of that opinion
3  from the medical examiner?
4     A   I was, yes.
5     Q   With regards to the video investigation,
6  there I believe was a portion of your testimony with
7  Mr. Greenamyre that you indicated there was video Mr.
8  Sylvester provided that was turned over for analysis.
9  Was that correct?
10    A   I'm sorry. Can you repeat it?
11    Q   I believe you mentioned that there was
12 video that Mr. Sylvester provided that was turned
13 over for analysis. Would that be accurate?
14    A   That's true.
15    Q   Did Mr -- I believe you mentioned
16 Mr. Leonpacher's name. Was he the one who analyzed
17 that video?
18    A   At the beginning, yes.
19    Q   Okay. What specifically were his findings
20 with regards to deleted portions of that video?
21    A   He was concerned about the deletions,
22 whether they had been strategically deleted by Keith
23 to show some kind of behavior that he didn't want
24 on the -- he didn't want shown. And that's the
25 reason we went to the Secret Service for analysis.

Page 197

1   Q   Did they confirm or deny that portions of
2   the video had been deleted?
3   A   They confirmed that much.
4   Q   Did they specify which portions and
5   specifically which time frames of that video had been
6   deleted?
7   A   No. That was the problem. They could not.
8   Q   Could you use that video to exclude Mr.
9   Sylvester as a suspect in this matter?
10   A   No, I didn't. No.
11   Q   Did this video signify that Mr. Sylvester
12   could not have been at the home when the fire
13   occurred?
14   A   I don't believe it showed that. Because we
15   didn't know when the fire happened.
16   Q   And when you say -- I'll get to that in a
17   few. Almost done, Detective Barnett. With regards
18   to the medical examiner's report determining the
19   cause to be -- the cause of death, how was it
20   possible for Mr. and Mrs. Hubbard to have been
21   strangled when there was soot in their lungs?
22   A   They were strangled to unconsciousness but
23   not death, which means after the person had released
24   the strangulation, released the pressure on their
25   neck, they were still breathing, maybe slightly, but

Page 198

1   they were still alive. Maybe not conscious but
2   alive.
3   Q   Do you recall who the medical examiner was
4   in this case?
5   A   Dr. Heninger.
6   Q   And do you know of any of his -- who does
7   he work for?
8   A   Fulton County Medical Examiner's Office.
9   Q   Do you know how long he's been there?
10   A   I do not, but I think he's pretty senior.
11   Q   And was it consistent -- and I'm going to
12   ask specifically with regards to the medical
13   examiner's report -- was his report consistent with
14   the soot being present in the lungs of both Mr. and
15   Mrs. Hubbard?
16   A   Yes.
17   Q   Okay. As to the fire, do all fire
18   investigations involve arson?
19   A   No.
20   Q   Why was this investigation determined to
21   have involved arson?
22   A   Honestly, I don't know what their protocols
23   are. I'm not -- I know very little about it. All I
24   know is when I got to the scene the arson
25   investigators were already there. I don't know if

Page 199

1   it's commonplace or it's just certain instances.
2   Q   Do you make that determination, Detective
3   Barnett?
4   A   I do not.
5   Q   With regards to how the fire started, what
6   were the findings of the arson investigators?
7   A   What they could tell me was no accelerant
8   was used to start two separate fires in the back of
9   the house.
10   Q   And specifically where were those two
11   points of initiation for this fire?
12   A   From what I remember is the office that
13   Deborah was in and -- found in and the bedroom next
14   to that.
15   Q   Was that consistent with the burn damages
16   to the home?
17   A   It was, because most of the burn damage was
18   in the back of the house, the most severe burn
19   damage.
20   Q   Could the arson investigators rule out the
21   theory of a slow-burn fire?
22   A   No. They couldn't give me any kind of time
23   frame whatsoever.
24   Q   Were the mothballs that were in the
25   video -- I think it was Plaintiff's Exhibit 7 -- and

Page 200

1   the photos that were shown to you, were they
2   determined to be the mothballs that were purchased by
3   Mr. Sylvester?
4   A   I have no idea. I don't know how many
5   boxes of mothballs Keith owned or his mom owned that
6   could have been destroyed in the fire.
7   Q   How many hours did you spend investigating
8   this matter in totality?
9   A   I've never thought about it. I worked four
10   days a week eight hours a day. Pretty much for the
11   first six months I had -- from July to December I had
12   a total of three homicide cases that I was working.
13   Actually this one and another one that took a lot of
14   time, and then I had another case I was assigned to
15   that turned into being an aggravated assault because
16   the victim didn't die. But those three cases were
17   the only cases I was working in that time frame, so I
18   spent a lot of time on this case, especially being my
19   first case, you know.
20   Q   Approximately how many days would you say
21   you spent investigating this case only?
22   A   Probably every day up until my next
23   assignment which I believe was in October maybe. I
24   was full time on this case.
25   Q   And how many other homicide investigators

Keith Sylvester vs.
James Barnett, et al.

Detective James Barnett
April 9, 2021

Page 201

1 would have been involved throughout the course of
2 this investigation approximately?
3    A   Six or seven.  Probably I would guess that
4 the entire unit had their hands on this case at one
5 time or another.  Everybody was helping out, and
6 everybody was interested in the case because it's a
7 doozy.  So everybody wanted to give their opinion on
8 it.
9    Q   And I recall you and Attorney Greenamyre
10 mentioning that doctrine where one officer's
11 knowledge is imputed to the other.  Was there a lot
12 of shared opinions with you throughout this
13 investigation from other homicide investigators?
14    A   Yes.
15    Q   How many arson investigators approximately
16 do you believe were involved throughout the course of
17 this investigation?
18    A   Lieutenant Dorgan, Captain Bonner, there
19 may have been a couple of others.
20    Q   And what about specialists?  How many
21 specialists do you think were consulted?  And I mean
22 those individuals that have that special area of
23 expertise whether it be in a technical or
24 evidentiary, physical analysis, this type of way?
25    A   Well, the GBI was utilized as far as

Page 202

1 accelerants by the arson investigators, and I used
2 the Secret Service.  We used to have a person that
3 checked social media type stuff.  I don't remember if
4 I utilized her or not in this investigation.  But,
5 you know, whenever something came up that I wasn't
6 comfortable with or didn't have an expertise in I
7 would seek out advice or get help from another
8 detective.
9    Q   How many calls approximately do you think
10 you had with the medical examiner?
11    A   Maybe six.  I was communicating with Dr.
12 Heninger a bit.
13    Q   And as a homicide detective, when you
14 investigate homicides do you regularly consider
15 alternative theories throughout the course of the
16 investigation?
17    A   Absolutely.  Absolutely.  I try to keep an
18 open mind.  You know, you don't want to get -- you
19 don't want to get tunnel vision on one guy.  You
20 know, if you lose focus you'll jeopardize the
21 investigation.
22    Q   Did you consider any other alternative
23 theories aside from homicide in this instant
24 investigation that we're here for today?
25    A   At the beginning of the investigation we

Page 203

1 weren't even sure if it was a homicide, but more and
2 more things would come in, yeah, it's looking like a
3 homicide.  So early on we determined it was going to
4 be a homicide, I was going to be the lead, and we
5 went from there.
6    Q   And were the citronella candles considered
7 as possible culprits for the murders of Mr. and
8 Mrs. Hubbard?
9    A   They were considered, yes.
10    Q   A couple more questions.  Did you
11 intentionally leave any information out of the
12 warrant affidavit?
13    A   I did not.
14    Q   At the time that you signed the warrant
15 affidavit did you believe that probable cause
16 existed?
17    A   One hundred percent, yes.
18    Q   Did you act with intent to harm or
19 otherwise do damage to Mr. Keith Sylvester during the
20 course of this investigation?
21    A   I did not.
22       MS. LEWIS:  No further questions.
23    Thank you.  Do you have any others, Zack?
24       MR. GREENAMYRE:  Yeah, maybe just a
25    couple.

Page 204

1       FURTHER EXAMINATION
2 BY MR. GREENAMYRE:
3    Q   If you saw that Harry Hubbard was using his
4 phone making phone calls after the time that Keith
5 had left the home, would that at least get you to
6 believe that Keith was not involved in this?
7    A   Well --
8       MS. LEWIS:  Objection.  Speculation.
9    But you may answer, Detective Barnett.
10    A   (Continuing)  Okay.  So like I said before,
11 when you consider the deletions from the video and
12 the unknown time frame of when the fire started, and
13 the fact that maybe Keith was calling his father's
14 cell phone that he picked up after he strangled him,
15 there's a lot of reasons to doubt whether that could
16 be accurate or not.
17       But that would be something to think about
18 definitely.  But I don't think it would say, no, it's
19 impossible.  Because we did discuss that, whether --
20 you know, and that was one of -- interestingly that
21 was one of Keith's concerns:  What happened to my
22 dad's phone; was it burned up.  And so it's curious
23 that you would ask that actually.  That reminded me
24 that Keith was very concerned about where his
25 stepdad's phone was.  And that makes me start

Keith Sylvester vs.
James Barnett, et al.

Detective James Barnett
April 9, 2021

Page 205

1 thinking of other things.

2    Q   And did you ever determine where his --

3 Harry Hubbard's phone was?

4    A  No.  Originally we thought that it had been

5 burned up; but at that time, no.

6    Q   Do you think it had been burned up based on

7 its pattern of communications or was that not

8 something that was considered at that particular

9 time?

10    A  It was considered because I couldn't find

11 it.

12        MR. GREENAMYRE: I've got nothing

13 further.  Thank you.

14        MS. LEWIS: I'm also done.  Thank you.

15        (Off-the-record discussion.)

16        (The right of the witness to read and

17    sign the deposition transcript was waived.)

18        THE VIDEOGRAPHER: Off the video

19 record at 4:14.

20        (Deposition concluded at 4:14 p.m.)

21

22

23

24

25

---

Page 206

1       COURT REPORTER DISCLOSURE STATEMENT

2

3 STATE OF GEORGIA      Deposition of witness:

4 COUNTY OF COBB       DETECTIVE JAMES BARNETT

5

6     I am a Georgia Certified Court Reporter.  I am

7 here acting as a sole practitioner.

    I was contacted by the offices of MITCHELL &

8 SHAPIRO through Lyon Reporting, Inc. to provide court

9 reporting services for this deposition.  I will not

be taking the deposition under any contract that is

10 prohibited by O.C.G.A. 15-14-37(a) and (b).

11     I have no contract/agreement to provide

reporting services with any party to the case, or any

12 reporter or reporting agency from whom a referral

might have been made to cover this deposition.  I

13 will charge my usual and customary rates to all

parties in the case, and a financial discount will

14 not be given to any party to this litigation.

15

16 _____ CCR B-929  Date _____

17 Certified Court Reporter

18

19

20

21

22

23

24

25

---

Page 207

1        C E R T I F I C A T E

2

3 G E O R G I A:

4 COBB COUNTY:

5     I hereby certify that the foregoing

6 deposition was taken down, as stated in the caption,

7 and the questions and the answers thereto were

8 reduced to typewriting under my direction; that the

9 foregoing pages 1 through 205 represent a true and

10 correct transcript of the evidence given upon said

11 hearing, and I further certify that I am not of kin

12 or counsel to the parties in the case; am not in the

13 regular employ of counsel for any of said parties;

14 nor am I in any way interested in the result of said

15 case.

16     I further certify that I have no contractual

17 agreement with any parties in the case, and my

18 charges are reasonable and customary.

19     This, the 27th day of April, 2021.

20

21

22

23         ALLISON H. BRADFORD, CCR-B-929
        My commission expires:
        January 30, 2022

24

25

---

**$**

**$180,000 (1)**
64:25

**[**

**[sic] (1)**
138:21

**A**

**abandoned (2)**
59:22;60:1
**ability (1)**
71:7
**able (12)**
78:23;92:16,24;93:1;
100:15,21;111:17;
134:22;135:2,21;
162:1;180:24
**above (2)**
76:1;149:6
**absence (4)**
20:18;63:20;114:17;
115:13
**Absolutely (8)**
9:18,25;10:11;13:25;
45:19;194:23;202:17,
17
**abuse (1)**
169:18
**AC (2)**
138:12,16
**accelerant (4)**
63:21;86:6;135:1;
199:7
**accelerants (4)**
85:15;86:3,9;202:1
**accessible (1)**
19:5
**accident (3)**
36:23;107:12;130:15
**accidental (1)**
158:3
**accidents (1)**
38:5
**accommodate (1)**
81:4
**According (7)**
41:18;50:2;55:7;
68:19;120:21;126:3;
151:17
**accounted (2)**
162:9;166:8
**accurate (11)**
9:16,19;10:9;13:20;
41:2;66:6;125:23;
172:4;187:15;196:13;
204:16
**accurately (1)**
149:15

**accuse (1)**
32:23
**accused (1)**
59:20
**Ace (1)**
134:20
**acknowledge (1)**
153:18
**acne (1)**
168:18
**across (5)**
28:23;41:21;59:23,
24;80:19
**act (1)**
203:18
**acted (2)**
64:14;189:14
**acting (2)**
12:21;15:4
**action (1)**
14:24
**activate (1)**
182:11
**activated (1)**
185:14
**active (1)**
170:8
**activities (10)**
19:19;21:5,7;36:4,
16;37:12;187:10,13;
188:4;189:8
**activity (1)**
167:16
**actually (14)**
10:1;15:13;19:6;
29:2,3;37:2;41:18;
60:13;93:4;109:5;
111:10;165:25;200:13;
204:23
**ADA (3)**
97:4;104:4;175:1
**add (4)**
6:15;54:5;89:7;
106:11
**added (2)**
74:10;89:9
**addition (1)**
24:13
**additional (1)**
104:12
**administered (1)**
40:22
**administrative (1)**
174:17
**admits (1)**
68:16
**adopted (1)**
78:25
**advance (1)**
154:1
**advancements (1)**
173:3
**advantage (3)**

46:15;47:21;50:22
**adverse (1)**
14:24
**advice (1)**
202:7
**Advocacy (1)**
137:15
**affect (2)**
79:5;127:21
**affected (2)**
79:9;129:25
**affidavit (16)**
10:19,25;24:9;25:18;
27:2;54:19;66:16;70:4;
71:12;72:21;89:15;
143:21;145:22;188:20;
203:12,15
**affidavits (2)**
10:8,9
**afford (1)**
138:16
**afternoon (1)**
13:1
**afterwards (3)**
70:24;80:4;178:15
**ag (1)**
129:24
**again (19)**
20:1;23:17;51:18,19;
54:18;93:25;110:15;
113:15;123:3;150:21;
151:6;156:16;158:2,
20;170:17;175:3;
179:23;187:23;191:5
**against (6)**
6:4;14:25;95:22;
170:20;171:7;179:19
**agencies (1)**
172:24
**aggravated (3)**
193:4,9;200:15
**aggressor (1)**
130:22
**agitated (1)**
40:15
**ago (8)**
6:11;44:3;78:5;
95:23;119:6;178:4;
187:3,3
**agree (69)**
4:22;7:11;8:17;9:14;
10:8,12,18,23;11:3,4,7,
8,21;12:18;13:8,12,13,
17,22,25;14:1;15:3;
20:2;21:15;25:23;26:4,
13;28:1,12;102:10;
104:11;105:4;119:13,
15;120:8;126:23;
129:1;130:25;132:12;
133:5;135:7;136:2,9,
19;138:6,11;139:7,8,
11;140:5;141:6,10;
143:8;145:12,17,21;

148:10;149:25;150:5;
157:20;158:8;162:4;
165:11;167:4,21;
172:8;176:18;182:10;
183:15
**Agreed (4)**
4:25;5:4;86:11;
171:16
**agreement (1)**
4:11
**ahead (7)**
7:17;20:22;23:18;
27:15;46:8;47:10;
84:16
**air (6)**
30:4;62:4,8;98:10;
138:8;157:18
**al (1)**
4:8
**alcohol (9)**
30:12,21;63:12,18;
64:3;86:7;134:23;
168:12,22
**alerts (1)**
172:25
**Alex (3)**
131:16,21,23
**alibi (1)**
14:4
**alive (5)**
110:25;111:5;
167:11;198:1,2
**allegations (1)**
19:21
**alleged (1)**
13:19
**allow (1)**
187:25
**allowed (3)**
24:21;66:12;126:6
**alluded (1)**
117:4
**alluding (1)**
117:21
**almost (6)**
46:2;62:18;69:7;
78:10;173:2;197:17
**along (3)**
55:20;137:19;159:14
**alternative (2)**
202:15,22
**Althea (6)**
59:1;137:15,18;
138:3;162:24;163:25
**although (5)**
18:5;25:6;34:14;
110:18;173:17
**altogether (1)**
32:17
**always (10)**
12:1;38:21;46:10;
54:13;75:16;143:10;
167:7;175:6;181:19;

182:17
**ambiguity (1)**
30:19
**amended (1)**
33:13
**Amendment (4)**
10:12;11:11,21;
12:22
**amongst (1)**
128:11
**amount (1)**
114:2
**analysis (14)**
38:12;56:23;57:3,12;
70:7;129:25;156:6;
161:11;167:17;169:10;
196:8,13,25;201:24
**analysts (1)**
57:1
**analyzed (1)**
196:16
**anchor (1)**
129:6
**and/or (2)**
102:1;189:8
**Andre (4)**
164:10,15,17,18;
165:2,7
**Android (1)**
76:18
**anecdote (1)**
155:10
**Angel (3)**
162:18;163:2;180:13
**Angela (1)**
162:18
**angry (1)**
49:20
**answered (4)**
101:19;127:2;
171:11;187:21
**anticipate (1)**
23:24
**anticipated (1)**
189:23
**anticipating (4)**
8:11;71:22;109:9;
182:23
**Antonio (2)**
98:2;138:8
**anymore (2)**
33:1;62:10
**Apart (2)**
115:6;174:1
**apartment (8)**
5:25;47:16;51:7,8;
100:1;138:24;168:16,
23
**apartments (2)**
46:17;55:13
**APD (11)**
10:1;17:25;67:20;
74:18,21,24;76:22;

100:7;173:21;181:11;
192:4
**APD-issued (1)**
76:13
**APD's (1)**
95:24
**apologies (1)**
101:22
**apologize (4)**
97:7;123:1;182:14;
191:23
**app (2)**
75:25;76:10
**apparent (1)**
176:15
**appear (5)**
57:10;73:2;101:13;
113:14;148:17
**appearance (1)**
56:21
**appeared (2)**
28:11;104:15
**appearing (1)**
135:14
**appears (2)**
148:14;149:3
**application (8)**
11:9,20;12:19;72:22;
134:5;179:18;187:13;
188:5
**applications (2)**
189:10;195:24
**applied (1)**
136:10
**applies (1)**
20:17
**apply (3)**
108:12;109:14;171:6
**appreciate (4)**
4:20;85:25;118:9;
153:19
**appreciated (1)**
89:13
**approach (2)**
19:8;189:20
**appropriate (2)**
23:20,22
**approval (1)**
84:6
**approximate (2)**
159:10;186:19
**approximately (7)**
183:16;193:13,16;
200:20;201:2,15;202:9
**April (9)**
16:11;78:16;81:15;
192:9,11,12;193:14,17;
194:13
**area (23)**
17:21;22:6;47:5;
56:14,19;57:3,6,9,14,
16;59:17;83:24,25;
91:20;104:18,19;

106:14;114:17;172:1;
173:8,18,24;201:22
**areas (2)**
149:18;194:8
**argument (1)**
42:3
**argumentative (1)**
40:10
**arguments (3)**
12:2,9;13:2
**around (58)**
9:3;23:5;28:11;29:2,
8,9,14;31:16,20;32:4,
16;33:3,7;35:17,22;
36:16;37:11;54:25;
72:1;74:6;75:11;93:18;
94:13;95:2,3;100:11;
103:15,18,18,24;104:2,
13,18;105:8,18;106:1,
3,8,11;107:9;115:9,20,
24;116:2;130:6;131:7;
148:20;149:9;152:15;
153:18;162:6;166:16;
174:12;185:14,20;
186:20;191:25;195:16
**aroused (1)**
137:17
**arrest (21)**
12:3,10;25:22;27:2;
34:5;46:23;47:1,2,15;
79:16,23;81:7,11;
133:1;166:3;174:14,
16,22;179:19;188:12;
194:22
**arrested (4)**
74:6;79:14,19;81:9
**arrests (1)**
21:7
**arrival (2)**
125:18;126:23
**arrived (5)**
35:21;82:6;146:7;
149:16;194:19
**arriving (1)**
82:22
**arson (33)**
34:25;35:6,12,15;
36:10;58:2;59:22;64:4;
66:2;67:2;85:12,12;
88:21;89:7,9;95:9;
99:3,5;102:14;106:14,
16;107:2;188:18;
189:4;194:20,25;
198:18,21,24;199:6,20;
201:15;202:1
**article (3)**
41:7;42:4;73:10
**articulate (1)**
13:18
**articulated (1)**
13:20
**artistic (3)**
37:6,6;38:5

**ash (1)**
110:22
**ashes (1)**
136:7
**aside (1)**
202:23
**asleep (1)**
107:24
**aspect (3)**
56:20;58:11;190:23
**aspects (1)**
63:16
**aspersions (1)**
70:22
**asphyxiate (1)**
108:7
**ass (1)**
130:21
**assault (2)**
193:9;200:15
**assaults (2)**
129:24;193:5
**assessments (1)**
114:24
**assigned (4)**
15:22;194:1,8;
200:14
**assignment (1)**
200:23
**assistance (1)**
194:3
**assistant (1)**
172:17
**associated (2)**
105:6;170:8
**assume (21)**
7:12,12;29:25;31:17;
34:8;38:10;56:16;
58:10,21;62:19;63:14;
73:17;91:6;92:3;
107:14;113:6;124:15;
129:14;139:5;145:18;
147:16
**assumed (1)**
47:12
**assumption (3)**
103:11,16;145:20
**astounded (1)**
34:24
**astronomical (1)**
81:12
**AT&T (3)**
90:17;91:4,10
**Atlanta (17)**
15:5;34:3;55:5,19;
56:22;57:23;58:4;
78:14;80:21;89:25,25;
101:25;118:3;121:8;
126:2,25;142:17
**ATM (1)**
94:13
**attempted (1)**
68:21

**attention (12)**
30:10,24;31:11;
36:11,14;70:6,14;
82:10;97:18;126:9;
139:24;158:24
**attitude (1)**
137:16
**attorney (5)**
8:19;128:8,9;178:25;
201:9
**attorneys (2)**
172:17,18
**attorney's (2)**
179:16;191:12
**audio (22)**
43:12,19;150:14;
152:6,19;154:8;155:1,
8;156:22;158:1,19;
159:1;183:2,5,9,15;
184:11,24;185:18;
186:7,10,13
**audio-only (1)**
154:16
**August (7)**
54:22;73:17;74:5;
122:15;123:4;163:3,8
**author (1)**
41:7
**authored (3)**
97:4;119:23,25
**autism (1)**
45:6
**autopsy (14)**
29:8;90:12;103:22;
110:19;111:25;112:1,
2;114:25;116:13,16,
22;176:25;185:22;
186:1
**available (4)**
13:24;25:21;89:20;
173:1
**average (2)**
174:11;194:15
**avoid (1)**
32:16
**awake (1)**
159:16
**aware (29)**
41:14;44:23;51:12;
65:21;71:11;79:8;
98:22,25;114:7,21,25;
115:19;117:22;119:3;
120:14;121:19;128:4,
19;134:7,13;140:11,
18;160:8;171:2,21;
173:9,14;195:25;196:2
**away (3)**
55:5;85:21;178:15
**awful (1)**
185:22
**Axon (3)**
181:10;182:2,10

