## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

KEITH SYLVESTER,

      Plaintiff,

    v.

JAMES BARNETT, individually,

      Defendant.

CIVIL ACTION FILE
NO. 1:19-cv-4300-LMM-JKL

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

1.  On July 3, 2018, at approximately 8:30AM, Atlanta Police Department (APD) Detective James Barnett arrived at 2495 Harvell Drive NW, Atlanta, Georgia 30318 to investigate a house fire with two decedents. Atlanta Police Department Supplement Incident Report, Incident No. 18-184-0299, hereinafter "Incident Report", 1, attached hereto as Exhibit A.

**RESPONSE: Undisputed.**

2.  The Atlanta Fire and Rescue Department (AFRD) had been at the location battling the fire and securing the scene when one firefighter discovered the remains of Mr. Harry Hubbard. *Id.*

**RESPONSE: Undisputed.**

3.  Ms. Hubbard was later found with unidentified wire/rope-like material

wrapped around her neck twice and both AFRD Arson investigators and APD were notified. *Id.*

**RESPONSE: Disputed.**

Wire and rope and a shoelace are very different substances and the difference is significant here.

During the autopsy, as described in his deposition and report, Dr. Heninger described a shoelace (or possibly a string) that was wrapped around Ms. Hubbard's neck. Heninger Dep. 60:15–61:18; 63:24–64:13. He specifically stated that the suspected ligature was the shoelace or the string and not any wire. *Id.* at 63:24–64:13. Dr. Heninger testified that the shoelace was so "friable" that it would fall apart under minimal manipulation. *Id.* 60:1–6.

Barnett described a different kind of ligature entirely. In his warrant application he said that Ms. Hubbard was strangled with "wires from a cable junction box." Doc. 101-5 at 1. He also testified that it was wire or cable that strangled her in his deposition. Barnett Dep. 29:7–16; *see also id.* at 35:16–17 ("all these cables wrapped around her neck").

The statement in the warrant application is false because the evidence shows that the suspected ligature was a shoelace or other fabric string that was friable—not a metal and plastic based wire or cable.

There is also an omission in this statement because Barnett did not tell the magistrate that the medical examiner believed there was a different ligature entirely—a shoelace.

The difference in the suspected ligature is material. First, it is likely that the cables or wires connected to Ms. Hubbard were present because of damage caused by the fire and/or by virtue of the location of her falling to the ground—not as a result of strangulation. In fact, Ms. Hubbard's body was surrounded by seemingly hundreds of feet of wires and there was a nest of wires connected from the wall to her hair. Heninger Dep. 62:22–63:3 ("many hundreds" of feet of wire "either immediately touching her or immediately proximate to her"); Barnett Dep. 148:20–149:2 ("whole lot of wires everywhere" and "she's physically connected with the wire to the wall outlet"). If the suspected ligature was there by chance rather than by force, that is an exculpatory fact diminishing the likelihood of strangulation. A reasonable jury could infer that Barnett fabricated the wire ligature to bolster probable cause.

Second, a reasonable jury could also infer that Barnett was recklessly confused about the evidence or that he tried to mislead the magistrate about what he understood and the implications of differences in ligature used. For

example, Barnett's theory of wire or cable as a ligature is inconsistent with Mr. Hubbard's death. The only evidence of ligature strangulation on Mr. Hubbard was a band of uncharred skin. Heninger Dep. 52:6–9 (no soft tissue injuries); 52:12–17 (no signs of injuries from any struggle); 52:24–53:8 (no cartilage fractures); 53:9–16 (no strap muscle damage); 53:18–25 (nothing besides uncharred skin). No fragment of any ligature was recovered. Heninger Dep. 49:4–50:19. Heninger testified that the ligature had to be on Mr. Hubbard at the time of the fire based on the band of uncharred skin. Heninger Dep. 45:15–19. Heninger's explanation was that the fire burned through the ligature completely but did not impact Mr. Hubbard's skin at all, which he acknowledged was "kind of an interesting coincidence" because "[u]sually what you see is the ligature partly burned, like in her case. Like some of it is still there, some of it not, just the fire didn't get through burning it." Heninger Dep. 50:6–9. Ultimately, Heninger "ha[d] no explanation of why" the fire would have burned through the ligature around Mr. Hubbard's next 100% and burned his skin 0%. *Id.* at 50:10–12. Obviously, a wire or cable would not burn to disappearance like a shoelace might.

