# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

KEITH SYLVESTER,

       Plaintiff,

    v.

JAMES BARNETT, individually,

       Defendant.

CIVIL ACTION FILE
NO. 1:19-cv-4300-LMM-JKL

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

### Background to Investigation

1. Harry and Deborah Hubbard were found deceased in their home on July 3, 2018 after a house fire at 2495 Harvell Drive NW, Atlanta, Georgia 30318. *See* Exhibit M, APD Incident Report 181840299-00.

2. Defendant James Barnett was assigned as lead detective on the case. Barnett Dep. 15:17-21.

3. There was "no rush" and "no deadline" to the investigation, meaning that Defendant had all of the time he needed to conduct an adequate investigation. Barnett Dep. 86:17–87:4 ("I mean, there was no rush, there was no deadline, there was no anything. Like, I was getting no pressure. I just feel like the investigation was at a spot where, you know, I wasn't going to get anything else. That's how I felt

at the time.").

4.      Defendant was the one that made the decision to seek the warrant, which was his decision, and not subject to any review. Barnett Dep. 84:5–9.

**Prosecution Initiated, Case Dismissed**

5.      On December 28, 2018, Barnett initiated a prosecution against Plaintiff for the murders of Deborah Hubbard and Harry Hubbard. *See* Doc. 87-1, Harry Hubbard warrant; Exhibit N, Deborah Hubbard warrant.

6.      From December 29, 2018 to March 4, 2020, Plaintiff was incarcerated at the Fulton County Jail. *See* Doc. 101-2 at 19.

7.      Plaintiff was prosecuted for these murders from December 28, 2018 until March 2, 2020 when all charges against him were dismissed.  *See* Doc. 87-1; Exhibit J, Sprinkel Report at 1.

8.      The reason for the dismissal was a fact that was known to Defendant from the start: Plaintiff "not present at the scene."  Exhibit J, Sprinkel Report at 1.

**Before the Fire**

9.      Deborah Hubbard and Harry Hubbard were married and had been living together in Buffalo, New York until late 2017. Doc. 101-5.

10.      At that time, after a fallout from Harry's marital infidelity that had been captured on a dashboard camera, Deborah followed her son, Plaintiff Keith

Sylvester, to Atlanta and purchased the home at 2495 Harvel Drive NW, Atlanta, Georgia 30318. *Id.*; Barnett Dep. 120:20–121:2.

11.     On Friday June 29, 2018, Harry called asking that Deborah buy him a plane ticket that day to come down to Atlanta. Ticket prices were too high for a same day ticket, but Harry came down the next day, Saturday June 30. Ex. A, CVSA Converted part 1.mp4 at 5:21–6:19. Harry came down without any luggage, or even a change of clothing. Barnett Dep. 121:10–122:6.

12.     Prior to Harry's arrival, Plaintiff and his wife, Melissa, would spend many nights in the spare bedroom at the Harvel Drive home. But they also stayed sometimes at an apartment Melissa had rented a few miles away. Barnett Dep. 55:7–13.

13.     Wanting to give his mother and stepfather space, Plaintiff and his wife did not stay at the Harvel home while Harry was in town. Ex. A, 33D-6 at 0:24–0:39.

14.     On the afternoon of July 2, 2018, Plaintiff went with Harry to buy clothes (since he had not brought any with him) and to Wal-Mart to buy a few items, including cleaner, mothballs, citronella candles, and isopropyl rubbing alcohol. Barnett Dep. 29:20–30:2.

15.     The cleaner and mothballs were for dealing with a moisture smell at

his mother's home. Ex. A, K. and M. Sylvester on July 11 @ 0900.MP3 at 1:01:00–1:01:25.

16.     The citronella candles were purchased because the air conditioning was not functioning and Deborah and Harry planned to sleep with the windows open, but wanted to put a candle by the window to avoid mosquitoes getting inside. Doc. 101-5 at 1.

17.     The rubbing alcohol was for Plaintiff's personal hygiene. Barnett Dep. 168:11–20; Ex. F, Sylvester Decl. ¶ 11–12.

18.     After shopping, Plaintiff returned to the home and visited with Deborah and Harry until 8:00 pm, when he left. Barnett Dep. 94:24–95:21.

19.     Over the next hours, Plaintiff played video games in the back of several gas stations. Doc. 101-5 at 1.

20.     At 3:00 am, Plaintiff drove by his mother's home, briefly pulling into the driveway, before pulling out and heading to sleep at Melissa's apartment. Exhibit A - Sylvester not getting out of vehicle 0540 Incorrect timestamp.avi at 4:15–4:24 (by video runtime).

21.     Plaintiff told Defendant he did this because his mother was often up drinking coffee and smoking cigarettes at this hour and because he wanted to check on his ice cream truck, which was plugged into his mother's home via an extension

cord. Ex. A, CVSA Converted Part 1 at 12:20–12:41.

22.     Plaintiff saw the flicker of a citronella candle through a front window, but otherwise it appeared like people were sleeping and the truck was ok, so he left. *Id.*

23.     At 4:42, Plaintiff got a call from his mother's neighbor that the home was on fire. Doc. 101-2 at 1.

24.     He put on a clean t-shirt, but kept the other clothing he had on, and drove right over, arriving minutes later. *Compare* Exhibit Q, Screen capture from Valero gas station, *with* Exhibit R, Screen capture from Video 33D-6; Ex. F, Sylvester Decl. ¶ 3.

**The investigation at the scene:**

25.     The first report of a fire at 2495 Harvell Drive NW, Atlanta, Georgia 30318 was at approximately 4:00 am. *See* Exhibit M, APD Incident Report 181840299-00.

26.     The physical evidence at the scene of the crimes should have excluded Plaintiff as a suspect, but instead Barnett immediately focused on Plaintiff as the sole suspect. *See* ¶¶ 11–39, *infra*.

27.     A K9 named Ace rrained to sniff for any indications of accelerant was dispatched to the scene. *See* Exhibit O, K9 Accelerant Report at 1.

28. The K9 sniffed the inside of the home and found no evidence of accelerant. *See* Exhibit O, K9 Accelerant Report at 1–2, 4.

29. The K9 sniffed Plaintiff and found no evidence of accelerant. Barnett Dep. 98:25–99:17; Exhibit O, K9 Accelerant Report at 4.

30. The K9 sniffed Plaintiff's personal vehicle and his ice cream truck and found no evidence of accelerant. Barnett Dep. 99:6–17.

31. The K9 sniffed "all reasonable items located within the home including fire debris, clothing, fabric, furniture, structural members, etc." and found no evidence of accelerant. *See* Exhibit O, K9 Accelerant Report at 7.

32. Plaintiff was wearing the same dark colored below the knee denim shorts, underwear, socks, and shoes, as he had on earlier in the day. *Compare* Exhibit Q, Screen capture from Valero gas station, *with* Exhibit R, Screen capture from Video 33D-6; Sylvester Decl. ¶ 3.

33. Defendant knew Plaintiff was wearing the same clothes based on his review of the video of Plaintiff at Wal-Mart and various gas stations from July 2 and 3, 2018. Barnett Dep. 100:3–8.

34. The GBI analyzed the materials from the fire and determined that isopropyl alcohol was not used in the fire. *See* Exhibit P, GBI Accelerant Analysis.

35. The two boxes of mothballs Plaintiff had purchased that day from

Wal-Mart were unopened, unburned, and intact in the kitchen. Exhibit A, Crime Scene Video Shot by Leonpacher.MOV at 7:50; Exhibit E, Mothball Photo.





36.     The citronella candles Plaintiff had purchased that day from Wal-Mart were not used to start the fire. Barnett Dep. 161:2–5 (candle not in room where fire started); Crime Scene Video Shot by Leonpacher.MOV at 7:43 & Barnett Dep. 149:24–150:4 (candle used in kitchen where there was no fire).

