# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

KEITH SYLVESTER,

        Plaintiff,

    v.

JAMES BARNETT, individually,

        Defendant.

CIVIL ACTION FILE
NO. 1:19-cv-4300-LMM-JKL

## PLAINTIFF'S RESPONSE TO FACTS IN
## REPORT AND RECOMMENDATION

Pursuant to Docs. 121 & 122, Plaintiff identifies the material facts relied upon by the report and recommendation, Doc. 119, which were not relied upon by Defendant in the materials in support of his motion for summary judgment and which Plaintiff contends are disputed, inadmissible, and/or unsupported.

1.    Plaintiff gave conflicting accounts. For example, at the scene, he stated that he had left his mother's house between 5:00 p.m. and 7:00 p.m. on July 2, 2018; however, in an interview on July 8, 2018, he stated he left his mother's house between 8:00 p.m. and 11:00 p.m. Doc. 119 at 14.

**RESPONSE: Disputed in part and immaterial.**

**Disputed in part because the warrant does not support the 11:00pm time. Instead, the latest time was between 8:00pm and 9:00pm. Doc. 101-5 at 2.**

**That fact is immaterial. Defendant Barnett testified that was "just a little detail." Barnett Dep. 63:7–9.**

2.    On June 23, 2018, Plaintiff created a Facebook post that Plaintiff's brother, Willie Jenkins, described as "disturbing," and "pretty sick," and told Defendant that it was clear that Plaintiff was upset with his parents, that "something was brewing" and that "something was not right." Doc. 119 at 16.

**RESPONSE: Disputed.**

**Plaintiff made no such post. *See* Second Sylvester Decl. ¶ 3, attached hereto as Exhibit U. Defendant had access to Plaintiff's Facebook page, which was open to the public and in his real name. *See* Second Sylvester Decl. ¶ 4. Defendant knew Jenkins' report was so demonstrably false that he did not put this otherwise inculpatory fact into his narrative report. *See generally* Doc. 101-5.**

**This fact is immaterial because it was not contained in the warrant. *See W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982) ("[J]udicial review of the sufficiency of an affidavit for the issuance of a**

warrant must be strictly confined to the information brought to the magistrate's attention."); *Williams v. Aguirre*, 965 F.3d 1147, 1162–63 (11th Cir. 2020) (same).

3.     Also, during Defendant's investigation of the Hubbards' murders, family members and Plaintiff himself stated on more than one occasion that Harry had convinced Deborah to move back to Buffalo and that Plaintiff was not happy about it. Doc. 119 at 17.

**RESPONSE: Disputed in part.**

**The evidence was equivocal about what Deborah's plan was, with Harry's side of the family in Buffalo tending to think she might come back and Deborah's side of the family tending to think she would stay in Atlanta. Doc. 113-2 at ¶¶ 179–181.**

**The evidence was also equivocal about Plaintiff's attitude towards any move. Earlier in the same interview the R&R cited, Plaintiff stated that "We had convinced her to move back to Buffalo." K. and M. Sylvester on July 11@900.mp3 at 18:02–18:13. And in the same passage cited by the R&R, Plaintiff stated, "And I said, 'I'm not going to try to talk you [Deborah Hubbard] out of it' and I wasn't trying to talk her out of it." *Id.* at 1:04:44–**

**1:05:21. Any ambivalence can be attributed to Harry's infidelity. Doc. 113-2 ¶
10.**

4.      When Defendant asked Plaintiff if he regularly drove around at night
playing video poker Plaintiff responded that it was the first time he had ever done
so, which Defendant found odd. Doc. 119 at 19 n.8.

**RESPONSE: Immaterial.**

**The evidence showed that this was a rare occasion where Plaintiff was
not with his wife or his mother, such that he might choose to be out at night.
Doc. 113-2 ¶ 187.**

5.      Although both Defendant and Plaintiff indicate that the candle was
burning on the windowsill, Plaintiff told the officer at the scene and Defendant
during his interview on July 11, 2018, that the candle was burning on the stove.
Doc. 119 at 19 n.11.

**RESPONSE: Immaterial.**

**Based on the layout of the home and the driveway, it was reasonable to
have seen the flicker of the candle from the window when the candle was on
the stove. *See* Doc. 113-1 at 14 (image) & Crime Scene Video Shot by
Leonpacher.MOV at 7:50–7:55 (showing same window immediately across
from stove).**

6.     After hearing the news Plaintiff did not call his mother or stepfather to find out if they were okay; rather, he put on a clean t-shirt and drove to the Residence obeying all traffic laws and driving within the speed limit. Doc. 119 at 20.

**RESPONSE: Immaterial.**

**Plaintiff did not call his mother because he wanted to get there without delay, because he assumed the neighbor had called her before he called Plaintiff, and because if she wasn't answering the phone for the neighbor that he should go to the house. Second Sylvester Decl. ¶ 6.**

**The fact that Plaintiff did not drive recklessly is not inculpatory.**

**The changing of the shirt is immaterial because Plaintiff was wearing the same dark colored below the knee denim shorts, underwear, socks, and shoes, as he had on earlier in the day. Doc. 113-2 ¶ 32.**

**The fact regarding the shirt is also immaterial because it was not contained in the warrant. _See W. Point-Pepperell, Inc. v. Donovan_, 689 F.2d 950, 959 (11th Cir. 1982).**

7.     Firefighters had forced open the front door and carport door to extinguish the fire, but the back-burglary bar door was found open with the deadbolt engaged as if it had been locked from the inside. Doc. 119 at 20–21.