**B**

**babysitting (1)**
44:5
**back (68)**
6:14,17;18:15,20;
23:13,17;27:24;46:24;
47:6,16;50:6,10,19;
51:15;54:21;55:16,18,
22;62:25;71:11;72:17;
80:3;82:13;87:13;
88:10;89:1;100:1,19;
106:7;118:13,24;
122:20,22;123:4,24;
124:3,4;143:16,23;
144:23;148:2,7,21;
149:23;153:8;154:20;
160:6,14;161:14;
162:7;170:3,6,6;
172:10;174:2,24;
177:15;178:3;179:4,5,
22;182:1,19;191:7,11,
17;199:8,18
**background (3)**
9:10;14:23;191:25
**backup (1)**
89:11
**backward-facing (1)**
180:22
**backwards (1)**
88:9
**backyard (2)**
14:15;31:3
**bad (4)**
55:22,23;111:19;
164:7
**badly (1)**
141:24
**bags (1)**
121:25
**balance (1)**
31:3
**ball (2)**
100:10;135:4
**band (4)**
115:20,22;116:6;
130:6
**bar (1)**
27:24
**Barnett (31)**
4:7,8,13;5:7;24:3;
42:22;72:5;104:22;
106:22;118:18;132:14;
133:4,24;134:10,17;
145:25;170:13,18;
172:6,14;173:13;
176:4;177:8;184:8;
187:12,20;191:16;
192:3;197:17;199:3;
204:9
**Barnett's (2)**
19:22;21:4

based (14)
12:7;19:18;21:4;
46:15;81:11;101:13;
103:8,9;113:20;131:2;
132:16;146:19;157:18;
205:6
basic (6)
6:12;13:5;107:14;
116:21;119:17;192:19
basically (9)
16:18,19;40:15;53:5;
71:5;157:7;162:4;
177:3;193:7
basics (1)
116:13
basis (5)
13:18,20;31:23;
52:23;173:2
basket (1)
39:5,6
bat (1)
83:3
bearing (2)
81:23;153:20
beat (1)
58:15
became (2)
40:9,14
become (2)
108:8;109:5
bed (1)
108:4
bedroom (10)
87:23;88:10,12,12,
17,25,25;160:14;
161:3;199:13
began (1)
192:13
begin (1)
192:8
beginning (4)
83:12;187:2;196:18;
202:25
behavior (1)
196:23
behind (6)
75:20;134:14;
146:23;160:16;189:15;
190:11
belief (2)
13:18;141:18
believes (1)
187:12
bell (1)
145:7
Below (2)
68:10;149:3
beneficiaries (2)
128:15,16
beneficiary (9)
64:5,17,20;65:2;
66:3,5,20;127:16;
128:25

benefit (2)
18:15;62:25
benefits (3)
46:19;50:22;51:11
Benton (1)
17:17
benzodiazepine (1)
156:14
benzodiazepines (1)
156:5
beside (1)
51:19
besides (5)
43:24;83:22;85:3,13;
106:18
best (7)
4:21;6:23;26:2;42:5;
60:21;63:2;76:7,8;
100:9;105:3;108:23;
123:18,19;188:21;
191:19
better (6)
31:6;41:22;48:19;
49:4;98:6;189:1
beyond (2)
25:20;51:11
big (7)
63:7;122:13;150:18;
151:3,17;167:1;192:23
bigger (1)
131:20
biological (2)
64:18;139:13
birthday (7)
81:10,13,14,16,19,
22,22
bit (25)
27:8;30:19;34:12;
40:19;41:5;53:18;
71:25;75:20;100:18;
109:12;110:1;120:13;
127:13;129:15;130:23;
137:8;141:20;150:13;
154:6;155:6;157:25;
158:18;174:16;189:1;
202:12
BJ (6)
93:23;94:1,3,9,10,12
black (3)
131:6,9;165:22
blah (3)
82:18,18,18
block (1)
185:22
blood (3)
109:4;117:13,18
blow (1)
131:12
blue (3)
50:5;57:11;151:1
board (4)
16:1,13,16,17
bodies (4)

35:6;106:18;116:11;
141:23
body (14)
35:9,16,21;82:14;
83:6;90:1;100:7;
181:11,19;182:11,15,
25;183:10;185:3
bolt (2)
28:7;143:19
bone (11)
112:4,5,9,12,18,24;
113:7,15,18,20;115:7
bones (2)
113:20;114:8
Bonner (7)
34:4;87:11;102:1;
157:3,3,4;201:18
booking (1)
132:25
boss (2)
62:7;174:9
Both (28)
6:3;55:2;65:7;
107:16,16,18;108:4,4,
5,20,23;109:23;111:4;
122:16;123:11;127:6,
8;138:2;141:11,13;
164:14;166:22;169:8,
14;180:23;187:6;
195:22;198:14
bottle (3)
168:12,14,22
bottom (6)
10:2;16:5;74:19,23;
88:6;98:1
bought (10)
30:8,12;55:9;63:12,
24;120:17;121:4,20;
138:18;145:3
bouts (1)
168:25
box (6)
28:11,23;29:1,14;
149:4,4
boxes (7)
74:19;100:24;101:8;
150:6,7,11;200:5
bracelets (1)
135:12
brain (1)
109:4
branch (1)
41:14
brand (1)
182:3
Brandon (1)
93:23
breach (6)
78:14,19,22;79:1,4,9
bread (1)
42:5
break (15)
6:24;7:1;56:8;71:14,

16;79:11;112:24;
118:7,11,12,15;143:1;
153:1,17;169:22
break-in (1)
140:11
breaking (2)
80:22;113:7
breaks (1)
112:9
breathing (3)
110:23;151:12;
197:25
brief (2)
72:16;98:2;118:23;
153:7;170:2;191:22
briefly (3)
28:4;30:3;44:2
bright (1)
149:25
bring (2)
46:24;121:24
bringing (1)
121:14
broke (2)
60:15;164:19
broken (1)
113:15
brought (4)
81:24;82:10;126:8,8
brunt (1)
149:22
Buffalo (19)
54:22;55:16,22;
58:17;64:21;65:19;
117:23;121:8;122:22;
123:4;124:5;126:2,25;
130:24;138:2;140:12;
142:17;162:21;178:17
buffering (1)
182:18
bug (2)
29:25;30:7
bunch (5)
72:2;79:12;89:23;
105:8;152:11
burglaries (1)
57:5
burglarizing (1)
140:19
burglary (4)
27:24;56:13;57:5,17
burn (12)
29:24;30:8;31:12;
82:16;95:18;102:2;
135:20;138:13;149:21;
199:15,17,18
burned (14)
14:14;30:9;34:18;
66:1;104:25;134:15;
138:7;141:24,24;
149:19;158:15;204:22;
205:5,6
burned-out (1)

16;79:11;112:24;
118:7,11,12,15;143:1;
153:1,17;169:22
break-in (1)
140:11
breaking (2)
80:22;113:7
breaks (1)
112:9
breathing (3)
110:23;151:12;
197:25
brief (2)
72:16;98:2;118:23;
153:7;170:2;191:22
briefly (3)
28:4;30:3;44:2
bright (1)
149:25
bring (2)
46:24;121:24
bringing (1)
121:14
broke (2)
60:15;164:19
broken (1)
113:15
brought (4)
81:24;82:10;126:8,8
brunt (1)
149:22
Buffalo (19)
54:22;55:16,22;
58:17;64:21;65:19;
117:23;121:8;122:22;
123:4;124:5;126:2,25;
130:24;138:2;140:12;
142:17;162:21;178:17
buffering (1)
182:18
bug (2)
29:25;30:7
bunch (5)
72:2;79:12;89:23;
105:8;152:11
burglaries (1)
57:5
burglarizing (1)
140:19
burglary (4)
27:24;56:13;57:5,17
burn (12)
29:24;30:8;31:12;
82:16;95:18;102:2;
135:20;138:13;149:21;
199:15,17,18
burned (14)
14:14;30:9;34:18;
66:1;104:25;134:15;
138:7;141:24,24;
149:19;158:15;204:22;
205:5,6
burned-out (1)

148:11
burning (6)
37:11;57:7;60:12;
85:22;95:5;150:4
burns (1)
30:25
business (2)
42:12;127:22
businesses (1)
166:9
button (1)
185:6
buy (3)
29:23;100:25;121:7
buying (1)
50:1
buys (1)
50:6

C

cable (3)
28:11;29:1,14
cables (9)
35:16;104:2,6,10,12,
12;105:5,6,8
call (13)
8:23;35:3,18;47:22;
48:16;57:1;69:9,19,25;
84:17;95:2;164:22,23
called (16)
35:4;36:10;46:22;
47:2;60:6;69:17;75:17;
85:20;98:12;137:15;
151:22;152:4;159:8;
165:22;166:3,24
calling (1)
204:13
calls (16)
47:3;48:21,22;75:10;
133:8;134:9,16;
145:24;146:24;162:13;
166:23;167:9;172:12;
190:16;202:9;204:4
cam (10)
37:24;38:4;69:10;
92:21;100:6;161:8;
177:5;180:21,23;185:3
came (23)
25:7;35:7;62:5;
64:13;78:4,15;79:21;
82:7;85:8;97:18;
104:16;121:17,24;
122:10;125:11;138:4;
141:22;161:25;162:3,
7;177:23;193:15;202:5
camera (30)
8:5;36:17;37:3;
82:14;83:2,6;91:1;
93:3;120:18;121:4;
177:17;180:21,22;
181:6,11,19;182:11,15,
15,25;183:10;185:13,

15,25;186:3,6,6,23,25,
25
**cameras (6)**
36:19;90:1;100:7;
180:23;181:22;182:4
**camp (1)**
42:8
**cams (1)**
180:20
**can (112)**
4:20,22;5:5;6:17,25;
7:12,17;8:12,13;9:8;
14:1,4,24;17:1;19:4,8;
21:9;23:1,5,7,20;24:2,
18;25:6,11;27:4;28:14;
38:23,25;39:6,14;41:6;
42:3,6;43:21;51:21;
56:7;57:15;58:14;
63:19;66:11,13,25;
67:25;69:14;73:5,12;
75:20;77:9,15,17;
80:16;81:16;82:1;
87:17;94:8;97:12;
101:20;103:4;104:21;
105:3;107:6;109:2;
122:25;124:1,23;
128:14;129:15;131:1,
4,20;134:25;136:2,23;
139:24;142:24,25;
145:16;146:13;148:20,
24;149:18;150:13,21;
151:21;152:1,25;
155:15;157:5;160:1;
164:13;166:17;169:21;
172:3;173:13;174:1;
175:6,10,18;176:8;
178:4,20;181:23;
183:8,19;184:2,3,4;
186:9;187:25;190:13;
196:10
**canceled (1)**
123:12
**cancer (1)**
165:25
**candle (5)**
30:9,23;31:9;150:3;
161:3
**candles (11)**
29:24;30:8,25;63:12,
17;105:15;148:18;
150:1;160:9,22;203:6
**canvas (1)**
59:17
**canvassing (1)**
194:3
**capability (1)**
8:8
**Captain (5)**
34:4;85:7;87:10,11;
201:18
**captain's (1)**
157:2
**car (15)**

34:20;36:19;55:10;
62:8;69:20;80:4,7;
82:7,9;93:20;94:4;
120:18,25;138:18;
185:12
**carboxyhemoglobin (1)**
117:17
**card (2)**
33:19;138:17
**cards (2)**
33:22;34:2
**care (2)**
76:14;139:20
**caretaker (2)**
47:5,25
**care-taking (1)**
44:5
**carport (1)**
88:7
**carry (1)**
181:17
**cars (2)**
50:1;80:23
**cartilage (1)**
114:12
**cartilages (3)**
114:11,16,18
**Cascade (1)**
29:23
**Case (74)**
4:8,15;5:20,22;7:22;
9:12;13:3;14:18;15:1,
9,17,18,20;17:11;18:6,
14;19:22;21:8;22:14;
25:4,9,10;34:15;36:23;
37:6;49:2,2,3,4,6;
56:15;57:8;58:9;68:6;
69:15;75:10;76:6;
77:10,20,22,24;78:8,
23,25;79:6,9;85:9;
95:24;108:15;109:6;
110:3;122:24;124:25;
137:21;163:11;173:17;
174:16;175:20;177:9,
12;180:7,11;188:13;
190:9;194:1,14;198:4;
200:14,18,19,21,24;
201:4,6
**cases (12)**
14:1;42:25;60:20;
79:4;174:9,10;175:2;
181:18;193:2;200:12,
16,17
**cast (4)**
54:4;70:22;162:14;
165:24
**catch (1)**
75:21
**category (1)**
156:14
**caught (3)**
70:6,14;158:24
**cause (43)**

10:14,21;11:10,13,
15,16,21;12:3,20;
13:22;14:5;18:9,20,21;
24:7,23;25:15;27:17;
38:17;70:7;84:12;85:2;
87:6;111:7;114:19;
115:1,15;119:8;
124:10;129:25;156:17;
167:17,22;169:10,12;
187:5,18;188:11,16;
195:18;197:19,19;
203:15
**caused (1)**
103:22
**causes (1)**
195:20
**ceiling (4)**
104:13,17;105:6;
106:4
**cell (14)**
8:7,20,21;17:5;60:3;
63:1;83:23;91:4,13;
162:10;174:1;186:24;
194:7;204:14
**Center (2)**
63:11;88:6
**central (1)**
30:4
**certain (9)**
13:9;45:23;67:18;
83:23;159:15;172:1,1;
179:25;199:1
**certainly (6)**
21:18;31:2;54:3;
59:6;90:7;184:2
**certifications (1)**
53:13
**certified (1)**
40:6
**cetera (1)**
63:2
**chair (7)**
103:2,8,10;105:13,
13;148:9,12
**chambers (1)**
20:3
**change (3)**
73:25;131:2;189:24
**changed (8)**
73:23;74:7;99:23,24,
25;100:1,3;187:24
**changer (1)**
173:7
**changing (1)**
173:2
**character (2)**
70:23;178:17
**characters (2)**
54:4;162:14
**charge (2)**
8:8;60:2
**charged (3)**
24:8;25:18,23

**charges (3)**
95:22;129:15,19
**chart (2)**
57:13;161:4
**cheated (1)**
54:24
**check (5)**
50:23;51:12;95:4;
114:3;116:17
**checked (2)**
32:18;202:3
**chemical (1)**
134:12
**chemicals (1)**
134:24
**chest (1)**
182:16
**chewed (1)**
31:4
**child (1)**
192:20
**children (6)**
65:6;128:12;137:22;
139:10;164:11;191:24
**choosing (1)**
13:10
**chores (1)**
60:21
**Chrysler (1)**
99:9
**chunk (1)**
139:22
**cigarette (1)**
107:25
**cigarettes (1)**
107:15
**circular (2)**
116:4,6
**circumstance (1)**
154:22
**circumstances (6)**
9:11;13:23;15:1;
169:14;175:19;190:15
**circumstantial (1)**
175:20
**citizens (1)**
10:13
**citronella (19)**
29:24;30:8,23,24,25;
31:4,9;63:12,17;64:2;
105:15;148:18;150:1,
3;159:3;160:8,22;
161:3;203:6
**city (9)**
8:7,7;15:10;49:8;
57:23;58:4;77:2;78:14;
95:2
**civilian (5)**
6:5,6,7,9,9
**claim (1)**
19:18
**claiming (1)**
19:16

**claims (1)**
21:3
**clarification (1)**
7:9
**clarified (1)**
93:6
**clarify (1)**
24:18
**class (1)**
110:5
**classes (3)**
172:23,25;192:22
**clean (2)**
168:18,19
**cleaner (3)**
24:4;63:13,22
**clear (20)**
7:6;14:19;15:15;
23:19;33:10;42:10;
61:25;62:14;66:2,18;
80:6;83:1;96:21;98:21;
109:12;111:3,4;
119:21;160:21;189:16
**clearer (1)**
66:14
**clearly (5)**
6:21;7:4;8:12;22:16;
28:25
**clever (1)**
46:13
**clicking (1)**
74:8
**client (4)**
18:25;19:7,12;22:17
**client's (1)**
21:3
**clinical (1)**
45:11
**clip (13)**
150:17;151:8;154:8;
155:1,8;156:22;158:1,
19;159:1;183:13,23;
184:18;186:13
**clock (1)**
93:2
**close (8)**
31:4;92:1;100:16;
116:9;125:9,10;
174:16;187:1
**closed (4)**
35:24;174:13;175:5,
6
**closest (2)**
139:12,15
**clothed (1)**
181:19
**clothes (3)**
100:2;121:14;122:11
**clothing (1)**
99:20
**cloud (1)**
77:1
**coached (5)**

43:3;45:17;51:23;
  52:4;53:2
**coaching (3)**
  50:20;51:16,17
**coaxial (1)**
  104:10
**cocaine (2)**
  117:24;141:1
**code (3)**
  132:2,7;133:21
**coin (1)**
  41:22
**cold (1)**
  55:11
**collaborative (2)**
  67:19,21
**collect (1)**
  67:6
**collection (1)**
  194:3
**collective (3)**
  68:3;83:13;127:14
**color (3)**
  54:11,12;149:11
**combination (3)**
  45:7;82:24;108:18
**combust (1)**
  136:6
**comfortable (1)**
  202:6
**coming (11)**
  45:22;50:10;67:8;
  78:6;106:8;118:3;
  125:17;127:5;129:13;
  140:20;182:1
**comments (1)**
  59:6
**commission (1)**
  96:4
**commit (1)**
  187:5
**committed (7)**
  13:19;24:8;25:17;
  28:5;34:7;71:7;164:2
**commonplace (1)**
  199:1
**common's (1)**
  115:6
**communicate (1)**
  195:11
**communicated (1)**
  195:6
**communicating (1)**
  202:11
**communication (2)**
  8:22;166:11
**communications (2)**
  8:18;205:7
**companies (1)**
  65:5
**company (2)**
  139:19;171:25
**comparing (1)**

**100:5**
**competent (2)**
  12:12,15
**complaint (5)**
  19:20;21:11;33:13,
  14;37:1
**complete (3)**
  9:17,21;10:9
**completed (1)**
  193:14
**complex (1)**
  5:25
**compound (1)**
  106:24
**computer (7)**
  38:12;77:14,17;
  78:13;104:18;105:7;
  159:10
**computerized (1)**
  87:22
**concern (2)**
  50:21;80:17
**concerned (10)**
  46:9,22;62:23;91:15;
  126:11,12;137:15;
  166:12;196:21;204:24
**concerning (2)**
  35:5;47:7
**concerns (3)**
  58:19;138:2;204:21
**concluded (3)**
  120:7;157:13;205:20
**conclusion (3)**
  24:22;176:24;189:18
**conclusive (3)**
  14:4;145:18;195:5
**concrete (1)**
  13:6
**condition (2)**
  106:12;117:19
**conditioner (1)**
  62:9
**conditioning (2)**
  98:10;138:8
**conducted (1)**
  131:15
**confined (2)**
  108:21,21
**confirm (5)**
  14:24;89:19;116:23;
  179:25;197:1
**confirmed (2)**
  86:2;197:3
**confusing (1)**
  7:6
**conjunction (1)**
  63:19
**connected (3)**
  96:1;148:25;153:14
**connection (2)**
  110:3;170:10
**connects (1)**
  91:23

**conscious (2)**
  110:24;198:1
**consciousness (6)**
  108:13;109:18;
  110:11,12,18;111:1
**consider (5)**
  30:1;130:13;202:14,
  22;204:11
**consideration (1)**
  139:18
**considerations (1)**
  84:10
**considered (10)**
  68:24;70:17;82:4;
  141:13;174:14;188:14;
  203:6,9;205:8,10
**considering (1)**
  188:14
**consistent (4)**
  138:13;198:11,13;
  199:15
**conspired (1)**
  162:25
**constitutional (1)**
  13:2
**consult (1)**
  17:8
**consulted (1)**
  201:21
**consumed (2)**
  111:5;115:12
**contact (4)**
  22:23;65:12;77:12;
  166:10
**contacted (1)**
  46:6
**contacting (1)**
  20:3
**contained (3)**
  25:21;134:4;145:22
**context (5)**
  5:17;21:19;22:21;
  163:17,20
**continue (6)**
  104:21;106:24,25;
  116:25;153:15;174:21
**Continued (1)**
  174:22
**Continuing (6)**
  40:1;104:23;107:1;
  113:4;190:6;204:10
**controlled (1)**
  178:14
**controlling (2)**
  49:17,21
**convenience (1)**
  90:24;92:23;93:1
**conversation (9)**
  45:15;113:25;
  117:15;121:13;124:2;
  137:16;148:5;163:2;
  175:16
**conversations (12)**

**49:7,13;52:7;84:14,**
  15,24;87:6,9;120:3,24;
  123:15;178:8
**convinced (2)**
  45:19;86:7
**cooperative (7)**
  143:1,3,9,13;163:5,
  16,19
**copy (2)**
  129:12;145:19
**cord (5)**
  55:11;104:7,9,10;
  116:8
**Cornelius (5)**
  25:22;132:12,25;
  170:5,15
**corner (1)**
  94:6
**correctly (2)**
  9:19;94:2
**corroborate (1)**
  92:17
**counsel (2)**
  4:3,11
**count (1)**
  42:24
**counted (1)**
  42:25
**counter (1)**
  101:9
**country (1)**
  41:21
**county (5)**
  6:2;26:10;99:2;
  172:18;198:8
**couple (28)**
  6:13;14:12,23;32:22;
  47:24;60:16;68:2;
  82:25;83:4,15;93:4,5;
  100:14;109:14;113:12;
  117:5,8;119:1;137:4;
  142:13;152:12,24,24;
  162:12;187:1;201:19;
  203:10,25
**course (22)**
  6:19;11:15;42:2;
  53:25;65:10;74:7;76:2;
  77:4;95:25;98:3;99:21;
  124:15;133:19;138:21;
  158:14;186:24;192:20,
  20;201:1,16;202:15;
  203:20
**court (8)**
  4:2;6:22;19:9;22:23;
  26:20;38:16;128:17;
  173:10
**coverage (1)**
  65:7
**crack (3)**
  117:24;141:1;164:20
**crazy (8)**
  38:6;61:15;132:6,6;
  142:14,16;154:24;

**165:4**
**cream (3)**
  55:11;99:7;138:25
**create (2)**
  12:3;74:13
**created (2)**
  61:6;95:17
**credibility (2)**
  19:25;96:18
**credit (1)**
  138:17
**cried (2)**
  60:14,15
**crime (25)**
  13:19;26:16;35:24;
  36:6,12,13;45:20;
  56:12,25;57:1,3,12,14,
  22;58:25;59:24;61:2;
  71:8;96:3,4;129:20;
  130:2;151:22;164:2;
  189:22
**crime-ridden (1)**
  57:19
**crimes (8)**
  24:8;23;25:16,17;
  26:7;56:14,19;129:23
**criminal (5)**
  19:11;129:8,12,16;
  180:10
**criticizing (1)**
  165:4
**cuff (1)**
  185:8
**culpability (1)**
  189:18
**culpable (1)**
  189:22
**culprits (1)**
  203:7
**culture (2)**
  67:20,23
**curious (1)**
  204:22
**current (1)**
  176:3
**currently (3)**
  25:23;26:1;80:20
**cut (2)**
  110:19,20
**cutting (1)**
  79:12
**CVSA (8)**
  38:9,12,19;40:22;
  42:25;175:8,16,21
**cycles (1)**
  129:9