Third, any disagreement between medical examiner and lead detective about what the ligature was made out of is material. Whether or not the

**ligature can be reliably determined is directly relevant to whether or not there was a ligature used.**

4.    Plaintiff, son of Deborah Hubbard and stepson to Harry Hubbard, arrived at his parents' home shortly after 4:42AM. *Id*.; Video 33D-7, attached hereto as Exhibit B.

**RESPONSE: Undisputed. Per Defendant Barnett's report, Plaintiff received a call at 4:42 am about his mother's house being on fire and he immediately came to the house.**

5.    Plaintiff stated that he had driven to the home at approximately 3:00AM that morning and did not notice any issues at the home. Video 33D-7.

**RESPONSE: Undisputed.**

6.    He stated that he saw a citronella candle burning inside the home in the windowsill but did not go in the home. *Id.*

**RESPONSE: Undisputed.**

**Barnett knew that Plaintiff knew that the air conditioner at his mother's home was broken, so he expected the window to be open for circulation and the citronella candle to be in place to prevent bugs from coming in the open window. Barnett Dep. 30:4–8.**

7.    Instead, Plaintiff exited the driveway and went to various locations to

play video poker between 3:00AM and 4:42AM when he received the call that the house was on fire. *Id.*

**RESPONSE: Disputed and immaterial.**

**This fact is disputed because Barnett knew that during this time, Plaintiff went to his wife's apartment to turn in for the night. *See* Barnett Dep. 91:17–19 ("I'm sure he was exactly where he said he was when he said he was. I've got no doubt about that."); Exhibit A, Video 33D-6 at 6:52–7:38 ("By the time I got home, before I could even touch the pillow, the neighbor called me and said, the house is scorched. It's on fire."). This is corroborated by the video from Plaintiff's dashboard camera and his cell phone records with geolocation.**

**This fact is immaterial because it was not stated in warrant. *See* Doc. 101-5.**

8.    When asked about his activity that morning, Plaintiff stated that he had video evidence of all of his whereabouts that morning and provided said videos to APD. *Id.*

**RESPONSE: Disputed in part.**

**Plaintiff told investigators questioning him about his whereabouts that his vehicle had a dashboard camera that would show his movements. Bonner**

Dep. 40:18–21. But Barnett sought and obtained video from various locations that corroborated Plaintiff's statements about where he was, which was not obtained until later. Barnett Dep. 90:23–25.

9.      Plaintiff also began to give alternate theories concerning suspects and the way in which the fire could have started at the scene. Video 33D-7.

**RESPONSE: Disputed and immaterial.**

**First, Plaintiff did not offer any theories concerning any "suspects." Instead, after seeing multiple windows being broken, he asked what was going on. In response to specific questioning from law enforcement about his neighbors, Plaintiff stated "there was nothing major" and clarified that he was "not accusing him of anything" but there was a neighbor who frequently stole electricity and water from other neighbors. He said he was providing this information only "if the investigator finds out that something is wrong other than . . . a cigarette or something" and because he had previously called 911 about this neighbor's thefts. Exhibit A, 33D-6 at 3:35.**

**Plaintiff did not mention anyone else, meaning that there were no plural "suspects." He did not accuse anyone of anything, but rather answered questions directed to him at a chaotic time.**

**Plaintiff did not offer any theories about how the fire started, but did**

**ask whether it was electrical or caused by gas, which were also questions asked of him. Exhibit A, 33D-6 at 8:25.**

**This fact is also immaterial because it does not bear on the question of probable cause. Plaintiff reacted in an understandable fashion upon learning of the likely deaths of his relatives in horrific circumstances in the very early morning hours. He answered questions put to him reasonably.**

10.  After the autopsies of the victims, Det. Barnett spoke with other family members including children and siblings of the victims, the majority of which believed Plaintiff was or could have been responsible for the arson and double-homicide. Incident Report, at 3,5,8.

**RESPONSE: Plaintiff objects because the cited evidence does not support the proposition. Plaintiff also objects because this is not properly a single fact, but multiple facts. Plaintiff further notes that this statement is disputed and immaterial.**

**First, Defendants' reference to three pages of Barnett's incident report does not lead to evidence that supports the proposition put forward in ¶ 10. None of the text on these three pages supports the notion that anyone said Plaintiff "was responsible" or "could have been responsible."**

- **On page 3, Barnett has a passing reference to an unspecific concern**

from Willie Jenkins;

- **On page 5, Barnett reported that Diedra Palmer commented that Plaintiff "was a gambler" and made some unspecified "conflicting statements" about the incident and Willie Jenkin's comment that Plaintiff burned leaves in his mother's backyard and had a dispute with her about housekeys; and**

- **On page 8, Barnett reported that Cassandra and Kimberly Woodson stated that Plaintiff's wife visited them in Virginia on short notice in the days before the fire.**

None of these statements—even with Barnett's (disputed) statements about what these people told him—state that *anyone* said that Plaintiff killed his mother and stepfather. Similarly, none of these statements state that anyone said that Plaintiff "could have been responsible" for their deaths. The "evidence" does not support the proposition, and this statement is not proper under LR 56.1(B)(2)(a)(2)(iii).