37.     Once the fire was put out, Harry's body was found inside in the hallway. Pl. Ex. 17, AFRD Floorplan.

38.     No signs of trauma, no ligature, nothing indicating foul play was observed with Harry, and his body was transported to the medical examiner. Barnett Dep. 35:5–22; Ex. A, Initial Scene Recording.mp3 at 15:10–15:30.

39.     Deborah's body was found in the back office. Pl. Ex. 17, AFRD Floorplan.

40.     Her final resting place was where the computer was located, right next to the home's electrical panel. Pl. Ex. 17, AFRD Floorplan; Ex. A, Crime Scene Video Shot by Leonpacher.MOV at 1:11–1:40.

41.     Between the various computer cables and the wiring that fell from the ceiling in the fire, there were "many hundreds" of feet of wire "either immediately touching her or immediately proximate to her." Heninger Dep. 62:22–63:3.

42.     Deborah was "physically connected with the wire to the wall outlet." Barnett Dep. 148:20–149:2.

43.     Because Deborah was tangled in these wires, including something around her neck, investigators hit the pause button to examine the scene for potential homicide. Barnett Dep. 35:20–25.

44.     The scene was filmed, and Deborah was transported to the medical

examiner's office with whatever objects were around her.  Exhibit A, Crime Scene Video Shot by Leonpacher.MOV

45.    There was no ligature associated with Harry Hubbard at the scene. Barnett Dep. 35:5–22.

46.    Investigators on site did not suspect any strangulation of Harry Hubbard until after his body had been removed and transported and only based on the wires found proximate to Deborah Hubbard. Barnett Dep. 35:5–22.

47.    Investigators on site noted no trauma on the male. Exhibit A, Initial Scene Recording.mp3 at 15:10–15:30.

48.    There was no physical evidence of a ligature associated with Harry Hubbard at any point. Heninger Dep. 49:4–50:19; Pl. Ex. 20, Harry Hubbard ME Report.

49.    After Plaintiff told officers that he had been at the home at approximately 3:00 am before the 4:00 am report of the fire, he was treated as the suspect. *See* Doc. 101-3, Video 33D-6 at 9:45–11:00 (officers speculating about "weird" nature of Plaintiff and facetiously stating "Innocent until proven guilty"); Sylvester Decl. ¶ 5; Exhibit A, Initial Scene Recording.mp3 at 29:41–33:15 (Defendant speaking with others to convince Plaintiff to stand in a lineup for the K9 and to plot to get consent to search his car and ice cream truck); Exhibit A, Initial

Scene Recording.mps at 6:30–6:50 (Defendant stating that Plaintiff's story "makes no sense").

50.     Plaintiff was detained and was not free to go. Ex. F, Sylvester Decl. ¶ 6.

51.     He was told to stand right next to a police car and not to move. He was told he could not leave. *Id.*

52.     Plaintiff had a dashboard camera in his vehicle. Barnett Dep. 91:1–3.

53.     Plaintiff understood that he was being treated as a suspect. Exhibit F, Sylvester Decl. ¶¶ 5–8.

54.     Plaintiff understood that it was a bad coincidence that he had been at the home shortly before a fire broke out. Sylvester Decl. ¶ 7.

55.     To further the investigation, and to clear any suspicion as to his activity, Plaintiff offered to give officers his dashboard camera video. Sylvester Decl. ¶ 8.

56.     Plaintiff did give officers his dashboard camera video. Sylvester Decl. ¶ 9.

57.     The video showed that Plaintiff pulled into the driveway at his mother's home and then immediately left. Barnett Dep. 93:16–22; Exhibit A - Sylvester not getting out of vehicle 0540 Incorrect timestamp.avi at 4:15–4:24 (by video runtime).

58.     Plaintiff's car did not stop. Exhibit A - Sylvester not getting out of

vehicle 0540 Incorrect timestamp.avi at 4:15–4:24 (by video runtime).

59.    Plaintiff did not exit the car. Barnett Dep. 93:16–22; Exhibit A, Sylvester not getting out of vehicle 0540 Incorrect timestamp.avi at 4:15–4:24 (by video runtime).

60.    Defendant reviewed the video and knew that Plaintiff did not exit his vehicle. *Id*.

61.    Barnett knew that Plaintiff had gifted dashboard cameras to other family members. Barnett Dep. 120:20–121:2; Sylvester Decl. ¶ 10.

62.    Barnett knew that one source of marital strife between Deborah and Harry Hubbard arose when Deborah learned that Harry had conducted extramarital romantic relations in his vehicle that was captured on the dashboard camera that Plaintiff had purchased for Harry. Barnett Dep. 120:20–121:2.

63.    Barnett knew that Plaintiff had a dashboard camera for a long time prior to the fire; it was not recently purchased to create an alibi. Exhibit A, K. and M. Sylvester on July 11 @ 0900.mps at 42:00–42:30; 45:17–45:40.

64.    Defendant learned at the scene that Harry Hubbard and Deborah Hubbard were smokers. Barnett Dep. 107:18–23; Exhibit A, Initial Scene Recording.mp3 at 35:00–35:20 (Barnett stating "they both smoke").

65.    When Plaintiff arrived and saw the home in flames, he started asking

officers questions: can I go inside? were the windows broken out? what's going on? He saw flames in the bedroom area of the house and feared the worst. Ex. A, 33D-6.mp4 at 0:00–1:30.

66.     He was immediately forthcoming with officers, telling them that he had been at the house at 3:00 am. *Id.* 12:00–13:04.

67.     Throughout the entirety of the investigation, Defendant acknowledged that Plaintiff was "very cooperative" and "always volunteering information" and eager to talk "at any time" and to permit law enforcement to "search everything." Barnett Dep. 143:8–13.

**Physical Impossibility based on Timing**

68.     Barnett knew where Plaintiff was physically located at every moment between 8:00 p.m. on July 2, 2018 and 4:00 a.m the next morning based on evidence he collected including: GPS location data from Plaintiff's cellular phone, Plaintiff's own voluntary statements corroborated by surveillance video footage from multiple locations, from footage Plaintiff provided to Barnett from his own personal dashboard cameras in his car, and from automatic license plate readers throughout the city that captured Plaintiff's vehicle as it travelled. Barnett Dep. 91:12-18; 162:4-11.

69.     Barnett testified that he knew beyond any doubt that Plaintiff was

exactly where he said he was when he said he was there throughout July 2 and July 3. Barnett Dep. 91:12–18 ("He had video evidence of where he was, when he was. . . . I'm sure he was exactly where he said he was when he said he was. I've got no doubt about that.").

70.    Based on his knowledge of Plaintiff's whereabouts every moment the night of the crimes, Barnett knew Plaintiff had not been inside his mother's home from 8:00 pm on July 2 until after the fire. Barnett Dep. 94:24–95:21.

71.    Barnett knew it was physically impossible for Plaintiff commit the murder because (1) Plaintiff was not physically present at the scene for at least 8 hours before the fire started, since 8:00 pm, *see id.*; (2) he knew it was not a slow burn fire, Bonner Dep. 33:5–12; Doc. 101-2 (Barnett's report noting that "the fire was probably not started the previous evening of July 2, 2018 and was not a slow burn."); (3) he knew people who are strangled to unconsciousness but not death regain consciousness within "seconds or minutes," Heninger Dep. 71:6–12; and (4) he knew that Harry had spoken to Nyaira Walton at 9:30 pm on the phone. *See* Exhibit A, Nyaira Walton.amr at 1:27–2:30; Doc. 87-4, AT&T Phone Records Excerpt (row 4900 shows latitude and longitude coordinates of the cell phone's location, showing it at the mother's house); Exhibit D, Cell tower nearest to Harvel Dr..

72.     Defendant claimed that his theory was that sometime before he left his mother's house at 8:00pm on July 2, 2018, Plaintiff used a ligature to strangle his mother and stepfather to the point of unconsciousness but not death. Barnett Dep. 94:24–95:21; 108:15–17.