**RESPONSE: Immaterial.**

**Defendant testified that he knew that the other doors to the house were capable of being locked on the way out without a key. *See* Doc. 113-2 ¶¶ 247. And he knew that the back door had no key. *See* Doc. 113-2 ¶¶ 246. He further knew that the explanation for the locked but open back door was that the fire burned the door from the frame. Doc. 101-5 at 2.**

8. Several officers on the scene briefed Defendant on what they knew and what Plaintiff had told them, one of whom indicated that Plaintiff's story did not sound right and that he may be a suspect. Doc. 119 at 23.

**RESPONSE: Immaterial in part.**

**Defendant does not identify any supposed inconsistency reported by people on the scene other than that Plaintiff apparently was *too* upset that his parents had apparently died. *See* Barnett Dep. 82:16–23 ("And he's telling the officers on the scene all this about this can't be happening, you know, blah, blah, blah. . . . So it was just – the arriving officers had questions about Keith's sincerity while the house was still on fire."). Elsewhere, Defendant criticized Plaintiff for not showing enough emotion because he drove normally. *See* ¶ 6, *supra. Cf. Harris v. State*, No. S22A0092, 2022 WL 2230373, at \*32 (Ga. June 22, 2022) ("The witnesses and police officers who testified**

that they found Appellant's emotional response to be strange also acknowledged that they did not know Appellant or how he reacted to trauma. . . . Moreover, the witnesses' testimony about how they believed a man who has just [suffered trauma] should act was inconsistent – with some witnesses asserting that Appellant was acting too 'hysterical' or 'frantic' to be genuine, while other witnesses asserting that his 'calm' demeanor was unexpected.") (alteration adopted).

This fact is material for showing that Plaintiff was a suspect immediately. *See* ¶ 42, *infra*.

But this is immaterial for any inculpatory reason because it was not conveyed to the magistrate. *See W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982).

9.      Defendant testified that later during several interviews when he asked Plaintiff pointed questions about some of Plaintiff's theories, Plaintiff would "misdirect and redirect and start talking about some other crazy notion." Doc. 119 at 23 n.14.

RESPONSE: Unsupported by the record and immaterial.

First, the statement is not supported by the record. Barnett testified in the portion cited by the R&R that he asked two "pointed questions" of

Plaintiff: "why would Ron kill your parents, or Ron, if Harry was involved -- why would Harry be involved in his own murder." However, upon review of the various interviews between Plaintiff and Defendant it does not appear that Defendant ever posed these pointed questions, and much less that Plaintiff responded in a "crazy" fashion.

This fact is also immaterial in that Plaintiff was frustrated that he was being treated as a suspect "right from the start" (in Defendant's words, Barnett Dep. 82:12–13) and nothing could convince Defendant otherwise.

10.     Moreover, Lieutenant Dorgan indicated that while there was no evidence to support the slow burn theory, there also was no evidence that would *not* support any such theory. Doc. 119 at 24–25.

**RESPONSE: Disputed and immaterial.**

Dorgan testified that the use of accelerant, which was Defendant's theory as presented to the magistrate, was inconsistent with a slow burn fire. Dorgan Dep. 35:23–36:1. And according to Defendant, Dorgan told him point blank that the fire was not started the previous night and was not a slow burn fire. Doc. 101-2 at 18 ("Lt. Dorgan believes because ethe [sic] fire was started in two separate locations, the fire was probably not started the previous evening of July 2, 2018 and was not a slow burn.").

This fact is immaterial in that it was not conveyed to the magistrate. *See W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982).

11.     Detective Leonpacher initially reviewed the footage from Plaintiff's dash camera and was concerned because he found some portions had been deleted. Doc. 119 at 25.

**RESPONSE: Disputed and immaterial.**

**There were no deleted portions, which is shown both by Plaintiff's testimony, *see* Doc 113-7 ¶ 4; and by the fact that no one could determine where any deletion might have come from. Barnett Dep. 161:16–162:3. Because Defendant knew Plaintiff's location at every relevant moment, *see id.* at 162:411, and because he could not identify a single moment that was not present in the dash camera video that supposedly should have been present, a reasonable inference is that any deletion was not from any remotely material time.**

**This fact is immaterial because it was not contained in the warrant. *See W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982).**

**Further, if Plaintiff preserved excerpts from the dash camera and deleted other excerpts days or weeks earlier, that would not be material. A**

reasonable officer would understand that such a dash camera would have limited storage space.

12.      Investigator Barhalter told Plaintiff that when they reviewed the dash cam footage it showed that Plaintiff stopped at a church parking lot and got out of the car and that Plaintiff could be heard counting money, to which Plaintiff responded, "Maybe I did. There's nothing wrong with that." Doc. 119 at 25 n.16.