**D**

**DA (1)**
  95:22
**dad's (1)**
  204:22

**daily (3)**
75:15,19;173:2
**damage (5)**
149:21,21;199:17,
19;203:19
**damaged (2)**
142:2;149:22
**damages (1)**
199:15
**Darren (1)**
40:21
**DA's (6)**
25:3;77:12;95:23;
96:1,23;97:4
**dash (14)**
37:24;38:4;69:10;
91:1;92:21;100:6;
120:17;161:8;177:4,
17;180:20,21,23;181:6
**data (6)**
29:13;78:14;79:9;
159:9
**date (18)**
73:17,20,22,23,24;
74:4,7,11,22;79:16;
81:7;92:22;121:9,11;
132:10;133:17;171:14;
175:8
**dated (1)**
26:25
**daughters (4)**
126:3;162:19;
165:15;166:12
**day (24)**
8:2;17:23;35:3;
59:15;73:21;75:10,18;
79:20;81:20;98:13;
121:20,20;125:7,8,8;
142:22;166:23;167:16;
168:13;176:25;187:2,
6;200:10,22
**days (12)**
50:6,7;78:5;121:16;
125:2,3,3;140:12;
166:4;176:16;200:10,
20
**dead (6)**
85:23;107:9;109:3,7;
113:14;115:8
**deadbolt (5)**
27:25;68:11;145:14;
146:15,18
**deadline (1)**
86:25
**deal (2)**
6:12;122:13
**dealing (1)**
79:3
**death (28)**
16:7;26:5,9,12,19;
58:15;60:16,16;62:6;
108:12,17;109:13;
110:8;111:7,14,22;

115:1,2;119:4;122:8;
125:3;140:12;166:4;
192:20;195:18,20;
197:19,23
**deaths (2)**
167:17;192:14
**Deborah (51)**
31:8;34:1;35:16;
54:21,24;55:16,22;
65:20;87:24;90:17;
101:6;103:2;105:12;
114:22;119:3;120:10,
10,15,22;122:16;
123:3;124:3;127:24;
128:20;129:2;130:17,
20;133:1;139:9,20;
142:21;143:5,17;
145:12,19;146:2;
147:11;157:23;159:10;
162:25;165:9,19;
166:22;169:2,5,18;
185:20;186:20;188:17;
192:14;199:13
**Deborah's (12)**
35:23;65:7;81:19;
100:15;123:18,19;
124:20;135:8;140:7;
141:8,18;147:5
**debris (1)**
120:11
**Decatur (1)**
51:7
**deceased (5)**
14:15;105:9;108:9;
109:6;115:12
**December (12)**
24:9;26:25;68:5;
71:11;76:15;79:14,15;
83:17;89:21;94:20;
98:23;200:11
**deception (2)**
38:9;41:23
**decide (1)**
128:13
**decided (1)**
59:3
**decision (8)**
25:12;83:16,18;84:7,
8,9;96:10;176:21
**decisions (2)**
190:9,10
**deemed (1)**
195:1
**Defective (1)**
14:17
**defendant (5)**
40:3;96:2;170:20;
171:7;187:14
**Defendant's (1)**
7:25
**definitely (6)**
49:7;51:1;84:15;
129:5;159:25;204:18

**definitive (2)**
177:18;180:17
**Dekalb (4)**
99:2,3,3;134:20
**delay (1)**
86:19
**delete (1)**
177:24
**deleted (5)**
177:25;196:20,22;
197:2,6
**deletions (9)**
161:7,18,20,22,24;
162:2;177:23;196:21;
204:11
**delivery (1)**
139:1
**Demeester (11)**
14:17;17:16;151:1,9,
17;152:10;155:12,15;
158:7,20;159:3
**Demeester's (1)**
155:10
**demented (2)**
132:5,8
**den (1)**
149:20
**dental (1)**
142:21
**dentist (3)**
142:4,6,9
**deny (1)**
197:1
**Department (9)**
15:6;41:15;42:11;
51:2;56:22;82:16;85:4;
87:11;89:25
**departments (4)**
10:7;41:21;42:16;
172:10
**depending (2)**
167:4;172:2
**depends (1)**
13:22
**depict (1)**
149:15
**depicted (1)**
69:10
**deposed (1)**
4:21
**deposition (12)**
4:7;5:12,19,23;
21:19;22:21;23:17;
153:19;187:22;188:10;
205:17,20
**depositions (4)**
5:15,18;6:12;9:4
**describe (2)**
9:19;133:14
**described (1)**
133:21
**designate (2)**
128:15,16

**designed (2)**
74:21;88:9
**desk (2)**
105:7;106:5
**desktop (1)**
74:16
**despite (1)**
164:2
**destroyed (2)**
111:11;200:6
**detail (4)**
27:8;62:23;63:8;
93:10
**detailed (2)**
33:2;116:16
**details (7)**
9:22;17:10;19:4;
52:5;117:14;128:3;
131:10
**detained (1)**
26:1
**detect (4)**
134:22,22,25,25
**detecting (2)**
38:19;41:23
**Detective (64)**
4:7,13;5:7,12,21;
16:16,24;17:6,18,22;
19:21;24:3;40:6,7,9,13,
21;54:1;56:21;59:16;
60:10;69:23;72:5;82:7;
91:8;92:11;93:9;
104:21;106:22;118:17;
132:14;133:4,24;
134:10,17;142:20;
145:25;146:25;147:5;
164:7;167:25;170:13,
18;172:6,13;173:13;
176:4;177:8;181:13;
182:2,7;184:8;186:16;
187:12;191:16;192:3,
8,25;193:24;197:17;
199:2;202:8,13;204:9
**detectives (13)**
16:1;17:12;44:21;
67:5;75:11;84:25,25;
85:4;86:11;87:9;103:7;
110:6;173:21
**detector (1)**
38:22
**deterioration (1)**
113:20
**determination (12)**
24:16;25:4,7;114:19;
115:16;119:9;124:10;
156:17;167:23;169:12;
194:22;199:2
**determine (9)**
48:17;91:10;111:10;
127:23;151:15;161:21,
21;177:22;205:2
**determined (2)**
198:20;200:2;203:3

**determining (2)**
151:19;197:18
**develop (1)**
84:1
**developed (3)**
21:22;78:22;179:13
**development (1)**
177:11
**developments (2)**
22:4;172:22
**device (5)**
8:4,22;170:9,10;
181:21
**diabetes (1)**
117:13
**diagnosis (1)**
45:12
**die (2)**
110:13;200:16
**died (5)**
108:18;109:7;
130:14;165:25;168:14
**difference (1)**
193:5
**different (15)**
17:4;25:13;75:1,17;
77:9;89:23;107:2,5,6;
109:20;130:18;140:7;
167:18;173:1;189:21
**differently (2)**
190:13;191:9
**difficult (2)**
105:1;147:8
**difficulties (1)**
169:16
**dime (1)**
138:19
**direct (4)**
39:6,7,14;175:23
**directed (1)**
187:11
**direction (2)**
20:4;39:3
**directions (1)**
67:8
**directly (3)**
9:11;21:11;91:7
**directs (1)**
16:25
**disability (9)**
45:2;47:22;50:23,25;
51:11;52:10;53:1,17;
139:4
**disabled (2)**
44:24;52:8
**disagree (4)**
11:22;25:3,6,11
**disbelief (1)**
65:18
**disbelieve (2)**
140:16,22
**discipline (2)**
14:24;15:2

**disclosure (1)**
4:2
**discoverable (2)**
13:14;21:2
**discovered (4)**
35:6,22;36:7;104:1
**discovery (1)**
22:21
**discredited (1)**
92:6
**discrepancies (3)**
92:20;93:7,11
**discrepancy (1)**
62:19
**discuss (3)**
130:5,10;204:19
**discussed (5)**
15:12,13;85:9;93:8;
110:5
**discussing (1)**
113:8
**discussion (2)**
23:12;205:15
**discussions (1)**
86:10
**dismissed (4)**
95:22;96:6,7,22
**disputes (1)**
25:3
**disregard (1)**
13:9
**distinguish (1)**
52:24
**distribution (1)**
128:18
**District (3)**
4:10;172:17,18
**divide (1)**
127:19
**divided (3)**
127:21,21;128:11
**DNA (1)**
142:8
**dock (1)**
181:14
**docs (1)**
83:23
**doctor (5)**
112:8,15,17;113:15;
115:9
**doctrine (5)**
68:3,4;83:14;127:15;
201:10
**document (12)**
7:21,22;26:23,25;
72:25;74:16,18;97:3,5,
6,10;152:3
**documents (5)**
7:20,23;8:2;119:12;
160:21
**dog (1)**
134:21
**domestic (1)**

169:11
**done (15)**
18:6;33:4;54:24;
86:24;91:12;94:22;
147:10;153:25;189:3,
24;190:13;193:16;
194:8;197:17;205:14
**door (23)**
27:24;60:17;68:11;
88:18,19;105:24;
143:16,24;144:2,23,25;
145:4,13,20,22;146:5,
9,12,21,23;148:7;
160:15,16
**doors (1)**
59:17
**doozy (4)**
15:20,21;18:13;
201:7
**Dorgan (17)**
64:9;84:18,21;85:3,
8;86:17;87:8,10;89:17;
101:25;120:8;154:9,
12;155:5;157:1,5;
201:18
**double (1)**
58:1
**doubt (13)**
81:2;91:18;93:12;
110:16;111:24;124:7;
125:20,22;138:16;
165:10,24;195:14;
204:15
**down (26)**
23:18;35:24;39:11;
55:5;60:12,15,22;72:2;
79:12;86:23;88:6;95:5;
105:15;106:9;109:12;
121:8,17,24;122:10;
126:2;127:5;133:19;
138:5,7,13;140:20
**dozen (2)**
194:15,15
**dozens (2)**
193:1,1
**Dr (14)**
103:25;108:15;
110:19;113:8,25;
116:10;117:16;119:16;
120:3,4;176:21,23;
198:5;202:11
**drafted (1)**
33:14
**drafting (1)**
10:19
**drafts (1)**
9:14
**drag (1)**
174:5
**draw (1)**
139:24
**dream (1)**
61:4

**drip (1)**
135:25
**Drive (12)**
49:9;51:10;62:7;
76:25;77:6,16,19;78:4,
6,11,21,25
**driven (1)**
31:16
**drivers (1)**
38:6
**driver's (5)**
80:9,13,17;133:13,
16
**driveway (2)**
62:7;93:17
**driving (6)**
32:4;33:3,7;36:16;
94:12;95:1
**drop (3)**
106:5;135:24;174:5
**dropped (1)**
106:9
**drove (6)**
31:19;47:15,15;69:9;
80:3;138:25
**drug (4)**
41:23;42:25;129:14,
20
**due (3)**
19:10;56:13;120:5
**duly (1)**
5:8
**dumb (1)**
64:1
**during (8)**
8:19;50:15,15;95:25;
96:3;110:23;137:16;
203:19
**dying (1)**
115:19
**dynamics (2)**
141:3,5

# E

**earlier (21)**
6:14;73:3;76:24;
83:14;94:24;97:25;
117:4,21;122:14;
133:25;150:7;155:9,
14;159:8;176:14;
185:18;186:23;187:22;
188:10;191:7;192:25
**earliest (2)**
82:4;121:21
**early (7)**
59:14;63:5;87:14;
135:8;155:16;157:9;
203:3
**easier (2)**
113:13;137:19
**easily (1)**
13:14

**easy (1)**
110:8
**EcoATM (3)**
137:4,6,7
**effect (1)**
114:19
**efficacy (1)**
38:19
**effort (4)**
16:23;17:8,22;
193:25
**efforts (1)**
138:7
**eggs (1)**
39:5
**eight (3)**
6:10;160:24;200:10
**either (27)**
28:22;31:8;32:11;
42:3,8;67:23;81:1;
106:19;114:22;120:10;
121:10,20;123:11;
127:24;128:9;130:14;
133:18;135:5;136:21;
144:19;154:16;156:5,
7,13;162:9;168:4;
180:19
**elaborated (1)**
51:24
**elderly (13)**
57:7,20;60:16;
108:20,23;109:21;
113:1,4,12,19,19;
117:12;169:18
**elect (1)**
13:13
**electrical (6)**
106:17,20;107:4,11;
149:4,6
**electricity (2)**
55:10;62:15
**electronic (1)**
76:10
**electronics (2)**
173:1,2
**element (1)**
38:17
**elimination (1)**
71:6
**else (27)**
8:14;32:9,18;46:3;
51:19;53:21;56:2;
72:21;83:10,18;84:1,3;
87:3;116:7;118:18;
134:4;144:1;152:8,10;
155:20;159:7,16;
167:2;178:20;186:15;
194:1,9
**email (6)**
92:10,13;93:8;
172:25;173:25;174:4
**emails (2)**
168:8;192:21

**emphasize (1)**
6:13
**employment (2)**
15:5;18:3
**en (1)**
35:21
**enabled (1)**
170:9
**encampment (1)**
80:20
**encompass (1)**
19:20
**encounters (1)**
38:6
**encouragement (1)**
55:6
**end (5)**
9:5;18:1;20:23;74:3;
187:6
**endeavor (1)**
7:3
**ended (2)**
116:22;142:7
**enforcement (12)**
6:5,8;9:16;10:19;
12:12;15:6;18:2;66:23;
71:2;146:7;172:10,22
**engaged (5)**
27:25;143:20;
144:21;145:14;146:6
**engineered (1)**
122:8
**engulfing (1)**
162:8
**enough (8)**
8:12;39:16;84:12,22;
85:2;86:18,21;163:23
**ensure (1)**
153:13
**entered (1)**
103:12
**enthusiastically (1)**
34:2
**entire (2)**
57:23;201:4
**entirety (5)**
20:10;27:11;77:18;
78:2,3
**entities (1)**
89:23
**entitled (1)**
22:16
**entry (2)**
88:7;145:1
**epidemic (1)**
80:23
**equal (1)**
141:13
**errands (2)**
48:14;159:8
**error (1)**
31:12
**esophagus (1)**

110:21
**especially (21)**
9:7;20:18;22:19;
26:16;33:20;49:3,22;
50:11;51:13;58:10;
60:11;67:21;75:9;
108:20;130:24;138:1;
163:23;174:20;178:16;
193:3;200:18
**essentially (2)**
69:8;102:5
**establish (7)**
11:10,13,20;12:1,20;
13:3;93:1
**established (2)**
11:14;16:2
**estate (1)**
128:11
**estimate (1)**
193:13
**et (2)**
4:8;63:2
**even (23)**
14:2;19:8;26:11;
54:8;60:6,15;62:16;
64:20;66:24;74:20;
79:13;86:15;92:20;
93:20;112:11;116:1;
136:13;143:8;147:23;
176:19;179:8;195:15;
203:1
**evening (4)**
63:5,13;94:24;95:15
**events (2)**
9:19;191:5
**eventually (1)**
111:20
**everybody (14)**
17:3;36:9;57:21;
65:17;109:19;118:18;
140:24;143:4,6;153:4;
194:1;201:5,6,7
**everybody's (1)**
115:6
**everyone (2)**
191:24;194:9
**everywhere (1)**
148:22
**evidence (37)**
7:22;13:3,9;14:3;
18:16;22:17;28:18;
29:11;31:7;36:6,11;
51:16;63:1;67:6,16;
86:2;91:16;95:24;
102:1,12,23;104:24;
106:18;108:1;115:19;
134:14;136:9,20;
147:24;150:10;158:9,
10;174:24;179:25;
189:8;190:25;194:3
**evidentiary (1)**
201:24
**exactly (6)**

28:14;35:13;91:17;
125:19;141:21;194:13
**EXAMINATION (3)**
5:10;192:1;204:1
**examine (1)**
100:15
**examined (1)**
5:8
**examiner (5)**
31:7;195:18;196:3;
198:3;202:10
**examiner's (6)**
90:11;119:14;
195:16;197:18;198:8,
13
**example (7)**
14:4;149:19;167:8;
169:10;174:9;182:25;
185:9
**Excel (1)**
57:13
**except (3)**
4:23;86:13;105:22
**exception (3)**
33:20;99:22;158:9
**exchange (1)**
163:4
**exclude (1)**
197:8
**excludes (1)**
56:17
**excluding (2)**
22:11,14
**exculpate (2)**
13:15;37:20
**exculpatory (4)**
11:5;28:17;36:6;
59:8
**excuse (1)**
33:5
**Exhibit (17)**
27:5;73:6,7,10,10,
14;87:18,19;97:15;
123:3;132:22;151:23,
24;160:2,3;170:24;
199:25
**exist (2)**
112:19;180:1
**existed (4)**
36:18;171:15;172:9;
203:16
**existence (2)**
105:23;173:6
**expand (1)**
61:13
**expect (7)**
42:10;112:17,23;
135:20,21;139:13;
147:21
**expected (2)**
36:22;37:4
**expeditiously (1)**
9:8

**expending (1)**
138:12
**expert (1)**
102:14
**expertise (7)**
17:4;53:3,12;85:12;
135:3;201:23;202:6
**explain (6)**
28:14;34:20;61:22;
63:20;86:8;174:15
**explained (2)**
84:22;161:23
**explaining (1)**
51:3
**explanation (5)**
32:3;33:2,6;169:6;
185:15
**explanations (1)**
32:15
**explicit (1)**
120:24
**extended (1)**
129:3
**extension (1)**
55:11
**extensive (1)**
129:8
**extent (27)**
19:20;20:17;21:3;
24:18;44:14;51:5;
67:18;105:11;137:25;
143:9;147:4;152:7;
170:19;171:5;176:3,5,
17;177:6;179:17;
187:9,16;188:2,7;
189:7,11;190:24;191:2
**extra (1)**
6:13

---

**F**

**fabric (1)**
116:8
**Fabuloso (2)**
63:13,22
**face (2)**
124:22;168:19
**facilitated (1)**
111:14
**facing (4)**
160:16;181:3,7,8
**fact (47)**
14:4;28:2,10,13,24;
29:25;31:15,18;43:5;
44:16;49:14;51:18;
56:20;58:1,18,18;
62:19;63:7,17;64:6,11,
12;68:10,14,15;69:8;
70:5,6;81:18;82:25;
85:14;105:17,25;
106:12;108:10;122:7,
14;126:7,8;135:22;
136:16;144:20;145:14;

162:15;177:22;187:5;
204:13
**factor (2)**
119:8;167:22
**factored (1)**
169:20
**factoring (1)**
167:17
**facts (43)**
9:11;10:20,25;11:6,
13;13:14;15:1,12;
17:11;19:4;24:13,15,
15,18,20,24,25;25:20;
26:13;27:9,19;29:17;
33:21,23;34:8;54:16,
17,18;59:11;69:4;
70:25;71:10,10;
116:13;134:3;145:21;
169:9;176:14;179:9,
11,12,14;190:14
**failed (1)**
11:9,20;12:20;
175:16
**fails (1)**
181:22
**fair (24)**
7:11;21:23;34:10;
39:16;44:12,13;54:3;
70:8;71:2;108:1;
109:15,16;113:24;
114:17;115:13;123:25;
136:2;137:22,23;
158:14;163:23;164:13;
177:19;187:15
**fairly (1)**
149:15
**faith (1)**
190:8
**fall (1)**
156:13
**fall-asleep (1)**
155:19
**fallen (2)**
103:8;106:4
**falling (2)**
105:14;107:24
**familiar (6)**
41:10,13;118:4;
119:5;134:11;185:4
**families (1)**
143:2
**family (40)**
5:24;34:15;46:6;
47:2,6,11;48:9,11;
49:18;50:3,9;52:8;
55:7;58:19;59:6;64:20;
65:6,6,18;70:11;86:16;
107:20;117:22,23;
119:5;124:24,24;
126:9;127:19;129:3,6;
130:24;131:1;135:7;
141:3,5;142:25;166:9;
178:9;191:24

**family's (1)**
46:19
**far (26)**
32:5;40:1;50:2;56:6;
57:4,6;65:24;69:4;
71:25;111:6;129:16,
20;140:9;144:19;
149:15;158:10;161:21;
166:11;167:2;173:3;
174:15;179:7;183:2;
189:13;194:2;201:25
**fashion (1)**
59:1
**fast (1)**
144:5
**fat (1)**
130:8
**father's (1)**
204:13
**fault (1)**
74:2
**favor (1)**
139:10
**favorite (1)**
54:11
**fear (1)**
46:5
**fears (1)**
122:21
**February (1)**
78:17
**Federal (4)**
4:12;42:16,17;
173:10
**feed (2)**
113:3;164:20
**feeding (1)**
164:7
**feel (5)**
48:19;60:18;75:3;
87:1;189:10
**feeling (3)**
46:20;53:8,11
**feels (1)**
52:3
**fell (3)**
104:12;105:5,12
**fellow (1)**
67:4
**felt (7)**
46:10,10;47:20,23;
51:25;81:21;87:3
**female (2)**
28:10;48:2
**fence (1)**
59:2
**few (9)**
13:4;50:5,7;56:2;
121:16;131:5;176:15;
191:22;197:17
**field (1)**
53:4
**fifth (1)**

56:11
**figure (5)**
74:1;144:21;166:6,
24;186:9
**figured (1)**
174:8
**figures (1)**
133:11
**figuring (1)**
54:8
**file (13)**
49:9;68:6;77:10,15,
17,22;78:2,3;95:24;
174:5;180:8,11;186:11
**filed (3)**
33:11,13,15
**files (2)**
77:3;79:8
**filing (1)**
9:14
**fill (1)**
78:11
**film (3)**
147:9;186:4,17
**final (9)**
71:4;84:7;100:16;
104:14;119:21,23,24;
120:6;177:16
**finalized (1)**
119:14
**finally (5)**
59:3;61:6;95:3;
177:16
**financial (1)**
128:23
**financially (2)**
46:15;129:2
**find (7)**
42:3;43:19;86:3;
107:5;135:21;148:9;
205:10
**finding (1)**
10:21
**findings (2)**
196:19;199:6
**fine (6)**
7:16;27:11;118:17,
20;150:22;188:5
**finger (1)**
59:14
**fingerprints (1)**
141:25
**fingers (1)**
141:25
**finish (1)**
66:12
**finished (1)**
73:24
**fire (86)**
14:10,13;17:13;
18:23;26:15;27:18;
30:15,19;34:4;36:10;
63:14,19;69:9,18;70:3;

82:16,23;84:17;85:4,
14,15,18,18,19,22;
86:8;87:11;89:25;
94:23;95:1,4,9,18,20;
98:13;101:6,25;102:8,
11,13,16,24;103:12;
104:24;106:18,20;
107:4,6,11,15,24;
108:5;109:8;110:23;
111:5,11,14;115:12;
125:8;134:20;135:1,3,
4;136:1;141:12;
144:16,22,25;146:6;
147:7;149:22;151:12;
158:15;164:25;165:3;
184:20;195:14;197:12,
15;198:17,17;199:5,11,
21;200:6;204:12
**fire-damaged (1)**
147:7
**fires (5)**
107:12;108:3;
130:17;169:15;199:8
**first (47)**
5:8,19;6:4;8:1;9:9;
15:14,17,18,20;16:16;
18:5,10;20:8;27:14;
28:10;30:14,18;32:23;
34:16,22;37:20,25;
49:2;50:19;52:14,14;
57:8;59:12,15;69:18;
98:1;103:12;112:1,2;
126:5;146:7;155:4;
169:18;175:25;176:10,
15,16;182:5;184:19;
193:21;200:11,19
**fit (1)**
173:23
**five (8)**
23:8;61:7;72:4;
102:19;118:16;153:3;
183:18,24
**five- (1)**
71:15
**five-minute (2)**
153:1;169:22
**five-second (2)**
183:16,17
**fixing (1)**
138:19
**flames (1)**
162:8
**flight (3)**
121:11,20,21
**flipping (1)**
41:22
**floor (2)**
160:6;169:5
**flow (1)**
157:18
**flustered (1)**
54:10
**fly (1)**