Plaintiff also objects because ¶ 10 violates LR 56.1(B)(1) because "[e]ach material fact must be numbered separately and supported by a citation to evidence proving such fact." This paragraph is the (disputed) sum of a series of conversations with many people over many months. The form of this

paragraph makes a succinct response impossible.

Plaintiff also disputes the substance as a matter of fact. First, as to <u>Willie Jenkins</u>, Barnett knew that Jenkins did not "believe[] Plaintiff was or could have been responsible" for the Hubbards' murders. In fact, Barnett called Jenkins to chastise him for giving an interview to a Buffalo, New York local news station in which he told a reporter he didn't know who could have possibly done this. *See* Exhibit A, WIVB Interview at 0:45–1:00; *see also* Exhibit A, Willie Jenkins on 4July2018.amr at 0:00–0:50 (recorded phone call in which Barnett advised Jenkins that doing interviews "makes my job a little harder").

Detective Barnett and Jenkins had a conversation about a previous time when Deborah Hubbard had asked Keith Sylvester to return her house keys for the house in Atlanta. Jenkins Decl. ¶ 17. Jenkins told Detective Barnett that everyone in the family agreed that Keith Sylvester should keep the keys because he did a good job of taking care of Deborah Hubbard and she was experiencing health problems. Jenkins Decl. ¶ 18. Jenkins told Detective Barnett that Deborah Hubbard only thought that Keith Sylvester should return the keys for a brief time and then she changed her mind and invited Keith Sylvester and his wife, Melissa to live with her at least some of the time.

Jenkins Decl. ¶ 19. Detective Barnett knew from conversations with Jenkins that Keith Sylvester was never living in Deborah Hubbard's home without her permission. Jenkins Decl. ¶ 20.

Jenkins understands that Detective Barnett reported that he told him that Keith Sylvester tried to put Deborah Hubbard in a hospital or nursing home against her will. That is not true, and Jenkins did not tell Detective Barnett that was true. Jenkins Decl. ¶ 21. The truth is that Deborah Hubbard had some serious health problems, including a recent history of falls, stroke, and hospitalization for a repeated dislocation of her jaw. Jenkins Decl. ¶ 22. Keith Sylvester encouraged Deborah Hubbard to go to the hospital to get these kinds of things checked out. Jenkins Decl. ¶ 23. Jenkins told Detective Barnett that at one point Keith Sylvester and Deborah Hubbard disagreed about whether she should go to the hospital. Jenkins Decl. ¶ 24. Jenkins never told Detective Barnett that Keith Sylvester tried to have Deborah Hubbard put into a mental hospital or nursing home against her will. Jenkins Decl. ¶ 25.

Jenkins understands that Detective Barnett reported that he told him that Keith Sylvester had previously burned debris in the backyard of the Deborah Hubbard's home. Jenkins Decl. ¶ 26. Jenkins specifically told

Detective Barnett that he did not see a problem with Keith Sylvester having done that before and did not think it was wrong for him to have done that. Jenkins Decl. ¶ 27. Jenkins saw no connection between Keith Sylvester having burned leaves in the backyard months prior and Deborah Hubbard and Harry Hubbard's deaths, and Jenkins did not tell Detective Barnett that he thought there was any connection. Jenkins Decl. ¶ 28.

Second, as to <u>Diedra Palmer</u>, there is no cited evidence that she said anything that could be construed as indicating that she "believed Plaintiff was or could have been responsible" for the Hubbards' murders. Barnett reported that Palmer said Plaintiff was "a gambler" and gave "conflicting statements regarding the incident to family." Doc. 101-2. Barnett knew these statements were not inculpatory.

As to Plaintiff being "a gambler," there is no evidence that Plaintiff's stepfather's niece, who lived in a different state, would have any firsthand information about Plaintiff's habits. Presumably, Barnett would include the "gambling" fact to provide a pecuniary motive for the murders. But Barnett knew that Plaintiff would not receive any significant payout from his mother and stepfather's death because they had no significant assets and there were at least six beneficiaries of the Hubbards' estates. Hornsby-Culpepper Decl.