73.     Both the mother and stepfather had significant soot in their lungs and elevated carbon monoxide levels in their blood, which established that they were alive and breathing while the fire burned the house. Barnett Dep. 197:16–198:2; Dr. Heninger Dep. 35:7–17.

74.     Barnett did not disclose his theory that there was an eight-hour gap in between when the decedents were strangled to the point of unconsciousness and when they died in the fire to either the medical examiner or the magistrate judge considering the warrant application. *See* Doc 101-5.

75.     The Medical Examiner testified that it would not be possible for that much time to have elapsed. Heniger Dep. 71:6–72:6; 75:19–76:4.

76.     According to Barnett, before leaving, Sylvester then ignited a "slow burn" fire that caused the home to erupt in flames eight hours later at approximately 4:00am on July 3, 2018. Barnett Dep. 95:1–6.

77.     Barnett did not disclose his "slow burn" theory to the magistrate judge considering the warrant application. *See* Doc. 101-5, Warrant Affidavit.

78.    When Barnett asked the arson investigators about the theory, they stated unambiguously that there was no data to support it. *See* Barnett Dep. 101:24–102:25; *see also* Doc. 101-2, Narrative Incident Report at 18.

79.    Barnett knew, or should have known, that the use of accelerant is inconsistent with a slow burn fire. Dorgan Dep. 35:23–36:1.

80.    Barnett obtained and reviewed the mother and stepfather's cellphone records. Barnett Dep. 90:17–20.

81.     The phone records showed that Deborah and Harry Hubbard were inside the home for the whole of the time from 8:00 pm on July 2 until the fire. Ex. A, AT&T Phone Records Excerpt (row 4900 shows latitude and longitude coordinates of the cell phone's location, showing it at the mother's house).

82.    While located inside the home, Harry Hubbard had at least one phone call with Nyaira Walton who was living in Buffalo, New York *after* 8:00pm on July 2. Ex. A, AT&T Phone Records Excerpt (row 4900 shows a short call from the stepfather to Nyaira Walton at 1:20am July 3rd UTC time, which is 9:20pm July 2nd in Eastern Standard Time).

83.    8:00 on July 2 was the latest time at which they could have been strangled to the point of unconsciousness by Sylvester.

84.    Barnett corroborated that this phone call took place with the relative in

Buffalo who were on the other end of the line. Exhibit A, Exhibit A, Nyaira Walton.amr at 1:30–2:40 (describing receiving a 9:30pm call from the stepfather on July 2, in which he said he was fine).

85.     For Barnett's theory of the murders and arson to be consistent with the phone records, both mother and stepfather would have inexplicably failed to remove the ligatures (or have reapplied them), held an extended phone call with family without any signs of apparent distress, and failed to react in any way to a "slow burn" fire ravaging the home. Heninger Dep. 70:16–25.

86.     But that still does not explain how they regained consciousness before somehow re-succumbing to Sylvester's hours-earlier strangulation. Heninger Dep. 71:1–5.

87.     Defendant falsely told the Magistrate Judge it was possible for Plaintiff to commit these crimes when he knew it was physically impossible because Plaintiff was not physically present at the scene for at least 8 hours before the fire was reported. Barnett Dep. 91:17–19 ("I'm sure he was exactly where he said he was when he said he was. I've got no doubt about that."); Doc. 101-5.

88.     Both Mr. and Mrs. Hubbard were found with significant soot in their lungs and elevated carbon monoxide levels in their blood, which established that they were alive and breathing while the fire burned the house. Barnett Dep. 197:16–

198:2; Dr. Heninger Dep. 35:7–17.

89.     Barnett failed to inform the Magistrate that his theory of the crime was inconsistent with the phone records he obtained, which showed that while located inside their home, the Hubbards spoke with relatives after 8:00 p.m. on July 2, 2018.

90.     Barnett failed to inform the Magistrate that for his theory of the murders and arson to be consistent with the phone records both decedents must have inexplicably failed to remove ligatures (or reapplied them afterwards).  Heninger Dep. 70:16–71:5.

91.     Barnett failed to inform the Magistrate that for his theory of the murders and arson to be consistent with the phone records both decedents must have held an extended phone call with family without any signs of apparent distress. Exhibit A, Nyaira Walton.amr at 1:30–2:40 (describing receiving a 9:30pm call from the stepfather on July 2, in which he said he was fine).

92.     Barnett failed to inform the Magistrate that for his theory of the murders and arson to be consistent with the phone records, both decedents must have failed to react in any way to a slow burn fire consuming their home. Heninger Dep. 70:16–71:5.

**Insurance motive falsified**

93.     Defendant made up an insurance motive for Plaintiff to murder his

mother and stepfather that he knew was false. *See* Doc. 101-5 at 1 (testifying that Plaintiff was "the" beneficiary); Barnett Dep. 66:2–21 (testifying that he meant the sole beneficiary).

94.     Defendant falsely told the magistrate that Plaintiff was the sole beneficiary of the homeowner's insurance policy for Deborah Hubbard's Harvel road home. *See* Doc. 101-5 at 1 (testifying that Plaintiff was "the" beneficiary); Barnett Dep. 66:2–21 (testifying that he meant the sole beneficiary).

95.     Barnett testified that he learned about Sylvester being the sole beneficiary of the policy from Atlanta Fire and Rescue Department arson investigator Lt. Dorgan. *See* Doc. 101-5 at 1; Barnett Dep. 64:4–9.

96.     Lt. Dorgan was unequivocal that he did not provide, and would not have provided, that information to Barnett. Dorgan Dep. 18:9–20:10.

97.     Defendant had the USAA policy in his possession, readily available for his review. Barnett Dep. 68:5–9.

98.     Defendant either reviewed the USAA policy that he obtained or recklessly failed to do so. Barnett Dep. 68:5–9 ("And as of December 28th, 2018 USAA had also provided you with their file of the case including the policy itself, right? A. Yeah. It takes up a whole volume of -- it's a large policy."); 90:3–10.

99.     Defendant testified that the payout to Sylvester would be $180,000.

Barnett Dep. 64:24–25.

100. In fact, the payout to Plaintiff would be approximately $2,000. Exhibit B, Hornsby-Culpepper Decl. ¶ 15.

101. That figure was less than two weeks' wages for Plaintiff. Ex. F, Sylvester Decl. ¶ 13 (approximately $1,200 per month).

102. Defendant stated that he received this information from USAA. Barnett Dep. 64:24–25.

103. Defendant lied about this because USAA knew that Plaintiff was not the sole beneficiary and because USAA knew that the payout would be nowhere near $180,000. *See generally* Hornsby-Culpepper Decl.

104. Defendant Barnett and USAA recorded all conversations pursuant to this investigation. Barnett Dep. 48:21–49:11 (testifying that he should record all calls and thought he did so); 75:6–21; Exhibit C, USAA Subpoena Response (USAA produced 447 pages, including transcriptions of calls, pursuant to a subpoena (at 4)).

105. But there was no recording produced by either USAA or Defendant or the Atlanta Police Department related to any such conversation. Exhibit C, USAA Subpoena Response. (Plaintiff cannot cite to the absence of production from Defendant and the City of Atlanta).

106.    Avis Hornsby-Culpepper represented Keith Sylvester as an attorney in connection with obtaining any proceeds from Deborah Hubbard's homeowner's insurance policy with USAA for her residence at 2495 Harvel Drive, Atlanta, GA 30318. Exhibit B, Hornsby-Culpepper Decl. ¶ 3.

107.    Keith Sylvester was not a named beneficiary of the homeowner's policy. His name appears nowhere in the policy. Exhibit C, USAA Policy; Exhibit B, Hornsby-Culpepper Decl. ¶ 4.

108.    The named insureds were Deborah Hubbard and Harry Hubbard. Exhibit C, USAA Policy; Exhibit B, Hornsby-Culpepper Decl. ¶ 5.