**RESPONSE: Disputed and immaterial.**

**First, this is disputed because the R&R recognized that no such noise can be heard. Doc. 119 at 42 n.28.**

**Second, this fact is immaterial because it was not contained in the warrant. _See W. Point-Pepperell, Inc. v. Donovan_, 689 F.2d 950, 959 (11th Cir. 1982).**

**It is further immaterial because it is undisputed that Plaintiff had cash on him from playing video poker immediately prior. This is also immaterial because the relevance of any money to Defendant's theory of culpability was that Plaintiff wanted insurance money that he would not be able to count before the fire had been started.**

13.     Plaintiff started to mention that he might have been calling Georgia Power about a hazardous pole, a call which Barhalter pointed out that Plaintiff could not have made at 4:00 in the morning. Doc. 119 at 25–26 n.16.

**RESPONSE: Disputed and immaterial.**

**Plaintiff did in fact call a phone number associated with Georgia Power (888-660-5890), that appears to be operational 24 hours a day on this night, as evidenced by the 7 minute, 12 second call.**

| Conn. Date | Conn. Time (UTC) | Seizure Time | ET | Originating Number | Terminating Number |
|---|---|---|---|---|---|
| 07/03/18 | 01:38:25 | 0:01 | 7:12 | 18045036505 | 18886605890 |

**This fact is immaterial because it was not contained in the warrant. *See W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982).**

14.     During his investigation, Defendant was told by USAA insurance agent Claudia Janka that she was suspicious of Plaintiff because Plaintiff seemed to be more concerned about the payout under Deborah's homeowners' insurance policy than about his mother's and stepfather's murders. Doc. 119 at 26.

**RESPONSE: Disputed and immaterial.**

**First, this is disputed because Plaintiff said no such thing to Janka. *See generally* Sylvester Janka Transcript, attached hereto as Exhibit T. Plaintiff answered questions put to him, rambling occasionally, over a twenty-minute**

conversation. But he did not discuss insurance proceeds at all. Defendant

knew this because he was provided the USAA file, from which this transcript

is derived, before he obtained the warrant. Barnett Dep. 68:5–9.

Second, this is disputed because there is no recording of this exchange

happening and there should be recordings on both ends. *See* Doc. 113-2 ¶¶

104–105.

Third, this is disputed because Barnett lied about other aspects of his

conversations about the USAA policy, stating that he was told that Plaintiff

was the sole beneficiary of any homeowner's insurance policy. Barnett Dep.

66:2–21; *see also* Doc. 113-2 ¶¶ 93–98.

This fact is immaterial because it was not contained in the warrant. *See*

*W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982).

15.     Defendant did not, however, say that the entire insurance proceeds

would be paid to Plaintiff; indeed, he stated that he did not "know how insurance

companies work." Doc. 119 at 27.

RESPONSE: Disputed.

Defendant stated that the "payout" of the policy was $180,000. And he

stated that Plaintiff was the sole beneficiary, as set out in the warrant

application. Barnett Dep. 66:15–21 ("A. With the knowledge that I had at the

time when I was writing that affidavit that is what I knew. Q Okay. And to be clear, when you say that is what I knew, you believed that Keith was the only beneficiary of the homeowner insurance policy, right? A. That was my impression."). A reasonable jury could certainly read the warrant affidavit as intending to state that Plaintiff was the sole beneficiary of a large sum of money from a total loss in a homeowner's policy.

Further, Defendant repeated this false statement that Plaintiff was the sole beneficiary at the preliminary hearing. *See* Doc. 113-12 at 12:15–17 & 40:13–16.

16.     The evidence is uncontroverted that Defendant was told by USAA personnel that Plaintiff was the beneficiary under the policy. Doc. 119 at 28.

**RESPONSE: Unsupported by the evidence and otherwise disputed.**

First, this is unsupported by the evidence. In the cited portion of Barnett's testimony, he states that he received the information that Plaintiff was the sole beneficiary *from an "arson investigator,"* Barnett Dep. 66:2–3, and elsewhere from "another officer," *id.* 66:25–67:1. There is no other place where Barnett purports to get this information from USAA and no objective evidence of this fact.

**Second, it would make no sense for USAA to provide Defendant objectively incorrect information about its own insurance policy. Defendant has also lied about the conversations with USAA.** *See* **¶ 14,** *supra*.

**This fact is immaterial because it was not contained in the warrant.** *See* ***W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982). Defendant only stated that he got this information from the arson investigators who denied providing it to him. Doc. 113-2 ¶ 96.**

17. Nyaira Walton, Harry Hubbard's granddaughter, and her mother, told Defendant that: Plaintiff kept talking about how the police could not prove anything because there was nothing on the dash cam [Pl.'s Ex. A, "Nyaira Walton.amr" at 5:35-5:52]; Plaintiff "slipped up" and changed his story several times [id. at 3:33- 3:42]; Plaintiff asked people for money for the funeral even though it was already paid for and they felt that he was raising money so he could skip town [id. at 6:29-6:42, 7:37]; Plaintiff asked family members if they were going to get insurance money and telling them "we need some of that too." [id. at 7:20-7:29]; and Plaintiff kept talking about someone raising a reward for information, and stating, "why do [sic] he think we care about somebody raising a reward, we hope they catch YOU [i.e., Plaintiff], that's what we hope." [id. at 6:05-6:09]. Doc. 119 at 29–30.