50:6
**focus (1)**
202:20
**fold (1)**
130:7
**folder (3)**
77:23;161:24;174:6
**folks (7)**
57:20;70:21;101:25;
106:16;109:21;113:12;
124:11
**follow (2)**
50:18,19
**followed (3)**
40:18;145:4,10
**following (1)**
179:16
**follows (1)**
5:9
**follow-up (5)**
32:22;40:16;47:24;
50:20;191:23
**follow-ups (1)**
56:2
**foolproof (1)**
38:24
**footage (2)**
82:14;83:6
**force (2)**
112:25;146:10
**forced (1)**
145:1
**foreknowledge (1)**
52:17
**forensic (2)**
29:11;142:20
**forgot (3)**
14:11;56:25;85:7
**forgotten (3)**
68:23;121:23;165:6
**form (18)**
4:23;5:2,2;10:15;
11:1,23;12:23;14:6;
18:16;29:5;39:24;
41:25;42:14;74:18,20,
23,25;76:3
**forms (1)**
75:2
**forth (4)**
12:8;49:21;55:3;
117:14
**forward (7)**
12:2;37:3;84:24;
144:5;149:10;181:2,7
**forwarded (2)**
86:1;166:15
**forward-facing (1)**
180:21
**forwards (1)**
182:20
**found (25)**
14:14,20;26:8;27:25;
34:17;47:4;87:24;88:9,

13,15;92:6;96:2;103:2,
13,14;137:3;143:17;
147:10;159:11;161:3,
5;169:5;178:10;
181:17;199:13
**four (2)**
160:25;200:9
**four-minute (1)**
149:9
**Fourth (4)**
10:12;11:10,21;
12:22
**foyer (1)**
88:6
**fracture (1)**
112:18
**fractured (2)**
112:13;114:8
**fractures (2)**
113:18;114:18
**fragment (1)**
116:2
**frame (13)**
50:15;85:17;95:9;
97:2;109:23;125:11,
19;176:12;177:25;
178:1;199:23;200:17;
204:12
**framed (1)**
181:11
**frames (1)**
197:5
**fraud (2)**
46:17;51:4
**fraudster (1)**
165:13
**free (1)**
189:10
**frequented (1)**
90:24
**friend (5)**
48:4,10,11;123:18,
19
**friends (4)**
67:4;86:16;124:24;
166:9
**front (11)**
7:23;8:4,11;88:3,5,
16;106:8,10;144:25;
146:5;148:7
**fuck (1)**
157:6
**full (1)**
200:24
**fully (2)**
163:5,16
**Fulton (7)**
6:3,3,26:10;97:3;
132:24;172:18;198:8
**funded (1)**
41:19
**funds (1)**
128:18

**further (6)**
152:6;178:8;191:20;
203:22;204:1;205:13
**fuse (2)**
95:18;149:4

## G

**Galaxy (1)**
76:18
**gambling (1)**
31:22
**game (2)**
142:18;173:7
**gas (1)**
100:6
**gasoline (1)**
14:14
**gather (1)**
127:3
**gave (5)**
40:6,7;57:12;70:21;
84:18;179:3
**GBI (1)**
86:2;174:24;201:25
**geared (1)**
20:10
**general (10)**
9:10;12:18;56:20;
59:16;70:22;117:3;
130:25;172:24;178:17;
191:8
**generally (14)**
9:4;12:17;41:11;
59:8;70:13;103:18;
120:14;134:14;135:14;
138:11;141:5,9;
182:24;191:4
**gentlemen (1)**
150:23
**geofence (14)**
18:17;22:2;96:9;
97:17;171:1,2,19,21;
172:9,15;173:6,10;
190:22;191:10
**Georgia (1)**
4:10
**gets (1)**
16:16
**gift (2)**
120:18;121:5
**gigabytes (1)**
78:9
**given (10)**
5:12,15;36:5;40:17;
58:5;77:20;91:11;
116:10;174:10;191:19
**giving (2)**
34:17;36:11
**glass (1)**
88:18
**Gloria (5)**
125:13,16,23;

126:21,21
**goal (1)**
17:3
**goes (7)**
56:6;58:8;75:18;
128:16;182:18,20;
183:2
**gold (7)**
135:14,14,19,24;
136:1,2;147:22
**Good (21)**
4:13,16;33:5;39:10;
62:4,13;71:20,20,21;
72:2;79:14;81:3,5;
91:14;109:20;113:12;
153:3,3;167:7;190:8,
11
**Google (3)**
30:13,14,18
**government (1)**
42:18
**GPS (2)**
91:5;162:10
**Graham (3)**
93:23;94:1,3
**grain (1)**
141:11
**grand (2)**
25:5;96:11
**granddaughter (3)**
166:19;180:4,4
**gray (1)**
22:6
**great (2)**
6:22;93:10
**greatest (2)**
122:21;173:4
**greatly (1)**
127:21
**GREENAMYRE (91)**
4:6,14,17;5:1,5,11;
10:18;11:4;12:11;13:4;
14:9;19:14;20:5,22;
21:15;22:7,15;23:4,15;
24:3,20;29:10;42:9,19;
43:1;66:13;71:14,19,
23;72:11,19;73:5,9,12,
16;87:17;96:21;97:7,9,
12,25;101:20,24;
105:4;118:8,20;119:1;
127:13;132:19;133:5,
15,25;134:13,19;
146:5;147:3;151:21;
153:2,17,25;154:3;
160:1;169:21;170:5,
14,22;171:9,17;172:8,
20;173:16;176:9;
177:14;179:21,24;
184:2,10,16;187:21;
188:8,9;189:16;
190:12,21;191:6,18;
196:7;201:9;203:24;
204:2;205:12

**grieving (3)**
163:5,16,19
**grocery (1)**
48:14
**gruesome (1)**
58:4
**guarantee (1)**
138:19
**guess (55)**
11:18;16:19;28:16,
25;30:7;50:23;58:8,17;
60:12;61:25;63:2;66:9;
76:9,13;77:9;79:2;
82:24;85:6;86:17;
89:20;90:14;91:8;93:3;
96:7;98:15;99:3;
102:17;103:15;111:3,
13;128:13,24;130:13;
132:6,7,14;135:24;
138:1;139:17;142:1;
144:16;146:4;147:4;
148:6;150:20;157:12;
166:21;168:4,15;
169:8;171:9;181:25;
182:7;194:14;201:3
**guidance (1)**
22:25
**guide (2)**
39:1,2
**guided (2)**
175:21,22
**guilt (2)**
14:3;28:19
**guilty (2)**
26:8;133:12
**gullible (1)**
40:5
**gut (2)**
53:8,11
**guy (14)**
18:18;36:11;50:13;
51:25;64:23;82:20;
86:12;91:13;94:6;
98:10;117:6;139:1;
177:20;202:19
**guys (5)**
95:10;103:12;
153:11;173:25;174:1
**guy's (1)**
82:8
**Gwen (4)**
123:17;124:18,19,19

**H**

**habit (1)**
164:20
**habitually (1)**
147:11
**half (1)**
194:15
**halfway (2)**
56:7;71:24

**hallway (2)**
88:15;103:13
**hand (1)**
8:3;130:15
**handed (1)**
34:2
**handicapped (2)**
52:16;132:6
**handle (3)**
146:15,21;193:7
**handled (1)**
193:9
**hands (1)**
201:4
**handyman (1)**
131:24
**happen (6)**
9:3;57:11,24;58:4;
107:6;192:12
**happened (14)**
21:12;35:14;46:21;
47:13;70:23,24;80:2,4;
87:7;116:17;142:5;
165:6;197:15;204:21
**happening (1)**
82:18
**happens (3)**
9:2;110:14;182:24
**happy (3)**
143:10;153:17;
162:17
**hard (10)**
34:14;45:18;71:25;
77:14;78:4,6;108:11;
173:3,19;190:8
**harder (1)**
113:11
**harm (2)**
60:11;203:18
**Harry (86)**
29:22;31:8;32:19;
35:8,20;54:21,23,24;
55:6,15,17,20;60:25;
61:9,10;63:10;88:15;
90:17;100:25;105:17,
23;106:12;108:20;
110:20;114:23;115:18,
19;116:2;117:5,24;
120:10,14,17,22,23;
121:4,24;122:6,8,10,
11,16,18;123:3,9,22;
124:4;125:2,11;126:1,
24;127:5,11,24;129:8;
130:1,2,4,14,16;133:1;
140:20;143:5;156:9;
158:22;162:25;164:15,
24;165:3,4,9;166:3,12,
14,16,22;167:8,10;
169:1,10;180:3,10;
188:17;192:15;204:3;
205:3
**Harry's (13)**
65:7;81:22;115:24;

120:18,24;130:17;
140:12,20;162:19;
164:10,19;165:8,15
**Harvel (5)**
51:10;61:1;91:22;
92:1;122:12
**Hawkins (1)**
123:17
**hazing (1)**
15:23
**headquarters (1)**
80:19
**heads (1)**
43:21
**health (6)**
107:18;108:24;
110:16,17;111:19;
113:13
**healthy (1)**
117:5
**hear (11)**
82:8;96:5;150:14,18;
152:1;154:1;155:15;
157:5;162:16;183:5;
184:3
**heard (21)**
15:14;20:8;26:9,12,
21;39:9,11;41:12;
49:18;57:24;64:22;
69:8;115:7;140:21;
141:4;157:5,15;158:2;
159:2;171:18;178:16
**hearing (1)**
64:14
**heart (2)**
117:8;164:1
**heat (1)**
30:6
**heated (1)**
136:3
**heathier (1)**
113:9
**heavy (1)**
149:20
**heinous (2)**
26:16;131:3
**help (17)**
16:19;17:2;25:2;
34:15;37:3;38:25;39:6,
7;74:1;87:23;150:10;
161:11;162:1;175:10;
194:2,9;202:7
**helped (1)**
194:11
**helpful (3)**
25:1;50:17;103:5
**helping (1)**
201:5
**helps (3)**
136:24;151:7;155:7
**hemorrhaging (2)**
114:22;115:14
**Heninger (15)**

103:25;108:15;
110:19;113:8,25;
116:11;117:16;119:16;
120:3,4;130:5;176:22,
23;198:5;202:12
**here's (4)**
36:3,3;45:25;94:7
**herself (4)**
52:24;53:18;123:19;
124:18
**hesitate (1)**
6:16
**hey (9)**
35:17;36:2,11;53:8;
61:16;70:3;86:22;
115:9;116:18
**high (2)**
117:13,18
**highlight (2)**
33:25;41:17
**highlighted (6)**
33:21;37:17,18;38:8;
56:11;140:1
**highlighting (1)**
139:7
**himself (2)**
37:20;130:3,18
**hindsight (5)**
18:16;190:1;191:4,7,
9
**hired (2)**
18:1;192:6
**hiring (1)**
138:8
**history (6)**
46:16;129:8,13,16;
169:11;180:10
**hit (1)**
183:1
**hits (1)**
172:2
**Hogan (13)**
43:2,17,24;44:9,11,
17,19,20;45:22;51:22,
25;52:9;53:15
**Hogan's (1)**
44:15
**hold (6)**
35:23;65:11,12;
81:20;179:4,5
**holding (2)**
191:11,17
**holster (1)**
185:10
**hom (1)**
15:18
**home (17)**
8:14;35:2;47:17;
50:7;56:13;68:22;
87:21;138:13;140:12,
20;160:9;162:8;
164:19;167:9;197:12;
199:16;204:5

**homeless (1)**
80:20
**homeowner (1)**
66:20
**homeowners (4)**
65:2;127:17;128:20;
140:3
**home's (2)**
138:8;160:6
**homicide (57)**
8:23,25;15:17;16:1,
3,7,10;18:6;35:1,19,25;
44:21;49:1;67:5,7,20;
78:16,18;85:5,9;
107:13;115:2;116:19,
20,24;119:19;120:5;
142:25;151:15,19;
172:16,24;174:20;
181:15;182:9;192:10,
15,18,19,23;193:3,5,
15,21,22;194:10;195:2,
5,15;200:12,25;
201:13;202:13,23;
203:1,3,4
**homicide-related (1)**
5:23
**homicides (2)**
75:17;202:14
**honest (7)**
9:17,24;10:10;13:20;
80:18;81:14;116:9
**honestly (4)**
58:24;86:15;115:1;
198:22
**hope (2)**
153:25;171:10
**hopefully (3)**
40:4;111:2;132:20
**hoping (1)**
81:25
**horrible (1)**
111:23
**hospital (1)**
68:22
**hour (2)**
152:5;153:23
**hours (11)**
35:1;63:13;83:1;
98:13;100:14;138:6,
14;166:4;188:13;
200:7,10
**house (73)**
14:13;18:23;26:15;
29:24;30:5;34:19;
35:10;37:12;46:17,25;
50:1;55:9,19;57:7;
59:22,25,25;60:12;
62:1,4,10,20;63:3;64:5,
15,22;65:17,22;66:1,4,
5;68:16;69:17;70:2;
80:3;82:16,23;85:16;
88:4,8;89:1;94:22;
95:3,5,12;98:18;99:12;

100:22;103:12;107:7;
111:17;127:9;138:7,9,
19;139:14,21,23;
144:13;145:3,5;147:8,
9,9,12;149:18,23;
160:16;162:6;168:15,
15;199:9,18
**houses (2)**
57:4;131:25
**Howard (1)**
25:7
**Hubbard (36)**
29:23;31:8;32:19;
54:24;63:11;77:23,24,
24;79:5;88:15;100:25;
105:17;108:20;114:23;
117:5;119:3;127:11;
128:11;129:2,8;
130:14;133:1;137:22;
155:23;165:15,17,18;
166:12;167:8,10;
188:17;192:15;197:20;
198:15;203:8;204:3
**Hubbards (5)**
85:22;138:2;141:7;
165:12;178:17
**Hubbards' (3)**
30:4;59:25;114:8
**Hubbard's (13)**
34:1;35:9,16,20;
101:6;110:20;126:1;
128:12,20;139:9;
180:10;185:20;205:3
**huge (1)**
65:6
**humdinger (1)**
57:8
**hundred (3)**
41:1;52:19;203:17
**hundreds (6)**
18:7;52:1,2;193:2,
19,19
**hung (2)**
33:9;165:3
**hurry (1)**
121:24
**husband (4)**
14:14;53:2;103:13;
165:24
**husbands (1)**
165:20
**hyoid (5)**
112:4,12,18;113:18;
114:8

---

**I**

---

**ice (3)**
55:11;99:7;138:25
**ID (1)**
141:23
**idea (4)**
37:7;112:11;184:11;

200:4
**ideal (1)**
75:15
**ideally (1)**
75:19
**ideas (1)**
38:5
**identified (1)**
54:17
**identify (6)**
27:20;142:4,6,10,20;
174:23
**ignore (1)**
13:10
**illegal (1)**
51:5
**imagine (4)**
53:24;69:16;100:12;
173:20
**immediate (1)**
85:19
**immediately (4)**
16:13;84:11;138:14;
154:13
**impact (2)**
115:15;189:18
**impacted (2)**
156:6,16
**impatient (1)**
95:19
**implicate (2)**
176:3;187:17
**implicated (1)**
194:20
**implicating (1)**
190:25
**import (1)**
151:10
**important (7)**
9:16,22;38:17;50:16;
70:4,5;150:16
**importantly (1)**
58:18
**impossible (1)**
204:19
**impounded (1)**
80:5
**impression (3)**
45:12;59:5;66:21
**imprint (1)**
116:7
**improve (1)**
177:11
**imputed (1)**
201:11
**incident (8)**
9:15;31:17;45:20;
50:15;79:25;86:15;
136:23;159:22
**include (3)**
10:20,24;63:23
**included (4)**
24:15;63:24;71:12;

91:5
**including (5)**
68:6;90:3;109:10;
118:2;138:8
**income (2)**
55:23;138:23
**inconsistencies (1)**
39:20
**incorrect (3)**
10:24;29:7;106:2
**incredible (1)**
141:3
**incriminate (1)**
39:1
**inculpated (1)**
176:1
**inculpatory (50)**
10:24;27:9,19,21;
28:1,9,10,12,15,17,18,
20,21,25;29:17,21;
30:1;31:18;33:23;34:9;
37:18;38:10;43:5;
54:17,18;56:3,16;
58:21;59:7,11;62:19,
22;63:14,16,22;64:6;
68:14,14,17,25;69:4;
70:17;71:10;134:3;
145:23;176:10,14;
178:6;179:8,14
**independent (1)**
96:1
**indicated (1)**
196:7
**indication (2)**
101:16;161:6
**indications (1)**
45:17
**indirect (1)**
32:11
**indirectly (1)**
17:24
**individuals (1)**
201:22
**indoors (1)**
31:13
**infallible (1)**
39:13
**influence (2)**
124:9;131:4;169:12
**inform (3)**
24:16,21;56:24
**information (39)**
13:10;19:23;20:11,
12,14,25;21:2,6,10,16,
21,24;37:19;50:13;
67:7;77:19;78:20,24;
85:13;89:20;91:10,19,
24;96:9,12,23;97:22;
98:21;102:6;143:10;
159:17;164:7;171:6;
172:3;178:14;179:4,5;
187:9;203:11
**initial (8)**

120:8;152:4,14;
157:14;160:2;185:17;
186:4,11
**initially (1)**
35:6
**initiation (1)**
199:11
**injuries (6)**
108:18;111:9;115:3,
11;120:6;195:20
**injury (1)**
119:20
**input (1)**
91:9
**inside (8)**
14:15;29:24;30:8,25;
31:5;144:6,10;150:4
**installed (1)**
34:3
**instance (3)**
40:5;54:4;67:19
**instances (1)**
199:1
**instant (1)**
202:23
**instead (1)**
184:25
**Institute (2)**
41:19;42:11
**instruct (12)**
18:25;19:12;23:22;
96:15;97:24;133:23;
170:12,18;171:8;
179:19;187:19;189:8
**instructing (1)**
19:6
**instruction (1)**
22:22
**instructions (1)**
179:16
**insulation (1)**
104:1;106:2
**insurance (23)**
36:24;64:5,13,15,22;
65:3,5,10,16,21,22;
66:4,6,20;127:14,17;
128:21;139:9,19,23;
140:2,3,6
**insurance's (1)**
127:22
**integrity (4)**
19:3;20:1;22:12;
96:19
**intellectual (4)**
45:1;52:10;53:1,16
**intellectually (2)**
44:24;52:8
**intensive (1)**
7:22
**intent (2)**
138:13;203:18
**intentional (2)**
161:18,19

**intentionally (2)**
42:12;203:11
**interact (2)**
53:6;98:3
**interacting (1)**
45:5
**interactions (1)**
52:7
**interested (4)**
32:8;62:12;124:25;
201:6
**interesting (2)**
10:7;177:21
**interestingly (1)**
204:20
**interior (1)**
99:12
**internal (2)**
114:22;115:14
**internet (3)**
153:13;159:9,14
**interposed (1)**
179:1
**interpretation (1)**
29:12
**interpreted (1)**
126:4
**interrogation (1)**
40:2
**interrupt (3)**
6:17;20:21;89:5
**Interruption (1)**
113:3
**interview (19)**
17:7;31:16,24;40:8;
43:4,7,9,19,24;44:2,15;
51:3,23;52:21;68:16;
69:24;79:22;131:16;
181:23
**interviewed (3)**
43:10,15;60:9
**interviewing (1)**
44:6
**interviews (7)**
32:6;40:2;43:18;
52:2;61:7;94:10;
154:17
**intimated (1)**
186:14
**into (38)**
13:6;17:10;20:14;
21:21;22:1;27:16;57:4;
60:3;62:7;68:21;72:8;
74:14,15;75:25;77:14;
91:23;93:10,17;98:4,
18;108:11;109:25;
112:7;119:8;125:11;
135:20;136:25;139:17;
141:20;146:22;156:13;
161:24;164:19;167:17,
22;168:1;192:14;
200:15
**intricacies (2)**

115:4;185:4
**invasion (1)**
56:13
**investigate (1)**
202:14
**investigated (2)**
193:1;194:6
**investigating (5)**
116:19,19;193:4;
200:7,21
**investigation (79)**
9:15;16:7;17:1;19:1,
3,11,24;20:1;21:8;
22:9,13;32:21;34:13;
39:1,2,7,15;59:15;
65:11,14;67:4,15,18;
76:6,11;77:6;81:23;
83:21;87:2,15;95:25;
96:2,17,19;97:23;98:4;
105:1;114:13;116:24;
127:20;131:3,14;
132:17;135:9;143:1,4;
157:10;161:7;163:12;
167:2;175:22;176:4,7,
17;187:19;188:22;
189:13,20,25;190:7,14;
191:1,12;192:14,19;
193:4;194:7,17;196:5;
198:20;201:2,13,17;
202:4,16,21,24,25;
203:20
**investigations (14)**
52:1,2;75:17;112:7;
174:20,21;193:3,7,10,
14,18,22;194:10;
198:18
**investigative (10)**
19:15,19;20:16;21:5;
73:2;167:6;187:10,13;
188:3;189:7
**investigator (15)**
12:16;21:4;43:2,17,
24;44:17,18,20;49:1;
64:23;66:3;75:2;
167:18;194:20,25
**investigators (25)**
34:5,25;35:7,12,15;
36:10;64:4;67:2,3;
85:12;89:8;107:2;
120:9;127:23;172:17;
175:1;192:24;195:13;
198:25;199:6,20;
200:25;201:13,15;
202:1
**involve (3)**
176:5;188:3;198:18
**involved (22)**
5:20;17:24;36:12;
58:20,25;59:4,21,21;
61:1,5,10,10,17,20,21;
67:3;167:2;188:23;
198:21;201:1,16;204:6
**involvement (1)**

19:22
**involving (1)**
194:18
**iPhone (1)**
76:15
**irrelevant (2)**
21:13;172:13
**isopropyl (1)**
134:23
**ISP (1)**
159:17
**issuance (1)**
22:4
**issue (9)**
8:10;9:1;17:6;20:2;
22:25;23:3;32:16;
170:19;171:6
**Issued (4)**
76:22;181:10,25;
182:5
**issues (1)**
22:6
**items (8)**
22:3;30:11,14,15,17,
18;137:3;164:19

**J**

**jail (3)**
47:3;48:16;132:24
**James (2)**
4:7;5:7
**jealous (1)**
49:17
**Jenkins (7)**
68:19;140:19;141:1;
162:24;163:25;164:19;
165:25
**Jenkins' (1)**
137:16
**jeopardize (1)**
202:20
**jewelry (11)**
135:8,11,16,19,20;
136:11,14,16,21;
137:11;147:22
**job (5)**
53:5,7,14;60:15;
143:7
**join (2)**
17:25;153:15
**joined (1)**
192:4
**joint (1)**
68:3
**Jones (9)**
125:13,16,23;
126:21;164:10,15,24;
165:2,7
**Jr (4)**
68:19;141:1;162:24;
164:19
**judge (2)**

11:14;23:25
**judgment (1)**
31:12
**July (32)**
50:5;62:6;67:14;
71:1,1;76:14;79:3;
87:13;92:14;95:15;
98:18;99:1,21,21;
103:6;123:13;131:15;
163:24;166:14;170:16;
175:11,12,14,25;
176:11;178:5,7,24;
179:15;180:4;194:13;
200:11
**jump (2)**
153:24;194:17
**jumped (1)**
72:1
**junction (5)**
28:11,23;29:1,14;
104:18
**juncture (4)**
18:25;19:7,9;96:15
**June (5)**
92:22;97:18;170:25;
171:2,17
**jury (2)**
25:5;96:11
**Justice (5)**
41:15,20;42:11,12;
143:6

**K**

**K-9 (4)**
98:25;99:6,22;
134:20
**Kareemah (9)**
4:22;7:15;19:14;
25:2;43:22;71:20;
171:10;179:21;187:21
**keep (7)**
55:10;75:11;109:1,4;
172:21;173:4;202:17
**Keith (132)**
4:14;18:21;22:9;
24:7,23;25:15,17;
26:14;27:2;28:2;32:24,
25;34:1;36:1,15;44:6;
45:19;46:10,16,23;
47:20;48:12;49:17;
50:22;51:2;55:7,8,20,
23;56:16;58:19;59:20;
60:4,6,20,24;61:8,12,
19,22;64:6,14;65:1,18;
66:4,19;67:14,14;69:8,
25;70:14,22;71:6;
79:14;81:1,9;82:2,4,10,
15;83:11,17;86:14;
90:18,22,24;92:7,17;
93:16;94:2,11,21;
95:17,23;98:12;99:19;
100:24;120:17;121:4;