¶¶ 8–10.

Indeed, Barnett repeatedly lied about Plaintiff being the sole beneficiary of a homeowner's insurance policy, when he knew that was not the case. *See* Doc. 101-5 at 1 (testifying that Plaintiff was "the" beneficiary); Barnett Dep. 66:2–21 (testifying that he meant the sole beneficiary). Barnett testified that he learned about Sylvester being the sole beneficiary of the policy from Atlanta Fire and Rescue Department arson investigator Lt. Dorgan. *See* Doc. 101-5 at 1; Barnett Dep. 64:4–9. Lt. Dorgan was unequivocal that he did not provide, and would not have provided, that information to Barnett. Dorgan Dep. 18:9–20:10. Defendant had the USAA policy in his possession, readily available for his review. Barnett Dep. 68:5–9. Defendant testified that the payout to Sylvester would be $180,000. Barnett Dep. 64:24–25.  In fact, the payout to Plaintiff would be approximately $2,000. Exhibit B, Hornsby-Culpepper Decl. ¶ 15.

As to the supposedly "conflicting statements," the sum of this from the phone call with Palmer is that she heard that Plaintiff said that he could see into the kitchen window when he went to check whether his mother was awake and whether he ice cream truck had been broken into. About this, Palmer said "That's impossible. . . . He had his van in the driveway, which

means if you park behind that van, there's no way you could see what's happening in the kitchen, and they had curtains in the kitchen." Exhibit A, Tanika and D Palmer on 4July18.amr at 3:00–3:38. As a matter of fact, Palmer is incorrect about what could be seen, and Barnett knew this from his review of Plaintiff's dashboard camera when he drove to check on the house that night and his familiarity with the scene.



    The two windows between the ice cream truck and the front door are in the kitchen in the above photograph. *See also* Exhibit A, Crime Scene Video Shot by Leonpacher.MOV at 7:45–8:30 (video showing kitchen that was not

burned but did sustain smoke damage; video shows no curtains that would impede view; citronella candle can be seen under stove hood at 7:55–8:00).

Further, from listening to the recording of the call with Ms. Palmer, one can readily see a chaotic and unreliable narrator. Indeed, Barnett knew that the key statements Ms. Palmer offered were not true. In sum, as to Ms. Palmer, Barnett knew that she offered no inculpatory information.

Third, as to Cassandra and Kimberly Woodson, their supposedly inculpatory statements actually *undermine* probable cause and *directly contradict* Barnett's statements in his warrant application. Barnett's supposed theory of how the Woodsons' statements were inculpatory is that "[w]ithout explanation [sic], Sylvester sends Melissa [his wife] home to Virginia one day before the fire and murder of Harry and Deborah Hubbard." Doc. 101-2 at 8. But the Woodsons'—by Barnett's own admission—provided the ticket information to him, so he knew this was false. Doc. 101-5; Exhibit G, Melissa Sylvester Flight Receipt. Melissa Sylvester's mother also told Barnett that she knew Melissa was coming home "a week" before she arrived in Virginia. *See* Exhibit A, Gloria Jones.amr at 2:13–2:30 ("Q. How many times did she come to visit? A. I guess that's the first time since, in over a year I know. Q. Okay. So that's kind of unusual. How much notice did you get that she was going to

be coming up on July 1st? A. I think it was the week before she came. Q. A week? Okay.").

Barnett mislead the magistrate judge into believing that Plaintiff arranged for his wife to be out of state after he knew that Harry Hubbard would be in town, so that he could murder his mother and stepfather. *See* Doc. 101-5 at 2. In fact, Barnett knew that Melissa Sylvester had purchased a plane ticket to go to Virginia on June 23, or nine days before the fire, not "one day before the fire," as he falsely swore in his warrant application. *Compare* Exhibit G, Melissa Sylvester Flight Receipt, *with* Doc. 101-5 at 2. Making Barnett's false statements more egregious is that he knew that Harry Hubbard had suddenly announced he was coming to Atlanta and bought a next-day plane ticket *after* Melissa Sylvester had purchased her plane ticket. *See* Exhibit A, CVSA Converted part 1.mp4 at 5:21–6:19 (explaining that Mr. Hubbard called on June 30, 2018 asking for Ms. Hubbard to buy him a same day plane ticket from Buffalo to Atlanta and that the ticket was purchased for July 1, 2018, instead).