109.    Because Deborah Hubbard and Harry Hubbard were both deceased in the fire, the beneficiaries of any homeowner's insurance policy benefits would be the Estate of Deborah Hubbard and the Estate of Harry Hubbard, with each to take one half. Exhibit B, Hornsby-Culpepper Decl. ¶ 6.

110.    Both Deborah Hubbard and Harry Hubbard died intestate to the best of my knowledge. Exhibit B, Hornsby-Culpepper Decl. ¶ 7.

111.    Per O.C.G.A. § 53-2-1, the Estate of Deborah Hubbard had at least four beneficiaries, her children Keith Sylvester, Althea Jenkins, Willie Jenkins, Jr., and the heir of Joseph Dial (Deborah Hubbard's son who predeceased her). Exhibit B, Hornsby-Culpepper Decl. ¶ 8.

112. The Estate of Harry Hubbard (whether under O.C.G.A. § 53-2-1 or New York's E.P.T.L. 4-1.1) had at least two beneficiaries, his children Tanika Hubbard and Antwan Hubbard. Exhibit B, Hornsby-Culpepper Decl. ¶ 9.

113. At most, Keith Sylvester would be in line to receive one quarter of one half of the proceeds of the homeowner's policy. Exhibit B, Hornsby-Culpepper Decl. ¶ 10.

114. The lien holder for 2495 Harvel Drive, Atlanta, GA 30318 was paid the entirety of the proceeds for the value of the home itself because the home had been recently purchased. Exhibit B, Hornsby-Culpepper Decl. ¶ 11.

115. The total proceeds paid to the estates of Deborah Hubbard and Harry Hubbard was $27,376.50 for the value of the property inside the home. Exhibit B, Hornsby-Culpepper Decl. ¶ 12.

116. Keith Sylvester's share of these proceeds should be $3,422.06. Exhibit B, Hornsby-Culpepper Decl. ¶ 13.

117. Keith Sylvester agreed to pay his attorney Ms. Hornsby-Culpepper $1,100 plus 7.5% of any money that he was entitled to for my services in obtaining the homeowner's insurance policy proceeds for him and the family. Exhibit B, Hornsby-Culpepper Decl. ¶ 14.

**"Slow burn" fire theory unsupported and specifically rejected**

118.   Recognizing that Plaintiff could not have set the fire at 3:00 am when he drove by the home but did not get out of his car, Defendant pretended to have a theory that Plaintiff had started a "slow burn" fire before he left the house at approximately 8:00 pm. Barnett Dep. 95:1–6.

119.   The house was very clearly not on fire at approximately 3:00 am from Plaintiff's dashboard camera video that Defendant reviewed. Exhibit A, Sylvester not getting out of vehicle 0540 Incorrect timestamp.avi at 4:15–4:24 (by video runtime).

120.   The "slow burn" fire theory was implausible on its face—how would the fire smolder for over seven hours only to start very quickly thereafter? Doc. 101-5 (not disclosing theory); Bonner Dep. 33:5–12 ("[B]ased on what I reviewed at the time, from what I saw, I would say that this is not a slow smoldering fire, like it did not take hours before it reached combustion and then consumed the house. I would say that roughly minutes after the fire started probably would show some signs of the house being on fire. And the house, I would say it would take not too long before it showed.").

121.   Defendant did not disclose to the magistrate that he had a "slow burn" fire theory. Doc. 101-5.

122.   Defendant asked arson investigators about a "slow burn" fire theory.

Doc. 101-2 at 18.

123.   The arson investigators told Defendant that there was no evidence to
support a "slow burn" fire theory. Doc. 101-2 at 18.

124.   The arson investigators told Defendant that the fire had not been
started by a "slow burn." Doc. 101-2 at 18 ("the fire was probably not started the
previous evening of July 2, 2018 and was not a slow burn.").

125.   Because Defendant knew the fire was not started by a "slow burn,"
and because Defendant knew that Plaintiff could not have started the fire later than
8:00 pm, Defendant knew that Plaintiff did not start the fire. Doc. 101-2 at 18;
Barnett Dep. 91:12–18.

**Implications of the decedents being alive during fire**

126.   Defendant knew that Deborah Hubbard and Harry Hubbard were both
alive during the fire because they had soot in their lungs and elevated
carboxyhemoglobin levels in their blood. Barnett Dep. 197:16–198:2; Dr.
Heninger Dep. 35:7–17.

127.   Defendant did not tell the magistrate that he knew Deborah Hubbard
and Harry Hubbard were both alive during the fire because they had soot in their
lungs and elevated carboxyhemoglobin levels in their blood. Doc. 101-5.

128.   Defendant knew from the very start that "the big thing is does she

have soot in her lungs" because if she did that meant she was not strangled in the fire. Exhibit A, Crime Scene Video Shot by Leonpacher.MOV at 8:00–8:05; Barnett Dep. 151:2–20.

129.    Defendant knew that Deborah Hubbard and Harry Hubbard had inhaled deadly amounts of smoke into their lungs. Barnett Dep. 197:16–198:2; Dr. Heninger Dep. 35:7–17.

130.    Defendant did not tell the magistrate that Deborah Hubbard and Harry Hubbard had inhaled deadly amounts of smoke into their lungs. Doc. 101-5.

131.    Defendant knew that Deborah Hubbard and Harry Hubbard were not killed directly by strangulation. Barnett Dep. 108:16–17 ("whoever strangled them strangled them to unconsciousness but not to death").

132.    Defendant did not tell the magistrate that Deborah Hubbard and Harry Hubbard were not killed directly by strangulation. Doc. 101-5.

133.    Barnett's theory of wire or cable as a ligature is inconsistent with Mr. Hubbard's death. Heninger Dep. 45:15–19.

134.    The only evidence of ligature strangulation on Mr. Hubbard was a band of uncharred skin. Heninger Dep. 52:6–9 (no soft tissue injuries); 52:12–17 (no signs of injuries from any struggle); 52:24–53:8 (no cartilage fractures); 53:9–16 (no strap muscle damage); 53:18–25 (nothing besides uncharred skin).

135.   No fragment of any ligature was recovered. Heninger Dep. 49:4–50:19.

136.   Heninger testified that the ligature had to be on Mr. Hubbard at the time of the fire based on the band of uncharred skin. Heninger Dep. 45:15–19.

137.   Heninger's explanation was that the fire burned through the ligature completely but did not impact Mr. Hubbard's skin at all, which he acknowledged was "kind of an interesting coincidence" because "[u]sually what you see is the ligature partly burned, like in her case. Like some of it is still there, some of it not, just the fire didn't get through burning it." Heninger Dep. 50:6–9.

138.   Ultimately, Heninger "ha[d] no explanation of why" the fire would have burned through the ligature around Mr. Hubbard's next 100% and burned his skin 0%. *Id*. at 50:10–12.

139.   Obviously, a wire or cable would not burn to disappearance like a shoelace might. Heninger Dep. 60:1–24.

140.   Defendant did not disclose to the magistrate his supposed theory that there was an eight-hour gap in between when the decedents were strangled to the point of unconsciousness and when they died in the fire to either the medical examiner or the magistrate judge considering the warrant application. Doc. 101-5.

141.   The Medical Examiner testified that it would not be possible for that

much time to have elapsed. Heninger Dep. 71:6–72:6; 75:19–76:4 ("Q. [It's] not likely that these people -- you know, that there were two people who were strangled at 8:00 p.m. that were still unconscious and but breathing at 4:00 a.m. when the fire gets going, right? A. That is an interesting question. Because I -- I initially just say not possible.").

**<u>Harry Hubbard's call with Nyaira Walton (after strangled and house set on fire)</u>**

142.    Defendant knew that Nyaira Walton is Harry Hubbard's daughter who lives in Buffalo. Barnett Dep. 166:19–20.

143.    Defendant spoke to Nyaira Walton about her conversation with Harry Hubbard on the evening of July 2, 2018. *See* Exhibit A, Nyaira Walton.amr at 1:27–2:30.