**RESPONSE: Immaterial.**

First, the important fact here is the repeated conversation between

Defendant and Walton about the 9:30 phone call between her and Harry:

| | |
|---|---|
| BARNETT: | So, the last time you talked to Bootsie was 9:30 on the second? |
| WALTON: | Yes. |
| BARNETT: | Okay. |
| WALTON: | Because I was staying in his house. While he was down there, I was staying in his house. And called me and was like, 'What you doing?' I was like, 'I'm on my way back from the beach."' |
| BARNETT: | He called you, or you called him? |
| WALTON: | He called me. He called me, and I was like, 'I'm going to call you when I get back to your house, because I'm leaving the beach with my friend.' And he was like- |
| BARNETT: | Okay. Exactly where were you? I mean, it was 9:30, and where were you at? Because I'm trying to think of time zone changes. |
| WALTON: | I was leaving from the beach, Southside Beach. |
| BARNETT: | Where? |
| WALTON: | Southside Beach in Buffalo. |
| BARNETT: | Okay. Is that Eastern time also? |
| WALTON: | Yes. |
| BARNETT: | Okay. So, it was 9:30 here and 9:30 there. |
| WALTON: | Yes, at night. |
| BARNETT: | And he called you at 9:30 PM, on the second, before all this fire broke out, and he said he was fine? What else did he have to say? Did he say anything interesting? |
| WALTON: | No. I didn't really get a chance to talk to him, because when he called, mind you, I just told you, I said, 'I'm going to call you back, I'm leaving the beach with my friends.' I never ended up calling him back. I got that call the next morning. I never, ever ended up calling him back. |

*Id.* 1:27–2:40; *see also id.* at 9:24 (same).

-15-

Second, this is immaterial because Walton's complaints are non-sensical and clearly inaccurate. Her chief complaint was that AARP sent a condolence letter to her father, but not to Deborah. *Id.* 0:00–0:52. Then she states that Plaintiff texted her from different numbers (after Defendant seized his phone so he could not use his old number). *Id.* 0:54–1:30. Defendant then tried to intimate that Walton knew that Plaintiff was inside the home at 2:00am. *Id.* 13:24 ("And I have also heard that you talked to [Harry] at 2:00 in the morning, and I didn't hear that from Keith. I heard that from somebody else.") But she would not quite go there. *Id.* ("Wait, did I talk to my granddad at 2:00 in the morning?").

Walton was also one of the Buffalo relatives who seemed to accuse Plaintiff of removing all of Deborah's teeth in the murder. *Id.* 16:05–16:35; *see also* Doc. 113-2 ¶ 227.

18.    Tanika and Deidre Palmer, Harry Hubbard's niece and grand-niece, told Defendant that: "I just want to be honest, I truly believe it's her son" [Pl.'s Ex. A, "Tanika and D Palmer on 4July18.amr" at 1:58-2:15]; "There is just something about[Plaintiff]" [id.at2:43-2:45];" Plaintiff has been telling the relatives all different stories, even though they did not ask him for any information and the stories do not make sense [id. at 2:58-4:10]; "I feel it in my bones, it's him, it's

him, it's him, it's him. I just hope you guys don't let him escape. It's him," and "I hope you guys don't let him skip town" [id. at 4:12-4:18]; Plaintiff "acts suspicious" and did not want his mother to go back to New York [id. at 5:15]; Deborah tried to get Plaintiff out of her house because Plaintiff was "taking control" [id. at 6:36];" and the crime seemed so personal, and the only person the Hubbards knew in the Atlanta area was Plaintiff [id. at 7:10]. Doc. 119 at 30–31.

**RESPONSE: Immaterial.**

**As set out in Doc. 113-1 ¶ 10 at 12–15, this recording does not provide any reasonably trustworthy information. The only objective facts that were provided Defendant knew to be false.**

19.     Jenkins reported to Defendant that Plaintiff made "disturbing" Facebook posts prior to the murders, and that: Plaintiff was very manipulative [Pl.'s Ex. A, "Willie Jenkins on 4July18.amr" at 2:24]; Deborah told him that Plaintiff refused to give her keys back after she asked Plaintiff to do so, and that Plaintiff was at her house all of the time [*id*. at 1:35, 2:24]; Deborah also told him that Plaintiff tried to put her in a hospital because he wanted her house and he was not going to get it [*id*. at 2:45];  he thought Plaintiff "was just going crazy" at that time [*id*. at 2:12]; and his mother made it clear on several occasions that she was

fed up with Plaintiff "and his controlling and overbearing ways" and she wanted

Plaintiff to leave but he would not do so [*id*. at 3:11]. Doc. 119 at 31–32.