122:5;126:6,13;127:4,
16;128:19;134:2;
136:13,20,25;138:2,7,
11,15;139:10;140:6;
143:8,23;145:2,13,18,
19;146:2;148:1;
155:16;159:6,7;
162:24;163:4,14;
164:2,7;165:13;
166:22;167:9,10;
168:11;170:20;171:7;
175:15;180:14,20;
184:20;187:5,14;
188:23;196:22;200:5;
203:19;204:4,6,13,24
**Keith's (17)**
69:22;80:4;82:22;
91:4,10;93:12;122:21;
134:23;138:22;159:8;
161:8;162:5;163:25;
166:2;178:17;189:18;
204:21
**kept (2)**
147:11,17
**key (15)**
11:18;28:7;68:15,20;
144:2,11,24,25;145:13,
19;146:2,22;148:2,4,7
**keys (7)**
144:13,15,16,17;
145:4;147:5,17,21;
148:2
**kids (4)**
140:7,7;141:8;165:9
**kill (7)**
61:9;108:25;117:19;
127:6,8;130:11;162:25
**killed (7)**
5:25;18:22;111:20;
141:12;143:5;165:19;
188:17
**killing (1)**
57:6
**Kimberly (1)**
165:11
**kind (83)**
8:18;12:5;13:5;
15:14,23;16:2,24;
22:18;27:12;30:10,15;
34:24;35:18;36:25;
37:4,6,7;38:15;39:12;
40:14;44:4,4;45:11,18;
46:18;49:3,17,23,24,
25;52:11;53:7,9,23;
55:3,24;56:22;58:12;
59:2,5;60:11;67:1;
69:16;74:21;75:2;
76:17;78:21;80:25;
81:12,12;84:2;85:17;
88:8;95:17;103:16;
105:2,18;106:18;
107:5;110:7;112:14;
114:5;116:10;121:15;

124:12;125:10;130:8;
139:4;141:7,8;145:6;
146:13;147:8;155:25;
156:14;163:10;173:1;
175:21;176:21;191:8;
193:25;196:23;199:22

**kinds (2)**
53:24;75:1

**kitchen (4)**
101:6,9;149:20;
160:10

**knew (22)**
21:10;34:6;48:4;
51:1;52:6;66:17,19;
91:15;107:16,18,19;
117:10;120:17;125:17,
24;127:4,9;128:1;
135:4;164:1;173:5;
195:15

**knob (1)**
144:7

**knock (2)**
60:22;105:15

**knocked (3)**
59:17;72:1;142:9

**knowable (1)**
20:12

**knowing (2)**
53:13;74:2

**knowingly (2)**
10:24;11:5

**knowledge (19)**
26:2;52:12;54:14;
56:21;66:15;68:3,3;
76:7,8;83:13;91:9;
115:6;127:15;171:12;
172:15,18;173:18;
188:21;201:11

**knowledgeable (1)**
110:6

**known (11)**
11:9,19;12:7,8,19;
13:23;20:11;48:5;71:2;
121:22;173:6

## L

**lace (3)**
103:22,25;116:8

**laces (2)**
103:25;104:3

**lack (3)**
56:14,19;132:16

**ladder (1)**
98:17

**lamp (6)**
104:6,9,10;116:8;
149:12,12

**language (1)**
11:18

**laptop (1)**
8:5

**large (4)**

65:25;68:9;114:10;
139:22

**laryngeal (3)**
114:10,12,18

**larynx (1)**
114:16

**last (13)**
6:1;24:5;36:4;51:15;
73:23;74:23,25;87:5;
92:11;110:1;128:5;
137:4;169:9

**late (1)**
6:1

**Lately (2)**
77:16;78:7

**later (9)**
35:2,4;41:4;50:19;
81:19;82:13;96:8;
104:1;139:2

**latest (1)**
173:4

**law (14)**
6:5,8;9:16;10:19;
12:12;15:6;18:2;66:23;
71:2;146:6;172:10,22;
173:8,18

**Lawson (5)**
162:18,19;163:2,2;
180:13

**lawsuit (2)**
15:16;33:11

**lawsuits (1)**
33:18

**laying (1)**
28:23

**lead (10)**
15:17,18;16:8,24;
18:5;89:17;193:21,23,
25;203:4

**leads (1)**
167:6

**learn (6)**
49:2,3;175:24;176:9;
178:23;191:4

**learned (12)**
42:3;64:5,8;66:3;
171:1;176:23;177:2;
178:2,5,12,15;179:6

**learning (1)**
47:21

**lease (1)**
62:2

**leased (1)**
62:11

**least (30)**
37:16;41:6;43:19;
48:22;86:17;101:13;
103:6;120:21;123:18;
129:3;135:14;136:2;
140:6,24;142:12;
145:2;146:14,19;
149:14;151:17;157:21;
158:23;167:14;171:11;

172:10;173:18;176:16;
182:11;194:13;204:5

**leave (7)**
9:21;112:14;126:16;
134:14;136:7;144:23;
203:11

**leaving (2)**
64:3;125:12

**led (1)**
96:9

**left (14)**
28:8;40:17;62:20,21;
63:3;88:7;94:13;95:1,
12;105:3;160:15;
162:5;167:9;204:5

**legal (5)**
33:18;62:11;66:24;
67:24;75:24

**legislature (1)**
107:9

**legitimately (1)**
60:17

**length (1)**
108:16

**lengthy (1)**
86:10

**Leonpacher (7)**
17:17;92:12;93:5,9;
151:23;186:4,16

**Leonpacher's (1)**
196:16

**less (8)**
7:5;79:25;112:18;
142:16;145:14,23;
149:19;181:18

**lets (1)**
50:13

**letters (3)**
32:19;60:24,25

**levels (3)**
114:4,4;117:18

**LEWIS (75)**
4:25;5:4;8:1;10:15;
11:1,23;12:23;14:6;
18:24;19:17;20:20,23;
21:20;22:11,22;23:9;
24:17;29:5;39:24;
41:25;42:14,21;66:11;
71:21;72:4,7,13;73:11;
85:11;96:14;97:6,21;
101:18,21;104:20;
106:22;118:15,16;
127:1;132:13;133:2,8,
22;134:9,16;145:24;
146:24;153:10,21;
169:24;170:11,17;
171:4,16;172:5,12;
173:12;176:2;177:6;
179:17;183:25;184:7,
14;187:8;188:2;189:5;
190:3,16,24;191:14,22;
192:2;203:22;204:8;
205:14

**license (5)**
80:10,13,17;133:13,
16

**lie (5)**
38:22;54:7,8,9;67:13

**lies (1)**
38:19

**Lieutenant (10)**
64:9;84:18,21;85:3,
8;86:17;87:8;154:9,12;
201:18

**life (5)**
53:25;139:9,12;
140:2,6

**ligature (12)**
29:3,15;103:20;
105:18,24;106:1;
108:7;115:24;116:2;
120:9;158:10;185:20

**ligatures (1)**
103:21

**light (3)**
69:20;122:1,6

**lighter (1)**
116:6

**lights (2)**
130:17;185:12

**likely (11)**
23:16;96:2;104:11;
108:8;111:17;112:18,
18,23;113:17;130:14;
179:22

**limited (3)**
190:19,19,22

**line (5)**
19:13;27:12,12;
132:15;170:8

**lines (1)**
159:14

**link (4)**
77:15,16;78:3,7

**list (3)**
16:6;61:6,19

**listed (1)**
140:8

**listen (5)**
44:15;124:1;142:22,
23;154:20

**listened (1)**
185:18

**listener (1)**
53:14

**listening (2)**
47:3;163:24

**listing (1)**
22:13

**lit (6)**
95:20;102:16,18,19;
107:25;144:22

**literally (1)**
82:9

**little (33)**
8:10;27:7;30:19;

34:12;40:19;41:5;
48:19;53:22;57:12;
63:7;71:25;75:20;
100:18;109:12,25;
116:13;120:13;127:13;
129:15;130:23;133:16;
137:8;141:20;144:7;
150:13;154:6;155:6;
157:25;158:18;161:24;
174:16;189:1;198:23

**lived (4)**
46:18;59:23;62:1,6;
94:6;162:21

**lives (1)**
94:1

**living (5)**
49:25;51:9;55:9;
139:21;149:19

**located (4)**
135:16;157:23;
170:6;182:15

**location (10)**
17:20;91:11,14;92:7;
93:12;100:15;103:8,9;
150:6;160:8

**locations (2)**
91:5;108:3

**lock (12)**
28:7;144:3,9,20;
145:21;146:3,3,17,21,
23,23;148:2

**locked (6)**
28:1;68:11;146:3,6,
12,14

**locks (2)**
144:20;146:13

**long (20)**
21:20;55:1;57:21;
85:21,22;100:13;
108:6,10;109:17,22;
110:2,10;118:11;
152:5;153:19;176:12;
187:2,3;192:15;198:9

**longer (4)**
71:22,24;152:23;
158:18

**long-winded (1)**
32:14

**look (19)**
10:1;23:7;24:14;
37:4;39:20;46:25;
107:11;110:21;111:25;
116:9;136:25;147:3,5;
149:9;159:9;166:3,22;
175:12;191:5

**looked (15)**
14:19;37:3;54:15;
57:23;74:25;82:13;
103:24;108:11;109:25;
113:22;115:1;129:16;
150:7;175:3,6

**looking (18)**
17:20;18:15;27:16;

47:8;48:18;54:17;
62:25;79:17;88:2;
117:1,1;148:11;
167:18,25;188:9;
191:7;195:3;203:2
**looks (10)**
8:14;35:18;74:3;
97:17;101:7;129:13;
137:24;148:25;175:10,
13
**lose (4)**
108:13;109:18;
110:12;202:20
**losing (1)**
55:23
**lost (2)**
78:20;144:16
**lot (38)**
9:6;10:6;24:5;29:11;
32:7;42:16,17;46:4;
47:18;48:17;58:13;
78:8,20;80:19;85:13,
25;92:9;107:1;108:22;
114:1,2;124:21,24;
128:17;135:11;137:21;
148:22;159:19;169:16;
195:13,13,14,14,17;
200:13,18;201:11;
204:15
**LPR (3)**
91:19,22,24
**lunch (3)**
118:11,11,14
**lungs (7)**
114:4;150:19;151:4,
11,18;197:21;198:14
**lying (1)**
9:24

## M

**ma'am (1)**
72:6
**machine (3)**
39:9,18;137:8
**machines (1)**
38:23
**mail (1)**
122:11
**mailbox (2)**
32:19;122:11
**mailboxes (1)**
61:1
**main (3)**
83:8;91:25;176:20
**makes (5)**
56:1;104:25;113:16;
137:18;204:25
**make-up (1)**
134:12
**making (5)**
37:15;82:21;152:16;
167:8;204:4

**male (3)**
131:6,9;158:5
**man (3)**
67:15;98:17;133:13
**manner (1)**
115:1
**many (18)**
5:15;100:24;104:24;
125:2;174:9,10;
189:24;193:14,15,18;
194:10;200:4,7,20,25;
201:15,20;202:9
**March (2)**
78:16,17
**marital (1)**
120:14
**mark (22)**
27:4;73:5,9,13;
87:18;97:12;132:19;
148:11,21,24;149:10;
150:1,5;151:21;
154:25;156:21;160:1;
183:16,17,18;184:5;
186:12
**marked (10)**
27:6;73:8,15;87:20;
97:16;132:23;151:25;
160:4;170:23;186:10
**marks (8)**
105:18;106:1,10;
107:9;115:9,25;116:3,
5
**marriage (1)**
55:4
**marriages (1)**
169:16
**married (4)**
46:11,12;55:1;
122:12
**Martin (3)**
59:13,14,19
**Mary (1)**
121:7
**master (1)**
130:2
**material (4)**
10:20;70:7;72:21;
115:24
**materials (2)**
77:8;90:3
**matriarch (1)**
129:6
**matter (13)**
4:8;75:6;76:2;77:4;
81:18;108:10;130:25;
132:18;134:2;170:20;
195:1;197:9;200:8
**matters (1)**
72:7
**may (61)**
7:15;9:1;10:16;11:2,
24;12:24;14:7;17:5;
20:2,5,15;25:2;26:7;

29:6;37:16;39:21,25;
42:1,15,22;43:12,12;
44:7,7;48:13;58:20;
79:3;82:10;83:4;
101:21;106:24,25;
110:25;112:16;127:2;
133:9;134:10,17;
140:2;146:1,25;161:7;
169:12;172:1,6,14;
176:3,4;177:8;184:7;
187:16;189:2,3,4;
190:5,17,25;191:2,16;
201:19;204:9
**maybe (68)**
11:18;16:22;19:8;
32:3;38:2;40:18;41:1,
5;43:21;51:17;52:15;
53:17,20,21;56:7;
57:16;59:1,15;60:22;
61:1,4,5;66:5;67:20;
68:2;70:5;76:20;78:17;
81:20;83:6;91:25;
100:14,18;103:16;
104:4,5;105:13;106:7;
107:24;111:18,18,19,
21,21;117:13;122:2,2;
131:9,10;139:1;145:6;
149:13;172:11;178:13;
183:24;186:8;188:13;
191:9;193:2;194:6,15,
16;197:25;198:1;
200:23;202:11;203:24;
204:13
**May's (1)**
23:25
**mean (57)**
12:1,6,8,25;20:20;
22:7,8,15;23:20;26:10;
28:14;34:24,25;38:1,
18,20,21;40:1,4;45:4;
51:25;52:12,13;53:3;
58:1,13;64:13;65:9;
66:9;67:23;86:24;94:7;
105:25;110:4;122:8;
126:5,15;127:7,22;
128:14,24;131:21;
135:2;139:14,19;
142:12,21;144:19;
151:16;163:18;169:13;
183:17;184:4;185:2;
190:1;195:12;201:21
**meaning (3)**
9:19,21,24
**means (8)**
12:6;28:18;58:10;
73:23;110:23;151:12;
172:21;197:23
**meant (1)**
30:9
**media (1)**
202:3
**medical (15)**
31:7;90:11;114:24;

115:5,5;119:2,14;
195:16,18;196:3;
197:18;198:3,8,12;
202:10
**medicated (1)**
155:22
**medications (3)**
155:23;156:1,10
**medium (1)**
173:24
**meet (1)**
52:12
**meeting (5)**
46:11;85:6;86:23;
106:21;119:15
**Melissa (33)**
43:3,4,7,24;44:8,11,
16,23;45:16;46:4;47:4,
16;48:14;49:19,22;
50:2,6;51:9,13;52:7,8;
80:9;125:6,17,24;
126:11,12,22;127:4;
165:12;178:10,13,14
**Melissa's (8)**
47:2;48:21;49:13;
50:22;51:8;125:14;
168:15,23
**melt (7)**
106:6,8;135:24,25;
136:3,3;142:2
**melted (3)**
106:5,9;147:23
**melting (1)**
104:16
**member (2)**
48:10,11
**members (9)**
49:18;58:19;59:7;
70:11;107:20;117:23,
23;130:24;162:13
**members' (1)**
131:1
**memorialize (1)**
83:24
**memorialized (1)**
168:7
**memory (3)**
44:14;77:2;123:5
**mental (3)**
45:6,9,9
**mentally (5)**
52:16;131:7,9;132:5;
185:21
**mention (4)**
45:23;94:5,7;121:1
**mentioned (21)**
18:13;26:19;60:24;
76:24;87:10;90:5;
104:5;107:4;115:7;
119:6;130:1;131:18;
135:5;136:17,17;
143:25;192:4,21;
194:19;196:11,15

**mentioning (2)**
107:3;201:10
**mentored (1)**
192:24
**ME's (1)**
35:21
**message (1)**
142:17
**messages (1)**
168:8
**met (5)**
52:14;67:14;79:21;
107:3;133:13
**metal (3)**
88:18;135:19,23
**Microsoft (1)**
77:1
**middle (1)**
39:12
**midst (1)**
153:11
**might (34)**
13:14;33:2;44:2;
48:3,5;49:15;54:12;
59:3;60:6,8;61:20,21;
62:9;87:14;103:4;
105:22;115:22;117:12;
119:5;121:16,22;
122:19;130:7;133:16;
135:5;139:1;140:9;
155:5;156:1;159:15;
163:7;178:12;181:20;
186:5
**Mike (1)**
97:5
**million (1)**
4:19
**mind (5)**
34:23;37:19;38:10;
69:13;82:3;118:6;
127:7;145:20;202:18
**minute (3)**
72:11;162:5;178:4
**minutes (13)**
23:8;71:19;72:4;
102:19;109:14;118:12,
16;152:5;153:3;
182:19;183:3;184:11;
185:1
**mirror (1)**
36:17
**misdirect (1)**
61:14
**misprints (1)**
93:5
**misrepresenting (1)**
42:13
**miss (1)**
69:20
**missed (1)**
69:3
**missing (4)**
135:8,16;136:16;

140:9

**misstating (1)**
177:7

**mistakenly (1)**
186:14

**mistakes (1)**
93:6

**mode (1)**
182:18

**model (2)**
76:19,20

**modify (1)**
6:16

**mom (13)**
46:18;49:15,24;
51:10;55:9;64:15;
69:19,25;70:3;94:25;
127:6;138:20;200:5

**moment (5)**
19:12;22:24;148:10;
162:8;189:15

**mom's (4)**
55:9;69:17;70:2;
138:17

**money (7)**
39:4,5;94:13;137:9;
138:12,15;139:23

**monoxide (1)**
114:4

**month (1)**
87:15

**months (6)**
46:11;85:7;126:15;
177:10;192:16;200:11

**more (36)**
13:6;14:23;19:8;
20:3;22:25;56:7;58:3;
66:6;79:25;88:10;
94:16;99:18;105:1;
109:13;112:17,23,25;
113:10,17;119:1;
123:25;132:10;141:21;
145:16;147:22;154:6;
155:6;173:22;174:17;
178:16;190:19,21;
192:24;203:1,2,10

**morning (3)**
4:13,16;99:1

**mosquito (1)**
30:7

**mosquitoes (1)**
31:2

**most (11)**
23:16;41:20;44:9;
54:5,6;70:5;117:11;
129:2;185:22;199:17,
18

**mostly (2)**
49:16;57:20

**moth (1)**
135:4

**mothball (1)**
150:7

**mothballs (12)**
30:12,20;63:12,18;
64:3;86:6;100:24;
101:9;134:7;199:24;
200:2,5

**mother (1)**
18:22;26:14;58:21;
68:21;69:9;125:14;
126:12,21;127:8;
168:13;188:24

**mother's (5)**
62:20;63:3;81:10;
138:16;162:6

**motion (2)**
20:6,7

**motive (3)**
60:18;71:7;124:13

**motives (1)**
61:3

**mouth (1)**
141:19

**move (6)**
29:18;55:22;82:1;
119:2;122:22;142:24

**moved (1)**
55:5

**movements (1)**
33:7

**movers (2)**
153:12;191:24

**Moving (5)**
29:20;56:10;62:18;
70:10;153:11

**Mrs (3)**
197:20;198:15;203:8

**much (19)**
6:10;24:1;71:22;
78:10;84:9;105:1;
108:24;113:2,5;
117:19;130:11;140:24;
149:21;158:14;162:1;
163:11;191:24;197:3;
200:10

**Muckle (8)**
18:18;22:2;25:22,23;
96:9;132:12,25;170:5

**M-U-C-K-L-E (1)**
18:18

**Muckle's (1)**
170:15

**Muhammad (1)**
137:14

**multi-pack (1)**
160:21

**multiple (3)**
32:6;94:17,19

**murder (13)**
34:6;37:21;58:20;
59:21;61:11,17;89:11;
105:24;130:2;131:3;
133:1;165:9;188:23

**murdered (3)**
26:14;34:18;165:13

**murders (5)**
25:24;28:6;58:4;
187:6;203:7

**musing (1)**
38:5

**must (4)**
10:9,20;13:17,20

**myself (3)**
34:13;59:16;93:8

**N**

**name (12)**
4:13;16:1;17:18;
48:5;77:23;85:8;92:11;
128:20;154:10;157:2;
164:12;196:16

**named (1)**
18:18

**naphthalene (2)**
134:8,14

**N-A-P-H-T-H-A-L-E-N-E (1)**
134:8

**narcotic (1)**
156:13

**narcotics (1)**
156:5

**narrative (12)**
7:24,24;27:17;74:8,
15;75:3,5;98:2;123:2;
129:7;159:23;168:5

**narrow (1)**
109:12

**National (2)**
41:19;42:10

**nature (4)**
45:1;56:15;58:9;
129:17

**nearly (1)**
149:21

**necessarily (4)**
39:4;73:20;106:15;
146:22

**necessary (3)**
12:3;20:25;23:2

**neck (33)**
28:12,23;29:2,8,9,
14;35:17,23;103:15,18,
24;104:3;105:18;
106:1,4,7,11,11;112:5,
25;113:6;114:16,22;
115:9,14,21,24;117:2;
130:7,8;185:20;
186:20;197:25

**necklaces (1)**
135:11

**necks (1)**
107:10

**need (16)**
6:24;7:20;8:8;19:9;
20:5;21:14;27:9;54:9;
84:6;93:10;97:7;
109:14;118:14;144:24;

152:7;174:23

**needed (3)**
146:22;154:23;
189:14

**needs (5)**
108:7;194:2,5,8,9

**negate (1)**
14:5

**negative (1)**
99:15

**neighbor (1)**
59:20

**neighborhood (6)**
57:19,20;131:6,8,17,
23

**neighbors (4)**
57:15;59:18;60:11;
85:20

**neither (5)**
114:7;128:5;145:12,
17,19

**new (18)**
18:16;19:19;24:14,
18,25;55:22;64:21;
68:14;70:25;96:11;
129:14;178:4,24;
179:12;188:3;189:7;
191:1,10

**news (3)**
64:13;135:5,5

**next (23)**
8:25;16:3,6;38:8;
49:4;56:10;58:8;59:23,
25;60:17;63:10;64:4;
68:14;69:7;79:20;
105:24;109:10;132:20;
182:23;184:5;189:23;
199:13;200:22

**nice (1)**
57:18

**niches (1)**
17:4

**night (17)**
31:16,20,21;32:4;
33:2,7;36:4;37:11;
71:1;90:25;92:4;99:21;
102:18;159:9;164:25;
165:3;184:20

**nighttime (1)**
107:21

**NIJ (3)**
41:8,10;73:10

**ninth (1)**
70:10

**nobody (3)**
70:25;126:12;173:5

**noise (1)**
184:3

**none (1)**
70:24

**Nope (1)**
150:12

**nor (6)**

89:12;145:12,19;
146:2;172:15,16

**normally (2)**
69:10;146:3

**Northern (1)**
4:9

**note (4)**
52:4;54:13;129:7;
136:15

**notebook (1)**
75:23

**notes (15)**
37:15;75:8,13,15,19,
22,25;76:3,5,6,9,10,10;
78:23;168:3

**noteworthy (2)**
30:16;50:12

**notice (5)**
4:10;101:11;116:7;
120:9;126:17

**noticeable (1)**
85:20

**notified (1)**
35:25

**notion (1)**
61:15

**novel (1)**
173:8

**nowhere (1)**
128:20

**Number (20)**
4:9;8:23;16:3,6,6,8;
17:12;27:5;73:7,14;
77:25;87:19;97:15;
132:22;151:24;160:3,
14;170:7,15,24

**numbers (3)**
83:25;166:3,7

**numerous (1)**
156:11

**Nyaira (2)**
166:19;180:5

**nylon (1)**
103:23

**nylon-coated (1)**
104:6

**O**

**oath (1)**
10:3

**object (18)**
7:15;10:15;11:23;
18:24;23:2,21;24:17;
39:24;96:14;132:13;
133:2,22;149:11;
171:4;176:2;183:25;
187:8;190:3