In sum, as to the Woodsons, Barnett knew that Melissa Sylvester made arrangements to go to Virginia *before* anyone knew that Harry Hubbard was coming to Atlanta. But Barnett falsely swore to the magistrate that Plaintiff

"**sent his wife Melissa home**" *in response to* **Harry Hubbard coming to Atlanta. Doc. 101-5 at 2. He knew that was false.**

**Plaintiff further notes that the language in this statement that "the majority" of interviewed family members "believed Plaintiff was or could have been responsible for the arson and double-homicide" is disputed. Barnett spoke with other family members who said complimentary things about Plaintiff and/or cast suspicion on others. For example, Althea Jenkins (daughter to Deborah Hubbard), Gwen Hawkins (Deborah Hubbard's best friend), and Melissa Sylvester (Plaintiff's wife) all made exculpatory statements about Plaintiff.** *See* **Exhibit A, Althea Jenkins on 8July2018.amr at 5:19–6:13 ("[T]here's rumors and speculation going around that my brother did this. And, in my heart of hearts, I will never accept that as true."); Exhibit A, Gwen Hawkins on 25July18.amr at 5:29–7:30 ("Keith was the son, I'm going to tell you, Keith was the son that was there and done everything for them two. . . . He lived two doors down, moved into a house two doors down from her in Buffalo, took care of them. Took them to their doctor's appointments, to the store, wherever they needed to go. He was that one. . . . He was the one that was taking them to the base, taking them to the doctor appointments, taking them wherever they had to go. I never seen none of the**

-17-

other kids do that. . . . He took care of her through all her rough patches and everything."); *see generally* Exhibit A, Sylvester 000060 - Melissa Sylvester Audio Interview July 8, 2018 No Video (corroborating basics of Plaintiff's timeline); *id.* at 27:08–28:14 (denying Plaintiff ever got "mad" or "mean" or "ugly" with her or Harry or Deborah Hubbard); Barnett Dep. 45:18–21 ("I would say I remember her being absolutely convinced that Keith had nothing to do with this incident, this crime.").

Additionally, Tanika Hubbard (a daughter of Harry Hubbard) speculated that Deborah Hubbard was responsible because her three previous husbands had all previously died. *See* Exhibit A, Tanika Hubbard 1OCT18 at 5:27–8:38 (relating theory of Deborah's culpability and stating "the personal thing is from me and her conversations is this is kind of what goes on with her husbands, like a black widow spider type, because that's what I used to call her.").

Plaintiff also objects to the statement in ¶ 10 as <u>immaterial</u>, for at least three independently sufficient reasons.

First, the statement in this paragraph is different than what was contained in the warrant application. Only the facts contained in the warrant application matter. *See W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959

(11th Cir. 1982) ("[J]udicial review of the sufficiency of an affidavit for the issuance of a warrant must be strictly confined to the information brought to the magistrate's attention."); *Williams v. Aguirre*, 965 F.3d 1147, 1162–63 (11th Cir. 2020) (same). And Barnett testified that he put all of the known inculpatory facts into the text of the warrant affidavit. Barnett Dep. 71:10–13. The corresponding facts in the warrant allegation are either knowingly false ("Sylvester had sent his wife Melissa home one day prior to the fire," Doc. 101-5 at 2) or far too vague and conclusory to be inculpatory or otherwise support probable cause. *See* Doc. 101-5 at 2 (stating without more, "Importantly, several family members raised concerns that Keith Sylvester may have been involved in the murder of his mother and step-father."). It is well established that in warrant affidavits, "mere conclusions will not suffice." Wayne R. LaFave, 2 Search & Seizure § 3.5(e) (6th ed. 2020); *United States v. Lockett*, 674 F.2d 843, 845 (11th Cir. 1982) ("Such a conclusory statement, without more, of course has no probative value.").

Second, Barnett's cited statements of Willie Jenkins, Diedra Palmer, and the Woodsons contain no indication that any of these people have any personal or firsthand knowledge as to what they were speaking about. Jenkins specifically told local news that he had no idea what could have happened to

the Hubbards. *See* **Exhibit A, WIVB Interview at 0:45–1:00. Barnett knew that Palmer's only claimed basis of knowledge about Deborah Hubbard's house—the kitchen windows as viewed from the driveway—was flat wrong. And Barnett knew that the Woodsons lacked relevant knowledge because they believed that Melissa Sylvester's flight arrangements were made the day before her flight, when Barnett and Ms. Sylvester's mother knew that the ticket was purchased nine days earlier.**