144.    Nyaira Walton told Defendant that she spoke to Harry Hubbard on the phone after 8:00 pm on July 2, 2018, which Defendant knew was the last time Plaintiff was at the home. *See* Exhibit A, Nyaira Walton.amr at 1:27–2:30.

145.    Nyaira Walton told Defendant that when she spoke to Harry Hubbard, he said he was fine and there was no issue of any kind. *See* Exhibit A, Nyaira Walton.amr at 2:15–2:30.

146.     Defendant obtained and reviewed Deborah Hubbard and Harry

Hubbard's cell phone records for July 2, 2018. Barnett Dep. 90:17–20.

147.   Harry Hubbard's cell phone records showed that he had a phone call with Nyaira Walton at 9:20 pm, consistent with the timing and duration of the call that she described having with Harry Hubbard. Doc. 87-4, AT&T Phone Records Excerpt (row 4900 shows latitude and longitude coordinates of the cell phone's location, showing it at the mother's house).

148.   The phone records from Deborah Hubbard and Harry Hubbard also showed that neither Deborah Hubbard nor Harry Hubbard left the home after 8:00 pm. *Id.*

149.   Defendant did not disclose the facts about the Nyaira Walton phone call, including that it was after he supposedly believed Plaintiff had strangled the Hubbards to unconsciousness but not death and tied ligatures around their necks that was present during the fire, and set the house on fire using a "slow burn" technique, and that the call had no indications of anything being wrong at that time. Doc. 101-5.

**Wal-Mart materials not used**

150.   Defendant told the magistrate that Plaintiff had purchased items from Wal-Mart on the day before the fire that were used to start the fire, namely: mothballs, isopropyl (or rubbing) alcohol, and citronella candles. Doc. 101-5 at 1.

151.   Defendant obtained a receipt showing that Plaintiff had purchased two boxes of mothballs, a six pack of citronella candles, and a single bottle of isopropyl alcohol. Barnett Dep. 90:14–15; Sylvester Decl. ¶ 2.

152.   This purchase was confirmed by surveillance video Defendant reviewed from Wal-Mart. Barnett Dep. 90:14–15.

153.   Defendant did not tell the magistrate why the mothballs and rubbing alcohol had been purchased. Doc. 101-5.

154.   Defendant knew that the citronella candles were purchased to be burned in the windows of the home because the air conditioning had broken and the Hubbards wanted to sleep with the windows open without allowing mosquitoes into the house. Doc. 101-5 at 1.

155.   Defendant knew that the mothballs were purchased because of a smell in the crawlspace at his mother's home. *See* Exhibit A, K. and M. Sylvester on July 11 @ 0900.MP3 at 1:01:00–1:01:25.

156.   Defendant knew that the rubbing alcohol was at Plaintiff's home and was for his personal use. Barnett Dep. 168:11–20.

157.   Defendant knew that the two boxes of mothballs were unopened and intact on the kitchen counter *after* the fire, meaning that they had not been used in starting the fire. Exhibit A, Crime Scene Video Shot by Leonpacher.MOV at 7:50;

Exhibit E, Mothball Photo.

158.   Defendant knew that there was no citronella candle involved in the supposed second starting point of the fire. Barnett Dep. 161:2–5 (candle not in room where fire started); Crime Scene Video Shot by Leonpacher.MOV at 7:43 & Barnett Dep. 149:24–150:4 (candle used in kitchen where there was no fire).

159.   Defendant failed to tell the magistrate that he knew that none of the Wal-Mart materials were used in the fire. Doc. 101-5.

160.   Defendant falsely told the magistrate that the Wal-Mart materials were used in the fire. Doc. 101-5.

161.   Defendant had no evidence that the GBI's gas chromatography and mass spectrometry analysis would fail to detect alcohol or naphthalene from the mothballs. Exhibit P, GBI Report (showing that could detect alcohol).

162.   Defendant failed to follow up with arson investigators about whether or not the mothballs would be picked up by the K9 and by the GBI report. Dorgan Dep. 68:18–69:8.

**Falsified evidence to bolster weak indications of strangulation**

163.   Defendant failed to wait for the medical examiner's report before taking out the warrants for Plaintiff's arrest. *Compare* Doc. 101-5 (December 28, 2018), *with* Pl. Ex. 20, Harry Hubbard ME Report; Pl. Ex. 21, Deborah Hubbard

ME Report.

164.  During the autopsy, as described in his deposition and report, Dr.

Heninger described a shoelace (or possibly a string) that was wrapped around Ms.

Hubbard's neck as the suspected ligature. Heninger Dep. 60:15–61:18; 63:24–

64:13.

165.  He specifically stated that the suspected ligature was not any kind of

wire. *Id.* at 63:24–64:13.

166.  Dr. Heninger testified that the shoelace was so "friable" that it would

fall apart under minimal manipulation. *Id.* 60:1–6.

167.  Defendant testified there was a different kind of ligature entirely.

168.  In his warrant application he said that Deborah was strangled with

"wires from a cable junction box." Doc. 101-5 at 1; *see also* Barnett Dep. 29:7–16;

*id.* at 35:16–17 ("all these cables wrapped around her neck").

169.  Defendant spoke with the medical examiner many times before taking

out the warrants. Barnett Dep. 202:9–12.

170.  The medical examiner told Defendant repeatedly that he did not know

what happened and was not confident in his conclusions. Exhibit A, Dr. Heninger

20DEC18.amr at 4:55–5:13 (in response to statements from Defendant that he

might take a warrant stating, "I don't know how to put it all together."); at 6:58–

7:05 ("It doesn't fit together real well."); Heninger Dep. 52:12–17 (unexplained why no injuries of resistance); *see also* Heninger Dep. 52:12–17 (unexplained why no injuries of resistance); 50:2–19 ("interesting coincidence" and "no explanation" about Harry's missing ligature).

171.    Defendant never told the medical examiner that his "theory" was that Plaintiff strangled the Hubbards to death before 8:00 pm on July 2 before the fire started at 4:00 am on July 3. Heninger Dep. 71:6–72:6; 75:19–76:4 (rejecting that theory as "not possible.").

172.    The medical examiner testified that was just impossible for the Hubbards to have been strangled to unconsciousness but not death for that long. Heninger Dep. 71:6–72:6; 75:19–76:4 (rejecting that theory as "not possible.").

173.    They would have regained consciousness in "seconds or minutes." Heninger Dep. 71:6–12.

174.    At the "tail end," the longest a person might be unconscious from strangulation before regaining consciousness is "just a few minutes." Heninger Dep. 71:13–72:6.

175.    They would not have talked on the phone to Nyaira Walton in Buffalo. Heninger Dep. 70:16–25.

176.    They would not have removed and then replaced the ligature on their

necks. Heninger Dep. 70:16–71:6.

177.    Between the medical examiner's conversations with Defendant and his report, there was significant reason to doubt that the Hubbards were strangled. Dr. Heninger 20DEC18.amr at 4:55–5:13 (in response to statements from Defendant that he might take a warrant stating, "I don't know how to put it all together."); at 6:58–7:05 ("It doesn't fit together real well."); Heninger Dep. 52:6–9 (no soft tissue injuries); 52:12–17 (no signs of injuries from any struggle); 52:24–53:8 (no cartilage fractures); 53:9–16 (no strap muscle damage); 53:18–25 (nothing besides uncharred skin); 65:69 (no fractures in hyoid bone or cartilage for Deborah).

**Marital reconciliation concocted**

178.    Defendant told the magistrate that Deborah Hubbard and Harry Hubbard had reconciled their marriage and decided to move back to Buffalo together. Doc 101-5 at 1.

179.    Defendant knew that was not true based on statements from people who were in the best position to know. Barnett Dep. 54:23–25; Exhibit A, WIVB Interview at 0:25–1:30 (explaining that the Hubbards planned to retire in Atlanta; stating they "were so proud to just get that home down there and be first time homeowners"); Exhibit A, Willie Jenkins on 4July2018.amr at 0:00–0:50 (recorded

phone call in which Barnett chastised Jenkins for giving this interview). Similarly, Gwen Hawkins, Deborah's best friend, told Barnett repeatedly and point blank that she did not think Deborah would go back to Buffalo with Harry. *See* Exhibit A, Gwen Hawkins on 25July18.amr at 10:44–12:00 ("No, she had no intentions of coming back to Buffalo. No, she did not.").