**RESPONSE: Immaterial.**

**Defendant knew that what Jenkins said was false. *See* ¶ 2, *supra***

**(Barnett knew there was no "sick" Facebook post).**

**Defendant also manipulated Jenkins into saying inculpatory things by**

**chastising him for giving an interview where he said he did not know who**

**could have killed his parents, and by selectively feeding inculpatory facts such**

**as that Plaintiff was at the house at 3:00am (while not disclosing that he did**

**not go inside). *See* Doc. 113-1 ¶ 10 at 10–12.**

20.    Defendant also received calls from Melissa Sylvester's two sisters,

both of whom expressed concern about the fact that Plaintiff sent Melissa – who

has learning disabilities – home to Virginia the day before the fire because before

that time Plaintiff never had allowed Melissa to visit them unless he was with her.

Doc. 119 at 33.

**RESPONSE: Disputed and immaterial, as set out in Doc. 113-1 ¶ 10 at 15–16.**

**Defendant testified in the warrant application that "Sylvester had sent**

**his wife Melissa home one day prior to the fire." Doc. 101-5. Defendant then**

testified that he believed that Melissa arranged home in "the same time frame that Harry came into town." Barnett Dep. 125:10–12.

But Barnett knew that the trip had been arranged more than a week in advance—before anyone knew Harry was coming to Atlanta or that Deborah might move to Buffalo. *See* Doc. 113-2 at ¶¶ 184–194.

A reasonable jury could find that Barnett provided fabricated facts about the timing of Melissa's trip to the magistrate.

Further, a reasonable jury could disregard this evidence because these phone calls are not recorded, making the only evidence of their contents Defendant's say-so in his narrative report.

Because Defendant has included other statements he knew to be false in this report, *see generally* Doc. 113 at 32–36, a jury would be entitled to reject his testimony and report in full. *The Santissima Trinidad*, 20 U.S. 283, 339 (1822) ("[A]pply the maxim *falsus in uno, falsus in omnibus*.").

Every fact except for the timing fact, which Defendant knew to be false, is immaterial because it was not contained in the warrant. *See W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982).

21.     Both sisters also told Defendant that they had suspicions about Plaintiff. Doc. 119 at 33.

**RESPONSE: Disputed and immaterial.** *See* ¶ 20, *supra*.

**The only suspicion conveyed to the magistrate was about the timing of her trip, which Defendant knew to be false.** *See W. Point-Pepperell, Inc. v. Donovan***, 689 F.2d 950, 959 (11th Cir. 1982).**

22.     Plaintiff's assertion that Defendant "fabricated" evidence that Plaintiff arranged for Melissa to be out of state is wrong. Doc. 119 at 33 n.23.

**RESPONSE: Disputed.** *See* ¶ 20, *supra*.

23.     When Defendant spoke with Melissa's mother, Gloria Jones, she told Defendant that she thought Melissa was in danger since the day Melissa married Plaintiff, and that Plaintiff was "crazy." Doc. 119 at 33.

**RESPONSE: Disputed and immaterial.**

**Ms. Jones told Defendant that her daughter "didn't seem to be any kind of danger or anything like that." Gloria Jones.amr at 5:28. The only other mention of danger was in the immediate aftermath of the double homicide** *at the home where she lived part time***, which was not attributed to Plaintiff.** *Id.* **at 4:23–4:45.**

**This fact is immaterial because it was not contained in the warrant.** *See W. Point-Pepperell, Inc. v. Donovan***, 689 F.2d 950, 959 (11th Cir. 1982).**

24.     She also told Defendant that Melissa did not come to Virginia very often, that she had received about a week's notice before Melissa arrived, and that her visit was "unusual," that is, the first time in over a year, because "whatever [Plaintiff] tells her to do she does."

**RESPONSE: Immaterial. When an adult child (without children of their own) lives several states away from a parent, it is not "unusual" for visits to be every year or so. (Note also that the word "unusual" came from Defendant and not Ms. Jones).**

**This fact is immaterial because it was not contained in the warrant. *See W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982).**

25.     But when Melissa was interviewed by Detective Hogan, she told him that since moving to Atlanta she visited her family in Virginia every month, which would have made the July 1, 2018, visit the ninth time she had done so.

**RESPONSE: Immaterial.**

**As her mother explained when presented with this fact, "she has a learning disability and she will, she really doesn't understand questions. You really have to ask her the same questions over and over and explain it to her what exactly, what you mean." Gloria Jones.amr at 2:47–2:55.**

This fact is also immaterial because it was not contained in the warrant. *See W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982).

26.     After the interview, however, Hogan told Defendant that it sounded as if Melissa had been coached.

**RESPONSE: Disputed and immaterial.**

According to Defendant, there should be a recording of this interview, Barnett Dep. 43:16–19, but there is not.

There is also no evidence that Hogan knew that Melissa was intellectually disabled, or that he would have any basis to disentangle any intellectual disability from any other irregularities in her speech. Barnett Dep. 43:1–46:8.

Defendant also testified that he was in at least part of that interview, Barnett Dep. 44:11–13, but that he could not identify any aspect of her interview where she was coached, Barnett Dep. 45:14–46:7.

27.     Additionally, Defendant was contacted by Andre Jones, Harry's son, who told Defendant that he also had concerns about Plaintiff's involvement in Deborah and Harry's deaths.