**objecting (1)**
19:6

**objection (47)**
5:2,3;11:1;12:23;
14:6;19:18;22:18,20,

29:5;41:25;42:14,21,
22;96:16;97:21;
101:18;104:20;106:23,
24;127:1;132:15;
133:3,8,23;134:9,16;
145:24;146:24;170:12;
171:5;172:5,12;
173:12;177:6;179:1;
184:7,14;188:6;189:5,
6;190:4,16,24;191:12,
14,15;204:8
**objections (4)**
4:22;7:25;23:20;
184:15
**observation (1)**
117:3
**observe (1)**
45:16
**observing (1)**
116:16
**obtain (2)**
13:14;180:24
**obtained (6)**
21:17,24;22:2;95:25;
101:3;119:13
**obviously (6)**
15:16;18:15;44:23;
52:6;83:18;87:22
**occurred (4)**
50:7;57:9;97:22;
197:13
**OCGA (1)**
4:1
**o'clock (2)**
153:13,22
**October (1)**
200:23
**odd (1)**
53:23
**off (18)**
23:7,10;44:16;72:14;
81:20;83:2;88:7;106:5;
118:21;124:15;145:6;
153:5,24;163:11;
169:25;185:8;189:13;
205:18
**offenses (1)**
129:17
**offer (2)**
85:24;192:19
**offered (2)**
13:10;172:23
**offering (1)**
175:18
**office (23)**
35:22;57:1;77:12;
84:25;85:9;86:11;
87:23;88:11,11;95:24;
96:1,23;97:4;103:1,2,
9;104:19;137:15;
148:12;157:22;181:22;
198:8;199:12
**officer (19)**

10:20,23;11:4,8,19;
12:13,13,18,21;13:8,
13,17,24;15:6;66:25;
67:1,25;68:1;184:22
**officers (11)**
9:16;17:12;67:5;
82:14,17,19,22;83:15;
173:20;184:5;195:14
**officer's (2)**
14:11;201:10
**Off-the-record (2)**
23:12;205:15
**often (1)**
57:24;112:12
**old (3)**
79:4;112:20;173:25
**older (1)**
113:21
**omit (1)**
11:5
**once (2)**
65:12;161:23
**one (125)**
5:23;6:4,21;8:14,23;
16:3,6,8;24:6;27:14,
24;31:25;34:8;37:14,
19;39:16;40:22;42:2;
44:20;48:18,25;49:9,
16;50:20;52:19;56:5;
57:5,16;58:2;59:19;
60:20;61:3,6;62:10;
69:8;76:25;77:6,16,19;
78:11,21,25;85:1;
86:18;87:8,10;92:9;
93:7;94:9,17,19;95:8;
99:18;104:6,9;105:15;
106:23;110:1;112:19;
114:1;122:20;127:18;
130:3;131:13,24;
132:20;139:14;140:9;
141:8;142:13;144:2,
19;145:16;146:13;
148:17,18;150:1;
151:2;156:17,23;
157:10,16;159:8,20,21;
160:5,10,11,13;161:5,
17;162:19;164:10,18;
165:8,15;166:6,12;
169:22;170:22;174:3;
179:13;180:15,17,20,
23;181:13,15;182:5;
183:5;184:25;185:15;
186:4;190:18;194:13,
14;196:16;200:13,13;
201:4,10;202:19;
203:17;204:20,21
**ones (1)**
156:11
**ongoing (5)**
19:1,11,24;73:20;
96:17
**only (28)**
8:2,22;44:1;57:14,

15;65:2,18;66:19;
68:15;71:6;136:7;
146:16;148:3,4,4;
152:20;166:11,17;
171:11;173:5;177:20;
178:1;181:7;186:6,10;
193:5;200:17,21
**onto (3)**
56:10;62:18;70:10
**open (11)**
27:25;30:6;43:22;
80:18;101:16;110:21;
132:17;144:9;174:10,
13;202:18
**opened (2)**
148:7;150:11
**operative (1)**
33:14
**opinion (9)**
25:8;49:24;84:19;
85:1;131:4;195:17,25;
196:2;201:7
**opinions (4)**
42:17;131:1;173:10;
201:12
**opportunity (3)**
40:13;71:7;127:6
**opposed (2)**
20:3;112:20
**option (1)**
181:6
**options (2)**
80:25;81:3
**order (6)**
16:2;20:7,19,24;
21:14;162:2
**organizations (1)**
42:24
**organized (1)**
123:1
**origin (5)**
88:22,24;157:11,17;
161:4
**original (3)**
24:21,24;25:15
**originally (5)**
24:8;25:18;27:18;
103:21;205:4
**others (10)**
5:16;25:9;27:20;
131:18;149:19;160:18;
164:8;173:22;201:19;
203:23
**otherwise (3)**
31:8;168:7;203:19
**ought (1)**
82:8
**out (91)**
9:21;12:22;16:19;
27:8,19;29:21;34:17;
35:1;40:15;44:4;47:4,
14;49:19;50:5,14;54:8,
16;56:5,24;57:11;62:5;

64:13;65:8,20,24;74:1;
75:17;79:13;82:7,9,16;
83:7,16;84:5,11;89:8,
14,21;90:19,22;93:20;
96:13;102:21;103:8;
105:11,12,14;108:14;
109:2,3;111:17;
119:22;120:2;126:14,
15,17;129:9,14,21;
133:16;135:2;136:19;
138:9;141:19;142:9,
15;143:20;144:21;
146:15,21;159:18;
161:14;166:2,6,24;
167:11;169:5;171:25;
174:4;178:10;185:10,
22;186:9;192:21,23;
194:2,15;199:20;
201:5;202:7;203:11
**outcome (3)**
19:19;119:16,17
**outlet (1)**
149:1
**outlier (1)**
57:22
**outlined (1)**
24:13
**outs (1)**
14:13
**outside (6)**
30:9;31:5;144:6,10;
146:14;187:10
**outstanding (1)**
55:2
**over (26)**
16:2;25:2;34:2;36:5,
24;45:23,23;49:24;
58:5;60:2;64:24;66:10;
80:13;85:8;105:14;
106:7,9;120:11;
124:12;163:3;166:23;
176:14;182:2;194:25;
196:8,13
**overall (2)**
16:25;143:3
**overnight (1)**
62:8
**overwhelming (1)**
14:3
**own (9)**
61:10,17;65:23;
77:14;78:6;122:8;
130:14;138:15;175:1
**owned (2)**
200:5,5

## P

**pad (1)**
75:24
**page (10)**
10:2;59:12;98:1,2;
131:14;137:24;139:8,

24;175:12;180:3
**pages (1)**
73:1
**paid (6)**
15:10,11;48:9,12,13;
65:24
**paper (1)**
76:9
**paragraph (21)**
27:17;29:18,18,20;
33:20,21,23,25;43:2;
54:15,19;56:3,11,11;
59:12;62:19;69:3,5,7;
70:10;71:4
**parameters (1)**
191:19
**parentheses (2)**
38:8,14
**parents (10)**
34:18;37:11;48:22,
23;49:13,15;61:9;
94:25;125:7;168:13
**parents' (2)**
32:18;95:12
**park (1)**
100:10
**parked (1)**
80:18
**parking (1)**
80:19
**parrot (1)**
46:2
**parse (2)**
188:25;191:18
**part (9)**
53:14;54:20;60:14;
89:1;103:23;141:22;
165:1;166:11;192:23
**particular (8)**
31:21;52:23;70:12;
79:9;143:24;144:3;
181:5;205:8
**partner (1)**
16:22
**parts (3)**
27:12;77:10;106:7
**pass (1)**
109:3
**passed (3)**
108:14;167:11;169:5
**past (4)**
70:23;118:2;122:7;
188:15
**patrol (1)**
182:6
**pattern (1)**
205:7
**Paul (1)**
25:7
**pause (1)**
22:24
**pawned (2)**
136:11,25

Case 1:19-cv-04300-LMM   Document 108   Filed 12/10/21   Page 70 of 79
Keith Sylvester vs.
James Barnett, et al.

Detective James Barnett
April 9, 2021

**pawning (1)**
137:11
**payment (2)**
15:14,15
**payout (4)**
64:24;65:10,25;
139:14
**PC (1)**
138:20
**PD (1)**
99:3
**penalty (4)**
26:5,9,12,19
**pending (6)**
4:9;19:2,11;22:9;
97:23;176:6
**Penn (4)**
98:2,9,15;138:9
**Penny (2)**
141:15,17
**people (49)**
35:3;36:19;39:10,10,
11;42:7;43:23;49:20;
53:6,7,24;54:5,7,9,9;
55:2;57:4,6,7;59:19;
60:14;64:21;67:12;
70:12,13;75:10;80:22;
107:8,16,17;109:20;
110:7;111:4;115:8;
120:21;124:21,25;
126:9;129:4;131:5;
142:14;145:5;152:11;
164:18;172:1;174:3,
23;181:17;191:5
**percent (3)**
41:1;52:19;203:17
**perfect (4)**
87:22;190:8
**perfection (2)**
12:13,14
**perfectly (1)**
7:5
**period (5)**
16:14,15;48:6;58:5;
168:9
**permissible (1)**
4:12
**person (27)**
16:8;28:8;46:13;
51:13;53:8,9,9;61:5,5,
20,20;68:15;71:6;
112:19,24;113:1,5,9;
131:1,7;132:6,8;
134:23;137:19;161:13;
197:23;202:2
**personal (6)**
8:21;56:14;58:9,12,
16;75:6
**personally (6)**
15:11;25:16;45:16;
51:17,20;185:3
**person's (4)**
69:13,13;131:2;

161:16
**pesticide (1)**
31:1
**petty (1)**
129:20
**phases (1)**
171:24
**phone (21)**
8:7,21,21;17:6;
22:24;40:19;49:8;59:9;
63:1;69:18;75:25;
76:13,17,18,19;83:24;
90:17,20,21;91:4,13;
124:12;131:15;153:15;
162:10,13;163:3;
164:22,23,25;166:21;
167:5,7,9,15,16,19;
168:1;170:6,7,10,15;
171:25;174:2;186:24;
194:7;204:4,4,14,22,
25;205:3
**phones (2)**
60:3;137:9
**photo (2)**
101:14;150:7
**photos (5)**
89:22;90:4,11;180:3;
200:1
**physical (1)**
201:24
**physically (2)**
75:23;148:25
**pick (5)**
47:12;53:23;69:18;
154:24;156:20
**picked (1)**
204:14
**picture (1)**
101:17
**pictures (5)**
103:5,23;111:24;
166:14,15
**piece (2)**
92:24;155:18
**pieces (3)**
13:9;159:4;179:25
**pinged (1)**
170:6
**pitch (1)**
194:2
**pizza (1)**
139:1
**place (9)**
34:14;37:20,25;
69:13;81:1;100:16;
104:14;143:19;169:18
**places (2)**
85:15;107:7
**plain (2)**
126:25;181:19
**Plaintiff's (13)**
8:1;27:4,5;72:20;
73:7,14;87:19;97:13,

15;132:22;151:24;
160:3;199:25
**plan (2)**
126:15;160:7
**plane (4)**
121:7,19;123:7,12
**planned (8)**
50:8;121:15,16;
126:1,5,6,22;127:8
**planners (1)**
128:23
**planning (2)**
127:10,10
**play (15)**
150:13,21;151:6;
152:6;154:6;155:6;
157:25;158:17;162:17;
182:25;183:1,22;
184:17;186:9,10
**played (17)**
150:17;151:8;154:8;
155:1,8,15;156:22;
158:1,19;159:1;
183:13,23;184:18,19;
186:13,22;193:22
**playing (4)**
31:20;33:3;148:21;
149:10
**please (4)**
27:21;66:13;89:6;
149:10
**Plenty (1)**
193:11
**pliable (1)**
135:23
**plug (1)**
77:14
**plus (2)**
58:2;76:9;162:24,24
**pm (3)**
62:21,22;205:20
**pocket (1)**
186:7
**point (24)**
32:15;33:8;83:22;
84:2,22;86:18;88:24;
101:24;110:12,13;
136:3;155:20;157:9,
11,16,16,20,22;161:4,
6;177:12;188:22;
190:13,18
**pointed (2)**
59:14;61:11
**points (8)**
32:22;50:18;61:7;
88:22;152:12,24;
157:13;199:11
**poisoned (1)**
31:9
**poker (2)**
31:20;33:3
**Police (14)**
15:5;36:25;38:6;

41:21;54:10;56:22;
60:7;89:25;132:2,7;
172:24;173:20;174:18;
195:14
**policy (16)**
64:6,13,25;65:3,16,
21,22;66:4,6,20;68:7,9;
127:14,17;128:21;
139:9
**policyholder (1)**
64:19
**pool (1)**
14:15
**poor (5)**
107:18;109:24;
110:15,17;182:14
**popular (1)**
41:20
**portion (4)**
41:17;45:14;140:1;
196:6
**portions (4)**
44:12;196:20;197:1,
4
**position (4)**
103:1,9;144:21;
146:4
**possibilities (1)**
142:13
**possibility (12)**
15:16;43:15;49:10;
54:12;55:15;56:12;
103:7;104:10;105:12;
106:17;130:6;142:15
**possible (14)**
7:4;17:20;65:25;
69:15;75:16;82:4;
119:25;144:19;146:19;
159:18;161:4;191:19;
197:20;203:7
**possibly (14)**
28:9;36:2;55:17;
59:21;90:6;113:7;
121:14;137:18;139:1;
148:18;154:14;167:4,
13;180:15
**post (3)**
22:4;97:22;176:11
**postdate (1)**
74:4
**potential (1)**
102:2
**potentially (3)**
19:5;52:25;53:1
**pounds (1)**
133:6
**practice (1)**
75:7
**preamble (1)**
24:5
**preface (1)**
162:18
**prefer (1)**

6:19
**preliminary (1)**
64:14
**premises (1)**
194:5
**preparing (1)**
175:2
**prepped (1)**
53:12
**prescribed (1)**
156:4
**prescription (1)**
156:2
**presence (2)**
114:17;115:13
**present (9)**
4:3;19:22;26:20;
43:23;45:15;50:4;96:3,
11;198:14
**presented (4)**
25:4;94:20;163:5;
190:14
**presenting (1)**
163:14
**preserved (1)**
4:23
**preserving (1)**
7:17
**pressure (7)**
87:1;108:12;109:1,
14;113:5;117:13;
197:24
**pretty (12)**
40:4;44:8;84:9;86:5;
100:16;132:12;140:24;
176:12;185:22;191:24;
198:10;200:10
**previous (6)**
6:16;76:20;165:19;
177:7,15;189:10
**previously (3)**
170:23;182:20;
186:10
**primarily (1)**
83:21
**primary (1)**
16:21
**prime (1)**
194:8
**principle (2)**
9:10;12:18
**print (1)**
174:4
**prior (36)**
5:17;18:3,7;21:7;
33:15;43:4;48:22;
52:20;56:23;84:11;
90:9,22;98:6;102:18;
118:2;119:4,13;120:1;
123:12;125:2,18,24;
126:1,24;129:17;
140:20;166:2,4,23;
167:16;182:1;192:4,7;

193:14,16;194:10

**priority (1)**
167:1
**privilege (2)**
4:23;19:15
**privileged (2)**
20:15;21:13
**pro (1)**
33:11
**probable (38)**
10:13,21;11:10,13,
15,16,20;12:3,20;
13:22;14:5;18:9,19,21;
24:7,22;25:14;27:17;
38:17;70:7;84:12;85:2;
87:6;114:19;115:15;
119:8;124:10;129:25;
156:17;167:17,22;
169:10,12;187:4,17;
188:11,16;203:15
**probably (41)**
6:10,11;17:23;18:6;
35:18;39:3;42:4;43:18;
44:11,18;45:21;52:16;
68:2;73:19,25;74:7;
89:18;91:7,12;104:1;
109:21;112:23;124:7;
129:1,2,5;130:20;
131:12;132:10;139:13;
152:14;159:24;164:5;
173:24;174:12;178:8,
9;193:18;194:12;
200:22;201:3
**probate (4)**
128:9,13,16;139:17
**problem (15)**
8:13;17:3;29:25;
30:7;31:22;55:3;64:12;
80:22;86:6;104:23;
108:2;141:22;153:21;
161:20;197:7
**problems (2)**
78:13;95:8
**proceed (3)**
23:1;84:13;85:2
**proceeded (1)**
51:6
**proceeding (1)**
26:20
**proceedings (1)**
20:8
**proceeds (1)**
128:10
**process (10)**
15:23;23:25;71:5;
73:20;74:9;75:9,25;
111:21,22;116:12
**Processing (2)**
194:4,4
**produced (3)**
152:3;183:1,14
**professional (1)**
48:9

**programs (1)**
41:20
**progress (1)**
95:4
**pronounce (1)**
92:11
**proof (2)**
94:8;145:18
**proportions (1)**
112:12
**proprietary (1)**
74:14
**prosecute (3)**
24:23;25:9,15
**prosecution (4)**
18:17;25:22;26:5,6
**prosecutions (1)**
10:13
**prosecutor (1)**
26:18
**prospects (1)**
123:22
**protective (3)**
20:6,18,24;21:14
**protects (1)**
10:13
**protocols (1)**
198:22
**prove (3)**
124:23;175:18,22
**provide (7)**
13:2;33:1;77:15;
95:10;102:15;143:7;
162:1
**provided (7)**
4:2;68:6;70:25;
102:22;145:4;196:8,12
**provides (2)**
28:18;77:3
**providing (1)**
77:16
**public (1)**
19:5
**publicly (1)**
25:21
**pull (12)**
7:21;27:8,19;29:21;
30:14;42:4;77:17;
91:19;103:5;122:24;
164:13;185:10
**pulled (5)**
36:24;54:16;92:3;
93:17;94:3
**pulling (1)**
17:19
**punish (1)**
26:7
**purchase (1)**
126:1
**purchased (5)**
121:12;123:7;
168:12,22;200:2
**purchasing (1)**

126:24
**purpose (3)**
122:9;169:22;187:23
**purposes (1)**
4:11
**purse (3)**
147:12,17,19
**Pursuant (2)**
4:1,10
**push (1)**
185:5
**pushed (1)**
145:6
**put (37)**
11:12;12:1,8;34:13;
35:23;36:15;37:13;
39:4;43:21;49:8;52:16;
54:20;55:24;65:11;
68:21;69:13;70:4;81:1;
82:16;100:19;106:23;
111:7;112:25;113:5,
10;119:12;122:5;
125:25;126:24;132:4;
146:22;159:4;174:2,5;
180:7;188:20;190:4
**putting (3)**
19:3;113:2;133:12

**Q**

**qualified (2)**
39:9;45:8
**quick (5)**
56:8;71:15;152:22;
179:24;187:1
**quicker (1)**
72:2
**quite (1)**
53:18

**R**

**raised (1)**
58:19
**ramifications (2)**
78:19;79:4
**random (2)**
16:9;56:13
**rate (1)**
38:19
**rather (2)**
4:19;38:5
**reach (1)**
171:25
**reaction (1)**
69:23
**reacts (1)**
136:1
**read (4)**
27:11,13;119:21;
205:16
**readily (1)**
13:23

**reading (1)**
120:1
**reads (2)**
41:18;131:15
**real (1)**
39:22
**realize (3)**
38:15;81:18;193:20
**realized (4)**
34:5;36:13;49:1;
50:10
**really (35)**
6:9;14:19;15:12;
16:21,22;17:8;36:18,
20;41:12;42:24;48:15,
16;61:24;62:12;78:10;
80:23;91:14;95:9;
101:15;104:17;107:19;
122:5;124:19;129:21;
143:1;149:13;157:19;
161:25;163:22;173:7;
175:4;176:19;177:22;
179:24;189:13
**rear (1)**
181:7
**rear-facing (1)**
180:24
**rear-view (1)**
36:17
**reason (23)**
38:1,4,20;55:24;
60:11;67:13;74:10,11;
80:11,15;83:1;93:12;
116:21,23,25;126:16;
140:15,22;142:3;
156:12;167:22;184:4;
196:25
**reasonable (2)**
12:13,21
**reasonably (1)**
12:12
**reasons (2)**
37:16;204:15
**recall (67)**
26:18;33:5,6;40:18,
21,25;41:3,3;44:1,6;
48:2;51:21;68:23;83:5;
90:23;91:6,24;98:5,8;
99:10,11,24;101:1;
103:1;107:3,22;114:1,
5,9;118:1;121:9;
123:10,14,15,23;124:5;
125:15,16,19;128:1,3;
129:18,21;136:15;
137:14;138:1;144:4;
145:11;146:18;148:3,
5;155:24;157:12;
159:18;161:5;163:22;
164:12;165:5;166:5,6;
167:19,19;169:7;
180:19;186:21;198:3;
201:9
**receipt (1)**

101:2
**receipts (1)**
90:14
**received (2)**
15:2
**receiving (2)**
60:25;139:3
**recent (5)**
41:19,23;118:2;
173:9,10
**recess (4)**
72:16;118:23;153:7;
170:2
**recklessly (1)**
10:24;11:5
**recognize (9)**
27:1;92:10;97:5,11;
101:5;132:24;151:2;
154:3;162:14
**recollection (9)**
80:12;97:19;100:10;
122:25;131:19;136:24;
137:5;138:1;146:20
**recollections (1)**
164:14
**reconcile (1)**
122:22
**reconciliation (2)**
54:22;55:15;123:22;
127:10
**record (27)**
4:4;6:20;7:18;8:18;
19:4;23:7,11,14,21;
24:4;26:19;38:4;49:10;
72:15,18;106:23;
118:22,25;124:14;
153:6,9;170:1,4;181:7,
7;190:4;205:19
**recorded (15)**
31:25;36:4;37:9;
43:7,12,13,16,19;
48:24;49:7;59:9;94:10;
119:15;124:7;183:9
**recorder (2)**
93:2;186:7
**recording (21)**
33:7;36:16;37:12;
38:6;120:23;152:4,7,
14,15,16,19;155:14;
160:2;161:22;162:16;
163:24,25;177:24;
181:21;185:17,17
**recordings (3)**
70:20;75:13;154:16
**records (20)**
43:17,23;63:1;90:17,
20,21,21;91:4,10;92:4;
142:21;166:21;167:5,
7,15,19;168:1,3;
182:19,21
**recover (1)**
144:13
**recovered (1)**

147:19
red (1)
149:11
redirect (1)
61:14
refer (1)
7:20
reference (1)
190:22
referenced (3)
48:21;73:3;143:20
referred (1)
180:2
referring (5)
30:20;81:8;164:22;
186:5;191:3
reflected (1)
159:22
refresh (6)
97:19;123:5;131:19;
136:24;137:5;164:14
refreshes (3)
44:14;122:24;137:25
refused (1)
68:20
regain (1)
110:10
regained (1)
111:1
regaining (1)
110:18
regard (1)
186:19
regarding (1)
41:23
regardless (1)
102:10
regards (11)
19:21;22:3;132:18;
176:6;192:17;193:22;
196:5,20;197:17;
198:12;199:5
regular (1)
31:22
regularly (1)
202:14
related (4)
38:2;76:10;83:15;
166:25
relationship (3)
46:14;55:21;122:3
relative (1)
48:3;121:11
relatively (6)
69:9;107:8;112:20,
21;113:17,19
relatives (1)
141:12
released (2)
197:23,24
relevancy (8)
19:17;22:18,19;
132:16;172:5;173:12;