**Third, the cited statements of Jenkins, Palmer, and the Woodsons, are immaterial because they were only made *after* Barnett told the relevant witnesses that Plaintiff was suspected of strangling his parents. *See* Exhibit A, Althea Jenkins on 8July2018.amr at 5:19–6:48 (stating that relatives were told by a detective to stay away from Plaintiff because he was dangerous and that a detective was "feeding" information to the family about Plaintiff).**

11.  Det. Barnett also learned that Plaintiff was a beneficiary on Ms. Hubbard's life insurance and that the Hubbards' planned to move back to Buffalo, NY and discontinue supporting Plaintiff. Deposition of James Barnett, taken April 9, 2021, hereinafter "Barnett Depo.", 58:12 – 59:10, attached hereto as Exhibit C. **RESPONSE: This statement is disputed, immaterial, and the proposition is in no way supported by the cited evidence.**

As a threshold matter, the cited portion of Barnett's deposition testimony has nothing to do with insurance, a move to Buffalo, or financial support. Thus, this paragraph cannot be considered. *See* LR 56.1(B)(1) ("The Court will not consider any fact: (a) not supported by a citation to evidence").

Separately, this statement is actually at least three facts (insurance, move to Buffalo, cessation of support), so it runs afoul of LR 56.1(B)(1) for a separate reason: "Each material fact must be numbered separately."

To the merits, this paragraph is disputed. Each fact contained within the paragraph will be addressed in turn.

<u>Life insurance</u>:

Barnett related nothing about life insurance to the magistrate. *See* Doc. 101-2. Thus, any statement about life insurance is <u>not material</u> to this malicious prosecution claim. The analysis is limited to the facts that were presented to the magistrate, meaning that facts an affiant knew but did not present cannot be considered. "In other words, . . . seizures pursuant to legal process concern whether the judicial officer who approved the seizure had sufficient information to find probable cause." *Williams*, 965 F.3d at 1162–63 ("'[A]n otherwise insufficient affidavit cannot be rehabilitated with information possessed by the officer when he sought the warrant but not

disclosed to the issuing magistrate.'" (quoting *Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971) (alterations adopted)); *see also W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982) ("[J]udicial review of the sufficiency of an affidavit for the issuance of a warrant must be strictly confined to the information brought to the magistrate's attention.").

Separately, this statement is false. Barnett knew that Deborah Hubbard had a life insurance policy in the amount of $1,000 that listed Harry Hubbard as the beneficiary. *See* Doc. 101-2 at 8 (describing CUNA policy in favor of Harry Hubbard that no one had attempted to claim). Barnett would later learn—*after* the warrant was obtained—that Deborah Hubbard had another life insurance policy, but that policy listed Sylvester as one of at least four beneficiaries. *See* Doc. 101-2 at 18. After-acquired information is also not material. "What counts for qualified immunity purposes relating to probable cause to arrest is the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later." *Jones v. Cannon*, 174 F.3d 1271, 1283 (11th Cir. 1999).

Further, Barnett lied in the warrant application when he said that Plaintiff was the sole beneficiary of Deborah Hubbard's *homeowner's*

insurance policy. *See* Doc. 101-5 at 2 ("[T]he beneficiary of the house insurance policy was Keith Sylvester."); *see also* Barnett Dep. at 66:2–21 (clarifying that he understood Sylvester was the sole beneficiary of the homeowner's policy). In his warrant application and deposition, Barnett attributed this fact to the arson investigators. *See* Doc. 101-5 at 2; Barnett Dep. at 64:4–9 (reporting he learned it from Lt. Dorgan with the Atlanta Fire and Rescue Department). Lt. Dorgan was unequivocal that he did not provide, and would not have provided, that information to Barnett. Dorgan Dep. 18:9–20:10. In any event, Barnett had the homeowner's insurance policy in his possession, readily available for his review. Barnett Dep. 68:5–9. Nowhere in that document is Plaintiff's name listed as a beneficiary. *See* Doc. 87-3.

<u>Moving to Buffalo</u>:

Again, there is no support in the cited deposition testimony about the Hubbard's returning to Buffalo. But Barnett put in the warrant affidavit that Harry Hubbard "planned to return to Buffalo on August 1, 2018 with his wife Deborah." Doc. 101-5 at 2. Barnett testified that he thought that Harry Hubbard had purchased plane tickets for him and his wife for August 1, 2018, Barnett Dep. 123:7–10, but he was unaware of whether the tickets had been cancelled prior to their deaths. Barnett Dep. 123:11–16.