180.   Gwen Hawkins told Defendant that there was no plan by Deborah to reconcile with Harry Hubbard. Exhibit A, Gwen Hawkins on 25July18.amr at 10:44–12:00 ("No, she had no intentions of coming back to Buffalo. No, she did not.").

181.   Willie Jenkins, Jr. told Defendant that any reconciliation would involve them staying at the house in Atlanta and not going back to Buffalo. Exhibit A, WIVB Interview at 0:25–1:30 (explaining that the Hubbards planned to retire in Atlanta; stating they "were so proud to just get that home down there and be first time homeowners"); Exhibit A, Willie Jenkins on 4July2018.amr at 0:00–0:50 (recorded phone call in which Barnett chastised Jenkins for giving this interview).

182.   Defendant did not tell the magistrate that witnesses had told him there was no reconciliation forthcoming. Doc. 101-5.

183.   Defendant did not tell the magistrate that witnesses had told him there were no plans to relocate to Buffalo. Doc. 101-5.

## Fabricated evidence of Melissa Sylvester's flight arrangements

184.    Defendant told the magistrate that it was suspicious that Plaintiff "had sent his wife Melissa home one day before the fire." Doc. 101-5 at 2.

185.    Defendant knew that statement was false.

186.    Melissa's sisters, the Woodsons'—by Barnett's own admission—provided the plane ticket information to him, so he knew the date her flight was purchased. Doc. 101-5; Exhibit G, Melissa Sylvester Flight Receipt.

187.    Melissa Sylvester's mother also told Barnett that she knew Melissa was coming home "a week" before she arrived in Virginia. See Exhibit A, Gloria Jones.amr at 2:13–2:30 ("Q. How many times did she come to visit? A. I guess that's the first time since, in over a year I know. Q. Okay. So that's kind of unusual. How much notice did you get that she was going to be coming up on July 1st? A. I think it was the week before she came. Q. A week? Okay.").

188.    Barnett mislead the magistrate judge into believing that Plaintiff arranged for his wife to be out of state after he knew that Harry Hubbard would be in town, so that he could murder his mother and stepfather. See Doc. 101-5 at 2.

189.    In fact, Barnett knew that Melissa Sylvester had purchased a plane ticket to go to Virginia on June 23, or nine days before the fire, not "one day before the fire," as he falsely swore in his warrant application. Compare Exhibit G,

Melissa Sylvester Flight Receipt, with Doc. 101-5 at 2.

190.   Barnett also knew that Melissa purchased the ticket with her own money. Exhibit G, Melissa Sylvester Flight Receipt, with Doc. 101-5 at 2.

191.   There was no evidence that Melissa was forced to travel to Virginia. Doc. 101-5 at 2.

192.   Barnett knew that Harry Hubbard had suddenly announced he was coming to Atlanta and bought a next-day plane ticket after Melissa Sylvester had purchased her plane ticket. *See* Exhibit A, CVSA Converted part 1.mp4 at 5:21– 6:19 (explaining that Mr. Hubbard called on June 30, 2018 asking for Ms. Hubbard to buy him a same day plane ticket from Buffalo to Atlanta and that the ticket was purchased for July 1, 2018, instead).

193.   Barnett knew that Melissa Sylvester made arrangements to go to Virginia before anyone knew that Harry Hubbard was coming to Atlanta. *See* Exhibit A, CVSA Converted part 1.mp4 at 5:21–6:19; Exhibit G, Melissa Sylvester Flight Receipt

194.   But Barnett falsely swore to the magistrate that Plaintiff "sent his wife Melissa home" in response to Harry Hubbard coming to Atlanta, which he knew was false. Doc. 101-5 at 2.

**Intentional manipulation of family members and the falsification of family statements**

195.   Immediately after their deaths, Atlanta Police Department Detective James Barnett started calling family members in Buffalo and telling people that Keith Sylvester was the suspect involved in strangling them to death and setting their house on fire. Exhibit L, Jenkins Decl. ¶ 3.

196.   On July 3, 2018, the day the Hubbards died, Defendant was already indicating to people in Buffalo that Keith Sylvester was the sole suspect. Exhibit L, Jenkins Decl. ¶ 4.

197.   Defendant indicated to people in Buffalo that Keith Sylvester was the sole suspect in a number of ways. Exhibit L, Jenkins Decl. ¶ 5.

198.   For one, he asked questions exclusively about Keith Sylvester and the ways that he might be suspicious or a bad son or a bad person. Exhibit L, Jenkins Decl. ¶ 6.

199.   For another, he told people in Buffalo inculpatory facts about Sylvester that he knew were false. Exhibit L, Jenkins Decl. ¶ 7.

200.   For example, Defendant told Willie Jenkins that Keith Sylvester had bought mothballs and rubbing alcohol and citronella candles that were suspected to be used in starting the fire. Exhibit L, Jenkins Decl. ¶ 8.

201.   At first, Jenkins thought that was suspicious. Exhibit L, Jenkins Decl. ¶ 9.

202.  But Jenkins did not know until later that Detective Barnett knew that these items were not used to start the fire. Jenkins knows now that Barnett knew that the mothballs were unopened in the kitchen, the rubbing alcohol was at Keith Sylvester's house, and the citronella candles were not involved in the fire. Jenkins also knows now that Barnett knew immediately that there was no accelerant used in the fire. Exhibit L, Jenkins Decl. ¶ 10.

203.  As another example, Detective Barnett told Jenkins that Keith Sylvester was at Deborah Hubbard's house at approximately 3:00 am before the house caught fire between 4:00 am and 5:00 am. Exhibit L, Jenkins Decl. ¶ 11.

204.  At first, Jenkins also thought that was suspicious. Exhibit L, Jenkins Decl. ¶ 12.

205.  But Jenkins later learned that Detective Barnett knew that Keith Sylvester had not been inside the house since the early evening on July 2 and that he did not exit his car at 3:00 am. Exhibit L, Jenkins Decl. ¶ 13.

206.  Based on his interactions with Detective Barnett, it is Jenkins' firm belief that Defendant intentionally acted to manipulate family against Keith Sylvester. Exhibit L, Jenkins Decl. ¶ 14.

207.  Based on discussions with other family members in Buffalo, their conversations with Detective Barnett followed the same pattern: Defendant told

everyone that Keith Sylvester was behind this and provided misleading facts about the investigation. Exhibit L, Jenkins Decl. ¶ 15.

208. It is Jenkins' firm belief that Detective Barnett knowingly manipulated people into saying disparaging things about Keith Sylvester. Exhibit L, Jenkins Decl. ¶ 16.

209. Detective Barnett and Jenkins had a conversation about a previous time when Deborah Hubbard had asked Keith Sylvester to return her house keys for the house in Atlanta. Exhibit L, Jenkins Decl. ¶ 17.

210. Jenkins told Detective Barnett that everyone in the family agreed that Keith Sylvester should keep the keys because he did a good job of taking care of Deborah Hubbard and she was experiencing health problems. Exhibit L, Jenkins Decl. ¶ 18.

211. Jenkins told Detective Barnett that Deborah Hubbard only thought that Keith Sylvester should return the keys for a brief time and then she changed her mind and invited Keith Sylvester and his wife, Melissa to live with her at least some of the time. Exhibit L, Jenkins Decl. ¶ 19.

212. Detective Barnett knew from conversations with Jenkins that Keith Sylvester was never living in Deborah Hubbard's home without her permission. Exhibit L, Jenkins Decl. ¶ 20.

213. Jenkins understands that Detective Barnett reported that he told him that Keith Sylvester tried to put Deborah Hubbard in a hospital or nursing home against her will. That is not true, and Jenkins did not tell Detective Barnett that was true. Exhibit L, Jenkins Decl. ¶ 21.