**RESPONSE: Disputed.**

**Andre Jones actually told Defendant that he knew or believed Tanika Hubbard committed the murders. Barnett Dep. 165:7–10. But that fact did not make it into Defendant's report, Doc. 101-2 at 14, or the warrant affidavit.**

28.      And one of Deborah's best friends, Ronnette Penny, told Defendant that Plaintiff had followed Deborah to Atlanta, that she was trying to get away from Plaintiff because he was always bothering her about money, and that Plaintiff once said he could make people disappear.

**RESPONSE: Disputed that such a statement could be reasonably relied upon. *See* Doc. 113-2 ¶ 227 (the only significant fact was that Penny believed that Plaintiff had removed all of his mother's teeth after he killed her).**

**Defendant knew that it was Deborah who followed Plaintiff down to Atlanta. Second Sylvester Decl. ¶ 2.**

**This fact is immaterial because it was not contained in the warrant. *See W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982).**

29.      The results of that test showed deception on the question, "Did you start the fire?" and that there were discrepancies with the question, "Did you strangle your mother?" Doc. 119 at 35.

**RESPONSE: Disputed.**

The facts actually show that the CVSA exonerated Plaintiff. *See* Doc. 113-2 at ¶¶ 258–275.

30.     Defendant had several lengthy discussions with other detectives who all agreed that Plaintiff "was the guy" – and none of those detectives thought that Defendant lacked probable cause. Doc. 119 at 35.

**RESPONSE: Immaterial and disputed.**

**This fact is immaterial because there is no evidence that any of these other officers were provided with the known wholly exculpatory facts that showed (a) Plaintiff did not, and could not have, strangled the Hubbards; (b) Plaintiff did not, and could not have, set the fire; (c) Plaintiff was not the sole beneficiary of any insurance policy; (d) the materials Defendant said Plaintiff bought to set the fire were not used in the fire. *Cf. Gleghorn v. Koontz*, 178 F.2d 133, 136 (5th Cir. 1949) (reliance on the opinion of others "is not available as a defense to [a malicious prosecution claim] unless the defendant is shown to have made a full and fair disclosure, in good faith, of all the facts known to him bearing upon the guilt or innocence of the accused, and upon which the criminal prosecution is sought to be based. . . . There is abundant evidence here to warrant and sustain the jury's finding that defendant did not attempt to make a full and fair disclosure of all the facts within his knowledge**

concerning the supposed theft by plaintiff."); *Washington v. Howard*, 25 F.4th 891, 904 (11th Cir. 2022) (officer's reliance is conditioned on "fully and honestly plac[ing] evidence before the" decisionmaker).

This fact is also immaterial because it was not contained in the warrant. *See W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982).

This fact is also disputed. Defendant testified that he consulted with the arson investigators who told him that they believed there was probable cause, but they testified that they did not have enough facts for probable cause, and that they tried to meet with Defendant to discuss the facts but he blew them off. Doc. 113-2 at ¶¶ 290–292.

31.     Based on all of the evidence, the very personal nature of the crime and the fact that the area where Deborah lived was not a crime-ridden neighborhood such that it was unlikely to have been a random incident, Defendant decided to seek an arrest warrant for Plaintiff. Doc. 119 at 36.

**RESPONSE: Disputed.**

Defendant did not consider all of the evidence, to wit: the wholly exculpatory facts showing (a) Plaintiff did not, and could not have, strangled the Hubbards; (b) Plaintiff did not, and could not have, set the fire; (c)

Plaintiff was not the sole beneficiary of any insurance policy; (d) the materials Defendant said Plaintiff bought to set the fire were not used in the fire.

Alternatively, a reasonable jury could find that he did consider these facts, but then hid them from the magistrate. *See* Doc. 101-5.

32.    Defendant continues to stand by what he said in the affidavit as true and correct to the best of his knowledge at the time, and he still believes that Plaintiff was involved in the murder of his mother and stepfather in some manner. Doc. 119 at 36.

**RESPONSE: Disputed and immaterial.**

**Plaintiff's materials have shown sufficient facts to conclude that Defendant knew the warrant contained falsehoods and omissions at the time he swore it out. Doc. 113 at 32–26.**

**Further, Defendant has absolutely zero evidence of any connection between Plaintiff and the new suspect Muckle. *See* Doc. 101-2 at 20–22.**

**Defendant's continued belief that Plaintiff committed the crimes charged is evidence that Defendant is objectively unreasonable or cannot adjust his opinions to meet new evidence.**

33.    Plaintiff also states that Defendant's decision to arrest Plaintiff was not subject to any review [PSAMF ¶4]; obviously, this is incorrect because a

magistrate judge reviewed that decision before signing the arrest warrant. Doc. 119 at 36 n.26.

**RESPONSE: Disputed and immaterial.**

**This statement is immaterial insofar as Plaintiff intended this statement to mean that no supervisor needed to give Plaintiff permission or to review all of his facts.**

**This statement is disputed because the Magistrate's review was hindered by Defendant's false statements and material omissions. *Cf. Washington v. Howard*, 25 F.4th 891, 904 (11th Cir. 2022) (officer's reliance is conditioned on "fully and honestly plac[ing] evidence before the magistrate").**

34. Deborah wanted her keys back from Plaintiff but he refused to give them back to her, and Plaintiff would not leave Deborah's house although she had asked him to do so. Doc. 119 at 41.