183:25;191:14
relevant (11)
12:9;15:4;19:10,23;
21:1,2,11,18;32:20;
33:10;77:5
relic (1)
147:24
relied (2)
135:2;179:18
rely (4)
42:24;66:25;106:15;
170:19
relying (6)
83:14;120:2,4;188:4;
189:7,9
remains (1)
147:7
remember (106)
5:22;6:9,15;14:16,
18;32:2;40:8;43:16;
45:19;49:12;54:13;
57:15;60:1,7;61:16;
62:3,9;78:2;80:16;
83:7,10;84:21;88:9;
91:21;92:13;93:24;
94:2,10;96:4,5;98:11,
19;102:2;103:6;104:8;
110:20;113:7;117:20;
119:24;120:1,19,20;
121:1,3,13,18;123:14,
17,21;125:13;128:2;
129:18;131:5,10,21;
136:15,17;137:6,20;
138:4,10;140:13;
141:14,16,17;144:1;
152:16;157:13,14;
159:11,19;160:20;
161:8;162:15,18,23;
163:6;164:1,4,6,9,23;
165:1,2,7,18,21;
166:15,17;167:1,15;
168:11,17,18,19;175:7,
15,17;182:5,6;185:16,
21,23;186:22;199:12;
202:3
remembered (2)
89:4;94:3
remembering (1)
188:13
Remind (1)
78:14
reminded (1)
204:23
remote (1)
56:13
remove (1)
103:14
removed (1)
35:9
removing (1)
120:11
renew (5)
133:3,23;170:11;

189:6;191:15
renewing (1)
42:22
re-orient (1)
8:13
repair (4)
98:10;138:7,12,17
repaired (1)
138:21
repeat (5)
51:18;52:6;53:18;
176:8;196:10
repeated (1)
120:3
repeatedly (1)
145:5
repeating (1)
52:24
repetition (2)
51:18,19
report (36)
10:2;57:3;73:2,17,
24;74:4,13;75:7;97:14;
114:25;119:14,17,22,
23,24;120:1,6;129:7;
131:14;132:25;136:24;
137:25;139:8,25;
159:22;161:14,16;
168:5;170:25;175:12;
177:3,16;195:17;
197:18;198:13,13
reported (8)
44:17;98:15,16;
117:23,24;164:18,24;
165:8
reporter's (2)
4:2;6:22
reporting (1)
186:11
reports (3)
9:15,15;104:5
represent (10)
4:14;43:20;73:1;
97:4;114:15;123:25;
124:2;128:4;145:2;
173:16
represented (2)
9:11;123:19
representing (1)
124:18
request (2)
89:10;138:20
requested (2)
57:2;89:12
rescue (3)
85:4;87:11;101:25
Research (1)
63:11
reserved (1)
4:24
re-share (1)
97:8
residue (1)

189:6;191:15
135:4
resolidify (1)
136:4
respect (4)
12:12;126:19,20;
139:10
responded (1)
17:12
response (2)
175:18;178:24
responses (1)
7:25
responsible (2)
129:3;130:4
resting (2)
100:16;104:14
restricting (1)
21:25
result (1)
23:16
results (2)
40:12;171:13
retardation (2)
45:6,9
return (2)
68:20;122:15
returns (1)
95:3
review (2)
70:20;129:22
reviewed (2)
83:6;95:24
reviewing (1)
40:8
revised (1)
74:23
rhyme (1)
74:11
Rice (1)
26:1
riding (1)
37:11
right (180)
6:16;8:10,24;9:22,
24;10:4,14;12:14;
14:22;18:7,11;25:1,24;
27:16;28:17,20;31:4,5,
13;37:22,23;38:6,13;
39:18,22,23;40:19,23;
44:24;47:17;49:6;
50:17;56:17;58:1,6;
59:9;63:8,14,19,20;
64:7;66:20;68:7,12,22;
69:11;72:19;74:19;
78:15;79:24;82:9,12;
83:2,3,5,11;85:21;87:5,
6;88:1,5,6,16,17,23;
89:1,3,19,23;90:1,9;
91:2;92:18,24;93:18;
94:14,16;95:13,15;
98:13,23;99:13;
100:19,20;104:7;
105:7,22,24,24;109:11;

111:5;112:1;116:2;
117:9,19;119:23;
120:15,18;121:23;
122:17;123:1,25;
129:10,19;132:7,21;
135:12,22;136:4,7,8,
21;137:1;142:18;
143:17,20,21;144:7,11;
147:17,24,25;148:17,
22;149:1,3,6,25;
150:16,25;151:13,14,
16;152:17;155:16,20;
156:18,23,24;157:18;
158:3,15,16;159:4;
160:5,12,15,16,17,22;
161:14;162:17;163:1;
164:15,17;165:16;
167:12,23,24;175:7,7,
11;176:25;177:5;
178:18,22;182:16;
183:3,6,7,10,11,19,24;
184:4,6,20;189:19;
190:10;205:16
rights (1)
13:2
ring (1)
145:6
rings (2)
135:12;142:15
road (5)
23:18;39:13;91:22,
23,25
role (1)
192:8
roles (1)
193:21
roll (1)
130:8
rolls (1)
105:14
Ron (15)
59:13,22,23;60:2,4,5,
8,9,13,15,18,23;61:9,9,
25
Ronnette (3)
141:15,16,17
room (8)
8:15;43:9;105:19;
106:13;143:16;149:20;
157:18,21
rooms (3)
100:22;107:13;
130:18
rotated (1)
100:18
rotation (3)
8:24;15:25;16:17
rough (2)
112:11;160:6
route (1)
35:21
routine (1)
91:13

**rubbing (5)**
30:21;63:12,18;
168:12,22
**Rule (6)**
23:25;75:4;102:21;
105:11;119:19;199:20
**Rules (1)**
4:12
**rumors (1)**
164:3
**run (6)**
48:14;69:20;72:8;
75:10;130:16;183:19
**run-in (1)**
60:4
**running (7)**
49:25;55:11;62:15;
98:18;177:23;182:17;
191:25
**rush (1)**
86:24

# S

**sad (1)**
143:4
**safe (2)**
21:9;81:1
**safekeeping (1)**
80:5
**sake (1)**
6:22
**salt (1)**
141:11
**Same (26)**
10:7;18:9;23:3;
32:23;96:16;97:21;
99:20;105:18;106:12;
107:7,7,8,14;125:10;
139:21;144:25;150:6;
156:9;178:16;180:3;
182:9;184:7,14;
190:14;191:13;193:7
**sames (1)**
25:24
**samples (1)**
117:1
**Sandy (1)**
14:20
**satisfaction (1)**
100:22
**satisfy (1)**
191:11
**save (4)**
76:2,5;77:3;78:23
**saved (1)**
76:5
**savvy (1)**
173:22
**saw (10)**
35:16;51:17,20;
55:14;93:23;94:8;
103:13;129:7;192:13;

**204:3**
**saying (22)**
22:8;32:24;42:5;
48:12;65:13;67:22;
84:21;124:5;125:23;
132:11;138:10;140:13;
151:3;154:2;158:22;
163:6,13;164:4,6,9;
173:10;183:9
**scan (1)**
174:4
**scarring (1)**
119:4
**scene (43)**
14:10;17:13,15;34:6,
23;35:24;59:24;67:6,7;
69:10;82:6,15,17;
89:22;90:4,12;96:3;
100:7,9;101:5;103:6;
120:9;135:17;149:15;
151:22;152:4,17,17;
154:16;158:23;160:2;
185:17;186:1,2,2,5,11,
20;194:4,19;195:4,15;
198:24
**scenes (2)**
16:18;192:23
**scheduled (1)**
156:1
**school (1)**
173:25
**scope (3)**
15:5;19:15;21:1
**Scottsdale (1)**
51:7
**screaming (1)**
169:1
**screen (3)**
26:22;97:8;139:25
**screw (1)**
128:17
**scroll (1)**
27:10
**SD (4)**
33:19,22;34:2,4
**se (1)**
33:11
**search (11)**
12:4,9;90:19,21;
143:11;147:6,10;
159:19;171:19,22;
194:5
**second (23)**
5:23;23:6;27:10,16;
28:9;29:17;33:22;
37:14;59:12;79:13;
92:9;93:17;98:1;103:4;
115:18;131:14;152:22;
155:2;160:5;170:22;
177:15;183:18;184:5
**secondary (3)**
16:14,19,22
**seconds (4)**

**183:24;184:12,19,25**
**secret (9)**
65:21;161:10;
174:25;176:22;177:2,
16,20;196:25;202:2
**Section (6)**
4:1;50:24;51:1,6,12;
138:25
**secure (1)**
86:5
**seeing (4)**
94:3,4,10;150:9
**seek (1)**
202:7
**seeking (1)**
187:9
**seem (4)**
60:10,19;91:23;
128:23
**seemed (1)**
60:17
**seems (10)**
15:24;31:12;119:5;
137:21;139:15;157:10;
176:13,15;187:2;
192:12
**select (1)**
181:6
**sell (1)**
55:19
**send (3)**
47:12;60:20;159:16
**sending (1)**
127:4
**sends (1)**
50:14
**senior (2)**
192:24;198:10
**sense (16)**
45:4;48:8;53:19;
56:1;60:13;61:18,23;
82:21;94:18;105:22;
107:25;113:16;130:19,
22;137:18;144:17
**sent (9)**
8:1;86:1;92:13;
159:18;166:13,14,16;
178:14;180:3
**sentence (10)**
37:17;38:8;43:1;
56:12;58:9;63:10;64:4;
69:3;71:4;150:18
**sentences (2)**
34:1;37:18
**separate (3)**
107:13;169:15;199:8
**September (2)**
74:3;164:23
**series (2)**
87:8;103:17
**serious (1)**
129:21
**Service (8)**

**161:11;174:25;**
176:22;177:3,16,20;
196:25;202:2
**services (1)**
48:9
**set (6)**
14:13;18:22;26:15;
93:3;94:22;95:1
**sets (1)**
54:16
**settlement (2)**
15:8,10
**setup (2)**
36:20;105:7
**seven (2)**
6:10;201:3
**seventh (1)**
153:23
**several (8)**
35:1;46:17;58:18;
64:23;65:5;90:19;
138:24;188:13
**severe (1)**
199:18
**sexual (1)**
158:11
**sexually (1)**
120:24
**shade (1)**
149:12
**shape (2)**
62:4;109:20,24;
169:17
**share (7)**
26:22;54:3;77:8,9,
10,15;163:11
**shared (3)**
78:1,3;201:12
**sharing (1)**
78:7
**shirt (1)**
151:1
**shocked (1)**
57:21
**shoe (5)**
103:22,24,25;104:3;
116:8
**shoot (1)**
58:14
**shootings (1)**
58:13
**short (5)**
9:7;118:10;125:5,12;
126:17
**shorter (1)**
9:5
**shortly (1)**
95:11
**shorts (2)**
99:25;100:3
**short-term (1)**
126:17
**shot (1)**

**151:22**
**shouting (1)**
169:1
**show (12)**
28:5;41:6;49:25;
72:25;102:23;136:23;
148:1;159:15;170:23;
183:12;184:16;196:23
**showed (6)**
26:14;38:9;92:25;
106:19;110:21;197:14
**showing (2)**
116:12;123:2
**shown (2)**
196:24;200:1
**shows (2)**
159:14;186:18
**side (6)**
42:4;65:7,7;124:20;
141:8,9
**sides (1)**
106:8
**sight (2)**
49:19;50:14
**sign (3)**
69:21;192:22;205:17
**signed (1)**
203:14
**significance (4)**
81:6;112:7;114:12;
132:3
**significant (4)**
14:2;134:4;167:5;
169:9
**signify (1)**
197:11
**signs (2)**
16:24;158:23
**similar (6)**
56:14;79;78:13;
114:10;191:6;193:2
**sincerity (1)**
82:23
**sing (1)**
37:8
**single (2)**
14:3;69:2
**siren (1)**
185:12
**sister (4)**
59:1;163:25;165:8,
12
**sisters (6)**
46:9;48:21,23;49:16;
126:11,20
**sit (7)**
16:19;18:18;24:6;
64:11;167:14;187:4;
188:11
**sitting (3)**
98:16;133:19;178:21
**situation (7)**
36:3;46:5;47:20;

48:20;52:18;62:13;
65:23

**six (8)**
160:24;177:10;
183:24;184:12;194:15;
200:11;201:3;202:11

**six-foot-five (1)**
133:6

**sixth (2)**
56:10;62:18

**sketch (3)**
87:21,22;160:6

**skin (4)**
115:20;116:6;130:6,
7

**skinny (6)**
131:6,9,17;132:12;
133:7,14

**Skipper (2)**
51:9;100:1

**skirt (1)**
32:16

**slash (2)**
111:8;131:17

**sleep (1)**
62:8

**sliced (1)**
42:5

**sliding (1)**
88:18

**slightly (3)**
25:13;142:16;197:25

**slow (4)**
86:23;95:18,18;
102:2

**slow-burn (3)**
102:13,24;199:21

**slow-burning (1)**
85:18

**slowly (1)**
148:21

**small (1)**
62:23

**smart (1)**
45:13

**Smith (2)**
40:22;175:17

**smoke (2)**
117:17;149:21

**smoker (1)**
117:13

**smokers (3)**
107:16,17,21

**smoking (5)**
107:19;108:4,4;
155:19;159:4

**sniff (2)**
99:9;135:2

**sniffed (3)**
98:25;99:12,22

**sniffs (2)**
99:15,19

**social (1)**

202:3

**soft (1)**
135:23

**software (1)**
74:14

**sold (3)**
136:21;137:3;145:5

**sole (1)**
127:16

**solicited (1)**
189:4

**solved (1)**
86:5

**somebody (26)**
39:1;45:24;46:3;
47:8,12;48:4,18;52:3;
53:5,19,21;58:15;
61:19;69:16;106:9;
108:11;109:2;110:8;
112:9,20;140:13;
152:9;159:7;185:9;
186:15;189:4

**somebody's (1)**
52:4

**somehow (1)**
17:24

**someone (20)**
14:10;30:15;48:8;
94:1;98:12;108:7,7;
109:13,18;110:2,10;
112:13;117:19;131:24;
133:6,21;141:18;
146:20;152:8;161:10

**something's (1)**
52:13

**Sometime (1)**
63:5

**Sometimes (8)**
6:22;33:9;39:21;
75:20;77:13;112:9;
133:11;181:20

**somewhere (3)**
91:25;93:17;135:25

**son (8)**
34:1;64:19;139:13,
20;163:5,16,19;164:15

**song (1)**
37:8

**soon (1)**
122:18

**soot (8)**
110:22;114:3;
150:19;151:4,11,18;
197:21;198:14

**sorry (19)**
13:4;20:20;42:21;
46:8;47:23;66:9;94:17;
113:4;115:23;118:8;
131:20;139:7,24;
164:12;176:8;182:13;
195:10;196:2,10

**sort (19)**
7:21;9:9;18:13;

29:12;34:8;47:5;48:15;
53:7;71:5;88:18;95:18,
20;112:11;137:7;
141:6;142:13;149:10;
171:24;173:19

**sound (9)**
51:4;82:8;104:7;
129:9;155:12;164:17;
175:11;182:21;185:5

**Sounded (1)**
152:10

**sounds (9)**
37:15;67:17,19;
71:19;121:23;142:12;
151:9;157:4;163:1

**sources (1)**
138:23

**space (1)**
6:20

**spanning (1)**
59:12

**spare (3)**
68:15;148:4,6

**speak (1)**
59:4

**speaker (3)**
157:1;158:5,6

**speakers (1)**
156:23

**speaking (4)**
12:17;141:5;154:13;
194:20

**special (1)**
201:22

**specialists (2)**
201:20,21

**specialty (1)**
106:15

**specific (6)**
54:16;102:12,23;
172:20;186:18;190:12

**specifically (15)**
30:20,23;33:1;49:12;
51:22;102:20,22;
107:3;110:20;179:11;
195:17;196:19;197:5;
198:12;199:10

**specifics (3)**
21:23;22:1;123:16

**specify (1)**
197:4

**spectrum (2)**
173:20,23

**speculate (5)**
133:9;145:25;
146:25;157:15;190:17

**speculating (1)**
165:18

**speculation (9)**
104:21;134:10,17;
138:4;140:21;172:13;
184:1;190:5;204:8

**speed (2)**

41:5;81:23

**speeding (1)**
69:21

**spend (5)**
92:9;138:15,19;
152:23;200:7

**spent (5)**
44:9;117:10;138:15;
200:18,21

**spiral-bound (1)**
75:23

**split (1)**
14:12

**spot (2)**
87:2;117:21

**spouse (1)**
49:17

**spread (2)**
65:8;157:17

**Springs (1)**
14:21

**Sprinkel (3)**
97:5;170:24;171:1

**Sprinkel's (3)**
97:13,18;104:4

**squatting (1)**
62:1

**stagnant (1)**
177:10

**stamps (2)**
92:21,22

**stance (1)**
21:14;25:11

**stand (6)**
24:24;38:16;64:25;
188:20;189:15;190:11

**standard (1)**
18:9

**standing (8)**
132:15;133:3,23;
170:12;171:5;184:5;
189:6;191:15

**standpoint (1)**
20:17

**start (16)**
16:10,12;29:22;41:7;
61:14;63:19;82:12;
102:12;107:6;158:17;
175:2;184:11,17;
185:8;199:8;204:25

**started (15)**
80:14;85:14,15;86:8;
102:9,11;103:14;
108:3,5;120:21,22;
157:22;169:15;199:5;
204:12

**starting (5)**
27:17;30:15;153:12;
157:25;186:11

**starts (3)**
184:12,24;185:5

**state (2)**
126:16;129:9

**stated (6)**
24:22;26:6;29:22;
31:15;43:2;193:20

**statement (7)**
11:19,22;31:24;
56:24;67:25;151:11;
163:9

**statements (6)**
10:3;29:21;66:25;
68:24;70:12,21

**states (1)**
123:3

**stations (1)**
100:6

**statistical (1)**
56:23

**statistics (4)**
42:2,13;57:14;
174:18

**stats (1)**
57:2

**status (1)**
33:18

**stay (3)**
20:7;125:6;153:14

**stayed (1)**
47:4

**staying (1)**
47:25

**steal (1)**
164:19

**stealing (2)**
80:23;142:14

**stemmed (1)**
21:5

**stents (1)**
117:9

**stepdad (3)**
61:17;95:1;127:6

**stepdad's (1)**
204:25

**stepfather (5)**
18:22;26:1;5;58:21;
168:14;188:24

**step-kids (1)**
141:7

**stiff (1)**
86:1

**still (26)**
18:19;19:1,2,24;
22:9;25:14;62:11;
65:12,14;78:18;82:23;
103:24;108:2;125:1;
151:12;167:11;168:14;
173:17;174:23;187:4,
15,17;188:15;190:10;
197:25;198:1

**stolen (1)**
81:2

**stood (1)**
40:15

**stop (4)**
69:20,21;86:20;

Case 1:19-cv-04300-LMM   Document 108   Filed 12/10/21   Page 75 of 79

Keith Sylvester vs.                                              Detective James Barnett
James Barnett, et al.                                                    April 9, 2021

100:19

**stopped (1)**
109:5

**stopping (1)**
84:2

**storage (2)**
77:1,1

**store (2)**
48:14;77:6

**stores (3)**
90:24;92:23;93:1

**story (4)**
14:10,11,16;82:8

**stove (4)**
150:2;160:11,12,13

**strange (7)**
30:11;31:19;36:5,9,
9;37:10;65:15

**strangers (1)**
56:17

**strangle (9)**
108:11,25;109:2,13,
18;110:2,8;113:11,13

**strangled (17)**
26:14;94:25;108:16,
17;109:7;110:11;
111:16;112:10,13,19;
115:10;156:8,8;
169:14;197:21,22;
204:14

**strangles (2)**
130:17,18

**strangling (1)**
29:8;189:3

**strangulation (22)**
58:2,10,14;94:22;
108:1,8,19;111:8,14,
20;112:7;113:19;
114:13;115:3,8,20;
119:19;120:5;167:12;
188:18;195:20;197:24

**strategically (1)**
196:22

**stream (1)**
55:23

**Street (5)**
26:1;59:23,24;80:19;
94:2

**strength (1)**
113:10

**stress (1)**
38:12

**strife (1)**
120:14

**strike (1)**
133:20

**strive (1)**
12:14

**struck (3)**
56:5;69:22,23

**stuck (1)**
129:21

**study (1)**

41:19

**Stuff (15)**
9:2;32:19;55:12;
72:2;74:10;78:24;
79:12,12;90:6,8,8;
114:2;142:22;175:3;
202:3

**subject (1)**
13:19

**subjectively (1)**
25:16

**subpoena (1)**
159:17

**subscriber (1)**
172:3

**subsequent (4)**
21:7,8;22:1,4

**subsequently (1)**
21:22

**substances (1)**
156:1

**sub-unit (1)**
42:11

**success (1)**
38:19

**suddenly (1)**
50:14

**suffered (2)**
45:5;115:10

**suffering (2)**
78:18;105:23

**sufficient (1)**
5:2

**suggested (1)**
81:9

**suggestion (1)**
55:6

**suing (1)**
5:25

**suit (1)**
6:4

**sum (1)**
105:21

**summation (1)**
71:5

**Summer (2)**
17:17;30:6

**sun (1)**
8:10

**super (1)**
149:25

**supervisor (1)**
116:18

**supplemental (1)**
97:13

**supplementary (1)**
170:25

**support (3)**
89:11;102:6,13

**supposedly (2)**
166:16;175:16

**Sure (50)**
7:8;23:2,9;33:12;

40:20;42:4,17;43:13;
44:7,8;47:17;55:1;
56:9;62:14;65:8,15;
67:11;74:17,20;76:19;
79:2;87:15;90:6;91:17;
99:10;102:4;107:4;
108:13;109:19,19;
119:7,18;121:17;
124:6;127:20;135:3;
138:17;143:25;155:5;
166:13;174:9;178:9,
11;180:2,15;183:8;
185:16;188:2;195:8;
203:1

**surface (1)**
163:18

**surgeries (1)**
117:8

**surgery (1)**
119:3

**surprise (9)**
41:24;42:23;50:9;
128:6,7,22,25;139:5;
173:15

**surprised (2)**
51:1;113:17

**surveillance (3)**
100:5,6;162:10

**suspect (11)**
13:15;39:17,21;40:3,
5;82:5,11;178:7;
187:18;194:21;197:9

**suspected (3)**
140:19;176:25;
185:20

**suspects (1)**
22:13

**suspicion (2)**
137:17;195:4

**suspicious (4)**
35:11,18;60:19;
145:15

**swear (3)**
5:5;39:10;42:7

**sweating (1)**
62:5

**swore (1)**
195:24

**sworn (2)**
5:8;192:11

**Sylvester (77)**
4:8,15;18:22;22:10;
24:7;25:15;26:7;27:2;
29:22;31:15;32:6;33:9;
34:2,3,4,5;38:9;40:9,
12,14,25;43:3,25;
44:24;46:12;48:4;
50:11;58:20,25;59:8,
13;61:8;64:6;65:2;
66:4;68:15,20,21;71:6;
77:23;79:5;83:17;
86:12;89:9;98:4;99:1;
131:18;134:2;136:11;

137:22;167:9;170:21;
171:7;176:1,10;178:6;
179:9,19;180:14;
187:5,14,18;188:12,17,
23;194:18,21,22,25;
195:7,11;196:8,12;
197:9,11;200:3;203:19

**Sylvester's (7)**
26:5;32:2;99:7;
128:19;175:8;177:4,17

**sympathetic (1)**
47:19

**sympathy (1)**
46:4

**symptom (2)**
52:25;53:16

**system (2)**
77:1;181:22

---

**T**

**table (1)**
26:6

**tablet (1)**
8:6

**tablets (1)**
137:9

**talk (33)**
6:21;19:8;32:9,9,10,
17;33:19,22;44:8;53:4,
5,24;54:6,7,10;57:16;
60:14;62:5;66:10;69:4;
86:23;94:8,9;106:16;
115:18;122:4;124:21,
23;130:23;133:20;
143:11,23;181:18

**talked (41)**
32:7;44:7;49:15,20;
56:3;58:17,24;59:17,
18,19;64:2,3,22;68:12;
69:2;70:11;72:22;
83:13;85:6;86:13,14;
87:7,8;107:1;108:15;
114:1,2;120:13;
122:14;127:13;129:4;
130:25;131:16;133:19;
155:16;158:9;187:24;
188:12,15;189:17;
195:16