Barnett understood that Harry Hubbard was trying to reconcile with his wife. Barnett Dep. 122:18–22. But Barnett also knew that Deborah had moved away from Harry and purchased a house in another state less than a year previously, after he cheated on her. Barnett Dep. 54:23–25; Doc. 101-5 at 1 ("Deborah had moved to Atlanta from Buffalo, NY in November 2017 because of marital problems with Harry."). Further, Barnett knew that people close to Deborah doubted that she would return to Buffalo. *See* Exhibit A, WIVB Interview at 0:25–1:30 (explaining that the Hubbards planned to retire in Atlanta; stating they "were so proud to just get that home down there and be first time homeowners"); *see also* Exhibit A, Willie Jenkins on 4July2018.amr at 0:00–0:50 (recorded phone call in which Barnett chastised Jenkins for giving this interview). Similarly, Gwen Hawkins, Deborah's best friend, told Barnett repeatedly and point blank that she did not think Deborah would go back to Buffalo with Harry. *See* Exhibit A, Gwen Hawkins on 25July18.amr at 10:44–12:00 ("No, she had no intentions of coming back to Buffalo. No, she did not.").

There is no indication in the record why Barnett believed Deborah had agreed to go back to Buffalo. But, at minimum, Barnett knew that there were multiple people that did not believe she was going to Buffalo making Barnett's

statement in his warrant application either recklessly or knowingly false or subject to a serious material omission.

**Cessation of monetary support**:

For this "fact," there are again two threshold problems.

First, Barnett related nothing the cessation of monetary support to the magistrate. *See* Doc. 101-2. Thus, any such statement here is **not material**. *Williams*, 965 F.3d at 1162–63.

Second, again, there is no support for this proposition in the cited evidence.

As to the merits of this statement, there is no evidence in the record that Deborah Hubbard "supporting" Plaintiff monetarily or that any such support would cease if she moved to Buffalo. Barnett knew that Plaintiff had one, if not two, jobs at the time and that he and his wife had their own apartments separate from Deborah's place. Barnett Dep. 138:22–139:1. Barnett also assumed that Melissa Sylvester received disability benefits due to her intellectual disabilities. *Id.* 139:3–6. Further, to the extent there was any support from Deborah to Plaintiff, Barnett had zero evidence that any such support would cease were she to move to Buffalo.

12.    All of this information coupled with Plaintiff's criminal history and

suspicious activity on the night of the fire led Det. Barnett to believe that Plaintiff

was the prime suspect in the arson double-homicide and apply for an arrest warrant

for Plaintiff. Criminal Warrant, Warrant No. EW-0253084, Affidavit for Arrest, 1

– 2. Attached hereto as Exhibit D.

**RESPONSE: Plaintiff objects to this "fact" as improper, as immaterial, and as**

**disputed.**

**First, it is unclear what fact or facts are intended to be contained within**

**this paragraph. There is no dispute that Barnett applied for the warrant, but,**

**for example, there is a dispute about whether any criminal history would**

**support a probable cause determination. Further, the only fact supported by**

**the evidence cited is the warrant itself. Any broader facts violate LR**

**56.1(B)(1).**

**Separately, Plaintiff disputes and objects to other implicit facts in this**

**paragraph.**

**Plaintiff's <u>criminal history</u> is not material because it was not**

**communicated to the magistrate. "[S]eizures pursuant to legal process**

**concern whether the judicial officer who approved the seizure had sufficient**

**information to find probable cause."** *Williams***, 965 F.3d at 1162–63 ("'[A]n**

**otherwise insufficient affidavit cannot be rehabilitated with information**

possessed by the officer when he sought the warrant but not disclosed to the issuing magistrate.'" (quoting *Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971) (alterations adopted)); *see also W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982) ("[J]udicial review of the sufficiency of an affidavit for the issuance of a warrant must be strictly confined to the information brought to the magistrate's attention.").

Separately, Plaintiff's criminal history was not similar to the charged offenses of arson or murder, so it was not relevant to a probable cause analysis. *See Martin v. State*, 316 Ga. App. 220, 226, 729 S.E.2d 437, 441 (2012) (holding dissimilar criminal history information not relevant; citing *Brinegar v. United States*, 338 U.S. 160, 172 (1949), for the proposition that "the United States Supreme Court has held that an officer's knowledge of prior arrests for similar conduct may be relevant to a determination of probable cause related to a new incident, even though the same evidence would not be admissible at trial.").

Barnett believed there was a criminal history for fraud and theft. *See* Doc. 101-2 at 3. These offenses are just not similar to a gruesome double murder with arson. Further, there was no evidence of any allegations of criminal conduct in the preceding ten-plus years.