214. The truth is that Deborah Hubbard had some serious health problems, including a recent history of falls, stroke, and hospitalization for a repeated dislocation of her jaw. Exhibit L, Jenkins Decl. ¶ 22.

215. Keith Sylvester encouraged Deborah Hubbard to go to the hospital to get these kinds of things checked out. Exhibit L, Jenkins Decl. ¶ 23.

216. Jenkins told Detective Barnett that at one point Keith Sylvester and Deborah Hubbard disagreed about whether she should go to the hospital. Exhibit L, Jenkins Decl. ¶ 24.

217. Jenkins never told Detective Barnett that Keith Sylvester tried to have Deborah Hubbard put into a mental hospital or nursing home against her will. Exhibit L, Jenkins Decl. ¶ 25.

218. Jenkins understands that Detective Barnett reported that he told him that Keith Sylvester had previously burned debris in the backyard of the Deborah Hubbard's home. Exhibit L, Jenkins Decl. ¶ 26.

219. Jenkins specifically told Detective Barnett that he did not see a

problem with Keith Sylvester having done that before and did not think it was wrong for him to have done that. Exhibit L, Jenkins Decl. ¶ 27.

220. Jenkins saw no connection between Keith Sylvester having burned leaves in the backyard months prior and Deborah Hubbard and Harry Hubbard's deaths, and Jenkins did not tell Detective Barnett that he thought there was any connection. Exhibit L, Jenkins Decl. ¶ 28.

221. Detective Barnett's prosecution of Keith Sylvester has had a devastating effect. Jenkins knows that it has negatively affected Keith Sylvester in a severe way. Jenkins also knows that it has hurt the family because people turned against each other for no good reason based on manipulative and falsified information. Exhibit L, Jenkins Decl. ¶ 29.

222. Defendant also spoke with several family members who related obviously incorrect facts that Defendant then attempted to use to procure the warrants for Plaintiff's arrest despite knowing that their statements were false and ridiculous. Barnett Dep. 162:23–163:1; 165:7–10; 165:15–23; 165:24–166:1; 141:14–19.

223. Angel Lawson, one of Harry Hubbard's daughters theorized that Plaintiff acted together with Willie Jenkins and Althea Jenkins to kill their mother and Angel's father, despite Willie and Althea not being nearby or having been in

contact with Plaintiff. Barnett Dep. 162:23–163:1.

224. One of Harry Hubbard's stepchildren, Andre Jones, told Defendant that Tanika Hubbard committed the murders. Barnett Dep. 165:7–10.

225. Tanika Hubbard told Defendant that Deborah Hubbard had killed all three of her previous husbands and was a "black widow." Barnett Dep. 165:15–23.

226. Tanika Hubbard also told Defendant that Deborah Hubbard had tricked people into believing that one of her husbands had died of cancer when she had actually murdered him. Barnett Dep. 165:24–166:1.

227. Ronnette Penny told Defendant that she believed that Plaintiff had removed all of his mother's teeth after he killed her, but Defendant knew Deborah Hubbard had all of her teeth intact from conversation with the medical examiner. Barnett Dep. 141:14–19.

228. Defendant also buried all of the supportive statements that family members made about Plaintiff. Doc. 101-5.

229. Althea Jenkins told Defendant that Plaintiff was not capbale of the murders. *See* Exhibit A, Althea Jenkins on 8July2018.amr at 5:19–6:13 ("[T]here's rumors and speculation going around that my brother did this. And, in my heart of hearts, I will never accept that as true.").

230. Gwen Hawkins told Defendant the same, adding that Plaintiff was the

son who most cared after his mother. Exhibit A, Gwen Hawkins on 25July18.amr at 5:29–7:30 ("Keith was the son, I'm going to tell you, Keith was the son that was there and done everything for them two. . . . He lived two doors down, moved into a house two doors down from her in Buffalo, took care of them. Took them to their doctor's appointments, to the store, wherever they needed to go. He was that one. . . . He was the one that was taking them to the base, taking them to the doctor appointments, taking them wherever they had to go. I never seen none of the other kids do that. . . . He took care of her through all her rough patches and everything.").

231.    Melissa Sylvester also said the same. *See generally* Exhibit A, Sylvester 000060 - Melissa Sylvester Audio Interview July 8, 2018 No Video (corroborating basics of Plaintiff's timeline); id. at 27:08–28:14 (denying Plaintiff ever got "mad" or "mean" or "ugly" with her or Harry or Deborah Hubbard); Barnett Dep. 45:18–21 ("I would say I remember her being absolutely convinced that Keith had nothing to do with this incident, this crime.").

232.    Defendant intentionally included facts he knew were incorrect that were inculpatory and intentionally excluded true facts that were exculpatory from family members. Doc. 101-5.

**Missing jewelry**

233.   Defendant intentionally did not tell the magistrate important exculpatory facts about Deborah Hubbard's jewelry. Barnett Dep. 135:7–15; Doc. 101-5.

234.   Defendant knew that Deborah Hubbard owned and always wore a lot of gold jewelry, including necklaces, bracelets, and rings. Barnett Dep. 135:7–15.

235.   Defendant was provided at least three photos showing the gold jewelry Deborah Hubbard always wore. Exhibit H, Deborah Hubbard Jewelry Photos.

236.   Defendant knew that no jewelry was recovered from the home or from Deborah Hubbard's person. Barnett Dep. 135:16–18.

237.   Defendant knew that the fire would not burn up the gold jewelry. Barnett Dep. 135:19–136:8.

238.   The disappearance of the jewelry is best explained by theft. Barnett Dep. 136:23–137:13; 136:19–22; 135:16–18.

239.   Defendant never had any evidence that Plaintiff ever possessed or sold Deborah Hubbard's gold jewelry. Barnett Dep. 136:19–22.

240.   Defendant looked into whether Plaintiff had pawned any items, including jewelry, and learned that Plaintiff had not done so. Barnett Dep. 136:23–137:13.

241.   Defendant did not tell the magistrate any facts about the gold jewelry, indicating a theft, or that he knew Plaintiff was not involved in anything having to do with the missing gold jewelry. Doc. 101-5.

**Missing keys**

242.   Defendant intentionally did not tell the magistrate important exculpatory facts about Deborah Hubbard's house keys. Doc. 101-5.

243.   Defendant told the magistrate that Plaintiff had the only set of spare keys to them home and that the doors were locked, so Plaintiff must have locked the door on the way out. Doc. 101-5.

244.   Defendant knew those facts were false. Sylvester Decl. ¶¶ 14–15; Exhibit K, Preliminary Hearing Transcript at 25:10–14; Barnett Dep. 144:1–146:4; Barnett Dep. 148:1–8; Barnett Dep. 146:12–147:2; 144:13–14; 147:21–25.

245.   Defendant knew that neither Plaintiff nor Deborah ever had a key to the back burglar door referred to in the warrant. Sylvester Decl. ¶ 14; Exhibit K, Preliminary Hearing Transcript at 25:10–14; Barnett Dep. 144:1–146:4;  148:1–8.

246.   Defendant knew the back burglar door could only be opened from the inside because there was no key. Sylvester Decl. ¶ 14; Exhibit K, Preliminary Hearing Transcript at 25:10–14; Barnett Dep. 144:1–146:4.

247.   Defendant knew that the other exterior doors to the house were

capable of being locked on the way out without a key by turning the doorknob's twisting lock. Barnett Dep. 146:12–147:2; Sylvester Decl. ¶ 15.

248.   Defendant also knew that Deborah's house keys were not recovered in the fire, meaning that it was likely someone took the keys (along with the gold jewelry). Barnett Dep. 144:13–14.

249.   Defendant also knew that Deborah Hubbard's purse was not recovered in the fire. Barnett Dep. 147:19–20.

250.   Defendant and others looked for the keys and could not locate them at the home. Barnett Dep. 144:13–14.

251.   Defendant knew that the keys would not disappear from the home without a trace in the fire. Barnett Dep. 147:21–25.