**RESPONSE: Disputed, as set out in ¶ 19, *supra* and Doc. 113-1 ¶ 10 at 10–12.**

35. Deborah believed that Plaintiff would try to put her in a hospital or a nursing home because Plaintiff wanted her house. Doc. 119 at 41.

**RESPONSE: Disputed, as set out in ¶ 19, *supra* and Doc. 113-1 ¶ 10 at 10–12.**

36. [O]n the same day that Plaintiff posted a "disturbing" and "very sick" Facebook post which made clear that he was upset with his parents, his learning

disabled wife bought a ticket to visit her family in Virginia the day before the fire, when Plaintiff previously had never let her visit them without him. Doc. 119 at 41.

**RESPONSE: Disputed, as set out in ¶¶ 2 (no Facebook post), 19 (Jenkins' statement), 20 (fabricated timeline about Melissa), *supra* and Doc. 113-1 ¶ 10 at 10–12 (Jenkins); Doc. 113-2 at ¶¶ 184–194 (Melissa).**

37.     Deborah decided to move back to Buffalo with Harry and planned to stop supporting Plaintiff. Doc. 119 at 42.

**RESPONSE: Disputed, as set out in ¶ 3, *supra*, and Doc. 113-1 ¶ 10 at 10–12; Doc. 113-2 ¶¶178–183.**

38.     Plaintiff was a beneficiary on Deborah's homeowner's policy, which Defendant was told had a payout of $180,000. Doc. 119 at 42.

**RESPONSE: Immaterial.**

**If Plaintiff was in line to get $180,000, or some similar sum, that is a material inculpatory fact providing a reasonable motive. However, if, as Defendant knew, Plaintiff was in line to get approximately $2,000 or less than two weeks' salary, that is not a material inculpatory fact because it does not provide any reasonable motive to kill parents. Doc. 113-2 ¶¶ 95–101.**

39.     [T]hree days after the fire and the Hubbards' murders, Plaintiff filed a claim against that homeowner's policy, and the agent thought it was suspicious

because Plaintiff seemed more concerned about the payout than about the murders of his mother and stepfather. Doc. 119 at 42.

**RESPONSE: Disputed, as set out in ¶ 14, *supra*.**

40.　[O]n the day of the fire Plaintiff bought, *inter alia*, rubbing alcohol and mothballs, which together could start a fire in multiple places without a trace of any accelerant. Doc. 119 at 42.

**RESPONSE: Immaterial because Defendant knew none of these materials were used in the fire. Doc. 113-2 ¶¶ 150–162.**

41.　[A]fter Plaintiff left Deborah's house at around 8:00 p.m., he spent several hours at different gas stations playing video poker, although he never had done so before. Doc. 119 at 42.

**RESPONSE: Immaterial, as set out in ¶ 4, *supra*.**

42.　Plaintiff volunteered and overshared information before he was even questioned about his whereabouts, including volunteering his dash camera video footage and speculating about who could have started the fire and how. Doc. 119 at 42.

**RESPONSE: Disputed.**

　　**Plaintiff and Defendant are in agreement that Plaintiff was treated as a suspect from the start. Doc. 113-2 ¶¶ 49–56 (Plaintiff feeling like a suspect and**

told he was detained); Barnett Dep. 82:12–13 (Plaintiff was a suspect "right from the start").

Further, it objectively looked suspicious that Plaintiff was at the home less than two hours before the fire started, and it made sense to clear that fact up before law enforcement found out about it later and came to the conclusion he was hiding something. Doc. 113-2 ¶¶ 53–55.

43. [M]any of Plaintiff's theories did not make sense, and when asked about them he would misdirect or redirect and start talking about something else that sounded crazy to Defendant. Doc. 119 at 42.

**RESPONSE: Unsupported by the record and immaterial, as set out in ¶ 9, *supra*.**

44. [T]he dash cam footage showed that right before Plaintiff went to the Residence, he made a stop and got out of the car for a few minutes, possibly counting money. Doc. 119 at 42.

**RESPONSE: Disputed and immaterial, as set out in ¶ 12, *supra*.**

45. [W]hen Plaintiff learned that Deborah's house was on fire, he changed his shirt, did not call Deborah or Harry to see if they were okay, and drove over to the house with no sense of urgency, obeying all traffic laws and within the speed limit. Doc. 119 at 43.

**RESPONSE: Immaterial, as set out in ¶ 6, *supra*.**

46.     [P]arts of the dash cam video footage had been intentionally deleted. Doc. 119 at 43.

**RESPONSE: Disputed and immaterial, as set out in ¶ 11, *supra*.**

47.     [T]he majority of family members and friends Defendant interviewed unequivocally thought that Plaintiff was responsible for the crimes, some even speculating that he would skip town. Doc. 119 at 43.