**talking (23)**
27:21;32:25;53:19;
61:14;72:20;75:11;
103:7;124:11,13;
125:13;128:2;131:6;
141:14;152:12;164:24;
165:4;168:17;178:23;
180:16;184:22;185:18,
25;186:2

**tall (1)**
133:18

**tampering (1)**
98:17

**tangentially (1)**

83:15

**tangled (1)**
105:13

**Tanika (3)**
165:15,17,18

**tape (2)**
35:24;36:22

**taser (2)**
181:10;185:11

**team (5)**
16:23;17:8,22;57:12;
193:25

**tech (1)**
173:22

**technical (2)**
74:17;201:23

**technically (2)**
175:5,5

**technique (1)**
171:12

**techniques (2)**
40:1,14

**technology (1)**
172:22

**teeing (1)**
23:24

**teeth (7)**
141:19;142:1,1,1,6,9,
15

**telephone (2)**
142:18;170:7

**telling (12)**
14:10;82:17;124:16,
22;125:16;126:9;
141:17;143:9;144:1;
163:10;164:1;168:11

**tells (1)**
7:16

**Ten (3)**
71:19;118:12;184:19

**tend (4)**
9:5;13:14;23:6;
181:17

**tending (1)**
102:23

**tends (1)**
28:5

**ten-minute (1)**
71:15

**ten-page (1)**
97:3

**tension (1)**
55:21

**tents (1)**
80:20

**term (5)**
66:24;67:24;125:5,
12;195:21

**terms (3)**
114:24;115:5;126:17

**terrible (2)**
31:2;46:4

**test (13)**

38:9,22;39:19;40:7,
7,8,12,16,16;114:3;
117:20,21;142:8
**testament (1)**
128:6
**testified (2)**
5:8;134:1
**testify (1)**
184:3
**testifying (1)**
176:6
**testimony (3)**
96:18;177:7;196:6
**tests (1)**
114:5
**texted (1)**
180:5
**texts (1)**
180:13
**theories (5)**
94:17,19;142:23;
202:15,23
**theorizing (1)**
162:23
**theory (11)**
28:4;94:17,19,25;
95:6;102:2,13;105:22;
111:13;159:13;199:21
**thereafter (1)**
138:14
**thermal (7)**
108:18;111:8;115:3,
10;119:20;120:6;
195:20
**thinking (8)**
43:18;44:8;64:1;
95:19,20;104:9;
105:21;205:1
**third (2)**
29:18,20
**though (7)**
8:24;15:24;79:13;
92:20;131:22;139:2;
153:22
**thought (41)**
10:7;30:16;36:5,8,8,
9;37:10,21;38:16;
45:17,24;50:12,16;
51:23;52:5;61:4,19;
62:24;70:3,6;81:10,15;
83:11;84:23;94:21;
99:25;103:25;104:5,
17,18;115:22;122:2,
20;123:9;176:19;
177:9,9,21;190:9;
200:9;205:4
**thousandth (1)**
18:10
**threaten (4)**
19:2,25;22:12;96:18
**threats (1)**
169:1
**three (16)**

37:16;38:2,2;44:3;
54:16;78:5;106:7;
119:6;125:3;137:3;
165:19;174:12;184:5;
192:16;200:12,16
**throat (2)**
114:16;119:3
**throughout (6)**
20:10;99:20;201:1,
12,16;202:15
**thus (1)**
21:1
**ticket (9)**
50:6;121:8,12,19;
122:15,18;123:15;
126:2,25
**tickets (2)**
123:8,12
**tied (1)**
191:1
**till (1)**
35:4
**timeline (3)**
93:2;102:15;119:12
**times (8)**
7:4;33:4;45:21;
92:25;93:6;108:22;
159:15;189:24
**timing (1)**
97:19
**title (1)**
41:7
**today (28)**
4:18;6:13,20;18:19,
20,21;24:1,6,23;25:16;
64:11;81:14;83:9;
127:15;128:19;146:20;
167:14;178:21;187:4,
6,24;188:11;189:2,17,
19;190:15;194:18;
202:24
**together (9)**
33:12;43:22;55:18;
92:24;116:11;119:12;
155:18;159:4;174:2
**told (35)**
37:5;38:3,21;40:12,
25;45:21;47:11,11;
49:14;52:15,20;53:21;
60:14;66:7;69:12,17;
79:22;84:19;85:10;
88:21;89:12;93:16;
117:12;120:4;135:1,8;
145:3;148:3;165:2,11;
177:21;179:1,6,15;
192:25
**ton (1)**
78:8
**took (19)**
29:22;42:2;52:4;
67:15,16;80:13;89:8,
21;90:19;94:7;96:13;
119:22;136:19;141:7,

7,8;161:13;177:13;
200:13
**tool (4)**
38:25;39:4,6,14
**tools (6)**
167:7;190:2,7,20,22;
191:10
**top (8)**
30:11;73:17;74:19;
98:1;103:18;104:13;
140:1;150:2
**topics (1)**
22:3
**total (2)**
175:20;200:12
**totality (3)**
13:23;15:4;200:8
**totally (3)**
16:9;63:25;80:18
**touch (4)**
182:12,15,18,21
**tough (1)**
111:25
**toward (2)**
28:19;38:17
**towards (4)**
20:11;56:16;59:8;
169:1
**tower (1)**
83:23
**towers (1)**
83:24
**town (3)**
75:11;125:2,11
**toxic (4)**
30:9;31:1,1,12
**toxicity (1)**
63:17
**trace (1)**
64:4
**trachea (1)**
110:22
**track (3)**
75:12;129:19;189:13
**traffic (1)**
159:15
**training (1)**
12:7
**trainings (1)**
192:17
**transcribed (1)**
154:18
**transcript (1)**
205:17
**transverse (1)**
115:14
**trauma (2)**
158:11,23
**traveling (3)**
54:21;55:16;123:4
**Travels (3)**
122:1;162:5,9
**treat (1)**

140:6
**tree (1)**
124:25
**tremendously (1)**
17:24
**trial (1)**
175:2
**tried (6)**
32:7;69:15;81:3;
142:4,5;185:21
**tries (1)**
186:19
**trip (5)**
50:8,15;126:14,15,
22
**trips (1)**
178:10
**trouble (1)**
120:21,22
**truck (4)**
55:11;98:16;99:7;
138:25
**true (13)**
15:2;19;81:17;
124:14,23;133:12;
139:6;146:4;163:9;
182:9;187:7;188:20;
196:14
**trust (1)**
67:12
**trusted (1)**
126:13
**trusting (1)**
144:6
**truth (8)**
39:17,22,22;67:1,9;
68:1;124:16;143:9
**truthful (1)**
187:15
**truthfulness (1)**
64:11
**try (26)**
6:21,23;9:2,4,7;13:1;
24:1,2;27:8,19,19;
29:21;34:13;52:24;
66:14;69:12,19;75:13,
14,19;103:5;105:21;
169:23;172:21;186:8;
202:17
**trying (24)**
18:14;23:4;29:10;
34:19,20;36:1;63:25;
107:5;122:5;130:16;
141:23;144:21;148:9;
151:15;155:18;159:4;
163:21;166:6,23;
174:4;176:13,17;
188:25;191:18
**T-shirt (1)**
99:23
**tunnel (1)**
202:19
**turn (5)**

144:24;182:12,14;
185:12,13
**turned (6)**
120:10;183:15;
194:25;196:8,12;
200:15
**turns (2)**
183:6;185:11
**TV (2)**
109:2,11
**twist (3)**
144:7;146:14,17
**twisted (2)**
142:17;146:20
**Two (47)**
5:16,16;8:2;16:6;
33:21;34:1;37:17,24;
38:2;41:20;44:1;55:13;
57:6;77:13;83:8;85:15;
88:1,22;93:7;101:8;
107:6,8,12,12;108:3,3;
115:8;125:3;130:17,
17;140:12;150:6,23;
157:13;166:23;169:9,
14;180:20;182:4,19;
183:3;184:11,25;
185:1;195:19;199:8,10
**two-minute (1)**
148:20
**two-page (1)**
26:25
**type (6)**
9:10;14:23;49:17;
119:2;201:24;202:3
**types (1)**
17:4
**Typically (1)**
16:16
**typing (1)**
75:24
**typo (1)**
132:3

**U**

**ultimately (1)**
176:24
**unable (1)**
142:20
**uncharred (2)**
115:20;130:6
**unclear (1)**
99:4
**unconscious (4)**
110:25;113:1,6,11
**unconsciousness (4)**
108:17,25;113:14;
197:22
**unconstitutional (1)**
173:11
**uncooperative (1)**
143:3
**under (6)**

4:12;10:3;65:14;
79:23;131:2;169:13
**understood (22)**
7:13,19;30:17;34:9;
42:9;52:6;54:15,23;
75:6,22;81:6;87:16;
109:9,11;110:9;111:7;
134:25;138:24;141:14;
175:7,24;177:14
**unfortunately (6)**
80:21;85:10;104:25;
109:6;115:11;141:11
**unhealthy (1)**
130:10
**unit (11)**
16:17,23;17:1,9;
30:4;67:5;85:5;91:13;
138:12;194:9;201:4
**units (2)**
172:24;181:15
**unknown (2)**
70:25;204:12
**Unless (4)**
7:16;16:4;75:14;
124:23
**Unlikely (2)**
108:5;124:4
**unlock (1)**
144:10
**unmask (1)**
172:3
**unopened (1)**
101:14
**unreasonably (1)**
13:9
**unsettled (1)**
173:18
**unstable (1)**
131:7
**unsuccessful (1)**
142:7
**untimely (1)**
192:14
**unusual (4)**
57:25;64:15;126:7,
13
**unwound (1)**
29:9
**up (85)**
7:21;11:12,14;14:12,
14;16:4,8,10;23:24;
30:14,18;31:4;33:9;
34:18;35:25;37:12;
38:16;39:10;40:15,18;
41:5;42:4;47:13;50:18,
19;52:13;53:21,23;
55:17;57:7;61:4;64:21;
65:19;66:1;68:8;69:18;
74:8;75:14,21;77:17;
78:11;79:21;81:24;
82:7;83:9;84:4;88:1;
92:25;103:5;104:25;
105:21;112:15;116:22;

122:24;127:20,21,22;
128:17;131:12;132:10;
135:20;141:22,24;
142:7;145:4,10;
154:25;156:20;158:15;
164:14;165:3;168:18,
19;169:23;172:21;
173:4;175:3;192:22;
194:1;200:22;202:5;
204:14,22;205:5,6
**update (4)**
73:25;75:14,19;77:4
**updated (1)**
74:7
**updates (3)**
65:13,14;75:3
**updating (1)**
74:11
**upload (1)**
77:5
**uploaded (1)**
77:19
**upon (1)**
179:18
**upper (1)**
88:1
**upset (1)**
60:17
**USAA (10)**
64:13,23;68:5;87:21;
90:3,6,8,8;128:20;
160:6
**use (17)**
38:20;39:9;41:20,23;
49:8;53:20;58:3;85:14;
171:5;172:21;181:14,
16,20,20,23;185:10;
197:8
**used (22)**
26:7,10;28:7;29:3,
14;38:25;39:14,16;
46:18;63:18;83:25;
88:11;103:19;135:1;
138:17;168:18;172:9;
181:24;185:3;199:8;
202:1,2
**useful (1)**
54:14
**user (1)**
117:25
**uses (2)**
55:10;74:22
**using (5)**
30:15;141:1;163:21;
170:9;204:3
**usually (7)**
43:17;76:4;79:12,14;
172:25;181:16;185:5
**utilize (1)**
186:25
**utilized (2)**
201:25;202:4

**V**

**vacation (2)**
16:4;50:8
**vague (2)**
32:8,11
**value (1)**
124:22
**various (1)**
162:13
**vehicle (2)**
34:3;194:4
**vending (1)**
137:8
**Ventura (3)**
131:16,16,21,23
**verdict (2)**
15:8,10
**verified (1)**
100:5
**verify (2)**
141:23;142:24
**versus (6)**
4:8;6:5,8,9;53:1;
181:7
**veteran (1)**
84:25
**veterans (1)**
55:2
**victim (5)**
28:10;54:20;113:19;
193:6;200:16
**Victims (3)**
137:15;141:13;
195:22
**victim's (2)**
5:24;34:15
**video (66)**
4:4;17:19,21;23:10,
14;31:20;33:3;34:6,17,
20;36:4;40:8;43:10,13;
63:2;72:18;78:8,10,24;
82:20;90:14,23;91:1,
15;100:5;118:21,25;
143:14;149:14;150:9,
17;151:8,22,22;152:6;
153:8;169:25;170:3;
180:25;181:2;182:21,
25;183:13,14,16,19,23;
184:18;185:5,9,11,19;
186:18;194:24;196:5,
7,12,17,20;197:2,5,8,
11;199:25;204:11;
205:18
**VIDEOGRAPHER (12)**
4:4;23:10,13;72:14,
17;118:21,24;153:5,8;
169:25;170:3;205:18
**videos (2)**
89:22;162:10
**video's (1)**
184:24

**view (3)**
116:22;148:9;186:19
**violated (1)**
12:21
**violates (3)**
11:10,21;13:1
**violence (3)**
129:23;158:11;
169:11
**Virginia (6)**
46:7;55:20;11;125:6;
127:4;178:11
**vision (1)**
202:19
**visit (4)**
125:17,25,25;154:17
**voice (4)**
38:12;154:4;155:2,4
**volume (1)**
68:8
**volunteered (4)**
34:4;37:19;83:2;
140:25
**volunteering (1)**
143:10
**voucher (2)**
50:24;51:12
**VSA (2)**
41:18,20

**W**

**waiting (3)**
95:2;174:24;176:20
**waived (1)**
205:17
**walk (3)**
60:3;75:8;100:21
**walked (5)**
40:15;60:5;146:21;
147:8;149:16
**walking (3)**
60:4;131:7;152:15
**walks (1)**
53:25
**wall (1)**
149:1
**Walmart (8)**
29:23;46:12;63:11;
90:15;100:25;101:2;
168:13,22
**Walton (1)**
180:5
**war (1)**
14:11
**warrant (83)**
10:8,9,19,25;11:9,15,
20;12:4,4,10,10,19,22;
18:10,11,17;21:6,17;
22:2;24:9,14,15,21;
25:21;27:1;48:23;
54:19;56:24;71:12;
72:21,22;77:11;79:16;

80:7;81:21;83:17;84:5,
11,20;86:21;89:8,15,
22;90:9,22;94:20;
96:13;97:17,22;98:7;
119:13,20,22;120:2;
122:16,24;123:2;
134:2,5;136:10,20;
143:21;145:22;166:2;
170:20;171:1,3,7,19;
172:15;173:6;177:13;
179:7,8,12,18;187:11,
14;189:10;191:10;
194:5;203:12,14
**warrants (14)**
16:25;18:7;22:5;
81:11;83:23;89:9,11;
90:20;159:19;171:22;
172:9;173:11;188:5;
195:25
**waste (1)**
11:17
**watch (4)**
17:23;35:3;44:15;
185:5
**watching (1)**
82:15
**water (2)**
62:15,17
**way (35)**
20:16;23:5,25;37:4;
39:16;43:8;52:16,19;
54:23;55:14;66:7;
69:19;80:12;84:6;
105:2;106:3,11;111:6,
23;126:4;127:18;
132:10;144:23;146:15;
154:21;156:17;161:17,
23;166:6;172:7;
179:13;180:17;189:21;
195:3;201:24
**ways (3)**
77:9,13;107:5
**weaker (1)**
113:20
**wealthy (2)**
51:13,14
**weapon (1)**
185:10
**wear (1)**
182:8
**wearing (1)**
99:20
**weave (1)**
116:8
**weed (1)**
105:2
**week (9)**
125:17,24;126:14,
16,22;176:16;194:14,
14;200:10
**weight (2)**
133:12,16
**weird (4)**

55:12;61:3;83:5;
92:22
**weren't (11)**
24:15;35:4;48:12;
51:12;65:21;71:1;
98:22;115:11;145:3;
166:8;203:1
**whatnot (1)**
174:25
**what's (15)**
25:10;38:18;54:11;
63:2;64:10;73:22;
75:25;77:11;79:16;
105:2;110:9,14;112:3;
114:11;144:17
**whatsoever (1)**
199:23
**wheelchair (5)**
108:21;111:19;
117:11;130:20;169:19
**wheels (1)**
148:15
**whenever (2)**
193:25;202:5
**wherever (2)**
14:21;91:23
**whipped (1)**
130:21
**whispering (1)**
82:19
**whole (14)**
16:23;17:9;48:19;
54:23;64:20;68:8;
73:24;74:9;105:8;
122:10;124:24;129:3,
6;148:22
**who's (7)**
52:1;91:13;112:20;
154:3;155:4;158:5;
174:3
**widow (1)**
165:22
**wife (9)**
14:20,20;50:14;62:6;
80:3;98:15;122:4,13;
133:12
**Wi-Fi (1)**
170:9
**Willie (6)**
68:19;140:19;141:1;
162:24;164:18;165:25
**Willie's (1)**
68:24
**willing (1)**
17:2
**window (2)**
55:12;105:16
**windows (1)**
30:5
**wire (1)**
148:25
**wires (20)**
28:11;29:1,7,9,13;

35:22;98:17;103:15,
17,19;104:2;105:13,
19;106:2,3,4,6,13;
148:22;149:6
**within (11)**
15:4;21:1;37:15;
46:11;47:5;57:17;
67:20;85:5;110:14;
134:4;176:16
**without (12)**
10:13;25:20;47:8;
50:11;74:10;79:25;
83:1;85:14;126:7;
163:23;169:6;170:10
**WITNESS (26)**
4:16;5:6,20,24;
21:18;23:22;43:14;
66:11;71:18;72:6,10;
96:15,20;97:24;118:6,
14,19;133:9;145:25;
146:25;152:25;154:17;
162:8;190:17;193:6;
205:16
**witnesses (1)**
181:23
**woman (2)**
120:23;163:10
**wood (2)**
136:6;147:22
**Woodson (1)**
165:12
**word (9)**
25:10;53:22;58:3;
67:24;74:16,17,18;
122:19,23
**words (3)**
53:20,20;68:2
**wore (1)**
135:11
**work (15)**
9:3;12:25;23:5;
41:18;47:14;53:25;
65:5;67:12;109:3;
118:19;131:24;153:18;
171:24;190:11;198:7
**worked (6)**
33:11;60:1;190:1,6,
8;200:9
**working (7)**
30:5;91:9;111:13;
177:10;182:1;200:12,
17
**worried (2)**
122:2,3
**worth (1)**
39:12
**wow (2)**
81:15,20
**wrap (1)**
169:23
**wrapped (2)**
35:17;106:3
**write (7)**

11:15;74:15;75:4,7;
79:11;81:20;89:14
**writing (4)**
66:16;74:13,15;
84:20
**written (4)**
73:18,21;75:4;81:11
**wrong (5)**
32:25;54:12;70:19;
105:20;115:22
**wrote (2)**
86:21;119:20

**Y**

**y'all (2)**
92:23;153:19
**yard (3)**
60:3,5,6
**year (6)**
6:1;57:17;58:5;
95:23;119:4;137:4
**years (7)**
6:11;44:3;64:24;
78:5;119:6;137:4;
162:14
**Yep (1)**
164:16
**York (3)**
55:22;64:21;129:14
**young (1)**
112:21
**younger (2)**
112:24;113:8

**Z**

**Zack (7)**
4:14;18:24;73:11;
96:16;153:10;187:16;
203:23
**zero (1)**
184:25
**Zimbrick (1)**
17:17
**zone (5)**
5:21,21;182:1,7;
193:12
**Zoom (3)**
8:19;27:9;113:3

**0**

**002N (1)**
74:24
**01 (1)**
184:5

**1**

**1 (4)**
27:4,5;72:20;123:3
**1:02 (1)**

156:20
**1:05 (1)**
157:25
**1:07 (1)**
158:17
**1:19-cv-4300 (1)**
4:9
**1:21 (1)**
118:22
**1:26 (1)**
118:25
**10 (1)**
175:12
**10:03 (1)**
4:5
**10:30 (1)**
23:11
**10:36 (1)**
23:14
**100 (1)**
45:21
**11 (1)**
137:24
**11:58 (1)**
72:15
**1105 (1)**
63:11
**11th (1)**
131:15
**12:05 (2)**
72:12,18
**12th (8)**
175:12,14,25;
176:11;178:5,7,24;
179:15
**145 (1)**
148:11
**15 (2)**
15:25;16:13
**15-14-37 (1)**
4:1
**155 (1)**
133:6
**15th (2)**
163:3,8
**18 (2)**
139:8,25
**18:30 (1)**
154:4
**18:42 (1)**
154:4
**18th (1)**
164:23
**1st (4)**
54:22;76:14;122:15;
123:4

**2**

**2 (7)**
73:10,13,14;87:23,
25;88:25;161:3
**2:32 (1)**

153:6
**2:37 (1)**
153:9
**2:45 (1)**
148:24
**2001 (2)**
74:23;75:1
**2005 (4)**
18:1,1;192:4,7
**2010 (2)**
192:9,25
**2016 (1)**
172:11
**2017 (1)**
172:11
**2018 (30)**
16:11;18:20;24:9;
27:1;63:6;68:5;71:12;
73:17;76:15;78:17,17;
89:21;98:18,23;123:4;
131:15;163:4,8,24;
170:16;172:11;175:14,
25;176:11;178:5,24;
179:15;192:11;193:15,
17
**2019 (5)**
97:18;170:25;171:2,
17;173:5
**2020 (2)**
74:3;132:25
**22 (2)**
73:1;131:15
**22-page (2)**
7:24;10:2
**23 (1)**
152:5
**24 (4)**
131:17;132:2,8;
133:21
**2495 (1)**
61:1
**26:30 (1)**
186:12
**28th (9)**
27:1;68:5;71:12;
79:14,18;83:17;89:21;
94:21;98:23
**29th (4)**
73:17;74:5;79:15,20
**2nd (8)**
63:6;71:1;94:24;
95:15;98:18;99:21;
166:14;180:4

**3**

**3 (7)**
33:21;73:6,7;88:12,
17,25;160:14
**3:00 (5)**
93:18;94:13;95:3,19;
153:13
**3:11 (1)**

170:1
**3:16 (1)**
170:4
**31st (1)**
76:15
**33D (1)**
183:12
**33D-2 (1)**
183:1
**33D-6 (2)**
184:17,20
**35-minute (1)**
154:25
**360-degree (2)**
185:19;186:18
**37 (1)**
23:25
**3rd (8)**
50:5;67:14;71:1;
74:3;99:1,21;103:6;
123:13

## 4

**4 (5)**
33:20,25;43:2;87:18,
19
**4:14 (2)**
205:19,20
**46 (1)**
129:9

## 5

**5 (8)**
5:21;54:15,19;59:12;
97:13,15;182:1,7
**5:00 (4)**
62:21;95:12;153:22;
162:6

## 6

**6 (4)**
69:3;76:20;132:20,
22

## 7

**7 (5)**
76:20;151:23,23,24;
199:25
**7:00 (3)**
62:21;95:13;162:7
**7:43 (1)**
149:25
**7:50 (1)**
150:5
**7-2 (1)**
63:13

## 8

**8 (8)**
50:24;51:1,6,8,12;
138:25;160:2,3
**8:00 (5)**
62:22;63:4;95:13;
100:11;162:7
**8th (2)**
163:24;175:11

## 9

**9 (1)**
131:14
**9:00 (4)**
62:22;63:4;95:13;
162:7
**9:21 (1)**
150:24
**911 (2)**
85:21;95:2
**99 (1)**
41:1
**9th (3)**
81:15;92:14;140:2