-27-

As to Plaintiff's supposedly "<u>suspicious activity</u> on the night of the fire," Defendants do not make any effort to describe what that behavior might be. Plaintiff, thus, cannot meaningfully respond to arguments that have not been made. In any event, Barnett knew that Plaintiff was not inside Deborah Hubbard's home for at least 8 hours before the fire was first reported and could not have physically committed the crime. Barnett knew it was physically impossible for Plaintiff commit the murder because (1) Plaintiff was not physically present at the scene for at least 8 hours before the fire started, since 8:00 pm, *see id.*; (2) he knew it was not a slow burn fire, Bonner Dep. 33:5–12; Doc. 101-2 (Barnett's report noting that "the fire was probably not started the previous evening of July 2, 2018 and was not a slow burn."); (3) he knew people who are strangled to unconsciousness but not death regain consciousness within "seconds or minutes," Heninger Dep. 71:6–12; and (4) he knew that Harry had spoken to Nyaira Walton at 9:30 pm on the phone. *See* Exhibit A, Nyaira Walton.amr at 1:27–2:30; Doc. 87-4, AT&T Phone Records Excerpt (row 4900 shows latitude and longitude coordinates of the cell phone's location, showing it at the mother's house).

As to Barnett's supposed <u>subjective belief</u> that Plaintiff was the prime suspect, that is both disputed and immaterial. Barnett knew that Plaintiff was

**not inside Deborah Hubbard's home for at least 8 hours before the fire was first reported and could not have physically committed the crime. Separately, under the Fourth Amendment's objective inquiry, Barnett's subjective belief is not relevant. *Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 517 (11th Cir. 2019) ("Subjective beliefs 'play no role in ordinary, probable-cause Fourth Amendment analysis.' *Whren v. United States*, 517 U.S. 806, 813 (1996)"); *Rankin v. Evans*, 133 F.3d 1425, 1434 (11th Cir. 1998) ("[T]his Circuit explicitly rejected the idea that the subjective belief of the arresting officer is relevant to the determination of whether probable cause exists.").**

**Finally, whether or not Plaintiff was the "prime suspect" is not itself material. What counts is whether there was probable cause.**

13.    Officer Smith did not participate in the investigation or assist in obtaining the warrant for Plaintiff's arrest. Deposition of Darrin Smith, taken June 16, 2021, hereinafter "Smith Depo.", 26:2 – 32:6, attached hereto as Exhibit E. **RESPONSE: Disputed only in small part.**

**Smith was involved in administering the voice stress test, but did nothing else. Barnett Dep. 40:21–24.**

14.    On December 29, 2018, Plaintiff was arrested and charged with the murder of his mother and stepfather. Incident Report, 16.

**RESPONSE: Undisputed.**

15.     Even after Plaintiff's arrest, the arson and murder investigations continued to determine whether any other suspects remained at-large. *Id*. at 18 – 21.

**RESPONSE: Disputed in part.**

**The Fulton District Attorney's looked through the materials Defendant Barnett had gathered to prepare the case for indictment and trial and determined that Plaintiff was not possibly present at the scene and that Barnett had no explanation for how Plaintiff could have committed the alleged crimes if he was not at the scene. *See* Exhibit J, Spinkel Report ("The Office of the Fulton County District Attorney (hereinafter "D.A.'s Office") reviewed the Atlanta Police Department's case file and evidence obtained during the course of their investigation. The D.A.'s Office also conducted an independent investigation and found that the defendant was likely not present at the scene of the crime during the commission of the crime."). Thus, they dismissed the charges.**

16.     With help from the Fulton County District Attorney's Office, a second suspect, Cornelius Muckle, was identified and arrested in August of 2020. *Id*. at 20.

**RESPONSE: Undisputed.**

17.    Mr. Muckle denied knowing Plaintiff and Plaintiff was released after fifteen (15) months of imprisonment. *Id*. at 22.

**RESPONSE: Undisputed.**

This the 10th day of December, 2021.

*/s/ Zack Greenamyre*
Zack Greenamyre
Ga. Bar No. 293002
Samantha Funt
Georgia Bar No. 943783
MITCHELL & SHAPIRO LLP
3490 Piedmont Road, Suite 650
Atlanta, GA 30305
404-812-4751
zack@mitchellshapiro.com
sam@mitchellshapiro.com

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing using the CM/ECF system, which will send notification of filing to all counsel of record.

This the 10th day of December, 2021.

*/s/ Zack Greenamyre*
Zack Greenamyre
Ga. Bar No. 293002