252.   The missing keys and the missing purse are best explained by theft. Barnett Dep. 144:13–14; 147:21–25.

253.   Defendant never had any evidence that Plaintiff had Deborah's set of keys or her purse. *See generally* Barnett Dep.; Doc. 101-5.

254.   Defendant did not tell the magistrate the Deborah's keys were missing. Doc. 101-5.

255.   Defendant did not tell the magistrate that no one ever had a key to the metal backdoor. Doc. 101-5.

256.   Defendant did not tell the magistrate that the other exterior doors could be locked from the inside on the way out. Doc. 101-5.

257.   Defendant did not tell the magistrate that Deborah's purse was missing. Doc. 101-5.

## CVSA test exonerated Plaintiff more than implicated him

258.   Defendant told the magistrate that Plaintiff failed a computer voice stress analysis ("CVSA") test. Doc. 101-5 at 1.

259.   Defendant knew that CVSA was inadmissible. Barnett Dep. 38:14–17.

260.   Defendant and Darrin Smith knew that CVSA results could not be used in a probable cause finding. Smith Dep. 42:1–5; *see also Munford, Inc. v. Anglin*, 174 Ga. App. 290, 294, 329 S.E.2d 526, 531 (1985) (reversible error to admit polygraph results to determine lack of probable cause in malicious prosecution case).

261.   Defendant knew that Plaintiff actually passed the CVSA test in important parts—such that the test was at worst inconclusive on one question. Exhibit I, CVSA Results; Exhibit A, CVSA Converted part 1.mp4 at 38:26–52:17.

262.   Plaintiff was asked the same set of questions two times. Exhibit I, CVSA Results (the last two pages show the results for the two times the test was conducted); Exhibit A, CVSA Converted part 1.mp4 at 38:26–52:17.

263.   In each set, there were three questions that bore on the question of Plaintiff's guilt ("Did you set the fire?" / "Did you ask someone to start the fire for you?" / "Did you strangle your mother?"). Exhibit A, CVSA Converted part 1.mp4 at 38:26–52:17.

264.   The first time the test was administered, Defendant knew that Plaintiff answered the questions without any indication of deceit. Exhibit I, CVSA Results (the last two pages show the results for the two times the test was conducted); Exhibit A, CVSA Converted part 1.mp4 at 38:26–52:17.

265.   The second time the test was administered, Defendant knew that Plaintiff was asked the "did you set the fire question" two times. Exhibit I, CVSA Results (the last two pages show the results for the two times the test was conducted); Exhibit A, CVSA Converted part 1.mp4 at 38:26–52:17.

266.   Defendant knew that the first time Plaintiff was asked the "did you set the fire" question during the second test, no deception was indicated. Exhibit A, CVSA Converted part 1.mp4 at 51:07–51:22.

267.   Defendant knew that the only time Plaintiff supposedly offered any deception was in response to the second time he was asked the "did you set the fire" question in the second time the test was administered. Exhibit I, CVSA Results.

268.   Defendant knew that Plaintiff was asked the "did you strangle your mother" question two times during the second time the test was administered. Exhibit A, CVSA Converted part 1.mp4 at 51:53–52:07.

269.   Defendant knew that Plaintiff showed no deception on the "did you strangle your mother" question all three times it was asked. Exhibit I, CVSA Results.

270.   Defendant did not tell the magistrate that Plaintiff showed no deception for the relevant questions on 7 of 8 times he was asked relevant questions. Exhibit I, CVSA Results; Exhibit A, CVSA Converted part 1.mp4 at 38:26–52:17.

271.   Defendant did not tell the magistrate that Plaintiff showed no deception on the "did you set the fire" question for 2 of the 3 times he was asked. Doc. 101-5.

272.   Defendant knew that the response that was supposedly indicative of deception looked identical to the responses that were not indicative of deception. Exhibit I, CVSA Results (the last two pages show the results for the two times the test was conducted).

273.   Defendant did not tell the magistrate that the response that was supposedly indicative of deception looked identical to the responses that were not

indicative of deception. Doc. 101-5.

274.    Defendant knew that none of the responses showed a "hard block" which is most indicative of deception. Exhibit I, CVSA Results (the last two pages show the results for the two times the test was conducted); Smith Dep. 41:7–10.

275.    Defendant did not tell the magistrate that the response that was supposedly indicative of deception was not a "hard block" but was, at best, a "medium block." Doc. 101-5.

**Electrical work on the house hours before the fire**

276.    Defendant should have known that there were electrical issues with the home on Harvel Drive. Exhibit J, Sprinkel Report at 1.

277.    Defendant knew that the air conditioning was not working at the time of the fire. Barnett Dep. 30:4–6.

278.    Defendant knew that a neighbor had been stealing electricity from Deborah's home. Barnett Dep. 59:13–60:8; Ex. S - Ron Martin APD Report (stating homeless person, who was Ron, was on property).

279.    Defendant should have known that the person who came to repair the air conditioning on July 2 was named Antonio Penn. Exhibit J, Sprinkel Report at 1–2.

280.    Antonio Penn reported that on the afternoon of July 2, he saw an

unidentified person on the roof of the Hubbard's home doing tampering with the wires leading to the home. Exhibit J, Sprinkel Report at 2.

281.   Defendant did not tell the arson investigators what he knew about the electrical issues. Dorgan Dep. 33:21–34:5.

282.   That fact is information arson investigators would have liked to have known about. Dorgan Dep. 33:21–34:5.

283.   Defendant did not tell the magistrate what he knew about the electrical issues. Doc. 101-5.

## The warrant application

284.   Defendant included all known inculpatory facts in the written warrant application. Barnett Dep. 71:10–13.

285.   According to Defendant, there were no material facts other than those that were included in his warrant application. Barnett Dep. 72:19–24.

286.   Defendant made the decision to seek the warrant, which was not subject to any review. Barnett Dep. 84:5–9.

## The Case Against Cornelius Muckle

287.   After the dismissal of the charges against Plaintiff, the Fulton County District Attorney's Office has charged a different person, Cornelius Muckle, with the murders.  Barnett Dep. 25:20-25.

288.   There is no connection between Plaintiff and Muckle. *See* Doc. 101-2 at 22; *see also* Doc. 101-1 ¶ 17 (admitting Muckle denied knowing Plaintiff).

289.   Unlike Plaintiff, there is significant evidence of Cornelius Muckle was selling jewelry consistent with the jewelry belonging to Deborah Hubbard in the immediate aftermath of her death. *See* Exhibit J, Sprinkel Report at 8–9; *See* Exhibit H, Deborah Hubbard Jewelry Photos.

## Barnett's credibility generally

290.   In his deposition, Defendant said that he spoke with the arson investigators, who were POST certified law enforcement officers working for the fire department, and they agreed with him that there was enough probable cause to arrest Plaintiff. Barnett Dep. 86:17–87:4.

291.   The arson investigators testified that they asked to meet with Defendant to discuss the case, but he blew them off. Dorgan Dep. 26:8–27:1.

292.   They also testified that they did not have enough information to believe there was probable cause for Plaintiff's arrest. Dorgan Dep. 25:19–26:1 ("I did not have, personally have the knowledge and enough information [f]or probable cause to arrest him.").

This the 10th day of December, 2021.

*/s/ Zack Greenamyre*
Zack Greenamyre
Ga. Bar No. 293002
Samantha Funt
Georgia Bar No. 943783
MITCHELL & SHAPIRO LLP
3490 Piedmont Road, Suite 650
Atlanta, GA 30305
404-812-4751
zack@mitchellshapiro.com
sam@mitchellshapiro.com

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing using the CM/ECF system, which will send notification of filing to all counsel of record.

This the 10th day of December, 2021.

*/s/ Zack Greenamyre*
Zack Greenamyre
Ga. Bar No. 293002