**RESPONSE: Disputed, as set out in ¶¶ 2, 17–25, 27–28 and Doc. 113-1 ¶ 10.**

**Further, the "majority" aspect of this fact is not supported by the evidence because there is no denominator as to who in the family Defendant spoke to and some conversations were either not recorded or not provided.**

**The "unequivocal" aspect of this fact is also disputed because these family members gave alternative theories. *See* Doc. 113-2 ¶¶ 222–227.**

**This fact is also immaterial because Defendant did not disclose the wide range of objectively ridiculous and nonsensical beliefs these family members put in the same conversations with Defendant. *See* Doc. 113-2 ¶¶ 222–227 (stating Willie Jenkins killed the Hubbards from Buffalo; Tanika Hubbard committed the murders despite not being in Atlanta; Deborah was a "black**

**widow" who killed her three previous husbands; Plaintiff harvested all of Deborah's teeth).**

**The "skip town" portion of this fact is disputed as Defendant knew Plaintiff would not skip town because he was being so cooperative. Nyaira Walton.amr at 7:35–8:15 ("I'm not so worried about him skipping town. . . . I mean, I talked to him, actually, he texted me this morning about something, and so he's . . . He's been helpful in certain ways.").**

48.     Plaintiff showed deception during the CVSA test, and when Detective Smith tried to discuss the results with him he refused to talk any further and left. Doc. 119 at 43.

**RESPONSE: Disputed.**

**The facts actually show that the CVSA exonerated Plaintiff.** *See* **Doc. 113-2 at ¶¶ 258–275.**

49.     Jenkins now attests that after having a conversation with Defendant about Deborah wanting Plaintiff to return her house keys, Jenkins "told Defendant Barnett that everyone in the family agreed that [Plaintiff] should keep the keys because he did a good job of taking care of Deborah Hubbard and she was experiencing health problems." (Jenkins Decl. ¶¶17, 18). Jenkins also states that he told Defendant that Deborah "only thought that [Plaintiff] should return the keys

for a brief time and then she changed her mind and invited [Plaintiff] and his wife, Melissa to live with her at least some of the time." (Id. ¶19). Jenkins does not make either of those comments in the two recordings in the record; instead, he specifically said that his mother did, in fact, tell him that Plaintiff refused to give her keys back or leave after she asked him to do so. (Pl.'s Ex. A, "Willie Jenkins on 4Jul18.amr" at 1:35, 2:24, 3:11).

Jenkins now attests that "I understand that Detective Barnett reported that I told him that [Plaintiff] tried to put Deborah Hubbard in a hospital or nursing home against her will. That is not true, and I did not tell Detective Barnett that was true." (Jenkins Decl. ¶¶21, 25; PSAMF ¶¶21, 25) (emphasis added). In one of the recorded conversations, however, Jenkins did, in fact, make that statement. (Pl.'s Ex. A, "Willie Jenkins on 4Jul18.amr at 2:45). Doc 119 at 32 n.21–22.

**RESPONSE: Disputed, but only in part.**

**The R&R discredits Jenkins' declaration, based on an inconsistency with a recorded call. A reasonable jury could largely harmonize the recorded call and the declaration because there were multiple calls.**

**Jenkins has provided inconsistent statements elsewhere. *See* Exhibit A, WIVB Interview at 0:45–1:00 (stating he didn't know who could have possibly**

done this); Willie Jenkins on 4Jul18.amr (providing vague but unflattering comments about Plaintiff).

The R&R notes a blatant contraction between Jenkins' declaration and the recording. In one paragraph, the declaration reads that, "I understand that Detective Barnett reported that I told him that Keith Sylvester tried to put Deborah Hubbard in a hospital or nursing home against her will. That is not true, and I did not tell Detective Barnett that was true." Doc. 113-13 ¶ 21.

In a later paragraph, Jenkins states, "I never told Detective Barnett that Keith Sylvester tried to have Deborah Hubbard put into a <u>mental</u> hospital or nursing home against her will." Doc. 113-13 ¶ 25.

The first statement is not accurate. The second statement is consistent with the recording, and, according to Jenkins in additional conversation he clarified, contextualized, or otherwise walked back his recorded statements to Defendant.

Plaintiff's counsel (Zack Greenamyre) regrets his error in failing to adequately review the "Willie Jenkins on 4Jul18.amr" audio file and failing to adequately review that portion of the language in the Jenkins' declaration.

Respectfully submitted, this the 26th day of July, 2022.

*/s/ Zack Greenamyre*
Zack Greenamyre
Ga. Bar No. 293002
Samantha Funt
Georgia Bar No. 943783
MITCHELL & SHAPIRO LLP
3490 Piedmont Road, Suite 650
Atlanta, GA 30305
404-812-4751
zack@mitchellshapiro.com
sam@mitchellshapiro.com

**CERTIFICATE OF COMPLIANCE**

Counsel hereby certifies that this document has been prepared in compliance with Local Rule 5.1C using 14-point Times New Roman font.

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing using the CM/ECF system, which will send notification of filing to all counsel of record.

This the 26th day of July, 2022.

*/s/ Zack Greenamyre*
Zack Greenamyre
Ga. Bar No. 293002